**SO ORDERED.**

**SIGNED this 25th day of April, 2016.**




Robert E. Nugent
United States Chief Bankruptcy Judge

___

DESIGNATED FOR ONLINE PUBLICATION ONLY

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ABENGOA BIOENERGY BIOMASS OF | ) | Case No. 16-10446 |
| KANASAS, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

### ORDER DENYING DEBTOR'S MOTION FOR INTER-DISTRICT TRANSFER UNDER 28 U.S.C. § 1412 AND FED. R. BANKR. P. 1014

Abengoa Bioenergy Biomass of Kansas, LLC moves to transfer this case to the United States Bankruptcy Court for the District of Delaware where cases involving its indirect parent companies and other affiliates are pending. This motion requires me to consider whether that transfer would serve the convenience of the parties or the interests of justice. After carefully considering both the evidence and argument

1

received on April 13 and 19, 2016, I conclude that the facts and unique circumstances surrounding this debtor and its known creditors do not warrant transferring the case.

**FACTS**

Petitioning Creditors and mechanics' lien claimants Brahma Group, Inc., CRB Builders, LLC, and Summit Fire Protection Co. commenced this case by filing an involuntary chapter 7 petition against debtor Abengoa Bioenergy Biomass of Kansas, LLC (ABBK) on March 23, 2016. Service on ABBK was made on March 25, 2016. On April 6, ABBK filed a motion to convert the case to chapter 11. An order granting that motion was entered on April 8. Contemporaneous with the motion to convert, ABBK filed a motion for inter-district transfer of the case from the District of Kansas to the District of Delaware, so it can be jointly administered with the chapter 11 cases filed by ABBK's affiliates, and requested an expedited hearing on its transfer motion. Also on April 6, ABBK filed a voluntary chapter 11 petition in the District of Delaware. Several mechanics' lien claimants and creditors filed objections to the transfer.[1] An evidentiary hearing was held on the motion on April 13.[2]

---

[1] *See* Dkt. 46 (Stoppel Dirt), 47 (Schaedler Enterprises, Inc.), 48 (ICM), 49 (Brahma), 51 (TUSA), 57 (Elliott Electrical Supply).

[2] After the evidentiary record was closed on April 13, the Court heard closing arguments from the parties on April 19. ABBK appeared by its counsel Christine Schlomann. Creditor Brahma Group appeared by its counsel Rick Griffin and Samantha Woods. Creditor ICM appeared by its counsel Thomas Lasater and Charles Milsap. Creditor Stoppel Dirt, Inc. appeared by its counsel Bruce J. Woner. Creditor Schaedler Enterprises, Inc. appeared by its attorney Richard Davis. Creditor Vista Energy, L.P. appeared by its counsel Jeffrey D. Leonard. Creditor Pioneer Electric Cooperative, Inc. appeared by its attorney Edward J. Nazar. The United States Trustee appeared by Richard A. Wieland. Victor Zhao, Assistant United States Attorney appeared telephonically on behalf of the U.S. Department of Energy.

2

In November of 2015, Brahma Group filed a state court mechanic's lien foreclosure suit against ABBK in the District Court of Stevens County, Kansas. At the time this involuntary case was commenced, there were approximately 25 lien claimants joined in the state court foreclosure action.[3] That action was stayed by the involuntary petition against ABBK.

### *The Debtor ABBK*

ABBK is one of hundreds of affiliates and indirect subsidiaries under the expansive umbrella of Abengoa, S.A., a Spanish multi-national engineering and clean technology conglomerate that operates in the energy and environmental sectors, including the industrial production of biofuels such as ethanol.[4] ABBK is a Kansas limited liability company organized in 2006 and is part of Abengoa's United States bioenergy group of subsidiaries and affiliates. Its principal asset is a so-called "second generation" biofuel/ethanol plant located on 400 acres in Hugoton, Kansas, the southwest part of the state.[5] In addition to the plant, ABBK owns the real estate and unspecified water rights. After 3 years of construction, the plant was substantially completed in 2014. The plant started up and achieved commercial production levels during 2015, but never reached its design capacity of 25 million gallons annually. Technology and production problems shut production down in November of 2015 and the plant remains in "idled maintenance" status. ABBK's witness Christopher Standlee testified that the plant was "not broken," but needs modifications or "fixes"

---

[3] *See* Ex. 3, Third Amended Foreclosure Petition
[4] *See* Ex. G.
[5] First generation ethanol plants produce biofuels from food crops like corn while second generation plants use renewable non-food plant matter like corn stover or switchgrass.

3

to run the plant profitably. He anticipated that fixing the problems could cost as much as $10-$20 million and take between two and six months. ABBK does not have the cash to fix the plant's operating problems. While the plant was running, ABBK had 70 to 80 employees; currently only ten remain, including the plant manager Danny Allison in Hugoton. Mr. Allison reports to Craig Kramer, the Vice-President of Operations in St. Louis where ABBK's officers are housed.

### *ABBK's Affiliate Relationships*

ABBK is wholly owned by Abengoa Bioenergy Hybrid of Kansas, LLC (ABHK), also a Kansas limited liability company. ABHK, in turn, is owned by Abengoa Bioenergy US Holding, LLC, (ABUSH) a Missouri limited liability company.[6] ABBK's mailing address for "official mail" is Chesterfield, Missouri (near St. Louis), the same address as ABHK's and ABUSH's principal place of business.[7] The ABBK facility's plant manager is in Hugoton, but the ABHK and ABUSH offices and the corporate officers direct, control and coordinate ABBK from St. Louis.

ABHK filed a voluntary chapter 11 petition in Delaware on April 6.[8] ABUSH filed a voluntary chapter 11 petition in the Eastern District of Missouri (St. Louis) on February 24 and is the lead debtor in the jointly administered case, together with other subsidiaries and affiliates in Abengoa's bioenergy group.[9]

Both of the Abengoa subsidiaries that supplied engineering and construction services at the Hugoton project or served as general contractor on the project are

---

[6] Ex. 2.
[7] Ex. 8.
[8] Ex. 8.
[9] Ex. F, p. 29; Ex. 2.

located in Phoenix, Arizona. They are Abeinsa EPC LLC[10] and Abener Teyma Hugoton General Partnership (Teyma). Both are parties to the Stevens County foreclosure. Abeinsa EPC and Teyma each filed voluntary chapter 11 petitions in Delaware on March 29, 2016.[11] Neither Abeinsa EPC nor Teyma are part of the Abengoa bioenergy group.[12] Abengoa's subsidiaries operate on a decentralized basis.[13]

Another Abengoa affiliate, Abengoa Bioenergy New Technologies, LLC (ABNT) developed and owns the second generation technology in use at the Hugoton plant. ABNT licenses that technology to ABBK, though there was no evidence offered at the hearing concerning the terms of use. ABNT also filed a voluntary chapter 11 petition in Delaware on April 6.[14]

### *ABBK's Books and Records*

While operational records are maintained at ABBK's Hugoton facility, ABBK's books and records reside in St. Louis. The construction records for the Hugoton facility are maintained by Teyma in Phoenix, Arizona.

### *The Known Creditors of ABBK*

ABBK's known creditors include the U.S. Department of Energy (DOE) which provides unspecified financial assistance to renewable energy enterprises and the mechanics' lien claimants who provided labor and materials in the construction of the

---

[10] "EPC" is the acronym for Engineering, Procurement, and Construction. *See* Ex. F, p. 5. Abeinsa EPC is a Delaware limited liability company.
[11] Ex. F, p. 28; Ex. 6.
[12] Ex. F, p. 5.
[13] Ex. F, p. 6.
[14] Ex. 7.

5

facility.[15] I assume there are numerous trade creditors as well as inter-affiliate obligations. ABBK's utility provider is Pioneer Electric Cooperative, Inc. and is located in southwest Kansas.[16] Though ABBK suggested at trial that DOE would assert a priority lien in its assets, DOE's counsel informed that court that the Government's interests are more in the nature of restrictions on ABBK's use of the land that are based upon certain regulatory provisions. DOE has no recorded lien, at least in Stevens County. The mechanics lien claimants are parties to the Stevens County case and those who have entered appearances in this case. DOE is located in Washington D.C. The mechanics lien claimants are located in Kansas and several other states across the country, but all have provided materials and services in the construction of the ABBK ethanol plant in Kansas.[17] The petitioning creditors' principal places of business are in Salt Lake City, Utah (Brahma); St. Louis, Missouri (CRB Builders); and St. Paul, Minnesota (Summit Fire). The following mechanic's lien claimants are located in Kansas or are entities organized under Kansas law: ICM, Inc., Stoppel Dirt, Inc., TUSA, Inc., Decker Electric, Inc., Mead O'Brien, Inc., Sunrise Staffing Services, LLC, Bearing Headquarters Company, and C.F. Service & Supply, LLC.

Non-Kansas lien claimants include creditors Acid Piping Technology and Cogent, Inc., both are located in Missouri. The following lien claimants are located in

---

[15] ABBK has not filed its schedules in either Kansas or Delaware. I assume there are numerous trade creditors as well as inter-affiliate obligations.
[16] ABBK and Pioneer entered into an Agreed Order for adequate assurance of payment under § 366 on April 20, 2016. *See* Dkt. 62.
[17] Ex. A and Ex. 3.

6

Georgia: Transglobal Energy, Inc., Black Diamond Industrial LLC, Air Techniques, Inc., and Dustex LLC. Creditor Maine Automation is located in Maine. Vista Energy is located in Washington. Sulzer Pump Services US Inc. is located in Texas. W-S Industrial Services, Inc. is located in Iowa. FHI Plant Services is located in Arizona. Lien claimant Pumping Solutions, Inc. is located in Illinois. We do not know the principal place of business of either Elliott Electrical Supply, Inc. or Schaedler Enterprises, two other lien creditors who oppose transfer. Other than these two creditors, none of the lien claimants appear to maintain a principal place of business in Delaware.

### *The Parties' Counsel*

Nearly all of the lien claimants have retained counsel for the Stevens County foreclosure from Kansas or the Kansas City metropolitan area. All of the Abengoa subsidiaries in the foreclosure – ABBK, Abeinsa EPC LLC and Abener Teyma Hugoton General Partnership, have retained the services of a Wichita, Kansas law firm. Ms. Christine L. Schlomann, ABBK's attorney on the motions filed in this case offices in Kansas City, Missouri.[18] Creditor counsel who have entered their appearances in this bankruptcy to date are nearly all from Kansas or the Kansas City area.[19] DOE appeared telephonically at the transfer hearing by a justice department attorney from Washington D.C.

---

[18] After the motion for transfer was heard, Ms. Schlomann moved for co-counsel R. Craig Martin's admission *pro hac vice* which was granted on April 20. Mr. Martin practices with DLA Piper LLP in Wilmington, Delaware.

[19] Counsel Jay Welford of the law firm Jaffe Raitt Heuer & Weiss, P.C. from Southfield, Michigan has entered an appearance for Varilease Finance, Inc., VFI KR SPE I, LLC and VFI-SPV VIII Corp.

7

*Witnesses*

ABBK's sole witness at the transfer hearing was Christopher Standlee, the Executive Vice-President for Global Affairs. He works for ABUSH, the upstream parent of ABBK and Eastern District of Missouri debtor, and is a member of its Board of Directors. He formerly worked out of the St. Louis office but now works from Washington D.C.[20] He is on the Steering Committee for Abengoa's global restructuring, but is not the "decision maker" for ABBK and has little or no "line" authority over its ABBK's operations.

Apart from the creditors, DOE, and on-site Hugoton plant manager who may be witnesses in ABBK's bankruptcy, the identity and location of other potential witnesses is unknown. The nature and location of the debtor's other professionals, such as investment bankers or restructuring experts is not in the record. The DOE witnesses would likely travel from the Washington D.C. area. It appears that the officers with authority and management over ABBK's operations are located at corporate offices ABHK or ABUSH in St. Louis. No corporate officers appear to be located in Delaware.

*The Eastern District of Missouri Cases*

In addition to ABBK's bankruptcy here, and the recent bankruptcy filings in Delaware as noted above, several Abengoa affiliates and subsidiaries that, like ABBK, are part of the bioenergy group, filed chapter 11 cases in St. Louis in the

---

[20] Before working for Abengoa, Mr. Standlee practiced law in Wichita, Kansas, later serving as general counsel to High Plains Corporation before it was acquired by Abengoa.

8

Eastern District of Missouri on February 24, 2016.[21] The lead debtor in the jointly administered Missouri bankruptcies is ABUSH – ABBK's upstream parent. Other subsidiaries owning or operating first or second generation ethanol plants in Ravenna, Nebraska; York, Nebraska; Colwich, Kansas; and Portales, New Mexico, including Abengoa Bioenergy of Nebraska, LLC and Abengoa Bioenergy Company, LLC, a Kansas limited liability company, are chapter 11 debtors in the Missouri proceedings. It appears that none of the Abengoa affiliates or subsidiaries that directly own and operate ethanol plants have filed bankruptcy in Delaware.

### *Abengoa, S.A.'s Global Restructuring*

This bankruptcy and the cascade of affiliate and subsidiary bankruptcy filings follow the ultimate parent Abengoa, S.A.'s efforts in 2015 to turnaround the conglomerate's financial situation.[22] In November of 2015 Abengoa, S.A. sought protection under the Spanish Insolvency Act to pursue negotiations with its principal financial creditors to reach a global agreement for restructuring its financial affairs. In March of 2016, Abengoa, S.A. presented its Restructuring Proposal in Spain – "the framework for the restructuring of Abengoa's financial obligations," and is seeking to obtain the requisite creditor approval in order for the Spanish Court to approve the same.[23] As part of a Standstill Agreement entered into between Abengoa and certain financial creditors, Abengoa, S.A. and its numerous Spanish affiliates filed chapter

---

[21] Ex. F, p. 29.
[22] *See* Ex. F, Runge Declaration ("Runge Dec."), pp. 4-14 for history of Abengoa, S.A., its corporate structure, and business activities leading up to the current global restructuring and reorganization efforts.
[23] *See* Ex. I, Business Plan & Financial Restructuring Proposal, March 16, 2016; Runge Dec., ¶ 27.

9

15 bankruptcy cases in the District of Delaware on March 28, 2016 to extend the Standstill Agreement.

The Abengoa entities and business activities are broken into four "distinct business units" – bioenergy, EPC (engineering, procurement, and construction), water, and solar.[24] They "operate on a decentralized basis," and the majority of operations are in the EPC and solar business units.[25] Through the Restructuring Proposal and its agents, Abengoa has expressed its plans with respect to its U.S. bioenergy affiliates and subsidiaries. With specific reference to the Missouri proceedings noted above, it stated that "the Bioenergy Debtors seek to reorganize through a sale of all or substantially all of their assets or a stand-alone restructuring."[26] As described in the Restructuring Proposal, the "new" Abengoa in general would focus on turnkey projects focusing on its engineering and construction business unit and no longer own "industrial plants."[27] Other publicity in 2016 regarding Abengoa's future reported that it was open to selling off the bioenergy unit because "making biofuels" was not part of its core business.[28]

At about the same time the Restructuring Proposal came out and shortly before this involuntary was commenced, the plant manager of the Hugoton facility offered for sale an extensive list of "surplus equipment."[29] Land and water rights have also

---

[24] Runge Dec., ¶ 11.
[25] *Id.* at ¶ 13.
[26] *Id.* at ¶ 33.
[27] Ex. I, p. 37.
[28] Ex. K. *See also,* Ex. L.
[29] Ex. J.

10

been offered for sale. Mr. Standlee testified these were excess rights and land due to over-purchase of water rights and land that was not needed to run the plant.

## ANALYSIS

The court may, in its discretion, transfer a case either for the convenience of the parties or in the interests of justice.[30] Fed. R. Bankr. P. 1014(b) provides that, if multiple cases involving the same debtor are filed in different districts, the court in which the first-filed petition is pending may decide, again based on the interests of justice or the parties' convenience, where the case should proceed. Because the first petition was filed in the District of Kansas, it falls to me to determine where this chapter 11 case should proceed. Usually, the burden is on the party seeking to transfer venue to prove that it is warranted by a preponderance of the evidence.[31]

Courts usually apply the *CORCO* test, weighing a series of factors set out in that case.[32] Those factors include (1) the proximity of creditors to the court; (2) the proximity of the debtor; (3) the proximity of necessary witnesses; (4) the location of the assets; (5) the economic administration of the estate; and (6) necessity for ancillary administration.[33] Many cases suggest that the party seeking to transfer the case to another venue has the burden to prove either the justice or the convenience of the contemplated move and at least one judge has noted that the burden of

---

[30] *See* 28 U.S.C. § 1412(a)(1) and (b).
[31] *See In re Enron Corp.*, 317 B.R. 629, 637-39 (Bankr. S.D.N.Y. 2004).
[32] *See In re Commonwealth Oil Ref. Co., Inc. ("CORCO")*, 596 F.2d 1239, 1247 (5th Cir. 1979), *cert. denied,* 444 U.S. 1045 (1980).
[33] *See In re Enron Corp.*, 274 B.R. 327, 332 (Bankr. S.D.N.Y. 2002).

11

determining what is "just" ultimately falls to the judge.[34] Courts also give deference to the debtor's choice of venue.[35] The first case filed was the creditors' involuntary petition against a Kansas debtor in Kansas. The debtor converted that case to a chapter 11 case here, simultaneously filing the companion case in the District of Delaware. I view the "first-filed" and "debtor preference" rules as part of the "interests of justice" determination. In weighing the CORCO factors, the court looks at the case "on the ground" as the record portrays it at the time of the hearing.[36] I am also mindful that transfer should not be granted if it merely shifts the inconvenience from one party to the other.[37]

### *Rule 1014(b) "Convenience" Considerations*

The first factor is the proximity of creditors of every kind to the court. Mr. Standlee testified that this debtor may have "thousands" of creditors in all fifty states. But ABBK's order for relief had only issued seven days before the hearing and there are no schedules. Based on the evidence, the only creditors we *know* about are the mechanics lienholders at the Hugoton project, debtor's utility provider, and the Department of Energy (DOE or Department). The lien creditors are from various

---

[34] *In re Caesars Entertainment Operating Company, Inc.*, 2015 WL 495259 at *5 (Bankr. D. Del., Feb. 2, 2015).

[35] *Caesars Operating* at *7 (noting the level of deference given to a debtor's choice of forum is less clear where an involuntary petition was filed against the debtor in a different venue prior to the debtor's voluntary petition).

[36] *In re West Coast Interventional Pain Medicine, Inc.,* 435 B.R. 569, 579-80 (Bankruptcy. N.D. Ind. 2010) (The court must focus on concrete facts that exist at the time venue motion is considered – not what may or may not play out in administration of the case); *CORCO,* 596 F.2d at 579-80.

[37] *In re Great American Resources, Inc.,* 85 B.R. 444, 446 (Bankr. N.D. Ohio 1988); *Matter of Lakeside Utilities,* 18 B.R. 115, 118 (Bankr. D. Neb. 1982).

12

places, but more than a few are from Kansas or have consented to its territorial jurisdiction by doing business in Kansas and by appearing in a Kansas state court proceeding concerning their claims.

The DOE's interest is unclear at present. At trial, the debtor said that the DOE has a lien-like interest in ABBK's real property by virtue of regulatory provisions that govern alternative energy grants and that this lien would prime the lien claimants' priority. Other than Mr. Standlee's testimony, no evidence of that was produced. At argument, DOE's counsel stated that the Department doesn't claim a lien; rather the regulations found in 10 C.F.R. § 601.321 gives the Department certain veto rights over the disposition of an alternative energy grantee's real estate.[38] It remains to be seen to what extent the DOE's claim affects the secured status of this asset or how those rights stack up to against perfected security interests in bankruptcy court. The creditor proximity test weighs against transfer for now.

The debtor has proximity to the court. ABBK is a Kansas limited liability company that is owned by another Kansas LLC, ABHK. ABHK is remotely owned by a Missouri entity, ABUSH. ABUSH's offices and ABBK's managing officers are located in St. Louis, Missouri, and Washington, D.C. Travel between here and those cities is hardly impossible. Given that this debtor's assets are few in number (though very valuable) and that its place in Abengoa's corporate scheme is as one of many distinct entities, its need to transport officers and witnesses may prove to be infrequent and, in any event, will not be burdensome. By comparison, requiring these

---

[38] 10 C.F.R. § 601.321.

creditors to go to East Coast to defend their Kansas law-based claims will undoubtedly be burdensome to them. This factor weighs against transfer.

As to the proximity of witnesses, the debtor argues that the necessity of appearance by investment bankers and other professionals who office on the East Coast demands venue in Delaware. But, some of the likely witnesses to the lien claims issues are from Kansas or are situated in the Midwest and easily accessible to Kansas. Many of them are subject to this court's subpoena power. This factors weighs slightly against transfer.

This debtor's assets, including 400 acres of land, water rights, and the plant's improvements, are located in Stevens County, Kansas. That is 250 miles from this courthouse and lies within this court's territorial jurisdiction. Oversight management occurs at the "home office" in St. Louis. Mr. Standlee testified he was unaware of other assets located outside Kansas. This factor weighs against transfer.

The record is less clear concerning the books and records of the debtor. The plant manager did not testify. Mr. Standlee stated that some of the books and records are maintained in St. Louis. The construction records for the debtor may be in Phoenix, and those business records not at the plant are in St. Louis. There is no suggestion those records reside in the District of Delaware. Given the ability to search and transmit records electronically, their physical whereabouts may not be as important as it once was. This factor weighs neutral.

As to the economical administration of this estate, the location of this debtor's management in Missouri, while not ideal to the case proceeding in Wichita, should

14

not impede efficiently prosecuting the case here. Mr. Standlee came from Washington to testify on extremely short notice. He is the Executive Vice President for Global Affairs of ABUSH which is a debtor in the Eastern District of Missouri. He said has no line authority over this debtor. Rather, he is a member of a steering committee overseeing all of the bankruptcy cases involving Abengoa entities. The operational assets are here and St. Louis is not far away. Nothing in the record suggests there are directly responsible administrators in Delaware. The court notes that it hears many business cases in which ownership and management are from outside Kansas. This factor weighs neutral.

In summary, convenience weighs against transferring this case. This is a debtor with a principal, albeit large and expensive, asset—the Kansas plant. Purposefully organized as such, it is one of many separate entities that make up a larger enterprise. Nothing prevents this debtor from benefitting from a debtor in possession credit facility that is approved in the Delaware cases. This court can certainly determine whether the amounts requested are appropriate and whether the extent to which this debtor's assets will be encumbered is proper. I can reach those and any other issues concerning the terms of a proposed credit facility as it affects this debtor very promptly. Right now, there is no evidence about whether such a facility is forthcoming or who the lenders might be.

Unlike the movants in *CORCO*, *Enron*, or *Caesars Operating*, these objecting creditors do not seek to transfer a mega-case filing to their venue. Rather, they simply ask that a case they initiated as an involuntary proceeding and that involves a legally

15

and financially distinct entity remain here. At this point, ABBK has simply failed to show why this case (and this debtor) cannot operate separately, but in tandem with, the Delaware and Missouri cases.

### *The Interest of Justice*

The interest of justice test involves balancing more intangible considerations. A court should exercise its power to transfer a bankruptcy case cautiously.[39] In doing so, it should consider what will promote the efficient administration of this estate, judicial economy, timeliness, and fairness.[40]

In cases with one or a few assets, courts have favored sending them to or leaving them in venues where the assets are located. In *In re Rehoboth Hospitality, LP*, the court faced a Delaware voluntary petition concerning a debtor who, while organized in Delaware, owned a hotel in Texas—its only asset.[41] In that case, the court noted that deference is often afforded the debtor's choice of forum, but that the debtor's choice is not dispositive when the choice is not directly related to the underlying facts and issues in the case.[42] There, because the asset and most of its creditors were situated in Texas, the court granted their motion to transfer after concluding the movants had carried their burden of proof.

Compare that result to *Caesars Operating*, where the court recognized that the level of deference is less clear where an involuntary petition was filed before the

---

[39] *CORCO,* 596 F.2d 1239, 1241; *Enron,* 274 B.R. at 342; *In re Condor Exploration, LLC,* 294 B.R. 370, 377 (Bankr. D. Colo. 2003); *In re Toxic Control Tech, Inc.*, 84 B.R. 140, 143 (Bankr. N.D. Ind. 1988).
[40] *Enron,* 274 B.R. 327, 343 (Bankr. S.D.N.Y.2002).
[41] *In re Rehoboth Hospitality, LP,* 2011 WL 5024267 (Bankr. D. Del. Oct. 19, 2011).
[42] 2011 WL 5024267 at *3.

16

debtor filed its voluntary case.[43] In that case, the Delaware court had the first-filed involuntary while the voluntary case was filed in the Northern District of Illinois. The creditors seeking the transfer in *Caesars* wanted the entire mega-case to be transferred from that district to the District of Delaware. The petitioning creditors in that matter filed their petition knowing that the debtor would be filing a voluntary case. In those circumstances, the court concluded that it would honor the debtor's venue preference.

Our situation is different in several ways. First, the petitioning creditors here sought involuntary relief more than ten days before the voluntary case was filed. ABBK presented no evidence that the petitioning creditors knew ABBK was going to file a voluntary chapter 11 in Delaware and that the Kansas involuntary was a preemptory strike. Second, the ABBK case, while part of a complex set of entities, does not itself seem to be nearly as complex. It is a company with few but valuable assets that are encumbered by liens, not unlike the hotel in *Rehoboth*. Third, the creditors seeking the transfer in *Caesars* wanted the entire complex of related cases to be transferred from the Northern District of Illinois to the District of Delaware. ABBK's creditors merely want this entity's case to be conducted in this District. They do not seek to wrest the Delaware cases away, nor would this court entertain such a notion.

In considering the fairness of a transfer, I should note the respective parties' concerns about ABBK's true intentions in this case. The objecting creditors believe

---

[43] *In re Caesars Operating Company, Inc.*, 2015 WL 495259 at *7 (Bankr. D. Del. 2015).

17

Case 16-10446    Doc# 69    Filed 04/25/16    Page 17 of 18

that this debtor will ultimately sell the plant because of what they perceive Abengoa's larger business strategy to be. Certainly, Abengoa's senior management has made clear its intention to exit the manufacturing business and rely more on engineering, procurement, and construction ("EPC") both in its overall business plan and in pleadings in this court. But this court is also open to the possibility that ABBK's position as the owner and user of a developing technology furthers the greater venture's EPC goals.

It may also be more efficient and less expensive to consider whether and to what extent to allow the claims in this case here. Like the Delaware cases, this case is in its infancy; neither court is likely to have "gained familiarity with many of the issues that have and will continue to arise."[44] The validity of the mechanics lien claims turns on Kansas law and many of the lien claimants are present in Kansas or have consented to its jurisdiction. This court has the time and expertise to reach those and any other necessary issues with dispatch. Even though my distinguished Delaware colleagues give every issue they get the closest and fairest consideration, I am reluctant to risk ABBK's creditors being lost in the sea of complex matters that may be pending in the larger Abengoa cases.

I conclude that ABBK has not demonstrated by a preponderance of the evidence that the case should be transferred on either convenience grounds or the interests of justice. The debtor's motion to transfer is accordingly DENIED.

### # # #

---

[44] *Id.*

18

Case 16-10446    Doc# 69    Filed 04/25/16    Page 18 of 18