## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| In re:<br><br>ABENGOA BIOENERGY BIOMASS OF KANSAS, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 16-10446 |

## NOTICE OF FIRST AMENDED DISCLOSURE STATEMENT
## FOR MISSOURI LIQUIDATING TRUSTEE'S FIRST AMENDED PLAN
## OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that Drivetrain, LLC, the liquidating trustee (the "Missouri Liquidating Trustee") pursuant to the confirmed plans of liquidation of the Debtor's affiliates in the United States Bankruptcy Court for the Eastern District of Missouri (Case No. 16-41161-659), filed its *Disclosure Statement for Missouri Liquidating Trustee's First Amended Plan of Liquidation pursuant to Chapter 11 of the Bankruptcy Code* on July 19, 2017 [Docket No. 969] (the "Missouri Liquidating Trustee's Disclosure Statement"). The Missouri Liquidating Trustee files its *First Amended Disclosure Statement for Missouri Liquidating Trustee's First Amended Plan of Liquidation pursuant to Chapter 11 of the Bankruptcy Code* (the "Missouri Liquidating Trustee's First Amended Disclosure Statement"), attached hereto as **Exhibit A**. Attached hereto as **Exhibit B** is a redline comparing the Missouri Liquidating Trustee's First Amended Disclosure Statement to the Missouri Liquidating Trustee's Disclosure Statement.

Dated: July 27, 2017

Respectfully submitted,

s/ *Mark Bossi*

**THOMPSON COBURN LLP**

Mark V. Bossi, Esq. (KS #13719)
One US Bank Plaza
St. Louis, Missouri 63101
Telephone: (314) 552-6000
Facsimile: (314) 552-7000
mbossi@thompsoncoburn.com

- and-

**HOGAN LOVELLS US LLP**

Christopher R. Donoho, III (admitted *pro hac vice*)
Ronald J. Silverman (admitted *pro hac vice*)
M. Shane Johnson (admitted *pro hac vice*)
Raphaella S. Ricciardi (admitted *pro hac vice*)
Hogan Lovells US LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
chris.donoho@hoganlovells.com
ronald.silverman@hoganlovells.com
shane.johnson@hoganlovells.com
raphaella.ricciardi@hoganlovells.com

*Counsel to the Missouri Liquidating Trustee*

**Missouri Liquidating Trustee's First Amended Disclosure Statement**

| | |
|---|---|
| In re:<br><br>ABENGOA BIOENERGY BIOMASS OF KANSAS, LLC,<br><br>    Debtor. | Chapter 11<br><br>Case No. 16-10446 |

**FIRST AMENDED DISCLOSURE STATEMENT FOR
MISSOURI LIQUIDATING TRUSTEE'S FIRST AMENDED PLAN
OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**DRIVETRAIN, LLC**

Alan J. Carr
Tim Daileader
630 Third Avenue, 21st Floor
New York, NY, 10017
Telephone: (212) 856- 9700
acarr@drivetrainadvisors.com
tdaileader@drivetrainadvisors.com

**THOMPSON COBURN LLP**

Mark V. Bossi, Esq. (KS #13719)
One US Bank Plaza
St. Louis, Missouri 63101
Telephone: (314) 552-6000
Facsimile: (314) 552-7000
mbossi@thompsoncoburn.com

- and-

**HOGAN LOVELLS US LLP**

Christopher R. Donoho, III (admitted *pro hac vice*)
Ronald J. Silverman (admitted *pro hac vice*)
M. Shane Johnson (admitted *pro hac vice*)
Raphaella S. Ricciardi (admitted *pro hac vice*)
Hogan Lovells US LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
chris.donoho@hoganlovells.com
ronald.silverman@hoganlovells.com
shane.johnson@hoganlovells.com
raphaella.ricciardi@hoganlovells.com

*Missouri Liquidating Trustee*

*Counsel to the Missouri Liquidating Trustee*

Dated: July 27, 2017

**THIS DOCUMENT IS A DRAFT PROPOSED DISCLOSURE STATEMENT AND IS SUBJECT TO CHANGE. IT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT UNDER SECTION 1125 OF THE BANKRUPTCY CODE. THE MISSOURI LIQUIDATING TRUSTEE IS NOT SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.**

## DISCLAIMER

IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE MISSOURI LIQUIDATING TRUSTEE URGES YOU TO VOTE TO ACCEPT THE PLAN.

**EACH HOLDER OF A CLAIM AGAINST THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND BANKRUPTCY CODE SECTION 1125. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTOR, ITS PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.[1]**

**THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE PLAN. NO SOLICITATIONS FOR OR AGAINST THE PLAN MAY BE MADE EXCEPT THROUGH THIS DISCLOSURE STATEMENT.**

**THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. ALTHOUGH THE MISSOURI LIQUIDATING TRUSTEE BELIEVES AND HAS MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NONBANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTOR AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.**

---

[1] Information and statements herein that are also contained in the Debtor's Disclosure Statement were approved by the Bankruptcy Court as containing adequate information on May 23, 2017 [Docket No. 872]. The Missouri Liquidating Trustee relies on this information and has not performed any independent review.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSES PERFORMED BY THE MISSOURI LIQUIDATING TRUSTEE AND ITS PROFESSIONALS UTILIZING IN PART INFORMATION SUPPLIED BY THE DEBTOR. ALTHOUGH THE MISSOURI LIQUIDATING TRUSTEE HAS MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE MISSOURI LIQUIDATING TRUSTEE CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER BUT RATHER AS THE MISSOURI LIQUIDATING TRUSTEE'S STATEMENT OF THE STATUS OF THE RESPECTIVE MATTER.

THE MISSOURI LIQUIDATING TRUSTEE RECOMMENDS THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN. IT IS THE OPINION OF THE MISSOURI LIQUIDATING TRUSTEE THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE MISSOURI LIQUIDATING TRUSTEE BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION .................................................................................................1

    A.   Overview of Chapter 11 and the Plan Confirmation Process. ...............................3

    B.   Recommendation of the Missouri Liquidating Trustee and Plan Overview. ..........4

    C.   Summary of Classification and Treatment of Claims Under the Plan. ..................4

    D.   Summary of Voting Requirements for Plan Confirmation. ...................................4

II.  BACKGROUND INFORMATION REGARDING THE DEBTOR.................................6

    A.   DOE Award and Loan........................................................................................8

    B.   The Debtor should be Substantively Consolidated with the Missouri
        Bioenergy Debtors because the Debtor Operated within Abengoa's
        Bioenergy Group.................................................................................................9

III. EVENTS LEADING TO THE CHAPTER 11 FILING.................................................11

    A.   Economic Challenges of the Bioenergy Business ................................................11

    B.   Economic Challenges of the Global Abengoa Business and Abengoa's
        Global Restructuring .........................................................................................11

    C.   Abengoa's Financial Position and the Gonvarri Investment Agreement..............12

    D.   The Spanish Proceedings...................................................................................12

    E.   The Delaware Chapter 11 Cases ........................................................................13

    F.   The Missouri Chapter 11 Cases .........................................................................14

IV.  MATERIAL EVENTS OF THE CHAPTER 11 CASE ...............................................15

    A.   Involuntary Petition, Request to Transfer Venue, and Appeals Processes. ..........15

    B.   Conversion to Chapter 11 and Entry of Certain Orders. .....................................16

    C.   Schedules and Statements. ................................................................................16

    D.   Retention and Employment of the Debtor's Bankruptcy Professionals. ..............16

    E.   DIP Financing. .................................................................................................16

\\NY - 045867/000001 - 7840945 v11

F.     Appointment of Creditors' Committee. ..............................................17

G.     Key Employee Retention Plan and Incentive Plan. ...............................17

H.     Exclusivity Extensions. .......................................................................18

I.     Sale of Substantially All of the Debtor's Assets. .................................18

J.     Claims Process and Bar Dates. ............................................................20

K.     Lienholder Claims, Litigation and Settlements. ..................................21

L.     Debtor's Plan .......................................................................................22

V.     THE CHAPTER 11 PLAN .................................................................................23

A.     Treatment of Claims and Equity Interests Under the Plan. ..................23

B.     Means for Implementation of the Plan. ...............................................26

C.     Provisions Governing Voting And Distributions...................................32

D.     Disputed Claims. .................................................................................36

E.     Treatment of Executory Contracts and Unexpired Leases. ..................38

F.     Conditions Precedent to the Effective Date.........................................39

G.     Indemnification, Release, Injunctive and Related Provisions. .............40

H.     Retention of Jurisdiction. ....................................................................44

I.     Miscellaneous Provisions. ...................................................................45

VI.     RISK FACTORS IN CONNECTION WITH THE PLAN ...............................49

A.     Bankruptcy Considerations. ................................................................49

B.     No Duty to Update Disclosures. ..........................................................50

C.     Representations Outside this Disclosure Statement..............................50

D.     No Admission. .....................................................................................50

E.     Tax and Other Related Considerations. ...............................................50

VII.     PLAN CONFIRMATION AND CONSUMMATION .....................................50

A.     The Confirmation Hearing. .................................................................50

\\NY - 045867/000001 - 7840945 v11

       B.      Plan Confirmation Requirements Under the Bankruptcy Code. ...........................51

VIII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...................................................................................................................54

       A.      The Debtor's Plan compared to the Missouri Liquidating Trustee's Plan ............54

       B.      Chapter 7 Liquidation. ........................................................................................55

       C.      Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code. ......................56

       D.      Dismissal of the Debtor's Chapter 11 Case. .........................................................56

IX.     CERTAIN FEDERAL TAX CONSEQUENCES .............................................................56

       A.      General. ...............................................................................................................57

       B.      U.S. Federal Income Tax Treatment With Respect to the Liquidating Trust. ........................................................................................................................58

       C.      U.S. Federal Income Tax Treatment With Respect to Holders of Allowed Claims that are Beneficiaries of the Liquidating Trust. .......................................59

X.      RECOMMENDATION AND CONCLUSION ...............................................................60

\\NY - 045867/000001 - 7840945 v11

## EXHIBITS

Exhibit 1    Missouri Liquidating Trustee's First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code

Exhibit 2    Recovery Analysis

Exhibit 3    Letter from Missouri Liquidating Trustee

Exhibit 4    Solicitation Procedures Order

Exhibit 5    Form of Ballot for Class 2 General Unsecured Claims

Exhibit 6    Summary of Missouri Plan Creditor Treatment

Exhibit 7    Liquidation Analysis

\\NY - 045867/000001 - 7840945 v11

## I.       INTRODUCTION

Drivetrain, LLC is the liquidating trustee (the "***Missouri Liquidating Trustee***") appointed pursuant to the plans of liquidation approved in the Chapter 11 cases of the Debtor's bioenergy business affiliates that were pending, and have now been confirmed, in St. Louis, Missouri (as described in more detail in Article III.F. below). The Missouri Liquidating Trustee asserts intercompany books and records claims on behalf of affiliates of the Debtor against the Debtor (as described in more detail in Article IV.J below).  The Missouri Liquidating Trustee submits this disclosure statement (the "***Disclosure Statement***"), pursuant to section 1125 of title 11 of the United States Code (the "***Bankruptcy Code***") and Rule 3017 of the Federal Rules of Bankruptcy Procedure, as now in effect or as hereafter amended (the "***Bankruptcy Rules***"), in connection with the solicitation of votes on its proposed *Missouri Liquidating Trustee's First Amended Plan of Liquidation pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 968] (the "***Plan***") and attached hereto as **Exhibit 1.**

**The Missouri Liquidating Trustee believes that confirmation and implementation of the Plan is in the best interests of the Debtor's Estate, Creditors and all other interested parties because the Plan provides an estimated recovery of 33% to General Unsecured Claims compared with an estimated 19% recovery if the Missouri Intercompany Claims (as defined in Article IV.J below) are allowed in full and receive *pro rata* treatment, which the Missouri Liquidating Trustee believes is otherwise legally appropriate. *See* Recovery Analysis, attached hereto as __Exhibit 2__, which provides information regarding estimated distributions to general unsecured creditors in the Missouri Chapter 11 Cases (as defined below in Article III.F) (estimated 30.2% exclusive of any recovery on claims against the Debtor), estimated distributions to general unsecured creditors in this Chapter 11 Case assuming that Missouri Intercompany Claims are allowed in full with *pro rata* treatment (estimated 19%), and estimated distributions to general unsecured creditors in this Chapter 11 Case pursuant to the terms of the Missouri Liquidating Trustee's Plan (estimated 33%). The Debtor and the Creditors' Committee disagree with the Missouri Liquidating Trustee's position that the Plan delivers an outcome for general unsecured creditors that is superior to legally permissible alternatives.**

To help explain the "dueling plan" dynamic further, the Missouri Liquidating Trustee has also included with this solicitation package a letter (also attached hereto as **Exhibit 3**) describing the differences between its Plan and the Debtor's Plan (as defined below in Article IV.L below). The Missouri Liquidating Trustee encourages you to read that letter carefully as it is a concise explanation of differences between the plans and why the Missouri Liquidating Trustee's Plan is appropriate. The Debtor and the Creditors' Committee do not agree with the Missouri Liquidating Trustee's conclusions in the letter.

The Debtor's Plan proposes to give zero recovery to the $69,504,933.16 of filed Missouri Intercompany Claims. The Missouri Liquidating Trustee believes that is not permissible and cannot be approved and accordingly has objected to the Debtor's Plan. Conversely, the Missouri Liquidating Trustee's Plan allows the Missouri Intercompany Claims to receive a recovery, but voluntarily limits that recovery to an amount that is less than what such claims would receive if given *pro rata* treatment with other general unsecured claims. Specifically, the Plan limits recovery on Missouri Intercompany Claims to such an extent as is

necessary to permit other general unsecured claims of the Debtor to receive the same percentage recovery that general unsecured creditors in the Missouri Chapter 11 Cases will receive assuming that the assets and liabilities of the Missouri Bioenergy Debtors and the Debtor were combined. The Plan does not provide for transfer of assets from the Missouri Bioenergy Debtors to the Debtor but rather provides enhanced recovery to the Debtor's general unsecured creditors (other than the Missouri Intercompany Claims) by limiting the recovery on the Missouri Intercompany Claims compared to the *pro rata* recovery on Missouri Intercompany Claims that the Missouri Liquidating Trustee believes is otherwise appropriate. The Missouri Liquidating Trustee believes that the Plan recovery is significantly higher than the recovery available to the Debtor's general unsecured creditors if the Missouri Intercompany Claims receive *pro rata* treatment with other general unsecured creditors and no such combination is effected: estimated to be 33% compared with 19% if the Missouri Intercompany Claims are allowed in full with *pro rata* treatment and no such combination is effected. *See* Exhibit 2 (Recovery Analysis). The Missouri Liquidating Trustee believes this settlement is fair to both estates and the general unsecured creditors of both because as explained herein, the Debtor operated within Abengoa's U.S. bioenergy group and the Missouri Liquidating Trustee believes the only reason it was not legally consolidated with the Missouri Bioenergy Debtors is that its case was filed in a different jurisdiction. As a technical matter, the Plan does not propose to legally consolidate the Debtor with the Missouri Bioenergy Debtors; instead, it compromises and limits the Missouri Intercompany Claims to provide the Debtor's General Unsecured Claims with the same recovery that the Missouri Bioenergy Debtors' general unsecured creditors would receive if such consolidation had occurred.

Section 2.2(a) of the Missouri Liquidating Trust Agreement specifically authorizes the Missouri Liquidating Trustee to exercise all power and authority that could have been exercised by the Missouri Debtors, "including, without limitation, in connection with the Abengoa Bioenergy Biomass of Kansas, LLC Chapter 11 case pending in the United States Bankruptcy Case for the District of Kansas." *See also* Missouri Liquidating Trust Agreement, §§ 2.2(k), 2.2(m) (authorizing the Missouri Liquidating Trustee to "appear for all purposes in the ABBK Case as successor to the [Missouri] Debtors"), and Ex. A (Power of Attorney). Furthermore, the Missouri Liquidating Trustee is authorized to undertake this settlement by the Missouri Plan and the Missouri Liquidating Trust Agreement (as defined in Article III.F below) approved in the Missouri Chapter 11 Cases. *See* Missouri Plan, Article IV.D & F and Missouri Liquidating Trust Agreement, §§ 1.1, 2.2(j) and 3.1.

Furthermore, even if the Missouri Intercompany Claims are disallowed in their entirety, by the Missouri Liquidating Trustee's calculations, the Debtor's General Unsecured Claims would only receive in reality an estimated recovery of 63%, not the 95% recovery included in the Debtor's Disclosure Statement (as defined in Article IV.L) because the Debtor's Disclosure Statement did <u>not</u> take into account the proposed $3.4 million settlement with the Department of Energy, among other things.

This Disclosure Statement and the other documents described herein are being furnished by the Missouri Liquidating Trustee to Creditors in the Debtor's Chapter 11 Case pending before the United States Bankruptcy Court for the District of Kansas (the "***Bankruptcy Court***"). This Disclosure Statement is intended to provide adequate information of a kind, and in sufficient detail, to enable the Debtor's Creditors to make an informed judgment about the Plan,

including whether to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding (i) the Debtor's prepetition operating and financial history; (ii) the Debtor's need for relief under chapter 11 of the Bankruptcy Code; (iii) significant events that have occurred during the Debtor's Chapter 11 Case; (iv) the terms of the Plan; (v) the manner in which distributions will be made under the Plan; (vi) certain effects of confirmation of the Plan; (vii) certain risk factors associated with the Plan; and (viii) the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

This Disclosure Statement is subject to the Bankruptcy Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan. *See* Solicitation Procedures Order, attached hereto as **Exhibit 4**. **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. To the extent that the information provided in this Disclosure Statement and the Plan (including any Plan Supplements) conflict, the terms of the Plan (including any Plan Supplements) will control. Terms not otherwise specifically defined herein have the meanings attributed to them in the Plan. Each definition in this Disclosure Statement and in the Plan includes both the singular and plural. Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

### A. Overview of Chapter 11 and the Plan Confirmation Process.

Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation or liquidation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets. The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the petition date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

\\NY - 045867/000001 - 7840945 v11

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires the plan proponent to prepare, and obtain bankruptcy court approval of, a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical investor of the relevant classes to make an informed judgment regarding the plan. This Disclosure Statement is presented to holders of Claims against the Debtor entitled to vote under section 1125 of the Bankruptcy Code in connection with the Missouri Liquidating Trustee's solicitation of votes on the Plan.

**B.      Recommendation of the Missouri Liquidating Trustee and Plan Overview.**

The Missouri Liquidating Trustee believes that the Plan, which provides for, among other things, the creation of a Liquidating Trust for the benefit of the Debtor's Creditors, will allow for a prompt resolution of the Debtor's Chapter 11 Case and will achieve the best possible result for Creditors and other interested parties. The following is a brief overview of the Plan and is qualified by reference to the Plan itself. **The Missouri Liquidating Trustee believes that its Plan will result in a materially higher recovery for creditors than the Debtor's Plan.**

**C.      Summary of Classification and Treatment of Claims Under the Plan.**

A brief summary of the Classes established under the Plan, including the treatment and voting rights of each Class, is set forth below. A complete description of the treatment of each class is set forth in Article III of the Plan and section V.A. of this Disclosure Statement. Parties should refer to those sections for a complete description of the proposed treatment for each class.

| Class | Claims & Interest | Status | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------------|--------|-----------|------------------|--------------------|
| 1 | Secured Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 2 | General Unsecured Claims | Impaired | Pro Rata Share of Liquidating Trust Cash | Yes | 33%[2] |
| 3 | Non-Missouri Intercompany Claims | Impaired | No Distribution | No (deemed to reject) | 0% |
| 4 | Equity Interests | Impaired | No Distribution | No (deemed to reject) | 0% |

**D.      Summary of Voting Requirements for Plan Confirmation.**

**1.      In General.**

Creditors should refer only to this Disclosure Statement and the Plan to determine whether to vote to accept or reject the Plan. Under the Bankruptcy Code, only holders of Claims that are "impaired" are entitled to vote to accept or reject the Plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated

---

[2] This estimated recovery assumes Allowed General Unsecured Claims in the amount of $30.2 million.

\\NY - 045867/000001 - 7840945 v11

payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default. An impaired class of creditors votes to accept a plan if the holders of at least two-thirds (2/3) in dollar amount, and more than one-half (1/2) in number, of those creditors that actually cast ballots vote to accept such plan. Those classes that are not impaired are not entitled to vote and are deemed to accept a plan. Those classes that are not entitled to a distribution and will not retain property under a plan are deemed to reject a plan.

A class of interest holders is deemed to accept a plan if the holders of at least two-thirds (2/3) in amount of those interest holders that actually cast ballots vote to accept such plan. A class of interest holders is impaired, not entitled to vote, and deemed to reject the plan if the plan treats such holders by providing that they will retain no property and receive no distributions under the plan.

Any Claim in an Impaired Class that is subject to a pending objection or is scheduled as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing the Claim for the purpose of voting on the Plan.

Pursuant to the Bankruptcy Code, only creditors who actually vote on the Plan will be counted for purposes of determining whether the required number of acceptances have been obtained. Failure to deliver a *properly completed ballot* by the Voting Deadline (as defined below) will result in an abstention; consequently, the vote will neither be counted as an acceptance or rejection of the Plan.

### 2. Impaired Classes Entitled to Vote.

Only the Claims in Class 2 (General Unsecured Claims) are Impaired and are entitled to vote to accept or reject the Plan. *See* Form of Ballot for Class 2 General Unsecured Claims, attached hereto as **Exhibit 5**.

### 3. Unimpaired Classes Deemed to Accept the Plan.

Under Bankruptcy Code section 1126(f), only the Claims in Class 1 (Secured Claims) are Unimpaired and the vote of holders of such Claims in these Classes will not be solicited.

### 4. Certain Classes Are Deemed to Reject the Plan and Do Not Vote.

Under Bankruptcy Code section 1126(g), the following Classes will receive no Distributions and are deemed to have rejected the Plan: Class 3 (Non-Missouri Intercompany Claims) and Class 4 (Equity Interests). The vote of holders of such Claims and Equity Interests in these Classes will not be solicited.

\\NY - 045867/000001 - 7840945 v11

### 5. Voting Deadline.

If a Creditor holds a Claim classified in a voting Class of Claims under the Plan, the Creditor's acceptance or rejection of the Plan is important and must be in writing and submitted on time. The voting deadline is [•], 2017 at 5:00 p.m. (prevailing Central Time) (the "***Voting Deadline***").

### 6. Voting Instructions.

IN ORDER FOR A VOTE TO BE COUNTED, THE BALLOT MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RETURNED TO THE VOTING AGENT BY THE VOTING DEADLINE.

### 7. Ballots.

Creditors must use only the ballot or ballots sent to them with the notice of this Disclosure Statement. If a Creditor has Claims in more than one Class, it should receive multiple ballots. IF A CREDITOR RECEIVES MORE THAN ONE BALLOT, THEN THE CREDITOR SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM AND SHOULD COMPLETE AND RETURN ALL OF THEM.

### 8. Additional Information.

If you have any questions about (a) the procedure for voting on your Claim, (b) the package of materials that you have received, (c) the amount of your Claim, (d) obtaining or replacing a ballot, or (e) obtaining an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact M. Shane Johnson, counsel to the Missouri Liquidating Trustee, at (212) 918-3775 or shane.johnson@hoganlovells.com.

## II. BACKGROUND INFORMATION REGARDING THE DEBTOR

The Debtor in this Chapter 11 Case, Abengoa Bioenergy Biomass of Kansas, LLC, is a limited liability company organized under the laws of the State of Kansas. The Debtor's ultimate parent is Abenoga, S.A. ("***Abengoa***"). Abengoa is a Spanish company founded in 1941 and has been a leading engineering and clean technology company with operations in many countries worldwide. Currently, Abengoa is registered in the Mercantile Register of Seville in volume 573, folio 69, sheet SE-1507. As of the end of 2015, Abengoa was the parent company of approximately 700 other companies around the world, including 577 subsidiaries, 78 associates, 31 joint ventures, and 211 Spanish partnerships (*uniones temporales de empresa*) (collectively, the "***Abengoa Group***" or the "***Company***").

Over the course of the Abengoa Group's 70-year history, it has developed a unique and integrated business model that applies its accumulated engineering expertise to promoting sustainable development solutions, including delivering new methods for generating solar power, developing biofuels, producing potable water from seawater, and efficiently transporting electricity to customers in the following sectors: energy, telecommunications, transport, water, utilities, environmental, industrial, and services. A cornerstone of the Company's business model has been investment in proprietary technologies, particularly in areas

\\NY - 045867/000001 - 7840945 v11

with relatively high barriers to entry. The Company supplies engineering projects under the 'turnkey' contract modality and operates assets that generate renewable energy, produce biofuel, manage water resources, desalinate sea water, and treat sewage. The Abengoa Group's business is organized under the following three activities:

- Engineering and construction: includes the traditional engineering activities in the energy and water sectors, with more than 70 years of experience in the market and the development of solar technology. The Abengoa Group is specialized in carrying out complex turnkey projects for thermo-solar plants, solar-gas hybrid plants, conventional generation plants, biofuels plants, and water infrastructures, as well as large-scale desalination plants, and transmission lines, among others.

- Concession-type infrastructures: groups together the Company's extensive portfolio of proprietary concession assets that generate revenues governed by long-term sales agreements, such as take-or-pay contracts, tariff contracts, or power purchase agreements. This activity includes the operation of electric energy generation plants (solar, cogeneration, or wind), desalination plants, and transmission lines. These assets generate low demand risk, and the Company focuses on operating them as efficiently as possible.

- Industrial production: covers Abengoa Group's businesses with a high technological component, such as development of biofuels technology. The Company holds an important leadership position in these activities in the geographical markets in which it operates.

Abengoa initiated the expansion of its global operations in the 1960s, first to South America and then into the United States. With a total investment of $3.3 billion, the United States has become one of Abengoa's largest markets in terms of sales volume, particularly from developing solar, bioethanol, and water projects. Abengoa has achieved a leading position within the renewable energy construction and technology sector in the United States through its efforts in developing commercial scale concentrated solar power and producing advanced biofuels on a commercial scale. Abengoa's US business operations can be organized into the following distinct business units:

- Abengoa's bioenergy companies ("*Bioenergy*"), among other things, had been a leader in the biofuel production sector and, in addition, specialized in the development of new technologies geared towards the second-generation production of biofuels, and biochemical products;

- Abengoa's engineering, procurement, and construction companies are dedicated to the engineering and construction of electrical, mechanical, and instrumental infrastructures in the energy, industrial, water management, and services sectors, as well as the development of innovative technology for Abengoa's businesses;

- Abengoa's solar companies specialize in the development and operation and maintenance of solar energy plants, mainly using solar thermal technology; and

\\NY - 045867/000001 - 7840945 v11

- Abengoa's water companies specialize in the development and operation and maintenance of facilities aimed at generating, transporting, treating, and managing potable water, including desalination and water treatment, as well as purification plants.

The U.S. operations of the Industrial Production segment consisted of both "first generation" operations and a "second generation" technology development and R&D projects. The first-generation operations largely consisted of production facilities that converted food-based grains (corn, sorghum/milo) into ethanol at several locations throughout the U.S.

### A.    DOE Award and Loan

The second-generation operations consisted of research and development into converting non-food-based matter into ethanol. In 2007, the United States Department of Energy (the "***DOE***") awarded the Debtor that certain Assistance Agreement DE-FC36-07GO17028 (as subsequently amended, the "***ABBK Award***") under the authority of the Energy Policy Act of 2005 (the "***Energy Policy Act***"). The funds provided under the ABBK Award, totaling approximately $95 million, assisted the Debtor in the construction, start-up and commissioning of its 25 million gallon nameplate cellulosic ethanol production facility (the "***Ethanol Plant***"). In addition, the Debtor constructed an electricity cogeneration plant (the "***Cogeneration Plant***") adjacent to the Hugoton Plant, and also owned approximately 400 acres of adjacent land, all located at 1043 Road P., Hugoton, Kansas 67951 in Stevens County (collectively, the "***Hugoton Plant***"). The costs related to the construction of the Hugoton Plant exceeded $850 million, with a portion of those costs covered by the funds from the ABBK Award. However, ultimately the Hugoton Plant was not fully completed and never achieved operational status. As more fully described below, the plant was sold during the course of this Chapter 11 Case.

Additionally, on September 28, 2011, the DOE, acting pursuant to Section 1705 of the Energy Policy Act of 2005, issued a loan guarantee under its Loan Guarantee Program (the "***LGP***"), providing available financing to ABBK up to $132,400,000 related to construction of the Ethanol Plant (the "***LGP Loan***"). Over the life of the LGP Loan, ABBK drew approximately $45 million from the facility. The LGP Loan was repaid in full, inclusive of principal, interest and penalties, prior to the filing of this Chapter 11 Case in March 2015.

The Debtor asserted that unlike the LGP Loan, issued pursuant to the LGP and pursuant to customary loan terms and conditions, the ABBK Award should be characterized as an equity investment in the Debtor, with an aim toward achieving certain objectives under the Energy Policy Act. The ABBK Award contains no repayment terms or payment enforcement rights; no maturity date; no interest provisions; and, in the Debtor's view, no other terms or conditions typical of a loan agreement, in contradistinction to the LGP Loan. Further, the ABBK Award includes certain provisions requiring DOE's oversight and/or approvals.

The DOE asserts, however, that its interest in the Ethanol Plant (and the sale proceeds therefrom) fall outside of the property of the Debtor's estate. On December 28, 2016, the United States of America, on behalf of the DOE, moved to intervene in Adversary Case No. 16-05151, which had been initiated by certain lienholders of the Debtor who have since dismissed their claims [Adversary Case No. 16-05151 Docket No. 56] (the "***DOE Motion to***

*Intervene*"). Attached as Exhibit 1 to the DOE Motion to Intervene is the United States' Complaint in Intervention (the "**DOE Complaint**"). On February 16, 2017, the Court entered an order granting the DOE Motion to Intervene, and deeming the DOE Complaint filed and served as of that date [Adversary Case No. 16-05151 Docket No. 81]. On May 26, 2017, the Debtor filed its Answer to the Complaint [Adversary Case No. 16-05151 Docket No. 128]. That same day the Debtor filed an objection to the DOE's claim [Docket No. 879]. The Creditors' Committed filed its Answer to the Complaint on June 5, 2017 [Adversary Case No. 16-05151 Docket No. 131]. On June 9, 2017, the DOE filed a response to the Debtor's claim objection [Docket No. 898]. On July 12, 2017, the Debtor announced during a court status conference that an agreement in principle to settle the DOE claim had been reached.

        In the DOE Complaint, as well as in various pleadings filed by the DOE in this Chapter 11 Case, the DOE alleges that it holds a 27% cost-share interest in the Ethanol Plant, and that the proceeds from the sale of such property fall outside of the property of the Debtor's estate, as defined in section 541 of the Bankruptcy Code. The Debtor disputes both the DOE's alleged cost-share amount as well as the conclusion that the DOE's interest falls outside of estate property.

### B. The Debtor should be Substantively Consolidated with the Missouri Bioenergy Debtors because the Debtor Operated within Abengoa's Bioenergy Group

**Management**

        The Bioenergy Debtors' (as defined below in Article III.F) board of directors and officers were the same or substantially similar. *See* Porras Declaration (as defined below), Ex. B. For example, Javier Garoz Neira and Ignacio García Alvear served as directors and officers for every Bioenergy Debtor and Jeffrey Bland served as the Secretary for every Bioenergy Debtor (including the Debtor) except Abengoa Bioenergy US Holding, LLC ("**ABUS**"). *See id.* Sandra Porras is the Chief Financial Officer for the Debtor and each Bioenergy Debtor. The Bioenergy Debtors were also centrally managed by the St. Louis-based management team who provided all accounting, legal, trading, purchasing, logistics, personnel, financing, regulatory, environmental compliance, business strategy, cash, and risk management services for the bioenergy plants. *See id.* at ¶ 44.

**Financial Statements and Budget**

        Abengoa Bioenergy Outsourcing, LLC ("**ABO**") prepared financial statements for ABUS that were consolidated to include all of the Bioenergy Debtors. *See id.* at ¶ 45 and Ex. C. And while each of the Bioenergy Debtors' bioenergy plants had an annual budget, those budgets were always integrated to present a consolidated forecast for the Bioenergy Debtors' assets. *See id.* at ¶ 45 and Ex. D.

**Shared Services**

        The Bioenergy Debtors that owned biofuel production facilities (such as the Debtor) received management, legal, accounting, trading, and other services from other Bioenergy Debtors (such as ABO, Abengoa Bioenergy Operations, LLC ("**AB Ops**"), and Abengoa Bioenergy Trading US, LLC ("**ABT**")) based on shared services agreements. *See id.* at

¶ 48-52. "Although the services were always provided, the service company sometimes waived the right to receive payment for its services, when, for example, a particular entity had insufficient cash on hand." *Id.* at ¶ 48.

**Employees and Supplies**

The Bioenergy Debtors, including their employees, were centrally managed by a team in St. Louis that routinely redeployed employees from a plant owned by one Bioenergy Debtor to a plant owned by another Bioenergy Debtor based on need. *See id.* at ¶ 55. The resulting travel expenses were charged to the Bioenergy Debtor that owned the employee's "home" plant, rather than the Bioenergy Debtor that owned the plant to which the employee was loaned. *See id.* Spare parts were also commonly utilized on an *ad hoc,* as-needed basis among the Bioenergy Debtors' various bioenergy plants. *See id.*

**Cost of Untangling Bioenergy Debtors**

Due in large measure to the integrated operations of the Bioenergy Debtors, as well as the overall integration of the other Abengoa entities, a substantial number of intercompany claims were created, which would be enormously time consuming, costly, and difficult to unwind and reconcile. *See id.* at ¶ 57; *see also* Wu Declaration (as defined below), ¶ 25 ("the intercompany claims preparation and reconciliation processes . . . can be quite time consuming and litigious") and ¶ 28 ("Generally speaking, creditors can be prejudiced by delays in case administration and closing that would occur if the cases are not consolidated, due to the time that would be required to prepare the inter-company claims and resolve any related litigation."). For example, the Missouri Liquidating Trustee believes that the Missouri Bioenergy Debtors undercharged the Debtor for shared services. And, of course, the Missouri Intercompany Claims are the product of hundreds of intercompany transactions undertaken by Missouri Bioenergy Debtors for the benefit of the Debtor.

Based on this evidence, the Missouri Bankruptcy Court (as defined below) ruled that the Missouri Debtors and the Official Committee of Unsecured Creditors in the Missouri Chapter 11 Cases (the "*Missouri Committee*") "demonstrated that the proposed consolidation structure is necessary and appropriate based on applicable case law because of the interrelationship among the [Missouri] Debtors, the significant benefits that the [Missouri] Plan provides to creditors in comparison to any potential harm that would result from confirmation of the [Missouri] Plan, and because creditors would be harmed if the [Missouri] Plan were not confirmed." Missouri Confirmation Order, ¶ II.

**Creditors dealt with the Bioenergy Debtors as a single unit**

Prepetition, many of the Missouri Bioenergy Debtors' creditors effectively treated the Missouri Bioenergy Debtors as a single entity. *See* Missouri Plan Memo of Law (as defined below), p. 37. It follows that the Debtor's creditors had similar expectations because as the owner of a bioenergy plant, which was part of a bioenergy conglomerate, the Debtor operated in a similar fashion to Abengoa Bioenergy Company, LLC ("*ABC*") and Abengoa Bioenergy of Nebraska, LLC ("*ABNE*"), who also owned at least one bioenergy plant as part of the same group. This is particularly the case for the Debtor, which was a startup plant in its operational

infancy. Upon information and belief, ABC acted as the entity that managed the Bioenergy Debtors' cash and typically would pay the expenses of the other Bioenergy Debtors. *See, e.g.,* Missouri Disclosure Statement, Arts. III.C.2.(b) and III.C.3. Thus, creditors would not obtain payment from the other operating Bioenergy Debtors such as the Debtor and instead would seek payment directly from ABC even if they performed services for another Bioenergy Debtor. In particular, upon information and belief, ABC used its bank (PPB) lines in this fashion to pay the expenses of other Bioenergy Debtors, including the Debtor. *See id.* at Art. III.C.3.

Indeed, certain of the Debtor's creditors supplied several bioenergy plants, and upon information and belief, received centralized payments not from the plant owners, but from ABC which served as centralized paymaster for the bioenergy group.

In summary, the entire U.S. Abengoa bioenergy group, which includes the Debtor, operated as a single integrated unit based in Missouri with shared officers and directors that would be difficult and costly to untangle.

## III. EVENTS LEADING TO THE CHAPTER 11 FILING

### A. Economic Challenges of the Bioenergy Business

The year preceding the Chapter 11 Case was marked by enormous disruption in the bioenergy industry. In the year leading up to the Petition Date, the average Crush Spread, a key measure of the profitability of corn ethanol production, based on Chicago Board of Trade (CBOT) corn and ethanol prices was approximately $0.4400/gallon. This compares drastically to the prior twelve-month period, in which Crush Spreads averaged over $0.9194/gallon. As a result of this deterioration in the market, a number of bioenergy facilities were forced to close, while others suffered a dramatic reduction in demand.

For the Debtor, while the initial costs of production of cellulosic ethanol gallons for the Ethanol Plant were higher than the first-generation production referred to above, these higher upfront costs came with production incentives, including (i) the federal cellulosic production credit, which provided a credit of approximately $1.50/gallon produced; and (ii) the California low-carbon intensity fuel credit, which provided a credit of approximately $1.20/gallon produced. These credits were intended to assist cellulosic ethanol producers in achieving commercial production and profitability.

### B. Economic Challenges of the Global Abengoa Business and Abengoa's Global Restructuring

At the height of Spain's economic crisis in early 2013, as the Spanish government struggled to pay the interest due on sovereign debt, subsidies for solar and wind power companies were dramatically curtailed. The cutbacks devastated Spain's renewable energy sector and many companies failed. Though Abengoa was able to survive this financial crisis, it was forced to issue substantial new debt to continue its global operations. From 2013 onward, Abengoa entered into or issued syndicated, bilateral, and other debt instruments totaling over $5 billion.

\\NY - 045867/000001 - 7840945 v11

### C. Abengoa's Financial Position and the Gonvarri Investment Agreement

During 2015, various factors, such as an insufficient upswing in the market in which the Abengoa Group operates and the difficulty of obtaining financing, precluded compliance with the Company's business plan. On July 31 2015, during Abengoa's results presentation for the first six months of 2015, Abengoa lowered its guidance for 2015 corporate free cash flow, which deepened existing market concerns regarding Abengoa's liquidity position, as well as raised concerns with its business partners and other shareholders regarding liquidity. These concerns adversely affected Abengoa's cash position, had a disruptive effect on its operations, contributed to a 27% decline in engineering and construction revenues in the third quarter of 2015 compared to the same period in the prior year, and caused the trading prices of Abengoa's Class A and Class B shares and outstanding bonds to fluctuate significantly during the third quarter and the beginning of the fourth quarter of the 2015 fiscal year.

In light of these developments, on September 24, 2015, as part of its comprehensive action plan aimed at improving its liquidity position and strengthening its corporate governance, Abengoa sought an equity raise to be underwritten by various financial institutions, which Abengoa was unable to secure. Further, Abengoa sought to secure an investment from Gonvarri Corporacion Financiera, S.L. ("*Gonvarri*"), a Gonvarri Steel Industries group company, and Waddell & Reed Investment Management, one of the main shareholders of Abengoa. Unfortunately, the Company was unable to consummate the Gonvarri transaction.

As no other proposal was received from any other potential subscriber that would immediately replace Gonvarri, the Company decided to initiate a refinancing process to try and reach an agreement with its main financial creditors, aimed to establish the framework to carry out such negotiations and provide the Abengoa Group with financial stability in the short and medium term. After a careful assessment of the situation and in order to provide the stability needed to carry out such negotiations with creditors, Abengoa's Board of Directors further announced on November 25, 2015, that it would continue negotiations with its creditors with the objective of reaching an agreement that ensures the Company's financial viability, under the protection of article 5 bis of the *Ley 22/2003 de 9 de julio, Concursal* (the "*Spanish Insolvency Law*"), a pre-insolvency statute that permits a company to enter into negotiations with certain creditors for restructuring its financial affairs.

### D. The Spanish Proceedings

On November 25, 2015, December 3, 15, and 28, 2015, January 27, 2016, and February 1, 2016, Abengoa and certain of its affiliates (collectively, the "*5 bis Companies*") filed notice with the Mercantile Court of Seville, Spain (the "*Spanish Court*") that they had commenced negotiations with their principal creditors in order to reach a global agreement on the refinancing and restructuring of their liabilities to achieve the viability of the Abengoa Group in the short and long term. The Spanish Court issued orders on December 14 and 22, 2015, and January 15, 2016, admitting the notices and granting the 5 bis Companies with the protection under the Spanish Insolvency Law.

\\NY - 045867/000001 - 7840945 v11

The Abengoa Group commenced negotiations with a large and diverse number of its main financial creditors, including a group of lenders that formed a coordinating committee, advised by Sullivan & Cromwell LLP, Uria Menendez Abogados, S.L.P.-C., and KPMG LLP, and an ad hoc committee of bondholders, advised by Clifford Chance LLP and Houlihan Lokey, Inc. The Abengoa Group, advised by Linklaters LLP, DLA Piper LLP (US), Alvarez & Marsal, Lazard Frères & Co., LLC and Madrid-based law firm Cortés, Abogados ("*Cortés*"), engaged with the coordinating committee and the ad hoc committee of bondholders regarding a restructuring, which led to Abengoa, S.A. and certain Delaware Debtors (as defined below) entering into a Standstill Agreement[3] and a Master Restructuring Agreement. Abengoa began preparing a business viability plan and the terms of a possible restructuring.

Alvarez & Marsal prepared a viability plan (the "*Viability Plan*") based on a preliminary review of specific projects, the existing project pipelines, and the most recent information and thinking with respect to asset disposals and financial debt. As part of this evaluation, Alvarez & Marsal evaluated (i) 200 projects, each above €2.5 million that covered 90% of the Abengoa Group's €8.6 billion backlog as of December 31, 2015, and (ii) each business line by region and operating division with the head of each business line.

On December 30, 2015 and January 25, 2016, Alvarez & Marsal presented the Board of Directors of the Abengoa Group with the Viability Plan that defined the structure of the future activity of the Abengoa Group. This Viability Plan was presented to the public in a conference call held on Wednesday, February 17, 2016. In broad general terms, this Viability Plan analyzed the old Abengoa Group, proposed a new business model for a new Abengoa Group, presented both valuation and cash flows, risks and opportunities, and set forth certain recommendations and conclusions as to the viability of the proposed new Abengoa Group. This plan did not contain a financial restructuring proposal, but was an operational plan.

With respect to the Debtor, generally, and the Hugoton Plant, specifically, the Viability Plan contemplated that Abengoa's second-generation bioenergy business would be sold or restructured as a stand-alone business.

E.      The Delaware Chapter 11 Cases

On March 29, April 6, and April 7, 2016 certain U.S. Abengoa entities in Abengoa's Bioenergy, Solar, and Engineering, Procurement, and Construction groups (collectively, the "*Delaware Debtors*") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "*Delaware Bankruptcy Court*"), Case No. 16-10790 (KJC) (collectively, the "*Delaware Chapter 11 Cases*").

On December 7, 2016, the Delaware Debtors filed the *Debtors' Modified First Amended Plans of Reorganization and Liquidation* [DE Docket No. 990] (the "*Delaware Plan*").

---

[3]      In order to provide the Abengoa Group with sufficient time to solicit and obtain the requisite creditor support for its financial restructuring plan, several Abengoa Group companies asked their financial creditors to adhere to a standstill agreement (the "*Standstill Agreement*") under which those financial creditors would stay certain rights and actions vis-à-vis the relevant Abengoa Group companies during a period of seven months from the date of the Standstill Agreement.

On December 15, 2016, the Delaware Bankruptcy Court entered the *Order Confirming Debtors' Modified First Amended Plans of Reorganization and Liquidation* [DE Docket No. 1042] (the "***Delaware Confirmation Order***"), which, among other things, approved the Delaware Plan's substantive consolidation of the Bioenergy and Maple Liquidating Debtors. *See* Delaware Confirmation Order, ¶ JJ; *see also* Delaware Plan, Arts. III.A.1 and IV.HH.

### F. The Missouri Chapter 11 Cases

On February 24, 2016, ABUS, ABO, ABT, Abengoa Bioenergy Engineering & Construction, LLC ("***ABEC***"), ABNE, and ABC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Missouri, Eastern Division (the "***Missouri Bankruptcy Court***"), jointly administered under Case No. 16-41161-659. Abengoa Bioenergy Meramec Renewable, LLC ("***ABMR***"), Abengoa Bioenergy Funding, LLC ("***ABF***"), Abengoa Bioenergy Maple, LLC ("***ABM***"), AB Ops, Abengoa Bioenergy of Indiana, LLC ("***ABI***"), and Abengoa Bioenergy of Illinois, LLC ("***ABIL***") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Missouri Bankruptcy Court on June 12, 2016 (collectively the "***Missouri Chapter 11 Cases***").

On March 2, 2017, the Missouri Debtors and the Missouri Committee filed the *Third Amended Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code* [MO Docket No. 1071] (the "***Missouri Disclosure Statement***"), which the Missouri Bankruptcy Court approved on that same day [MO Docket No. 1072]. *See* Summary of Missouri Plan Creditor Treatment, attached hereto as **Exhibit 6**. A copy of the Missouri Disclosure Statement, Missouri Plan, and Missouri Confirmation Order may be obtained from the website of the Missouri Debtors' claims agent: https://cases.primeclerk.com/Abengoa/. In support of the *Third Amended Joint Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code* [MO Docket No. 1070] (the "***Missouri Plan***") and the proposed separate substantive consolidation of (i) ABUS, ABO, ABT, ABEC, ABNE, ABC, ABMR, ABF, ABM, and AB Ops (collectively, the "***Missouri Bioenergy Debtors***" and collectively with the Bioenergy and Maple Liquidating Debtors, the "***Bioenergy Debtors***") and (ii) ABI and ABIL (collectively with the Missouri Bioenergy Debtors, the "***Missouri Debtors***") the Missouri Debtors also filed the (a) *Declaration of Christopher K. Wu in Support of Confirmation of the Third Amended Joint Plans of Liquidation under Chapter 11 of the Bankruptcy Code* [MO Docket No. 1306] (the "***Wu Declaration***"), (b) *Declaration of Sandra Porras Serrano in Support of Confirmation of the Third Amended Joint Plans of Liquidation under Chapter 11 of the Bankruptcy Code* [MO Docket No. 1307] (the "***Porras Declaration***"), and (c) *Memorandum of Law (i) in Support of Approval and Confirmation of Third Amended Joint Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code and (ii) in Response to Objections thereto* [MO Docket No. 1431] (the "***Missouri Plan Memo of Law***").

On June 8, 2017, the Missouri Bankruptcy Court entered the *Order Confirming Third Amended Joint Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code* [MO Docket No. 1443] (the "***Missouri Confirmation Order***"), which, among other things, approved the Missouri Plan's separate substantive consolidation of the Missouri Bioenergy Debtors and ABI and ABIL. In paragraph II of the Confirmation Order, the Missouri Bankruptcy Court found that "the proposed

consolidation structure is necessary and appropriate based on applicable case law because of the interrelationship among the [Missouri] Debtors, the significant benefits that the [Missouri] Plan provides to creditors in comparison to any potential harm that would result from confirmation of the [Missouri] Plan, and because creditors would be harmed if the [Missouri] Plan were not confirmed."

Pursuant to the Missouri Confirmation Order and Missouri Plan [MO Docket No. 1070] and the GUC Liquidating Trust Agreement dated June 30, 2017 [MO Docket No. 1439] (the "*Missouri Liquidating Trust Agreement*") approved thereby, Drivetrain, LLC was appointed as Liquidating Trustee for the Missouri Bioenergy Debtors. *See* Missouri Plan, Article IV.E; Missouri Liquidating Trust Agreement, Recitals.

The Missouri Plan's Effective Date (as defined in the Missouri Plan) occurred on July 6, 2017. *See Notice of (i) Entry of Confirmation Order, (ii) Occurrence of Effective Date under the Third Amended Joint Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code, (iii) Deadline to File Requests for Payment of Administrative Claims, (iv) Deadline for Professionals to File Final Fee Applications Pursuant to Sections 328, 330, and 503(b) of the Bankruptcy Code and (v) Deadline to File Claims arising from Rejection of Executory Contracts or Unexpired Leases* [MO Docket No. 1458].

## IV.     MATERIAL EVENTS OF THE CHAPTER 11 CASE

### A.     Involuntary Petition, Request to Transfer Venue, and Appeals Processes.

On March 23, 2016, three creditors (the "*Petitioning Creditors*") asserting then-disputed state law lien claims against the Debtor filed an involuntary petition in the Bankruptcy Court under chapter 7 of the Bankruptcy Code.

On April 25, 2016, the Bankruptcy Court entered an order [Docket No. 69] denying the Debtor's motion to transfer venue of the Chapter 11 Case to the United States Bankruptcy Court for the District of Delaware, where several of the Debtor's affiliates' chapter 11 cases are being administered. Among other things, the Bankruptcy Court held that "ABBK is a Kansas limited liability company organized in 2006 and is part of Abengoa's United States bioenergy group of subsidiaries and affiliates."

On May 2, 2016, the Debtor filed a motion for leave to appeal the denial of transfer of venue directly to the United States Court of Appeal for the 10th Circuit [Docket No. 78] (the "*Motion for Leave*"), a motion to stay this Chapter 11 Case pending appeal [Docket No. 79] ("*Stay Motion*"), and a Notice of Appeal and Statement of Election [Docket No. 81] (the "*Appeal*"). On May 5, 2016, the Debtor filed an emergency motion with the United States Bankruptcy Appellate Panel for the Tenth Circuit (the "*10th Circuit BAP*") to stay this Chapter 11 Case pending decision of the Bankruptcy Court regarding staying the case [10th Cir. BAP Docket No. 4]. On May 6, 2016, the Bankruptcy Court entered an order [Docket No. 97] denying the Stay Motion.

On May 8, 2016, the Debtor filed a supplement [10th Cir. BAP Docket No. 13] to its emergency motion to stay this case pending appeal with the 10th Circuit BAP. On May 16,

\\NY - 045867/000001 - 7840945 v11

2016, the 10th Circuit BAP denied the Debtor's emergency motion for stay of the Chapter 11 Case pending appeal. *See In re Abengoa Bioenergy Biomass of Kansas, LLC*, BAP Appeal No. KS-16-012 (10th Cir. BAP, May 16, 2016) (denying stay pending appeal) [10th Cir. BAP Docket No. 25]. On May 26, 2016, the Bankruptcy Court entered an order denying the Motion for Leave. On June 23, 2016, the 10th Circuit BAP entered an order dismissing the Appeal [Docket No. 214; 10th Cir. BAP Docket No. 38], which was agreed to by the Debtor and the appellees.

**B.      Conversion to Chapter 11 and Entry of Certain Orders.**

On April 8, 2016, the Bankruptcy Court entered an order [Docket No. 33] converting the case to a case under chapter 11 of the Bankruptcy Code. The Debtor is a debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. While substantially all of the Debtor's assets have been sold, the Debtor remains in possession of its remaining assets and continues to operate its business without interruption. As described in more detail herein, the Debtor has sold substantially all of its assets to a third-party purchaser.

During the course of the Chapter 11 Case, the Bankruptcy Court entered orders that, among other things, permitted the Debtor to make certain payments to employees and continue an expense reimbursement policy [Docket No. 291], and authorized the Debtor to pay certain pre-conversion and post-conversion insurance-related obligations [Docket No. 354]; and

**C.      Schedules and Statements.**

On May 20, 2016, the Debtor filed its Schedules and Statement of Financial Affairs [Docket Nos. 120 and 121], which were signed by Sandra Porras Serrano, the Debtor's Chief Financial Officer and the Chief Financial Officer for the Abengoa Group's U.S. bioenergy unit. The Debtor's Schedules listed the intercompany claims held by ABC, ABT, ABEC, and ABO as non-contingent, liquidated, and undisputed. *See id.*

On May 19, 2017, almost one year after the Debtor originally filed its Schedules, the Debtor filed its amended Schedule E/F [Docket No. 859] in order to (i) list the intercompany claims held by ABC, ABT, ABEC, and ABO as contingent, unliquidated and disputed, and (ii) list the DOE's asserted claim as disputed.

**D.      Retention and Employment of the Debtor's Bankruptcy Professionals.**

During the Chapter 11 Case, the Bankruptcy Court approved the Debtor's retention and employment of the following Professionals to assist in the administration of the Debtor's Chapter 11 Case: (i) DLA Piper LLP (US), as bankruptcy counsel to the Debtor [Docket No. 260]; (ii) Armstrong Teasdale LLP, as local bankruptcy counsel to the Debtor [Docket No. 261]; (iii) Josh Barker, Esq. as special litigation counsel to the Debtor [Docket No. 579]; and (iv) Ocean Park Advisors, LLC, as investment banker [Docket No. 259].

**E.      DIP Financing.**

In the ordinary course of its business, the Debtor required cash on hand to fund its working capital, liquidity needs and other routine payables. In addition, the Debtor required financing to fund its Chapter 11 Case and to explore restructuring alternatives, including a 363

\\NY - 045867/000001 - 7840945 v11

sale of all of its assets. Accordingly, during the course of this Chapter 11 Case, the Debtor sought and obtained approval from the Bankruptcy Court to obtain post-petition financing in the principal aggregate amount of up to $3,690,000 (the "*DIP Financing*") from Reich Brothers Business Solutions, LLC or its designee (the "*DIP Lender*"). On June 24, 2016, the Bankruptcy Court entered a final order approving the DIP Financing (the "*DIP Order*") [Docket No. 217]. On the Closing Date of the sale of substantially all of its assets, and in advance of the Maturity Date under the DIP Order, the Debtor satisfied in full all of its indebtedness and other obligations under the DIP Financing to the DIP Lender.

### F. Appointment of Creditors' Committee.

On June 14, 2016, an Official Committee of Unsecured Creditors (the "*Creditors' Committee*") was appointed by the United States Trustee [Docket No. 177]. The Creditors' Committee comprises: (i) Stoppel Dirt Inc.; (ii) Equipment Pro, Inc.; and (iii) Western Reserve Water Systems. On August 8, 2016, the Bankruptcy Court approved the retention of Baker & Hostetler LLP as primary counsel to the Creditors' Committee [Docket No. 342] and Robert L. Baer [Docket No. 343] as local counsel to the Creditors' Committee. On September 14, 2016, the Bankruptcy Court approved the retention of MelCap Partners LLC as financial advisor to the Creditors' Committee [Docket No. 427].

### G. Key Employee Retention Plan and Incentive Plan.

On August 25, 2016, the Bankruptcy Court approved the Debtor's key employee retention plan [Docket No. 395] (the "*KERP*"), permitting the Debtor to make certain bonus payments to three key, non-insider employees in order to retain them during the marketing and sale of the Hugoton Plant. The KERP provides that KERP payments would be made as follows: (i) 30% upon entry of the order approving the KERP, and (ii) 70% upon closing of a sale of the Hugoton Plant. To be eligible for each of the payments under the KERP, the employee was required to be an employee of the Debtor on the installment date(s) set forth above. There were three participants in the KERP, with payments totaling $85,486.

Moreover, on October 13, 2016, the Bankruptcy Court entered a stipulated order (the "*KEIP Order*") approving the Debtor's key employee incentive plan (as amended by the KEIP Order, the "*KEIP*") for three eligible insider and non-insider employees. The KEIP provides that KEIP payments would be made upon repayment in full of (i) DIP Financing (the "*Tier 1 Payment*"), and (ii) all allowed mechanic's liens (the "*Tier 2 Payment*"). To be eligible for the KEIP, the participant must (i) be an employee of the Debtor on the milestone dates set forth above, and (ii) execute, without revocation within any statutorily recognized revocation period, a general release of known and unknown claims existing as of the release date in favor of the Debtor and its affiliated persons and entities in a form satisfactory to the Debtor. The total aggregate Tier 1 Payments is $176,349 and the total aggregate Tier 2 Payments is $178,171.

The KEIP Order provides that the KEIP shall not be effective until such time as (i) each of the Debtor's affiliates with scheduled or timely filed claims against the Debtor shall have agreed in writing that its claims will be subordinated, and (ii) with respect to affiliates whose claims are scheduled or otherwise timely filed, the subordination of such claims is approved in the bankruptcy cases in which such affiliates are debtor entities, including: (A) Case

No. 16-41161 in the Eastern District of Missouri, (B) Case No. 16-10754 in the District of Delaware, and (C) Case No. 16-10790 in the District of Delaware. To date, no payments under the KEIP have been made.

To be consistent with Article VI.A of the Missouri Plan, the Plan provides that despite the KEIP Order, the KEIP, which amount, for the avoidance of doubt, shall not exceed the aggregate amount of $354,520.00, shall be paid prior to any distribution to the General Unsecured Claims.

## H.    Exclusivity Extensions.

On October 1, 2016, the Bankruptcy Court entered an order [Docket No. 407] granting the Debtor's request, pursuant to section 1121(d) of the Bankruptcy Code, to extend the Debtor's exclusivity period to file a plan of reorganization and solicit acceptances thereof to December 6, 2016 and February 2, 2017, respectively (together, the "**Exclusivity Periods**"). On December 21, 2016, the Bankruptcy Court entered an order [Docket No. 641] further extending the Exclusivity Periods to March 6, 2017 and May 8, 2017, respectively. On March 7, 2017, the Bankruptcy Court entered an order [Docket No. 762] further extending the Exclusivity Periods to April 20, 2017 and June 22, 2017, respectively. The Debtor's exclusivity lapsed on June 22, 2017 prior to the filing of the Plan.

## I.    Sale of Substantially All of the Debtor's Assets.

In an exercise of due diligence and following extensive consultation with its advisors, the Debtor determined that maximizing the value of its estate would be best accomplished through a sale, free and clear of liabilities, of the Debtor's assets. On July 12, 2016, the Bankruptcy Court approved the Debtor's engagement of Ocean Park Advisors, LLC ("**OPA**"), *nunc pro tunc* to April 19, 2016, as the Debtor's investment banker to assist in the marketing and sale of its assets [Docket No. 259].

The Debtor, OPA, and the Debtor's other professionals undertook extensive marketing efforts to identify potential purchasers of substantially all of the Debtor's assets, the centerpiece of which was the Hugoton Plant. Specifically, OPA began marketing the Hugoton Plant during the week of June 20, 2016 and contacted a wide range of strategic and financial investors in connection with the potential sale. In total, OPA contacted 212 potential buyers and 28 intermediaries, of which 60 executed (comprising 48 distinct parties) a non-disclosure agreement with the Debtor to gain access to confidential and supplemental diligence information in a virtual data room. In addition, OPA arranged 24 total site visits (from 18 distinct parties) to the Hugoton Plant.

Subsequently, the Debtor received eight non-binding letters of intent. In consultation with OPA and the Debtor's other professionals, the Debtor analyzed and considered the various bid packages. The Debtor ultimately entered into a stalking horse purchase agreement, dated October 12, 2016, with Shell Oil Company ("**Shell**"), for the purchase and sale of the Hugoton Plant for $26 million.

The *Debtor's Motion for Entry of an Order (I) (A) Approving and Authorizing Bidding Procedures in Connection with the Sale Substantially all of the Debtor's Assets,*

18

*(B) Approving Stalking Horse Protections, (C) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Notice Thereof, and (II) (A) Authorizing the Sale of Substantially all of the Debtor's Assets Free and Clear of All Liens, (B) Approving The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [Docket No. 467] (the "**Sale Motion**") set forth certain bidding procedures that would govern: (i) the bidding process for the sale of the Debtor's assets (the "**Sale**"), and (ii) procedures for the assumption and assignment of certain of the Debtor's executory contracts and unexpired leases. On October 14, 2016, the Bankruptcy Court entered an Order [Docket No. 481] (the "**Bid Procedures Order**") approving, among other things, the bidding procedures requested in the Sale Motion.

Following entry of the Bid Procedures Order, OPA led an exhaustive remarketing process ahead of the final bid deadline of November 18, 2016. The re-marketing process resulted in one additional qualified bid package from Synata Bio, Inc. ("**Synata**"). The Debtor invited Shell and Synata to attend an auction on November 21, 2016 at the offices of the Debtor's co-counsel, Armstrong Teasdale LLP in St. Louis, Missouri. At the close of the auction, Synata was determined to be the successful bidder of substantially all of the Debtor's assets (the "**Purchased Assets**") for a purchase price of $48.5 million, plus an agreement by Synata to use best efforts to enter into either (a) an agreement with the DOE pursuant to which the Debtor's rights and obligations related to the ABBK Award would be assumed and assigned to Synata, or (b) a novation of the ABBK Award.

On October 13, 2016, the DOE objected to the Debtor's bidding procedures motion [Docket No. 477], arguing that, pursuant to the ABBK Award, the Debtor was not entitled to sell the Ethanol Plant without accounting for "DOE's cost-share percentage with respect to property interests [of the DOE] in the [Ethanol Plant] and any proceeds from a Sale." *Id.*, ¶ 7. Further, on November 10, 2016, the DOE objected to the Sale [Docket No. 528] (the "**DOE Sale Objection**"), arguing that the Ethanol Plant could not be considered estate property due, in part, to "DOE's comprehensive control over its financial assistance awards[.]" *See* DOE Sale Objection, ¶ 6.

On November 19, 2016, the Debtor filed its response to the DOE Sale Objection [Docket No. 546] (the "**Debtor's Response**"), noting that the DOE had an investment interest in the Ethanol Plant, "much like any investor ... has in an entrepreneur[]" but that the DOE did not "control" the Debtor in any meaningful way. *See* Debtor's Response, ¶ 15. As further described in Article II above, and for the reasons fully set forth in the Debtor's Response, the Debtor believes that the ABBK Award, unlike the fully repaid LGP Loan, may be characterized as an equity investment in the Debtor, given it was an investment made to further serve the goals and objectives of the United States government.

On November 29, 2016, the Bankruptcy Court entered an order approving the sale and successful bid of the Purchased Assets [Docket No. 578] (the "**Sale Order**"). The sale of the Purchased Assets closed on December 8, 2016 (the "**Closing**"). With respect to the DOE's claimed interest, the Sale Order provided for the DOE's reservation of rights to assert its alleged cost-share interest in the Ethanol Plant, but only against the proceeds of the Sale. Specifically, the Sale Order states as follows:

Under the ABBK Award, the DOE asserts that it provided the Debtor with $95,452,893 (27.24%) of the $350,409,271 necessary for the construction, startup, and commissioning of the Plant (as defined in the Asset Purchase Agreement). The DOE reserves all rights to seek payment from the Debtor on account of the percentage of DOE's asserted cost-share interest, pursuant to its as-filed proof of claim [Claim No. 81] (the "DOE Claim"), but only against the proceeds of the Sale. Nothing in this Order shall serve as a bar to or waiver of the DOE Claim or right to assert its cost share interest, and, to the extent that the DOE Claim and cost share interest is ultimately determined to be valid, it shall attach to the proceeds of the Sale. For the avoidance of doubt, upon the closing, the DOE Claim ... shall attach to and may be asserted solely against the proceeds of the Sale ... (*See* Sale Order, ¶ 29)

**J.      Claims Process and Bar Dates.**

**Section 341 Meeting of Creditors**. On June 9, 2016, the U.S. Trustee held the meeting of creditors in the Chapter 11 Case pursuant to section 341(a) of the bankruptcy code.

**Bar Dates**. Pursuant to the Bar Date Order [Docket No. 408], the Bankruptcy Court established (i) September 30, 2016, at 4:00 p.m. (CT) as the deadline for creditors (other than governmental units) to file proofs of claim in the Chapter 11 Case (the "*General Bar Date*"); (ii) October 17, 2016, at 5:00 p.m. (CT) as the Initial Administrative Claims Bar Date; and (iii) October 5, 2016, at 4:00 p.m. (CT) as the Governmental Bar Date (the "*Governmental Bar Date*" and collectively, the "*Bar Dates*"). Notice of the Bar Dates was served on all potential creditors of the Debtor's estate on September 3, 2016, and was published in the New York Times on September 8, 2016.

**Intercompany Claims**. Prior to the Petition Date, ABBK and certain of its affiliates (as that term is defined in section 101(2) of the Bankruptcy Code, the "*Affiliates*"), engaged in certain intercompany transactions, including transactions related to the construction, start-up and commissioning of the Hugoton Plant. Certain of those Affiliates are chapter 11 debtors in the Delaware Chapter 11 Cases and the Missouri Chapter 11 Cases, (collectively, the "*Affiliate Cases*").

The Debtor and each of the Affiliates, as the case may be, have filed agreed extensions in this Chapter 11 Case and in the Affiliate Cases, respectively, for the deadline by which the Affiliates and/or the Debtor must file intercompany proofs of claim against one another, while the parties attempt to negotiate a global agreement related thereto (the "*Intercompany Extensions*"). Specifically, in this Chapter 11 Case, on each of October 4, 2016 [Docket No. 456], November 1, 2016 [Docket No. 511], December 16, 2016 [Docket No. 624], January 27, 2017 [Docket No. 693], March 15, 2017 [Docket No. 772], April 27, 2017 [Docket No. 829], May 9, 2017 [Docket No. 843] and May 12, 2017 [Docket No. 849], the Bankruptcy Court entered orders approving the Intercompany Extensions. The deadline for filing Intercompany Claims was May 23, 2017.

On May 23, 2017, certain Missouri Bioenergy Debtors filed the following claims that were signed by Sandra Porras, the Debtor's Chief Financial Officer, in almost the exact

amounts that the Debtor had originally scheduled them as non-contingent, liquidated, and undisputed: (i) Proof of Claim No. 93 filed by ABEC in the amount of $1,883,354.84; (ii) Proof of Claim No. 94 filed by ABT in the amount of $10,905,144.17; (iii) Proof of Claim No. 95 filed by ABC in the amount of $55,044,643.41; and (iv) Proof of Claim No. 96 filed by ABO in the amount of $1,671,790.74 (collectively, the "*Missouri Intercompany Claims*").

      **The DOE Claim**. On October 4, 2016, one day prior to the Governmental Bar Date, the DOE filed its Proof of Claim [Claim No. 81-1] (the "*DOE Claim*"), alleging an unliquidated interest in the Debtor's property. The DOE Claim is further described in paragraph 29 of the Sale Order, as quoted in Section IV.I above.

      The Court may reach one of at least three (3) determinations with respect to the DOE's Claim, each of which would lead to an alternative recovery for creditors in this Chapter 11 Case:

1. The Court may determine that, with respect to the ABBK Award, and unlike the LGP Loan, the DOE holds an equity interest in the Debtor's estate. In the event the Court makes such a determination, the unsecured creditors' recoveries will be substantially similar to those set forth herein and in the Plan.

2. The Court may determine that the funds against which the DOE asserts an interest are not property of the estate. In the event the Court makes such a determination, the unsecured creditors' recoveries may be less than half of the projected amounts set forth herein and in the Plan.

3. The Court may determine that the DOE's Claim is no different from a claim of any other unsecured creditor. In the event the Court makes such a determination, any distributions made to Holders of Claims in Class 2 (General Unsecured Creditors) will be made *pari passu* with distributions on account of the DOE's Claim, whatever that amount is determined to be by this Court.

      Instead of the uncertainty related to these potential outcomes, the Debtor settled the DOE Claim and related adversary proceeding in exchange for $3.4 million in cash [Docket No. 975].

## K.    Lienholder Claims, Litigation and Settlements.

      Prior to the General Bar Date, twenty-three (23) parties asserting state-law mechanic's liens, including the Petitioning Creditors (the "*Lienholders*"), filed secured proofs of claim against the Debtor in the aggregate total amount of $16,849,479.41 (the "*Lienholder Claims*"). Certain of these lienholders were parties to prepetition state-court litigation which was removed to the Bankruptcy Court as an adversary case on September 21, 2016 [Case No. 16-05151, Docket No. 2], and others filed adversary complaints against the Debtor in various adversary cases [Case Nos. 16-05090, 16-05104, 16-05116, 16-05117, 16-05118 and 16-05146] (collectively, the "*Adversary Litigation*").

Beginning after the Closing of the Sale, the Debtor and the Lienholders initiated settlement discussions with respect to the Lienholder Claims and the Adversary Litigation. On February 3, 2017, following extensive negotiations between the parties, the Debtor filed a motion to approve settlement agreements with 22 of the 23 Lienholders [Docket No. 700], and, on February 27, 2017, filed a supplemental motion to approve a settlement agreement with the final Lienholder [Docket No. 753] (together, the "***Settlement Motion***"). Pursuant to the Settlement Motion, in exchange for the release of claims against the Debtor (and, in certain cases, its affiliates) and the dismissal of the Adversary Litigation, as applicable, the Debtor, with the support of the Creditors' Committee, made payments on account of the Lienholder Claims for less than 100% on the dollar to each of the Lienholders, resulting in a substantial savings and a source of additional recovery for unsecured creditors under the Plan. On February 14, 2017, the Bankruptcy Court entered an order approving the Settlement Motion with respect to the initial 22 of 23 Lienholders [Docket No. 715] and on April 6, 2017, the Bankruptcy Court entered a supplemental order approving the Settlement Motion with respect to the final Lienholder [Docket No. 786] (together, the "***Settlement Order***").

### L.    Debtor's Plan

On April 14, 2017, the Debtor filed the *Debtor's Plan of Liquidation pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 811] (the "***Debtor's Plan***") and on May 21, 2017 the Debtor filed the *First Amended Disclosure Statement for Debtor's Plan of Liquidation dated as of April 14, 2017 pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 863] (the "***Debtor's Disclosure Statement***"), which Disclosure Statement the Court approved on May 23, 2017 [Docket No. 872]. The confirmation hearing on the Debtor's Plan is currently set for hearing on [•], 2017 at 9:00 a.m. Central.

On July 7, 2017, the Missouri Liquidating Trustee filed an objection to the Debtor's Plan [Docket No. 931] in which it argued that the Debtor's Plan is unconfirmable because it violates (i) section 1129(a)(1) of the Bankruptcy Code because disallowing the Missouri Intercompany Claims without any justification therefore and without any objection having been filed to their proofs of claim violates, *inter alia*, section 502(b) of the Bankruptcy Code; (ii) the "best interests of creditors" test under section 1129(a)(7) of the Bankruptcy Code because the Missouri Intercompany Claims would plainly receive more in a chapter 7 liquidation than under the Debtor's Plan as demonstrated by the Debtor's own Liquidation Analysis attached to the Debtor's Disclosure Statement, (iii) section 1122(a) of the Bankruptcy Code because it gerrymanders the classes to treat Missouri Intercompany Claims dramatically worse than other unsecured creditors, and (iv) section 1129(b)(1) of the Bankruptcy Code because it discriminates unfairly and is not fair and equitable as it provides a purported 95% recovery (not taking into account the proposed DOE settlement) to General Unsecured Claims while providing no recovery at all to the Missouri Intercompany Claims. For additional information about the Debtor's Plan, please see Article VIII.A.

## V. THE CHAPTER 11 PLAN

### A. Treatment of Claims and Equity Interests Under the Plan.

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1.

The Claims against the Debtor are divided into Classes according to their seniority and other criteria. The Classes of Claims for the Debtor and the funds and other property to be distributed under the Plan are described more fully below.

THE MISSOURI LIQUIDATING TRUSTEE BELIEVES THAT THE PLAN AFFORDS CREDITORS THE POTENTIAL FOR THE GREATEST REALIZATION OF THE VALUE OF THE DEBTOR'S ASSETS.

#### 1. Administrative Claims.

##### (a) Administrative Claims.

The Liquidating Trustee shall pay, from the Debtor's assets, each holder of an Allowed Administrative Claim, in satisfaction of such Allowed Administrative Claim, the full unpaid amount of such Allowed Administrative Claim in Cash: (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (3) at such time and upon such terms as may be agreed upon by such holder and the Liquidating Trustee; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however, that Administrative Claims do not include Administrative Claims filed after the Administrative Claims Bar Date or Administrative Claims filed or asserted pursuant to section 503(b)(9) of the Bankruptcy Code after the General Bar Date, unless the Liquidating Trustee, in its discretion, chooses to treat such Claims as Administrative Claims.

##### (b) Administrative Claims Bar Date.

Except as otherwise provided, on or before the Final Administrative Claims Bar Date, any Person or Entity that seeks allowance of an Administrative Claim shall file with the Bankruptcy Court and serve on counsel for (i) the Debtor, (ii) the Creditors' Committee, and (iii) the Liquidating Trustee, any request for payment of an Administrative Claim arising after May 31, 2016. Requests for payment of an Administrative Claim must include at a minimum: (i) the name of the holder seeking allowance of an Administrative Claim; (ii) the amount of the Administrative Claim sought; (iii) the basis asserted for allowance of the Administrative Claim; and (iv) all supporting documentation that justify allowance of the Administrative Claim asserted.

The request for payment of an Administrative Claim will be considered timely filed only if it is filed with the Bankruptcy Court and actually received by parties identified in

Article II.A of the Plan by the Final Administrative Claims Bar Date. Requests for payment of Administrative Claims may not be delivered by facsimile, telecopy, or electronic mail transmission.

### (c)   Accrued Professional Compensation Claims.

The deadline for submission by Professionals for Bankruptcy Court approval of Accrued Professional Compensation shall be sixty (60) days after the Effective Date. Any Professional or other Person or Entity that is required to file and serve a request for approval of Accrued Professional Compensation and fails to timely file and serve such request on or before such date shall be forever barred, estopped and enjoined from asserting such request or participating in Distributions under the Plan on account thereof. All Professionals employed by the Debtor or the Creditors' Committee, shall provide to the Debtor an estimate of their Accrued Professional Compensation through the Effective Date (including an estimate for fees and expenses expected to be incurred after the Effective Date to prepare and prosecute allowance of final fee applications) before the Effective Date.

### (d)   Priority Tax Claims.

The Liquidating Trustee shall pay, from the Debtor's assets, each holder of an Allowed Priority Tax Claim, in satisfaction of such Allowed Priority Tax Claim, the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the later of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law; provided, however that the Liquidating Trustee shall not pay any premium, interest or penalty in connection with such Allowed Priority Tax Claim.

### (e)   Other Priority Claims.

The Liquidating Trustee shall pay, from the Debtor's assets, each holder of an Allowed Other Priority Claim, in satisfaction of such Allowed Other Priority Claim, the full unpaid amount of such Allowed Other Priority Claim in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date such Allowed Other Priority Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Other Priority Claim is payable under applicable non-bankruptcy law.

### 2.   Classification of Claims and Equity Interests.

### (a)   Classified Claims Against and Equity Interests in the Debtor.

Except as set forth in the Plan, all Claims against and Equity Interests are placed in a particular Class. The Missouri Liquidating Trustee has not classified Administrative Expense Claims, Accrued Professional Compensation Claims, Priority Tax Claims, or Other Priority Claims.

The following table shows the classification of Claims against and Equity Interests in the Debtor for all purposes, including voting, confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan

deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies <u>within</u> the description of that Class and deems a Claim classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Each Class set forth below is treated under the Plan as a distinct Class for voting and Distribution purposes.

Subject to all other applicable provisions of the Plan (including its Distribution provisions), classified Claims shall receive the treatment described in Article III of the Plan. The Plan will not provide any Distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties.

| Class | Claims & Interest | Status | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------------|--------|-----------|------------------|--------------------|
| 1 | Secured Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 2 | General Unsecured Claims | Impaired | Pro Rata Share of Liquidating Trust Cash | Yes | 33% |
| 3 | Non-Missouri Intercompany Claims | Impaired | No Distribution | No (deemed to reject) | 0% |
| 4 | Equity Interests | Impaired | No Distribution | No (deemed to reject) | 0% |

### 3. Treatment of Claims and Equity Interests.

#### (a) Secured Claims (Class 1).

Except to the extent that a holder of an Allowed Secured Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable classification and treatment, each holder of an Allowed Secured Claim shall receive, at the sole option of the Liquidating Trustee, Cash in the full amount of such Allowed Secured Claim or the collateral securing its Allowed Secured Claim, on or as soon as practicable after the latest to occur of (i) the Effective Date; (ii) the first Business Day after the date that is ten (10) Business Days after the date such Claim becomes an Allowed Other Secured Claim; and (iii) the date or dates agreed to by the Liquidating Trustee and the holder of the Allowed Secured Claim.

#### (b) General Unsecured Claims (Class 2).

Except to the extent that a holder of an Allowed General Unsecured Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable classification and treatment, each holder of an Allowed General Unsecured Claim shall receive their Pro Rata share of remaining Cash, provided that distributions to holders of Allowed Missouri Intercompany Claims shall be limited to the extent necessary to permit General Unsecured Claims other than Missouri Intercompany Claims to receive percentage distributions hereunder equaling no less than the percentage distributions received by General Unsecured Claims classified as Bioenergy Class 2 in the Missouri Plan calculated as if the Debtor was substantively consolidated with the

Missouri Bioenergy Debtors. The Kansas KEIP, which amount, for the avoidance of doubt, shall not exceed the aggregate amount of $354,520.00, shall be paid prior to any distribution to the General Unsecured Claims. Distributions to holders of Allowed General Unsecured Claims shall be made as soon as practicable as the Liquidating Trustee may determine in its sole discretion.

As a result of the Missouri Bioenergy Debtors agreeing to voluntarily reduce the Allowed amount of the Missouri Intercompany Claims as set forth above, it is estimated that the General Unsecured Claims will receive an estimated recovery of 33%, compared to a 19% recovery if the Missouri Intercompany Claims are Allowed in full with *pro rata* treatment. *See* Introduction at page 1 above and Exhibit 2 (Recovery Analysis) hereto for the bases for, and further explanation of, this estimated recovery.

### (c) Non-Missouri Intercompany Claims (Class 3).

Holders of Non-Missouri Intercompany Claims will receive no Distribution under the Plan.

### (d) Equity Interests (Class 4).

Holders of Equity Interests will receive no Distribution under the Plan. All equity interests in the Debtor shall be deemed cancelled upon the Effective Date.

## B. Means for Implementation of the Plan.

### 1. Establishment of Liquidating Trust.

On the Effective Date, the Liquidating Trustee shall sign the Liquidating Trust Agreement and, in his capacity as Liquidating Trustee, accept all Liquidating Trust Assets on behalf of the beneficiaries thereof, and be authorized to obtain, seek the turnover, liquidate, and collect all of the Liquidating Trust Assets not in his or her possession. The Liquidating Trust will then be deemed created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date. The Liquidating Trust shall be established for the purposes of (i) liquidating any non-Cash Liquidating Trust Assets; (ii) prosecuting and resolving the obligations incurred by the Liquidating Trustee in administering the Plan and the Liquidating Causes of Action; (iii) maximizing recovery of the Liquidating Trust Assets for the benefit of the beneficiaries thereof; and (iv) distributing the proceeds of the Liquidating Trust Assets to the beneficiaries in accordance with the Plan and the Liquidating Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary for, and consistent with, the liquidating purpose of the Liquidating Trust.

### 2. Appointment of the Liquidating Trustee.

The Liquidating Trustee shall be appointed by the Plan Proponent pursuant to the Plan and the Confirmation Order. It is contemplated that Drivetrain, LLC, the Liquidating Trustee in the Missouri Chapter 11 Cases and an experienced liquidating trustee, will be the Liquidating Trustee in this Chapter 11 Case. Following appointment, the Liquidating Trustee shall have the same powers as the board of directors and officers of the Debtor, subject to the provisions of the Plan (and all bylaws, articles of incorporation and related corporate documents

\\NY - 045867/000001 - 7840945 v11

are deemed amended by the Plan to permit and authorize the same). In the event of resignation or removal, death or incapacity of the Liquidating Trustee, the Plan Proponent shall designate another Person or Entity to serve as Liquidating Trustee and thereupon the successor Liquidating Trustee, without any further act or need for an order of the Bankruptcy Court, shall become fully vested with all of the rights, powers, duties and obligations of the predecessor; provided, however, that the Liquidating Trustee shall be deemed removed on the date the Chapter 11 Case is closed, and no successor thereto shall be designated. The Liquidating Trustee shall be entitled to compensation payable from the Liquidating Trust Assets as set forth in the Liquidating Trust Agreement.

### 3. Beneficiaries of Liquidating Trust.

The holders of General Unsecured Claims against the Debtor entitled to Distributions shall be the beneficiaries of the Liquidating Trust. Such beneficiaries shall be bound by the Liquidating Trust Agreement. The interests of the beneficiaries in the Liquidating Trust shall be uncertificated and nontransferable except upon death of the interest holder or by operation of law.

### 4. Vesting and Transfer of Liquidating Trust Assets to the Liquidating Trust.

Pursuant to Bankruptcy Code section 1141(b), the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Liens, Claims and Interests, except as otherwise specifically provided in the Plan or in the Confirmation Order; provided, however, that the Liquidating Trustee may abandon or otherwise not accept any non-Cash Liquidating Trust Assets that the Liquidating Trustee believes, in good faith, have no value to the Liquidating Trust. Any non-Cash Liquidating Trust Assets that the Liquidating Trustee so abandons or otherwise does not accept shall not be property of the Liquidating Trust. The Liquidating Trust Assets include claims against third parties. These claims include, but are not limited to, preference, fraudulent transfer and other avoidance claims pursuant to chapter 5 of the Bankruptcy Code and state law counterparts. These claims will be preserved and transferred to the Liquidating Trust.

### 5. Liquidating Trust Expenses.

Subject to the provisions of the Liquidating Trust Agreement, all costs, expenses Trust, or in any manner connected, incidental or related thereto, in effecting distributions from, as applicable, the Liquidating Trust shall be a charge against the Liquidating Trust Assets remaining from time to time in the hands of the Liquidating Trustee. Such expenses shall be paid in accordance with the Liquidating Trust Agreement.

### 6. Role of the Liquidating Trustee.

The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust and the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect the Liquidating Trust Assets; (b) pay taxes or other obligations incurred by the Liquidating Trust; (c) retain and compensate, without further order of

the Bankruptcy Court, the services of employees, professionals and consultants to advise and assist in the reasonable administration, prosecution and distribution of Liquidating Trust Assets; (d) calculate and implement Distributions of Liquidating Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Liquidating Trust Agreement, Causes of Action vested in the Liquidating Trust; (f) resolve issues involving Claims and Interests in accordance with the Plan; and (g) undertake all administrative functions of the Debtor's Chapter 11 Case, including the payment of fees payable to the United States Trustee and the ultimate closing of the Debtor's Chapter 11 Case. The Liquidating Trust is the successor to the Debtor and its Estate.

On the Effective Date, the Liquidating Trust shall: (a) take possession of all books, records, and files of the Debtor and its Estate; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trust determines, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or required.

The Liquidating Trustee may invest Cash in the Liquidating Trust (including any earnings thereon or proceeds therefrom) in any manner permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

The Liquidating Trust shall have the right to object to Claims not otherwise Allowed in connection with post-Effective Date Claims allowance process.

In no event later than thirty (30) Business Days after the end of the first full month following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidating Trust has been distributed in accordance with the Plan, the Liquidating Trustee shall file with the Bankruptcy Court a report setting forth the amounts, recipients and dates of all Distributions made by the Liquidating Trustee under the Plan through each applicable reporting period.

The Liquidating Trustee shall file tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with the Plan. The Liquidating Trust shall also annually (for tax years in which Distributions from the Liquidating Trust are made) send to each beneficiary a separate statement setting forth the beneficiary's share of items of income, gain, loss, deduction or credit, and all such holders shall report such items on their federal income tax returns; provided, however, that no such statement need be sent to any Class that is not expected to receive any Distribution from the Liquidating Trust. The Liquidating Trust's taxable income, gain, loss, deduction or credit will be allocated to the Liquidating Trust's beneficiaries in accordance with their relative beneficial interests in the Liquidating Trust. As soon as practicable after the Effective Date, the Liquidating Trust shall make a good faith valuation of assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for all federal income tax purposes. The Liquidating Trust shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit for taxing purposes. The Liquidating Trust may request an expedited determination of taxes of the Debtor or of the Liquidating Trust under Bankruptcy Code section 505(b) for all tax returns filed for, or on behalf of, the Debtor and the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust. The

Liquidating Trust shall be responsible for filing all federal, state, and local tax returns for the Debtor and the Liquidating Trust. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.

The Liquidating Trust shall be responsible for payments of all Allowed tax obligations of the Debtor, and any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets.

### 7. Preservation of Right to Conduct Investigations.

The preservation for the Liquidating Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the liquidation and administration of the Liquidating Trust Assets. Accordingly, any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Debtor or the Creditors' Committee prior to the Effective Date shall vest with the Liquidating Trust and shall continue until dissolution of the Liquidating Trust.

### 8. Prosecution and Resolution of Causes of Action.

From and after the Effective Date, prosecution and settlement of all Causes of Action transferred to the Liquidating Trust shall be the sole responsibility of the Liquidating Trust pursuant to the Plan and the Confirmation Order. From and after the Effective Date, the Liquidating Trust shall have exclusive rights, powers, and interests of the Debtor's Estate to pursue, settle or abandon such Causes of Action as the sole representative of the Debtor's Estate pursuant to Bankruptcy Code section 1123(b)(3). Proceeds recovered from all Causes of Action will be deposited into the Liquidating Trust and will be distributed by the Liquidating Trustee to the beneficiaries in accordance with the provisions of the Plan and Liquidating Trust Agreement. All Causes of Action that are not expressly released or waived under the Plan are reserved and preserved and vest in the Liquidating Trust in accordance with the Plan. No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or this Disclosure Statement to any Cause of Action as any indication that the Liquidating Trustee will not pursue any and all available Causes of Action against such Person. The Liquidating Trustee expressly reserves all Causes of Action, except for any Causes of Action against any Person that are expressly released or waived under the Plan, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of confirmation or consummation of the Plan. No claims or Causes of Action against the Released Parties shall be transferred to the Liquidating Trust, the Liquidating Trustee shall not have standing to pursue such claims or Causes of Action, and all such claims and Causes of Action shall be waived, released and discharged pursuant to the Plan.

Settlement by the Liquidating Trust of any Cause of Action transferred to the Liquidating Trust shall require: (i) approval only of the Liquidating Trustee if the amount claimed by the Liquidating Trust against a defendant is less than five hundred thousand dollars ($500,000); and (ii) approval of the Liquidating Trustee and the Bankruptcy Court, upon notice

\\NY - 045867/000001 - 7840945 v11

and a hearing, if the amount claimed by the Liquidating Trust against a defendant is unliquidated or equals to or exceeds five hundred thousand dollars ($500,000).

9.     **Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets.**

For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution from the Debtor's Estate of an undivided interest in each of the Liquidating Trust Assets (to the extent of the value of their respective share in the applicable assets) and then contributed such interests to the Liquidating Trust, and the Liquidating Trust's beneficiaries will be treated as the grantors and owners thereof.

10.     **Limitation of Liability.**

No recourse will ever be had, directly or indirectly, against the Liquidating Trustee, its members, officers, directors, employees, professionals, representatives, agents, successors or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Trust under the Plan or by reason of the creation of any indebtedness by the Liquidating Trust or the Liquidating Trustee under the Plan. All such liabilities under the Plan will be enforceable only against, and will be satisfied only out of, the Liquidating Trust Assets. The Liquidating Trustee and its agents shall not be deemed to be the agent for any holder of a Claim in connection with Distributions made under the Plan. The Liquidating Trust and the Liquidating Trustee and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do, hereunder in good faith and in the exercise of their sound judgment; provided, however, that this section will not apply to any gross negligence or willful misconduct by the Liquidating Trust and the Liquidating Trustee or their respective officers, directors, employees, professionals, representatives, agents, successors or assigns.

11.     **Term of Liquidating Trust.**

The Liquidating Trustee shall be discharged and the Liquidating Trust shall be terminated at such time as (a) all Disputed Claims have been resolved, (b) all of the Liquidating Trust Assets have been liquidated, (c) all duties and obligations of the Liquidating Trustee under the Liquidating Trust Agreement have been fulfilled, (d) all Distributions required to be made by the Liquidating Trust under the Plan and the Liquidating Trust Agreement have been made, and (e) the Debtor's Chapter 11 Case has been closed; provided, however, that in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the third anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension not to exceed one (1) year is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

\\NY - 045867/000001 - 7840945 v11

## 12. Retention of Professionals by Liquidating Trust.

The Liquidating Trustee may retain and compensate attorneys and other professionals to assist in its duties on such terms (including on a contingency or hourly basis) as it deems reasonable and appropriate without Bankruptcy Court approval.

## 13. Conflicts Between the Liquidating Trust Agreement and the Plan.

In the event of any inconsistencies or conflict between the Liquidating Trust Agreement and the Plan, the terms and provisions of the Plan shall control.

## 14. Cancellation of Existing Securities and Agreements.

Except for purposes of evidencing a right to Distributions under the Plan or as otherwise provided hereunder, on the Effective Date, any and all agreements and other documents evidencing Claims or rights of any holder of a Claim or Equity Interest against the Debtor, including, but not limited to, all indentures, notes, bonds and share certificates evidencing such Claims and Equity Interests and any agreements or guarantees related thereto shall be cancelled, terminated, deemed null and void and satisfied, as against the Debtor but not as against any other Person.

## 15. Operations of the Debtor Between the Confirmation Date and the Effective Date.

The Debtor shall continue to operate as a debtor in possession during the period from the Confirmation Date through and until the Effective Date, and as a liquidating estate on and after the Effective Date. The retention and employment of the Professionals retained by the Debtor shall terminate as of the Effective Date, provided, however, that the Debtor shall be deemed to exist, and its Professionals shall be retained, after such date only with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, (b) motions seeking the enforcement of the provisions of the Plan or the Confirmation Order, and (c) such other matters as may be determined by the Debtor and the Liquidating Trustee, including, without limitation, the filing and prosecuting of objections to Claims solely with respect to Administrative Claims, Priority Tax Claims, and Other Priority Claims. On the Effective Date, the Debtor's directors and officers shall be terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and shall have no continuing obligations to the Debtor following the occurrence of the Effective Date.

## 16. Automatic Stay.

The automatic stay provided for under section 362 of the Bankruptcy Code shall remain in effect in the Chapter 11 Case until the Effective Date.

## 17. The Creditors' Committee.

Upon the Effective Date, the Creditors' Committee shall dissolve, and its members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Case. The retention and employment of

the Professionals retained by the Creditors' Committee shall terminate as of the Effective Date, provided, however, that the Creditors' Committee shall exist, and its Professionals shall be retained, after such date with respect to applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and motions seeking the enforcement of the provisions of the Plan or the Confirmation Order, including, to the extent necessary, to appoint a successor Liquidating Trustee.

### 18.      Books and Records.

As part of the appointment of the Liquidating Trustee, to the extent not already transferred on the Effective Date, the Debtor shall transfer dominion and control over all of its Books and Records to the Liquidating Trustee in whatever form, manner or media those Books and Records existed immediately prior to the transfer thereof to the Liquidating Trustee. The Liquidating Trustee may abandon all such Books and Records on or after ninety (90) days from the Effective Date, provided, however, that the Liquidating Trustee shall not dispose or abandon any Books and Records that are reasonably likely to pertain to pending litigation in which the Debtor or its current or former officers or directors are a party, or that pertain to General Unsecured Claims, without further order of the Bankruptcy Court. Pursuant to section 554 of the Bankruptcy Code, Article IV.R of the Plan shall constitute a motion and notice, so that no further notice or Bankruptcy Court filings are required to effectuate the aforementioned abandonment of the Books and Records of the Debtor.

### 19.      D&O Insurance Policies.

No prepaid D&O Insurance Policy shall be cancelled, and the Debtor's directors, officers and employees who have valid claims against the D&O Insurance Policies for indemnification, defense, reimbursement, or limitation of liability may be paid from the D&O Insurance Policies to the extent of the coverage provided by the D&O Insurance Policies, if any. As such, and notwithstanding anything in the Plan to the contrary, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the D&O Insurance Policies, to the extent the contract(s) providing for such is determined to be an executory contract, shall be deemed assumed by the Debtor.

### C.      Provisions Governing Voting And Distributions.

### 1.      Voting of Claims.

Each holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article III of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court. For purposes of calculating the number of Allowed Claims in a Class of Claims that have voted to accept or reject the Plan under section 1126(c) of the Bankruptcy Code, all Allowed Claims in such Class held by one Entity or any Affiliate thereof shall be aggregated and treated as one Allowed Claim in such Class. For purposes of any Claim in any Impaired Class that is Disputed as to its amount only, the holder of

\\NY - 045867/000001 - 7840945 v11

such Claim shall be entitled to vote on the Plan as if such holder held an Allowed Claim in an amount equal to the undisputed portion of such Claim.

### 2. Distribution Dates.

Distributions to holders of Claims shall be made as provided in Articles II and III of the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 3. Disbursing Agent.

All Distributions under the Plan by the Liquidating Trustee shall be made by the Liquidating Trustee, or such other entity designated by the Liquidating Trustee, as disbursing agent (the "*Disbursing Agent*").

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all Distributions contemplated by the Plan, (c) employ professionals to represent it with respect to its responsibilities, and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agent shall only be required to act and make Distributions in accordance with the terms of the Plan and shall have no (x) liability for actions taken in accordance with the Plan or in reliance upon information provided to them in accordance with the Plan or (y) obligation or liability for Distributions under the Plan to any party who does not hold an Allowed Claim at the time of Distribution or who does not otherwise comply with the terms of the Plan.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Liquidating Trustee acting as the Disbursing Agent (including, without limitation, reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash from the Liquidating Trust Assets.

### 4. Record Date for Distributions.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date. The Liquidating Trustee shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. In making any Distribution with respect to any Claim, the Liquidating Trustee shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon

\\NY - 045867/000001 - 7840945 v11

such other evidence or record of transfer or assignment that was known to the Debtor as of the Record Date and is available to the Liquidating Trustee.

### 5. Delivery of Distributions.

Subject to Bankruptcy Rule 9010 and except as otherwise provided in the Plan, Distributions to the holders of Allowed Claims shall be made by the Disbursing Agent at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim filed by such holder or (b) the last known address of such holder if no proof of Claim is filed or if the Liquidating Trustee has not been notified in writing of a change of address.

### 6. Undeliverable and Unclaimed Distributions.

In the event that any Distribution to any holder of an Allowed Claim made by the Liquidating Trustee is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder; provided, however, that all Distributions to holders of Allowed Claims made by the Liquidating Trustee that are unclaimed for a period of ninety (90) days after the date of the first attempted Distribution shall have its, his or her Claim for such undeliverable Distribution deemed satisfied and will be forever barred from asserting any such Claim against the Debtor or its property. Any Distributions which are undeliverable or have not been negotiated within the time period set forth above shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Debtor's Estate. The Liquidating Trustee shall have no further obligation to make any Distribution to the holder of such Claim on account of such Claim, and any entitlement of any holder of such Claim to any such Distributions shall be extinguished and forever barred; provided, however, that the holder of such Claim may receive future Distributions on account of such Claim by contacting the Liquidating Trustee at some point prior to the final Distribution.

### 7. Manner of Cash Payments Under the Plan.

Except as otherwise provided in the Plan, Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Liquidating Trustee.

### 8. Compliance with Tax Requirements.

The Disbursing Agent may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or Distribution on account of Claims. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such holders of the Claims. The Disbursing Agent shall be authorized to collect such tax information from the holders of Claims (including social security numbers or other tax identification numbers) as it in its sole discretion deems necessary to effectuate the Plan. In order to receive Distributions under the Plan, all holders of Claims will need to identify themselves to the Disbursing Agent and provide all tax information the Disbursing Agent deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable to each holder).

\\NY - 045867/000001 - 7840945 v11

The Disbursing Agent may refuse to make a Distribution to any holder of a Claim that fails to furnish such information within the time period specified by the Disbursing Agent and such Distribution shall be deemed an unclaimed Distribution under the Plan, and, provided further that, if the Disbursing Agent fails to withhold in respect of amounts received or distributable with respect to any such holder and such Disbursing Agent is later held liable for the amount of such withholding, such holder shall reimburse the Disbursing Agent for such liability. Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, and (b) no Distributions shall be required to be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such tax obligations or has, to the Disbursing Agent's satisfaction, established an exemption therefrom.

### 9.      No Payments of Fractional Dollars.

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

### 10.      Interest on Claims.

Except to the extent provided in section 506(b) of the Bankruptcy Code, the Plan, or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims, and no holder of an Allowed Claim shall be entitled to interest accruing on any Claim from and after the Petition Date.

### 11.      No Distribution in Excess of Allowed Amount of Claim.

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of such Claim.

### 12.      Setoff and Recoupment.

The Liquidating Trustee may setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that the Debtor or the Estate may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the Estate or the Liquidating Trustee of any right of setoff or recoupment that any of them may have against the holder of any Claim. Any such setoffs or recoupments may be challenged in Bankruptcy Court. Notwithstanding any provision in the Plan to the contrary, nothing in the Plan shall bar any creditor from asserting its setoff or recoupment rights to the extent permitted under section 553 or any other provision of the Bankruptcy Code provided that such setoff or recoupment rights are timely asserted; provided further that all rights of the Debtor, its Estate and the Liquidating Trustee with respect thereto are reserved.

\\NY - 045867/000001 - 7840945 v11

### 13. De Minimis Distributions; Charitable Donation.

Notwithstanding anything to the contrary in the Plan, the Liquidating Trustee shall not be required to make a Distribution to any Creditor if the dollar amount of the Distribution is less than $25 or otherwise so small that the cost of making that Distribution exceeds the dollar amount of such Distribution. On or about the time that the final Distribution is made, the Liquidating Trustee may make a charitable donation with undistributed funds if, in the reasonable judgment of the Liquidating Trustee, the cost of calculating and making the final Distribution of the remaining funds is excessive in relation to the benefits to the or holders of Claims who would otherwise be entitled to such Distributions, and such charitable donation is provided to an entity not otherwise related to the Debtor or the Liquidating Trustee.

### 14. United States Trustee Fees.

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtor. On and after the Effective Date, the Liquidating Trustee shall pay any and all such fees payable by the Debtor, when due and payable, and shall file with the Bankruptcy Court quarterly reports for the Debtor, in a form reasonably acceptable to the U.S. Trustee. The Debtor shall remain obligated to pay quarterly fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

### 15. Withholding from Distributions.

Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from Distributions pursuant to the Plan. The Liquidating Trustee may withhold from amounts distributable pursuant to the Plan to any Person or Entity any and all amounts, determined in the sole and reasonable discretion of the Liquidating Trustee, required to be withheld by any law, regulation, rule, ruling, directive, or other governmental requirement.

### 16. No Distributions on Late-Filed Claims.

Except as otherwise provided in a Final Order of the Bankruptcy Court, any Claim as to which a proof of Claim was required to be filed and was first filed after the applicable bar date in the Chapter 11 Case, including, without limitation, the General Bar Date and any bar date established in the Plan or in the Confirmation Order, shall automatically be deemed a late-filed Claim that is disallowed in the Chapter 11 Case, without the need for (a) any further action by the Liquidating Trustee or (b) an order of the Bankruptcy Court. Nothing in this paragraph is intended to expand or modify the applicable bar dates or any orders of the Bankruptcy Court relating thereto.

### D. Disputed Claims.

### 1. Disputed Claims Reserve.

After the Effective Date, the Disputed Claims Reserve shall be managed by the Liquidating Trustee for the treatment of Disputed Claims. On each Distribution date after the

Effective Date in which the Liquidating Trustee makes Distributions to holders of Allowed Claims, the Liquidating Trustee shall retain on account of Disputed Claims an amount the Liquidating Trustee estimates is necessary to fund the Pro Rata Share of such Distributions to holders of Disputed Claims if such Claims were Allowed, with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Liquidating Trustee. Cash retained on account of such Disputed Claims shall be retained in the Disputed Claims Reserve for the benefit of the holders of Disputed Claims pending a determination of their entitlement thereto under the terms of the Plan. If any Disputed Claim is disallowed or Allowed in an amount that is lower than the aggregate assets retained on account of such Disputed Claim, then the Liquidating Trustee shall, within fifteen (15) days after such disallowance or allowance, return the assets that exceed the Allowed amount of such Claim to the Debtor's Estate.

### 2. Resolution of Disputed Claims.

The Liquidating Trustee shall have the right to make and file objections to Claims in the Bankruptcy Court. Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, all Disputed Claims shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

### 3. Objection Deadline.

All objections to Disputed Claims shall be filed no later than the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing, with notice only to those parties entitled to notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002.

### 4. Estimation of Claims.

At any time, the Liquidating Trustee may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Liquidating Trustee or the Debtor have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Claim, the Liquidating Trustee may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 5.    No Distributions Pending Allowance.

Notwithstanding any other provision in the Plan, if any portion of a Claim is disputed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. Upon allowance, a holder of the Allowed Disputed Claim shall receive any Distributions that would have been made up to the date of allowance to such holder under the Plan had the Disputed Claim been allowed on the Effective Date.

### 6.    Resolution of Claims.

On and after the Effective Date, the Liquidating Trustee shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

### 7.    Treatment of Missouri Intercompany Claims

Notwithstanding anything to the contrary herein, in the Plan, or in the Confirmation Order or any other ancillary document, the Missouri Intercompany Claims shall constitute Allowed Claims for all purposes, including, without limitation, voting, confirmation, and Distribution, and shall not be subject to any setoff or recoupment, estimation, dispute, objection, challenge or any other attack.

### E.    Treatment of Executory Contracts and Unexpired Leases.

### 1.    Assumption or Rejection of Executory Contracts and Unexpired Leases.

In accordance with sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any Person or Entity shall be deemed rejected by the Debtor as of immediately prior to the Confirmation Date, except for any executory contract or unexpired lease (i) that has been assumed or rejected by an order of the Bankruptcy Court entered prior to the Effective Date or (ii) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Effective Date. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of rejection under section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejection is in the best interests of the Debtor, its Estate, and all parties in interest in the Chapter 11 Case.

### 2.    Claims Based on Rejection of Executory Contracts and Unexpired Leases.

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article VII.A of the Plan must be filed with the Bankruptcy Court and served on the

\\NY - 045867/000001 - 7840945 v11

Debtor and the Liquidating Trustee no later than thirty (30) days after service of notice of the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A of the Plan for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtor, its Estate, the Liquidating Trustee, their respective successors and assigns, and their respective assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.E of the Plan. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided in the Plan shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III of the Plan.

### 3. Indemnification and Reimbursement.

Subject to the occurrence of the Effective Date, all Allowed Claims against the Debtor for indemnification, defense, reimbursement, or limitation of liability of current or former directors, officers, or employees of the Debtor against any Claims, costs, liabilities or causes of action as provided in the Debtor's articles of organization, bylaws, other organizational documents, or applicable law, shall, to the extent such indemnification, defense, reimbursement, or limitation is owed in connection with one or more events or omissions occurring before the Petition Date, be (a) paid only to the extent of any applicable insurance coverage, and (b) to the extent a proof of Claim has been timely filed and is Allowed, treated as Allowed General Unsecured Claims to the extent such Claims are not covered by any applicable insurance, including deductibles. Nothing contained in the Plan shall affect the rights of directors, officers or employees under any insurance policy or coverage with respect to such Claims, costs, liabilities or Causes of Action or limit the rights of the Debtor, the Liquidating Trustee or the Debtor's Estate to object to, seek to subordinate or otherwise contest or challenge Claims or rights asserted by any current or former officer, director or employee of the Debtor.

### F. Conditions Precedent to the Effective Date.

### 1. Conditions Precedent.

The following are conditions precedent to the Effective Date that must be satisfied or waived:

      **(a)** The Bankruptcy Court shall have entered the Confirmation Order.

      **(b)** There shall be no stay or injunction in effect with respect to the Confirmation Order, which such Confirmation Order shall contain approval of the releases provided for in the Plan.

      **(c)** The appointment of the Liquidating Trustee shall have been confirmed by order of the Bankruptcy Court.

      **(d)** All agreements and instruments that are exhibits to the Plan shall be in a form acceptable to the Missouri Liquidating Trustee, and have been duly executed and delivered.

## 2. Waiver.

Notwithstanding the foregoing conditions in Article VIII.A of the Plan, the Missouri Liquidating Trustee reserves, in its sole discretion, the right to waive the occurrence of or modify any of the foregoing conditions precedent. Any such written waiver of a condition precedent set forth in Article VIII.B of the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan; provided, however, that the Creditors' Committee shall have the right to be consulted on and consent to any proposed modification of the Plan, the Plan Supplement or the Confirmation Order. Any actions required to be taken on the Effective Date or Confirmation Date (as applicable) shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## 3. Notice of Effective Date.

The Missouri Liquidating Trustee shall file with the Bankruptcy Court a notice of occurrence of the Effective Date within seven (7) days after the conditions in Article VIII of the Plan have been satisfied or waived pursuant to Article VIII.B of the Plan.

## G. Indemnification, Release, Injunctive and Related Provisions.

### 1. Compromise and Settlement.

Pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtor, the Estate and holders of Claims and Equity Interests.

### 2. Releases by the Debtor and its Estate.

**Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, the Debtor and its Representatives and the Estate (collectively, the "*Debtor Releasing Parties*") shall be deemed to have provided a full, complete, unconditional, and irrevocable release to the Released Parties (and each such Released Party so released shall be deemed released by the Debtor and its Representatives, the Estate, and the Creditors' Committee and its members but solely in their capacity as members of the Creditors' Committee and not in their individual capacities), from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstance existing or taking place prior**

to or on the Effective Date, arising from or related in any way to the Debtor, including, without limitation, those that the Debtor would have been legally entitled to assert or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of the Debtor or the Estate, including those in any way related to the Chapter 11 Case or the Plan; provided that the foregoing release shall not prohibit the Liquidating Trustee from asserting any and all defenses and counterclaims in respect of any Disputed Claim asserted by any of the Released Parties; and provided further that the releases granted to the Non-Missouri Affiliates under Article IX.B.1 of the Plan are expressly conditioned upon the subordination of the Non-Missouri Intercompany Claims to General Unsecured Claims for all purposes, including distributions. If the Non-Missouri Intercompany Claims are not subordinated to General Unsecured Claims for all purposes, including distributions, then the releases granted to the Non-Missouri Affiliates in Article IX.B.1 of the Plan shall be deemed null and void. Notwithstanding the above, the Releases by the Debtor Releasing Parties provided pursuant to Article IX.B of the Plan shall not affect any Causes of Action and any other debts, obligations, rights, suits, judgments, damages, actions, remedies and liabilities arising after the Effective Date and based on any act or omission, transaction, or other occurrence or circumstances taking place after the Effective Date; provided further that nothing set forth in the preceding proviso shall in any way limit the exculpation provisions set forth in IX.C of the Plan.

3.    Releases by Holders of Claims.

Except as otherwise provided in the Plan (including, without limitation, the rights accorded the Missouri Intercompany Claims), each Person, other than the Debtor, who votes to accept the Plan and does not mark such ballot to indicate a refusal to grant the release provided for in this paragraph, shall be deemed to fully, completely, unconditionally, irrevocably, and forever release the Released Parties of and from any and all Claims and Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor and its Representatives, whether direct, derivative, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, Disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in Article IX.B.2 of the Plan under Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action released by the Plan; (b) in the best interests of the Debtor and all holders of Claims and Equity Interests; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to the assertion of any Claim or Cause of Action thereby released.

\\NY - 045867/000001 - 7840945 v11

4.      **Exculpation.**

**Notwithstanding anything contained in the Plan to the contrary, the Released Parties shall neither have nor incur any liability relating to the Chapter 11 Case to any Entity for any and all Claims and Causes of Action arising after the Petition Date and through the Effective Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release, other agreement or document created or entered into in connection with the Plan, or any other post-petition act taken or omitted to be taken in connection with the Chapter 11 Case; provided, however, that the foregoing provisions of Article IX.C of the Plan shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.**

5.      **Preservation of All Causes of Action Not Expressly Settled or Released.**

Unless a Cause of Action against a holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order) of the Bankruptcy Court, the Debtor and its Estate expressly reserve such Cause of Action for later adjudication or administration by the Liquidating Trustee (including, without limitation, Causes of Action not specifically identified or described in the Plan or elsewhere or of which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances which may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan or Confirmation Order, except where such Causes of Action have been released in the Plan or any other Final Order (including the Confirmation Order). In addition, the Debtor and its Estate expressly reserve the right of the Liquidating Trustee to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to whom the Debtor has incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor, or leased equipment or property from the Debtor should assume that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (a) such Entity has filed a proof of Claim against the Debtor in the Chapter 11 Case; (b) the Debtor has objected to any such Entity's proof of Claim; (c) any such Entity's Claim was included in the Schedules; (d) the Debtor has objected to any such Entity's scheduled Claim; or (e) any such Entity's scheduled Claim has been identified by the Debtor as disputed, contingent or unliquidated**.**

6.    **Injunction.**

From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim or Equity Interest, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or satisfied or to be released or satisfied pursuant to the Plan or the Confirmation Order.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to the Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to the Plan or the Confirmation Order.

The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests against the Debtor or any of its assets or properties solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to the Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to the Plan or the Confirmation Order. On the Effective Date, all such Claims against, and Equity Interests in, the Debtor shall be satisfied and released in full.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Persons and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released pursuant to the Plan or Confirmation Order, from:

**(a)**    commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns and their assets and properties;

**(b)**    enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns and their assets and properties;

**(c)**    creating, perfecting or enforcing any encumbrance of any kind against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns and their assets and properties; and

\\NY - 045867/000001 - 7840945 v11

**(d)** commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled under the Plan.

**7.** **Releases of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estate distributed under the Plan shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the Debtor.

**H.** **Retention of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities, including, without limitation, the Liquidating Trustee, with respect to all matters related to the Chapter 11 Case, the Debtor and the Plan as is legally permissible, including, without limitation, jurisdiction to:

**1.** allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest against the Debtor, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims;

**2.** grant, deny or otherwise resolve any and all applications of Professionals or Persons retained in the Chapter 11 Case by the Debtor or the Creditors' Committee for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

**3.** resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired leases to which the Debtor is party or with respect to which the Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

**4.** ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan, including by resolving any disputes regarding the Debtor's entitlement to recover assets held by third parties;

**5.** decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Liquidating Trustee after the Effective Date;

**6.** enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures

and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

      **7.**    resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

      **8.**    issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

      **9.**    enforce Article IX.A, Article IX.B, Article IX.C, Article IX.D and Article IX.E of the Plan;

      **10.**    resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

      **11.**    resolve any cases, controversies, suits or disputes with respect to settlement of the Missouri Intercompany Claims;

      **12.**    enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

      **13.**    resolve any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement;

      **14.**    enter an order and a Final Decree closing the Chapter 11 Case.

    **I.**    **Miscellaneous Provisions.**

      **1.**    **Modification of the Plan.**

          **(a)**    **Preconfirmation Amendment.**

      The Missouri Liquidating Trustee may modify the Plan, subject to section 1127 of the Bankruptcy Code, at any time prior to the entry of the Confirmation Order provided that the Plan, as modified, and the Disclosure Statement pertaining thereto meet applicable Bankruptcy Code requirements.

          **(b)**    **Postconfirmation Amendment Not Requiring Resolicitation.**

      After the entry of the Confirmation Order, the Missouri Liquidating Trustee may modify the Plan, subject to section 1127 of the Bankruptcy Code, to remedy any defect or omission or to reconcile any inconsistencies in the Plan or in the Confirmation Order, as may be

necessary to carry out the purposes and effects of the Plan; provided that the Missouri Liquidating Trustee obtain approval of the Bankruptcy Court for such modification, after notice and a hearing. Any waiver under Section VIII.B. of the Plan shall not be considered to be a modification of the Plan.

### 2. Revocation or Withdrawal of the Plan.

The Missouri Liquidating Trustee reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans. If the Missouri Liquidating Trustee revokes or withdraws the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtor or any other Entity; or (iii) constitute an admission of any sort by the Debtor or any other Entity.

### 3. Binding Effect.

On the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtor and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a Distribution under the Plan.

### 4. Successors and Assigns.

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### 5. Governing Law.

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, unless otherwise stated, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to the principles of conflict of laws thereof.

### 6. Reservation of Rights.

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless and until the Effective Date occurs. Neither the filing of the Plan, any statement or provision contained in the Plan, nor the taking of any action by the Missouri Liquidating Trustee or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (a) the Debtor with respect to the holders of Claims or Equity Interests or other

parties in interest; or (b) any holder of a Claim or other party in interest prior to the Effective Date.

### 7. Section 1146 Exemption.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

### 8. Section 1125(e) Good Faith Compliance.

Confirmation of the Plan shall act as a finding by the Bankruptcy Court that the Missouri Liquidating Trustee and its Representatives have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

### 9. Further Assurances.

The Debtor, the Liquidating Trustee, all holders of Claims receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### 10. Service of Documents.

Any pleading, notice or other document required by the Plan to be served on or delivered to the Missouri Liquidating Trustee shall be sent by first class U.S. mail, postage prepaid as follows:

**To the Missouri Liquidating Trustee:**

> Drivetrain, LLC
> 630 Third Avenue, 21st Floor
> New York, NY, 10017
> Attention:      Alan J. Carr
>                 Tim Daileader
> E-mail address: acarr@drivetrainadvisors.com
>                         tdaileader@drivetrainadvisors.com

> *with a copy to:*

> Hogan Lovells US LLP
> 875 Third Avenue
> New York, New York 10022
> Telephone: (212) 918-3000

47

Attention:     Christopher R. Donoho, III
                Ronald J. Silverman
E-mail address: chris.donoho@hoganlovells.com
                ronald.silverman@hoganlovells.com


**To the Debtor:**

Abengoa Bioenergy of Biomass of Kansas, LLC
16150 Main Circle Drive, Suite 300
Chesterfield, Missouri 63017
Attention: General Counsel
E-mail address: jeffrey.bland@abengoa.com


*with a copy to:*


DLA Piper LLP (US)
1717 Main St., Suite 4600
Dallas, Texas 75201
Fax no.: (972) 813-6267
Attention:  Vincent P. Slusher
                David E. Avraham
E-mail address:vince.slusher@dlapiper.com
                    david.avraham@dlapiper.com

-and-

Armstrong Teasdale LLP
2345 Grand Blvd.
Suite 1500
Kansas City, Missouri 64108
Attention: Christine L. Schlomann
Email address: cschlomann@armstrongteasdale.com

### 11.     Filing of Additional Documents.

On or before the Effective Date, the Debtor may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 12.     No Stay of Confirmation Order.

The Debtor shall request that the Bankruptcy Court waive stay of enforcement of the Confirmation Order otherwise applicable, including pursuant to Federal Rules of Bankruptcy Procedure 3020(e), 6004(h) and 7062.

## VI.    RISK FACTORS IN CONNECTION WITH THE PLAN

The holders of Claims against the Debtor should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.    Bankruptcy Considerations.

Although the Missouri Liquidating Trustee believes the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent set forth in Article VIII.A of the Plan, and there can be no assurance that such conditions will be satisfied or waived. In the event the conditions precedent described in Article VIII.A of the Plan have not been satisfied, or waived (to the extent possible) by the Missouri Liquidating Trustee as of the Effective Date, then the Confirmation Order will be vacated, no Distributions will be made pursuant to the Plan, and the Debtor and all holders of Claims and Equity Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Missouri Liquidating Trustee believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Equity Interests encompass Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Plan provides that certain Classes are to receive a Pro Rata share of Liquidating Trust Assets, which will be generated, in part, by the liquidation of certain assets and the prosecution of certain Causes of Action. The potential recoveries from such actions, however, are unknown. In addition, there can be no assurance that the Liquidating Trust Assets will be sufficient to pay the fees and expenses of the Liquidating Trustee and/or the professionals employed in connection therewith or make any Distributions to the beneficiaries.

The Plan provides for no Distribution to certain Classes as specified in Article III of the Plan. The Bankruptcy Code conclusively deems these Classes to have rejected the Plan. Pursuant to section 1129(a)(10) of the Bankruptcy Code, notwithstanding the fact that these Classes are deemed to have rejected the Plan, the Bankruptcy Court may confirm the Plan if at least one Impaired Class votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class). As to each Impaired Class that has not

accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these Classes. The Missouri Liquidating Trustee believes that the Plan satisfies these requirements.

**B.      No Duty to Update Disclosures.**

The Missouri Liquidating Trustee has no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Missouri Liquidating Trustee is required to do so pursuant to an order of the Bankruptcy Court. Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

**C.      Representations Outside this Disclosure Statement.**

This Disclosure Statement contains representations concerning or related to the Debtor and the Plan that are authorized by the Bankruptcy Code and the Bankruptcy Court. Please be advised that any representations or inducements outside this Disclosure Statement and any related documents which are intended to secure your acceptance or rejection of the Plan should not be relied upon by holders of Claims or Equity Interests that are entitled to vote to accept or reject the Plan.

**D.      No Admission.**

The information and representations contained herein shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan on the Debtor or holders of Claims and Equity Interests.

**E.      Tax and Other Related Considerations.**

A discussion of potential tax consequences of the Plan is provided in section IX hereof; however, the content of this Disclosure Statement is not intended and should not be construed as tax, legal, business or other professional advice. Holders of Claims and/or Equity Interests should seek advice from their own independent tax, legal or other professional advisors based on their own individual circumstances.

**VII.   PLAN CONFIRMATION AND CONSUMMATION**

**A.      The Confirmation Hearing.**

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan (the "***Confirmation Hearing***"). The Confirmation Hearing is currently set for [•], 2017 at 9:00 a.m. Central. Notice of the Confirmation Hearing (the "***Confirmation Hearing Notice***") will be provided to all known Creditors or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Case 16-10446      Doc# 978      Filed 07/27/17      Page 62 of 280

Pursuant to Bankruptcy Code section 1128(b), any party in interest may object to confirmation of a plan of reorganization. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds of the objection, and must be filed with the Bankruptcy Court by [•], 2017 at 5:00 p.m. Central, together with proof of service thereof, and served upon: (i) counsel to the Missouri Liquidating Trustee: Hogan Lovells US LLP, 875 Third Avenue, New York, New York 10022 (Attn.: Christopher R. Donoho, III and Ronald J. Silverman); (ii) counsel to the Debtor, DLA Piper LLP (US), 1717 Main Street, Suite 4600, Dallas, TX 75201 (Attn: Vincent P. Slusher and David E. Avraham), and Armstrong Teasdale LLP, 2345 Grand Boulevard, Suite 1500, Kansas City, Missouri 63105 (Attn.: Christine L. Schlomann, Richard W. Engel, Jr. and Erin M. Edelman); (iii) counsel to the Creditors' Committee, Baker & Hostetler LLP, 127 Public Square, Suite 2000, Cleveland, Ohio 44114 (Attn.: Kelly S. Burgan and Michael A. VanNiel); (iv) the Office of the United States Trustee, 215 Dean A. McGee, 4th Floor, Oklahoma City, OK 73102 (Attn.: Charles S. Glidewell and Charles E. Snyder); and (v) such other parties as the Bankruptcy Court may order, so as to be *actually received* no later than the date and time designated in the Confirmation Hearing Notice.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan. **UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING CONFIRMATION OF THE PLAN.**

### B.    Plan Confirmation Requirements Under the Bankruptcy Code.

In order for the Plan to be confirmed, the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and this Chapter 11 Case. The Bankruptcy Code also requires that: (1) the Plan be accepted by the requisite votes of Creditors except to the extent that confirmation despite dissent is available under Bankruptcy Code section 1129(b); (2) the Plan is feasible (that is, there is a reasonable probability that the Debtor will be able to perform its obligations under the Plan without needing further financial reorganization not contemplated by the Plan); and (3) the Plan is in the "best interests" of all Creditors (that is, Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code). To confirm the Plan, the Bankruptcy Court must find that all of the above conditions are met, unless the applicable provisions of Bankruptcy Code section 1129(b) are employed to confirm the Plan, subject to satisfying certain conditions, over the dissent or deemed rejections of Classes of Claims.

### 1.    Best Interests of Creditors.

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (a) accepts the plan or (b) receives or retains under the plan property of a value, as of the effective date of the plan, that

is not less than the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The Missouri Liquidating Trustee, with the assistance of its professionals, has prepared the Liquidation Analysis attached hereto as **Exhibit 7.** The Liquidation Analysis is based upon a hypothetical liquidation in a chapter 7 case. In preparing the Liquidation Analysis, the Missouri Liquidating Trustee has taken into account the nature, status and underlying value of its assets, the ultimate realizable value of its assets, and the extent to which such assets are subject to liens and security interests. In addition, the Liquidation Analysis also reflects the required time and resources necessary to effectuate an orderly wind down of the Estate.

Based upon the Liquidation Analysis, the Missouri Liquidating Trustee believes that liquidation under chapter 7 would result in smaller distributions, if any, being made to Creditors than those provided for in the Plan because of (a) the likelihood that the Missouri Intercompany Claims would be allowed in full; (b) the likelihood that other assets of the Debtor would have to be disposed of in a less orderly fashion; (c) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (d) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations. In the opinion of the Missouri Liquidating Trustee, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford the holders of Claims as great a realization potential as afforded to them under the Plan.

Accordingly, the Missouri Liquidating Trustee believes that in a chapter 7 liquidation, holders of Claims would receive less than such holders would receive under the Plan. There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Missouri Liquidating Trustee's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

## 2. Feasibility of the Plan.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a plan proponent must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan. The Debtor has sold substantially all of its assets, and pursuant to the Plan, will transfer the Causes of Action and all remaining unencumbered assets to the Liquidating Trust to be liquidated and distributed to beneficiaries in accordance with the Plan and Liquidating Trust Agreement. Therefore, the Bankruptcy Court's confirmation of the Plan is not likely to be followed by liquidation or the need for any further reorganization.

## 3. Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, that, except as described below, each class of claims or equity interests that is impaired under a plan, accept the

plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. As a general matter under the Bankruptcy Code, a class is "impaired," unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such claim or equity interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the Debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated under the Plan), such Class shall be deemed to have voted to accept the Plan.

### 4. Section 1129(b).

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class, and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

### (a) No Unfair Discrimination.

The "no unfair discrimination" test requires that the plan not provide for unfair treatment with respect to classes of claims or interests that are of equal priority, but are receiving different treatment under the plan.

### (b) Fair and Equitable.

The fair and equitable requirement applies to classes of claims of different priority and status, such as secured versus unsecured. The plan satisfies the fair and equitable requirement if no class of claims receives more than 100% of the allowed amount of the claims in such class. Further, if a class of claims is considered a dissenting class ("***Dissenting Class***"),

\\NY - 045867/000001 - 7840945 v11

*i.e.*, a Class of Claims that is deemed to reject the Plan because the required majorities in amount and number of votes is not received from the Class, the following requirements apply:

### 5. Class of Secured Claims.

Each holder of an impaired secured claim either (a) retains its liens on the subject property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (c) receives the "indubitable equivalent" of its allowed secured claim.

### 6. Class of Unsecured Creditors.

Either (a) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the Dissenting Class will not receive any property under the plan.

### 7. Class of Equity Interests.

Either (a) each interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock and (ii) the value of the stock, or (b) the holders of interests that are junior to the interests of the Dissenting Class will not receive any property under the plan.

The Missouri Liquidating Trustee believes the Plan does not "discriminate unfairly" and will satisfy the "fair and equitable" requirement notwithstanding that certain Classes of Equity Interests are deemed to reject the Plan because no Class that is junior to such Class will receive or retain any property on account of the Claims and Equity Interests in such Class and the Plan does not provide for unfair treatment with respect to Classes of Claims or Equity Interests that are of equal priority.

## VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Missouri Liquidating Trustee believes the Plan is in the best interests of its Creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following four alternatives may be available: (i) the Debtor's Plan; (ii) a liquidation of the Debtor's assets pursuant to chapter 7 of the Bankruptcy Code; (iii) an alternative plan of reorganization or liquidation may be proposed and confirmed; or (iv) the Debtor's Chapter 11 Case may be dismissed.

### A. The Debtor's Plan compared to the Missouri Liquidating Trustee's Plan

The Plan proposes to limit the Missouri Intercompany Claims in a manner that would allow the Debtor's General Unsecured Claims to receive the same recovery as the Missouri Bioenergy Debtors' general unsecured claims. The Missouri Liquidating Trustee

believes this settlement is fair to both estates and the creditors of both because as explained herein, the Debtor operated within Abengoa's U.S. bioenergy group and the Missouri Liquidating Trustee believes the only reason it was not substantively consolidated with the Missouri Bioenergy Debtors is that its case was filed in a different jurisdiction.

The settlement of the Missouri Intercompany Claims embodied in the Plan would result in a _higher_ recovery for the Debtor's General Unsecured Claims compared with a plan that includes the Missouri Intercompany Claims in the class of General Unsecured Claims and provides them a _pro rata_ recovery, which the Missouri Liquidating Trustee believes is otherwise necessary to confirm the Debtor's Plan. The Debtor and the Creditors' Committee disagree and believe the Debtor's Plan is confirmable. If the Missouri Intercompany Claims are allowed the Debtor's General Unsecured Claims would only receive an estimated recovery of 19%. Even if the Missouri Intercompany are disallowed in their entirety the Debtor's General Unsecured Claims would only receive an estimated recovery of 63%, not the overstated 95% recovery included in the Debtor's Disclosure Statement, and recoveries other than under the Plan are likely to be lower in reality as they do not include any additional costs or time associated with litigating the Missouri Intercompany Claims, including potential appeals of those claims. Based on the most current available information, assets available for distribution to General Unsecured Claims is lower than the Debtor's Plan's assumptions and the Missouri Liquidating Trustee's review of the scheduled and filed General Unsecured Claims is higher than the Debtor's Plan's assumptions.

The Missouri Disclosure Statement estimated that the Missouri Bioenergy Debtors' general unsecured creditors would receive a recovery between 28.1% and 30.7%, which did not include any proceeds from the Debtor's assets. _See_ Missouri Disclosure Statement, p. 11 fn. 8. If the Missouri Intercompany Claims are allowed in full in the total amount of $69,504,933.16 and included in the Debtor's class of General Unsecured Claims (Class 2) then the Debtor's General Unsecured Claims would only recover approximately 19%. However, under the Plan proposed by the Missouri Liquidating Trustee the Debtor's general unsecured creditors would receive an estimated recovery of 33%—more than 10% _higher_ than they would receive if Missouri Intercompany Claims would be accorded normal _pro rata_ treatment under the Debtor's Plan. _See_ Exhibit 2 (Recovery Analysis).

The Plan also proposes that Drivetrain, LLC, who is currently the Liquidating Trustee in the Missouri Chapter 11 Cases, will be the Liquidating Trustee in this Chapter 11 Case, which will be more efficient than appointing a new trustee that is unfamiliar with the Abengoa Group. Drivetrain, LLC is an experienced independent fiduciary who as the Liquidating Trustee for both estates will be able to ensure that distributions to general unsecured creditors will be the same in Kansas and Missouri. Thus, the Missouri Liquidating Trustee believes that the Plan is a better alternative than the Debtor's Plan.

B.     **Chapter 7 Liquidation.**

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Debtor's Chapter 11 Case may be converted to a liquidation case under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed, pursuant to applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the assets of the Debtor

for distribution in accordance with the priorities established by the Bankruptcy Code. The Missouri Liquidating Trustee believes that such a liquidation would result in smaller distributions being made to the Debtor's creditors than those provided for in the Plan because (a) the likelihood that the Missouri Intercompany Claims would be allowed in full; (b) the likelihood that other assets of the Debtor would have to be disposed of in a less orderly fashion; (c) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (d) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations. The Missouri Liquidating Trustee has found that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

### C.      Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code.

If the Plan is not confirmed, the Missouri Liquidating Trustee may propose a different plan, which might involve an alternative means for the liquidation of the Debtor's assets. However, the Missouri Liquidating Trustee believes that the terms of the Plan provide for an orderly and efficient liquidation of the Debtor's assets and will result in the realization of the most value for holders of Claims against the Debtor's Estate.

### D.      Dismissal of the Debtor's Chapter 11 Case.

Dismissal of the Debtor's Chapter 11 Case would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*. Upon dismissal of the Debtor's Chapter 11 Case, the Debtor would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the various creditors of the Debtor, and possibly resulting in costly and protracted litigation in various jurisdictions. Dismissal will also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtor. The Missouri Liquidating Trustee believes that these actions could lead ultimately to the liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code. Therefore, the Missouri Liquidating Trustee believes that dismissal of the Debtor's Chapter 11 Case is not a preferable alternative to the Plan.

## IX.      CERTAIN FEDERAL TAX CONSEQUENCES

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

56

TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.     **General.**

The following discussion summarizes certain material U.S. federal income tax consequences to the Debtor, the Liquidating Trust and holders entitled to vote on the Plan. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "***IRC***"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "***Service***"). There can be no assurance that the Service will not take a contrary view, no ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to holders of Claims, the Liquidating Trust or the Debtor. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only. The tax treatment of a holder may vary depending upon such holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a holder, including any alternative minimum tax consequences and does not address the tax consequences to a holder that has made an agreement to resolve its claim in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, holders that have a "functional currency" other than the United States dollar and holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by holders as "capital assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan

\\NY - 045867/000001 - 7840945 v11

may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the holder in exchange for the Claim and whether the holder receives Distributions under the Plan in more than one taxable year; (iii) whether the holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the holder. Therefore, each holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such holder of the transactions contemplated by the Plan.

### B.      U.S. Federal Income Tax Treatment With Respect to the Liquidating Trust.

It is intended that the Liquidating Trust will be treated as a "grantor trust" for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. The Service, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Debtor is not requesting a private letter ruling regarding the status of the Liquidating Trust as a grantor trust. Consistent with the requirements of Revenue Procedure 94-45, however, the Liquidating Trust Agreement requires all relevant parties to treat, for federal income tax purposes, the transfer of the Debtor's assets to the Liquidating Trust as (i) a transfer of such assets to the beneficiaries of the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets) followed by (ii) a transfer of such assets by such beneficiaries to the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets), with the beneficiaries of the Liquidating Trust being treated as the grantors and owners of the Liquidating Trust. Each beneficiary of the Liquidating Trust will generally recognize gain (or loss) in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in such Claim. The amount realized for this purpose should generally equal the amount of cash and the fair market value of any other assets received or deemed received for U.S. federal income tax purposes under the Plan in respect of such holder's Claim. A holder that is deemed to receive for U.S. federal income tax purposes a non-cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of its deemed receipt.

The Plan and the Liquidating Trust Agreement generally provide that the beneficiaries of the Liquidating Trust must value the assets of the Liquidating Trust consistently with the values determined by the Liquidating Trustee for all U.S. federal, state, and local income tax purposes. As soon as possible after the Effective Date, the Liquidating Trustee shall make a good faith valuation of the assets transferred to the Liquidating Trust.

\\NY - 045867/000001 - 7840945 v11

Consistent with the treatment of the Liquidating Trust as a grantor trust, the Liquidating Trust Agreement and the Plan will require each holder to report on its U.S. federal income tax return its allocable share of the Liquidating Trust's income. Therefore, a holder may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Liquidating Trust whether or not the Liquidating Trust has made any distributions to such holder. The character of items of income, gain, deduction, and credit to any holder and the ability of such holder to benefit from any deduction or losses will depend on the particular situation of such holder.

In general, a distribution of underlying assets from the Liquidating Trust to a beneficiary thereof may not be taxable to such holder because such holders are already regarded for U.S. federal income tax purposes as owning such assets. Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the Liquidating Trust.

The Liquidating Trustee will file with the Service tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and will also send to each holder a separate statement setting forth such holder's share of items of Liquidating Trust income, gain, loss, deduction, or credit. Each such holder will be required to report such items on its U.S. federal income tax return.

The discussion above assumes that the Liquidating Trust will be respected as a grantor trust for U.S. federal income tax purposes. If the Service were to successfully challenge such classification, the U.S. federal income tax consequences to the Liquidating Trust and the beneficiaries of the Liquidating Trust could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Liquidating Trust).

C.     **U.S. Federal Income Tax Treatment With Respect to Holders of Allowed Claims that are Beneficiaries of the Liquidating Trust.**

Holders of Allowed Claims as of the Effective Date that are beneficiaries of the Liquidating Trust should be treated as receiving from the Debtor their respective shares of the applicable assets of the Liquidating Trust in satisfaction of their Allowed Claims, and simultaneously transferring such assets to the Liquidating Trust. Accordingly, a holder of such Claim should generally recognize gain or loss in an amount equal to the amount deemed realized on the Effective Date (as described above) less its adjusted tax basis of its Claim. Additionally, such holders should generally recognize their allocable share of income, gain, loss and deductions recognized by the Liquidating Trust on an annual basis.

Because a holder's ultimate share of the assets of the Liquidating Trust based on its Allowed Claim will not be determinable on the Effective Date due to, among other things, the existence of Disputed Claims and the value of the assets at the time of actual receipt not being ascertainable on the Effective Date, such holder should recognize additional or offsetting gain or loss if, and to the extent that, the aggregate amount of cash and fair market value of the assets of the Liquidating Trust ultimately received by such holder is greater than or less than the amount used in initially determining gain or loss in accordance with the procedures described in the

59

preceding paragraph. It is unclear when a holder of an Allowed Claim that is a beneficiary of the Liquidating Trust should recognize, as an additional amount received for purposes of computing gain or loss, an amount attributable to the disallowance of a Disputed Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim; (ii) the tax status of the holder of the Claim; (iii) whether the Claim has been held for more than one year; (iv) the extent to which the holder previously claimed a loss or bad debt deduction with respect to the Claim; and (v) whether the Claim was acquired at a market discount. A holder that purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the IRC. Under those rules (subject to a *de minimis* exception), assuming that such holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

It is possible that the Service may assert that any loss should not be recognizable until the Liquidating Trustee makes its final distribution of the assets of the Liquidating Trust. Holders should consult their tax advisors regarding the possibility that the recognition of gain or loss may be deferred until the final distribution of the assets of the Liquidating Trust.

Although not free from doubt, holder of Disputed Claims should not recognize any gain or loss on the date that the Liquidating Trust Assets are transferred to the Liquidating Trust, but should recognize gain or loss in an amount equal to: (i) the amount of cash and the fair market value of any other property actually distributed to such holder less (ii) the adjusted tax basis of its Claim. It is possible, however, that such holders may be required to recognize the fair market value of such holder's allocable share of the Liquidating Trust Assets, as an amount received for purposes of computing gain or loss, either on the Effective Date or the date such holder's Claim becomes an Allowed Claim.

Holders of Allowed Claims will be treated as receiving a payment of interest (includible in income in accordance with the holder's method of accounting for tax purposes) to the extent that any cash or other property received (or deemed received) pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of cash or other property should be attributable to accrued but unpaid interest is unclear. Each holder should consult its tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any). A holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

## X.    RECOMMENDATION AND CONCLUSION

The Missouri Liquidating Trustee believes that the Plan is in the best interests of its Estate, Creditors and other interested parties and urges the holders of Impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their ballots.

\\NY - 045867/000001 - 7840945 v11

Dated: July 27, 2017

Missouri Liquidating Trustee

By: */s/ Timothy Daileader*
     Name:   Timothy Daileader
     Title:   Authorized Signatory

\\NY - 045867/000001 - 7840945 v11

**Exhibit 1**
Missouri Liquidating Trustee's First Amended
Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code

\\NY - 045867/000001 - 7840945 v11

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In re: | Chapter 11 |
| ABENGOA BIOENERGY BIOMASS OF KANSAS, LLC, | Case No. 16-10446 |
| Debtor. | |

**MISSOURI LIQUIDATING**
**TRUSTEE'S FIRST AMENDED PLAN OF LIQUIDATION**
<u>**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**</u>

**DRIVETRAIN, LLC**

Alan J. Carr
Tim Daileader
630 Third Avenue, 21st Floor
New York, NY, 10017
Telephone: (212) 856- 9700
acarr@drivetrainadvisors.com
tdaileader@drivetrainadvisors.com

**THOMPSON COBURN LLP**

Mark V. Bossi, Esq. (KS #13719)
One US Bank Plaza
St. Louis, Missouri 63101
Telephone: (314) 552-6000
Facsimile: (314) 552-7000
mbossi@thompsoncoburn.com

- and -

**HOGAN LOVELLS US LLP**

Christopher R. Donoho, III (admitted *pro hac vice*)
Ronald J. Silverman (admitted *pro hac vice*)
M. Shane Johnson (admitted *pro hac vice*)
Raphaella S. Ricciardi (admitted *pro hac vice*)
Hogan Lovells US LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
chris.donoho@hoganlovells.com
ronald.silverman@hoganlovells.com
shane.johnson@hoganlovells.com
raphaella.ricciardi@hoganlovells.com

*Missouri Liquidating Trustee*

*Counsel to the Missouri Liquidating Trustee*

Dated: July 19, 2017

**Table of Contents**

                                                                                          Page

ARTICLE I. DEFINED TERMS AND RULES OF INTERPRETATION ..................................1
    A.    Defined Terms ...............................................................................................1
    B.    Rules of Interpretation...................................................................................8
    C.    Exhibits..........................................................................................................9

ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS ...............................................9
    A.    Administrative Claims ...................................................................................9
    B.    Administrative Claims Bar Date.....................................................................9
    C.    Accrued Professional Compensation Claims ................................................10
    D.    Priority Tax Claims......................................................................................10
    E.    Other Priority Claims ..................................................................................10

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
INTERESTS ...............................................................................................................11
    A.    Summary .....................................................................................................11
    B.    Classification and Treatment of Claims and Equity Interests .......................11
    C.    Special Provision Governing Unimpaired Claims.........................................13
    D.    Nonconsensual Confirmation .......................................................................13

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN........................................13
    A.    Establishment of Liquidating Trust ..............................................................13
    B.    Appointment of the Liquidating Trustee.......................................................14
    C.    Beneficiaries of Liquidating Trust................................................................14
    D.    Vesting and Transfer of Liquidating Trust Assets to the Liquidating Trust .........14
    E.    Liquidating Trust Expenses..........................................................................14
    F.    Role of the Liquidating Trustee....................................................................15
    G.    Preservation of Right to Conduct Investigations ..........................................16
    H.    Prosecution and Resolution of Causes of Action .........................................16
    I.    Federal Income Tax Treatment of the Liquidating Trust for the Liquidating
        Trust Assets ................................................................................................17
    J.    Limitation of Liability..................................................................................17
    K.    Term of Liquidating Trust ............................................................................18
    L.    Retention of Professionals by Liquidating Trust ...........................................18
    M.    Conflicts Between the Liquidating Trust Agreement and the Plan .....................18
    N.    Cancellation of Existing Securities and Agreements..........................................18

\\NY - 045867/000001 - 7769820 v10

|   | O. | Operations of the Debtor Between the Confirmation Date and the Effective Date | 18 |
|---|---|---|---|
|   | P. | Automatic Stay | 19 |
|   | Q. | The Creditors' Committee | 19 |
|   | R. | Books and Records | 19 |
|   | S. | D&O Insurance Policies | 19 |

**ARTICLE V. PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS** .................... 20

|   | A. | Voting of Claims | 20 |
|---|---|---|---|
|   | B. | Distribution Dates | 20 |
|   | C. | Disbursing Agent | 20 |
|   | D. | Record Date for Distributions | 21 |
|   | E. | Delivery of Distributions | 21 |
|   | F. | Undeliverable and Unclaimed Distributions | 21 |
|   | G. | Manner of Cash Payments Under the Plan | 22 |
|   | H. | Compliance with Tax Requirements | 22 |
|   | I. | No Payments of Fractional Dollars | 22 |
|   | J. | Interest on Claims | 22 |
|   | K. | No Distribution in Excess of Allowed Amount of Claim | 23 |
|   | L. | Setoff and Recoupment | 23 |
|   | M. | De Minimis Distributions; Charitable Donation | 23 |
|   | N. | United States Trustee Fees | 23 |
|   | O. | Withholding from Distributions | 23 |
|   | P. | No Distributions on Late-Filed Claims | 24 |

**ARTICLE VI. DISPUTED CLAIMS** ............................................................................ 24

|   | A. | Disputed Claims Reserve | 24 |
|---|---|---|---|
|   | B. | Resolution of Disputed Claims | 24 |
|   | C. | Objection Deadline | 24 |
|   | D. | Estimation of Claims | 25 |
|   | E. | No Distributions Pending Allowance | 25 |
|   | F. | Resolution of Claims | 25 |
|   | G. | Treatment of Missouri Intercompany Claims | 25 |

**ARTICLE VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .................................................................................................................... 26

|   | A. | Assumption or Rejection of Executory Contracts and Unexpired Leases | 26 |
|---|---|---|---|
|   | B. | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 26 |

\\NY - 045867/000001 - 7769820 v10

    C.      Indemnification and Reimbursement ................................................................26

ARTICLE VIII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ..........................27

    A.      Conditions Precedent ....................................................................................27

    B.      Waiver ..........................................................................................................27

    C.      Notice of Effective Date ...............................................................................27

ARTICLE IX. INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED
PROVISIONS ......................................................................................................................28

    A.      Compromise and Settlement.........................................................................28

    B.      Releases ........................................................................................................28

    C.      Exculpation ..................................................................................................29

    D.      Preservation of Causes of Action..................................................................29

    E.      Injunction.....................................................................................................30

    F.      Releases of Liens .........................................................................................31

ARTICLE X. RETENTION OF JURISDICTION ................................................................31

ARTICLE XI. MISCELLANEOUS PROVISIONS................................................................33

    A.      Modification of the Plan ...............................................................................33

    B.      Revocation or Withdrawal of the Plan ..........................................................33

    C.      Binding Effect ..............................................................................................33

    D.      Successors and Assigns .................................................................................34

    E.      Governing Law .............................................................................................34

    F.      Reservation of Rights....................................................................................34

    G.      Article 1146 Exemption ...............................................................................34

    H.      Section 1125(e) Good Faith Compliance ......................................................34

    I.      Further Assurances........................................................................................34

    J.      Service of Documents ...................................................................................35

    K.      Filing of Additional Documents ...................................................................36

    L.      No Stay of Confirmation Order .....................................................................36

\\NY - 045867/000001 - 7769820 v10

The Liquidating Trustee for the chapter 11 cases of Abengoa Bioenergy US Holding, LLC, *et al.*, Case No. 16-41161-659 in the United States Bankruptcy Court for the Eastern District of Missouri (the "*Missouri Liquidating Trustee*"), hereby respectfully proposes the following Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code.[1]

## ARTICLE I.

## DEFINED TERMS AND RULES OF INTERPRETATION

### A.    Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*Accrued Professional Compensation*" means, at any given moment, all accrued and unpaid fees and expenses (including, without limitation, fees or expenses Allowed or awarded by a Final Order of the Bankruptcy Court) for legal, financial advisory, accounting, liquidation, and other professional services and reimbursement of expenses of Professionals that are awardable and allowable under sections 328, 330(a), or 331 of the Bankruptcy Code, or otherwise rendered prior to the Effective Date, including in connection with (a) applications filed in accordance with the Bankruptcy Code and Bankruptcy Rules; (b) motions seeking the enforcement of the provisions of the Plan or Confirmation Order, by all Professionals in the Chapter 11 Cases that the Bankruptcy Court has not denied by a Final Order, to the extent that any Allowed fees and expenses have not been paid previously, regardless of whether a fee application has been filed for any amount; and (c) applications for allowance of Administrative Expenses arising under sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(6) of the Bankruptcy Code. To the extent the Bankruptcy Court or any higher court denies by a Final Order any amount of a Professional's fees or expenses, then those amounts shall no longer be Accrued Professional Compensation.

2.    "*Administrative Claims*" means Claims that have been timely and properly filed before the Initial Administrative Claims Bar Date, as set by the Bar Date Order, or the Final Administrative Claims Bar Date, pursuant to the deadline and procedure set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court), as applicable, for costs and expenses of administration under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation: the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor (such as wages, salaries or commissions for services and payments for goods and other services and leased premises). Any fees or charges assessed against the estate of the Debtor under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Claims and shall be paid in accordance with Article V.N of the Plan. Notwithstanding anything to the contrary herein, the filing of an Administrative Claim shall not be required in order to receive payment for any tax liability described in sections 503(b)(1)(B) and (C) in accordance with section 503(b)(1)(D) of the Bankruptcy Code.

---

[1] All capitalized terms not otherwise defined herein shall be subject to the definition of such capitalized terms in Article I.A. hereof.

\\NY - 045867/000001 - 7769820 v10

3. "*Administrative Expense*" means costs and expenses of administration under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation: the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor (such as wages, salaries or commissions for services and payments for goods and other services and leased premises).

4. "*Affiliate*" has the meaning in section 101(2) of the Bankruptcy Code.

5. "*Allowed*" means, with respect to any Claim against the Debtor, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtor in its Schedules filed in the Chapter 11 Case as other than disputed, contingent or unliquidated and as to which the Debtor or other parties-in-interest have not filed an objection by the Claims Objection Bar Date; (b) a Claim filed in the Chapter 11 Case and that either is not Disputed or has been allowed by a Final Order; or (c) a Claim filed in the Chapter 11 Case that is allowed: (i) in any stipulation of amount and nature of Claim executed prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation or written agreement with the Liquidating Trustee, of amount and nature of Claim executed on or after the Effective Date; or (iii) in or pursuant to any contract, instrument or other agreement entered into or assumed in connection herewith; (d) a Claim that is allowed pursuant to the terms of this Plan; (e) a Disputed Claim that the Debtor and/or Liquidating Trustee (as applicable) ultimately determine will not be objected to (such claim being deemed Allowed at the time such determination is made) or (f) notwithstanding any other provision of the Plan to the contrary, the Missouri Intercompany Claims.

6. "*Bankruptcy Code*" means Articles 101 et seq. of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

7. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Kansas.

8. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, the Local Rules of the United States Bankruptcy Court for the District of Kansas, the Rules of Practice of the United States District Court for the District of Kansas, and general orders and chambers procedures of the Bankruptcy Court, each as applicable to the Chapter 11 Case and as amended from time to time.

9. "*Bar Date Order*" means that certain order of the Bankruptcy Court dated as of September 1, 2016 [Docket No. 408], establishing September 30, 2016, at 4:00 p.m. (CT) as the General Bar Date for filing proofs of Claim in the Chapter 11 Case, with only those exceptions permitted thereby.

10. "*Books and Records*" means, with respect to the Debtor, all books and records of the Debtor, including, without limitation, all documents and communications of any kind, whether physical or electronic.

11. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)).

\\NY - 045867/000001 - 7769820 v10

12.     "*Cash*" means cash and cash equivalents in certified or immediately available U.S. funds, including but not limited to bank deposits, checks and similar items.

13.     "*Causes of Action*" means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including, without limitation, all claims and any avoidance, preference, recovery, subordination or other actions against insiders or any other Entities under the Bankruptcy Code) against any Person or Entity, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the Effective Date.

14.     "*Chapter 11 Case*" means the chapter 11 case with the case number 16-10446 that was commenced when the Bankruptcy Court entered an order converting the Debtor's involuntary case to a voluntary case on the Petition Date.

15.     "*Claim*" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured; or (c) any other claim, as such term is defined in section 101(5) of the Bankruptcy Code.

16.     "*Claims Objection Bar Date*" means the bar date for objecting to proofs of Claim, which shall be one hundred twenty (120) days after the Effective Date; provided, however, that the Liquidating Trustee may seek additional extensions of this date from the Bankruptcy Court, with notice only to those parties entitled to notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002. A party requesting to extend the Claims Objection Bar Date may specify which entities may benefit from such an extension.

17.     "*Class*" means a category of holders of Claims or Equity Interests as set forth in Article III herein and pursuant to section 1122(a) of the Bankruptcy Code.

18.     "*Confirmation Date*" means the date on which the Confirmation Order is entered by the Bankruptcy Court.

19.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

20.     "*Creditor*" shall have the meaning in section 101(10) of the Bankruptcy Code.

21.     "*Creditors' Committee*" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case by the U.S. Trustee, comprised of (i) Stoppel Dirt Inc.; (ii) Equipment Pro, Inc.; and (iii) Western Reserve Water Systems.

\\NY - 045867/000001 - 7769820 v10

22.     "*D&O Insurance Policies*" means all primary and excess insurance policies of the Debtor that provide for, among other things, coverage for liability related to the actions or omissions of the Debtor's directors and officers.

23.     "*Debtor*" means Abengoa Bioenergy Biomass of Kansas, LLC, a limited liability company organized under the laws of the State of Kansas, and where applicable, the Estate thereof.

24.     "*Disbursing Agent*" means the Liquidating Trustee, who is empowered and authorized to make all Distributions pursuant to Article V.C herein.

25.     "*Disclosure Statement*" means the *Disclosure Statement for the Missouri Liquidating Trustee's First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 969], prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and any other applicable law, as amended, supplemented or modified from time to time.

26.     "*Disputed*" means, with respect to any Claim: (a) listed on the Schedules as unliquidated, disputed or contingent, unless a proof of Claim has been filed in a liquidated, non-contingent amount; (b) as to which the Debtor, the Liquidating Trustee or any other party in interest, has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules; or (c) as otherwise disputed in accordance with applicable bankruptcy or insolvency law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

27.     "*Disputed Claims Reserve*" means the reserve funds created pursuant to Article VI.A. herein.

28.     "*Distributions*" means the distributions of Cash to be made in accordance with the Plan.

29.     "*Effective Date*" means the first Business Day after the Confirmation Date on which the conditions precedent specified in Article VIII of this Plan have been either satisfied or waived. Within five (5) Business days of the Effective Date, notice of the Effective Date shall be filed in the Bankruptcy Court.

30.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

31.     "*Equity Interest*" means any equity interest in the Debtor that existed immediately prior to the Petition Date.

32.     "*Estate*" means the Debtor's estate created pursuant to section 541 of the Bankruptcy Code upon the conversion of the Chapter 11 Case.

33.     "*Final Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days after the Effective Date and is the deadline for a holder of an Administrative Claim to file a request with the Bankruptcy Court for payment of such Administrative Claim in the manner indicated in Article II herein.

34. "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

35. "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to file an appeal, motion for reconsideration or rehearing, or request for a stay has expired with no appeal, motion for reconsideration or rehearing, or request for a stay having been timely filed.

36. "*General Bar Date*" means September 30, 2016, at 4:00 p.m. (CT) as established in the Bar Date Order.

37. "*General Unsecured Claims*" means Claims against the Debtor that are not Administrative Claims, Accrued Professional Compensation Claims, Secured Claims, Priority Tax Claims, Other Priority Claims, Non-Missouri Intercompany Claims, or Equity Interests.

38. "*Impaired*" means "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests.

39. "*Intercompany Bar Date Order*" means that certain order of the Bankruptcy Court dated as of May 12, 2017 [Docket No. 849], establishing May 23, 2017, at 5:00 p.m. (CT) as the Intercompany Bar Date for filing proofs of Claim in the Chapter 11 Case, with only those exceptions permitted thereby.

40. "*Intercompany Claims*" means Claims relating to an intercompany transfer of value to the Debtor by an Affiliate of the Debtor.

41. "*Initial Administrative Claims Bar Date*" means the date by which all persons or entities holding any right to payment constituting an actual, necessary cost or expense of administering the Debtor's Chapter 11 Case or preserving the Estate under sections 503(b) and 507(a)(2) of the Bankruptcy Code (except Claims arising under section 503(b)(9) of the Bankruptcy Code) for the period from the Petition Date through May 31, 2016 have to file a request for payment of an Administrative Claim. The Initial Administrative Claims Bar Date is October 17, 2016, at 5:00 p.m. (CT), as established in the Bar Date Order.

42. "*Kansas KEIP*" means the Key Employee Incentive Plan approved by the Bankruptcy Court on October 13, 2016 [Docket No. 473].

43. "*Lien*" shall mean any lien, mortgage, charge, security interest, pledge or other encumbrance against or interest in property to secure payment or performance of a claim, debt or litigation.

44. "*Liquidating Trust*" means the grantor trust to be created upon the Effective Date for the benefit of the beneficiaries thereof.

45. "*Liquidating Trust Agreement*" means the agreement, substantially in the form included in the Plan Supplement, governing the operations of the Liquidating Trust, as it may be subsequently modified from time to time.

5

46. "*Liquidating Trust Assets*" means the assets held in the Liquidating Trust comprised of (i) all Causes of Action of the Debtor excluding those expressly waived herein and (ii) all other unencumbered assets of the Debtor's Estate remaining after all required payments have been made pursuant to this Plan, the Confirmation Order and Liquidating Trust Agreement, as applicable.

47. "*Liquidating Trustee*" means Drivetrain, LLC, appointed as of the Effective Date or as soon as reasonably practicable thereafter, as the fiduciary responsible for administering the Liquidating Trust.

48. "*Missouri Bioenergy Debtors*" means Abengoa Bioenergy US Holding, LLC, Abengoa Bioenergy Outsourcing, LLC, Abengoa Bioenergy Trading US, LLC, Abengoa Bioenergy Engineering & Construction, LLC, Abengoa Bioenergy of Nebraska, LLC, Abengoa Bioenergy Company, LLC, Abengoa Bioenergy Meramec Renewable, LLC, Abengoa Bioenergy Funding, LLC, Abengoa Bioenergy Maple, LLC, and Abengoa Bioenergy Operations, LLC, who filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in United States Bankruptcy Court for the Eastern District of Missouri, jointly administered under Case No. 16-41161-659.

49. "*Missouri Debtors*" means the Missouri Bioenergy Debtors, Abengoa Bioenergy of Indiana, LLC, and Abengoa Bioenergy of Illinois, LLC.

50. "*Missouri Intercompany Claims*" means claims filed by certain Missouri Debtors against the Debtor in accordance with the Intercompany Bar Date Order. These consist of the following: (i) Proof of Claim No. 93 filed by Abengoa Bioenergy Engineering & Construction, LLC in the amount of $1,883,354.84; (ii) Proof of Claim No. 94 filed by Abengoa Bioenergy Trading US, LLC in the amount of $10,905,144.17; (iii) Proof of Claim No. 95 filed by Abengoa Bioenergy Company, LLC in the amount of $55,044,643.41; and (iv) Proof of Claim No. 96 filed by Abengoa Bioenergy Outsourcing, LLC in the amount of $1,671,790.74.

51. "*Missouri Plan*" means the *Third Amended Joint Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code*, dated February 27, 2017, as modified by the *Order Confirming Third Amended Joint Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code*, filed on June 8, 2017 in the United States Bankruptcy Court for the Eastern District of Missouri (Case No. 16-41161-659).

52. "*Non-Missouri Affiliate*" means any Affiliate other than the Missouri Debtors.

53. "*Non-Missouri Intercompany Claims*" means Claims, including without limitation, relating to an intercompany transfer of value to the Debtor, held by a Non-Missouri Affiliate of the Debtor.

54. "*Other Priority Claims*" means Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims.

\\NY - 045867/000001 - 7769820 v10

55.    "*Person*" means an individual, partnership, corporation, limited liability company, cooperative, trust, estate, unincorporated organization, association, joint venture, government unit or agency or political subdivision thereof or any other form of legal entity or enterprise.

56.    "*Petition Date*" for purposes of this Plan means March 23, 2016, which is the date on which three petitioning creditors three creditors filed an involuntary petition in the Bankruptcy Court under chapter 7 of the Bankruptcy Code.

57.    "*Plan*" means this Missouri Liquidating Trustee's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code including exhibits and supplements, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code or the Bankruptcy Rules.

58.    "*Plan Proponent*" means the Missouri Liquidating Trustee.

59.    "*Plan Supplement*" means the supplement to the Plan containing certain documents and forms of documents specified in the Plan, which documents and forms shall be filed with the Bankruptcy Court no later than seven (7) days prior to the commencement of the hearing on confirmation of the Plan.

60.    "*Priority Tax Claims*" means Claims of governmental units of the kind specified in section 507(a)(8) of the Bankruptcy Code.

61.    "*Pro Rata*" shall mean the proportion that the amount of a Claim in a particular Class or Classes bears to the aggregate amount of all Claims (including Disputed Claims, but excluding disallowed Claims) in such Class or Classes, unless this Plan provides otherwise.

62.    "*Professionals*" means any Person employed in the Chapter 11 Case pursuant to a Final Order in accordance with sections 327, 328 or 1103 of the Bankruptcy Code, and to be compensated for services rendered prior to the Effective Date pursuant to sections 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code.

63.    "*Record Date*" means the date that the Disclosure Statement is approved by the Bankruptcy Court.

64.    "*Released Parties*" means, collectively, the Debtor, the Debtor's current and former directors and officers, the Debtor's Professionals, the Affiliates, the Creditors' Committee, the members of the Creditors' Committee (solely in their capacity as members of the Creditors' Committee), the Creditors' Committee's Professionals, the Plan Proponent, any counsel or attorneys for the Plan Proponent, and the current and former Representatives of each of the foregoing.

65.    "*Representatives*" means, with regard to an Entity (including the Debtor), any investment bankers, financial advisors, consultants, agents and other representatives (including their respective officers, directors, employees, independent contractors, members and professionals).

66. "*Schedules*" mean the schedules of assets and liabilities, schedules of executory contracts and statement of financial affairs filed by the Debtor pursuant to section 521 of the Bankruptcy Code, as may be amended, modified or supplemented from time to time.

67. "*Secured Claims*" means Claim(s) against the Debtor that are secured by a Lien on property in which the Estate have an interest, which Liens are valid, perfected and enforceable under applicable law or by reason of a Final Order, or that are subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estate' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

68. "*Tax Code*" means the United States Internal Revenue Code of 1986, as amended.

69. "*U.S. Trustee*" means the United States Trustee appointed under Article 591 of title 28 of the United States Code to serve in the District of Kansas.

70. "*Unimpaired*" means not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests.

71. "*Voting Deadline*" means August 18, 2017 at 5:00 p.m. (prevailing Central Time).

## B.     Rules of Interpretation

1. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and the neutral gender; (b) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed hereby.

3. All references herein to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

\\NY - 045867/000001 - 7769820 v10

## C.     Exhibits

All exhibits and schedules, if any, to the Plan are incorporated into and are part of the Plan as if set forth herein. All exhibits and schedules to the Plan, shall be filed with the Clerk of the Bankruptcy Court not later than seven (7) days prior to the deadline set by the Bankruptcy Court to vote to accept or reject the Plan. Once filed, such exhibits may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court. Holders of Claims or Equity Interests may also obtain a copy of such exhibits, once filed, from counsel to the Missouri Liquidating Trustee by submitting a written request to the following address:

Raphaella S. Ricciardi
Hogan Lovells US LLP
875 Third Avenue
New York, NY, 10022
Telephone: (212) 918-3000
E-mail: raphaella.ricciardi@hoganlovells.com

## ARTICLE II.

## ADMINISTRATIVE AND PRIORITY CLAIMS

## A.     Administrative Claims

The Liquidating Trustee shall pay, from the Debtor's assets, each holder of an Allowed Administrative Claim, in satisfaction of such Allowed Administrative Claim, the full unpaid amount of such Allowed Administrative Claim in Cash: (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (3) at such time and upon such terms as may be agreed upon by such holder and the Liquidating Trustee; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however, that Administrative Claims do not include Administrative Claims filed after the Administrative Claims Bar Date or Administrative Claims filed or asserted pursuant to section 503(b)(9) of the Bankruptcy Code after the General Bar Date, unless the Liquidating Trustee, in its discretion, chooses to treat such Claims as Administrative Claims.

## B.     Administrative Claims Bar Date

Except as otherwise provided, on or before the Final Administrative Claims Bar Date, any Person or Entity that seeks allowance of an Administrative Claim shall file with the Bankruptcy Court and serve on counsel for (i) the Debtor, (ii) the Creditors' Committee, and (iii) the Liquidating Trustee, any request for payment of an Administrative Claim arising after May 31, 2016. Requests for payment of an Administrative Claim must include at a minimum: (i) the name of the holder seeking allowance of an Administrative Claim; (ii) the amount of the Administrative Claim sought; (iii) the basis asserted for allowance of the Administrative

\\NY - 045867/000001 - 7769820 v10

Claim; and (iv) all supporting documentation that justify allowance of the Administrative Claim asserted.

The request for payment of an Administrative Claim will be considered timely filed only if it is filed with the Bankruptcy Court and actually received by the notice parties identified above by the Final Administrative Claims Bar Date. Requests for payment of Administrative Claims may not be delivered by facsimile, telecopy, or electronic mail transmission.

## C.    Accrued Professional Compensation Claims

The deadline for submission by Professionals for Bankruptcy Court approval of Accrued Professional Compensation shall be sixty (60) days after the Effective Date. Any Professional or other Person or Entity that is required to file and serve a request for approval of Accrued Professional Compensation and fails to timely file and serve such request on or before such date shall be forever barred, estopped and enjoined from asserting such request or participating in Distributions under the Plan on account thereof. All Professionals employed by the Debtor or the Creditors' Committee, shall provide to the Debtor an estimate of their Accrued Professional Compensation through the Effective Date (including an estimate for fees and expenses expected to be incurred after the Effective Date to prepare and prosecute allowance of final fee applications) before the Effective Date.

## D.    Priority Tax Claims

The Liquidating Trustee shall pay, from the Debtor's assets, each holder of an Allowed Priority Tax Claim, in satisfaction of such Allowed Priority Tax Claim, the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the later of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law; provided, however that the Liquidating Trustee shall not pay any premium, interest or penalty in connection with such Allowed Priority Tax Claim.

## E.    Other Priority Claims

The Liquidating Trustee shall pay, from the Debtor's assets, each holder of an Allowed Other Priority Claim, in satisfaction of such Allowed Other Priority Claim, the full unpaid amount of such Allowed Other Priority Claim in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date such Allowed Other Priority Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Other Priority Claim is payable under applicable non-bankruptcy law.

\\NY - 045867/000001 - 7769820 v10

# ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

**A.     Summary**

1.     This Plan is the Missouri Liquidating Trustee's chapter 11 plan of liquidation. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Missouri Liquidating Trustee has not classified Administrative Claims, Priority Tax Claims or Other Priority Claims.

2.     The following table show the classification of Claims against and Equity Interests in the Debtor for all purposes, including voting, confirmation and Distribution pursuant to this Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. This Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and deems a Claim classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Each Class set forth below is treated under this Plan as a distinct Class for voting and Distribution purposes.

3.     Subject to all other applicable provisions of this Plan (including its Distribution provisions), classified Claims shall receive the treatment described in this Article III. This Plan will not provide any Distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties.

4.     Summary of Classification and Treatment of Classified Claims and Equity Interests.

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Claims | Unimpaired | Deemed to Accept |
| 2 | General Unsecured Claims | Impaired | Entitled to Vote |
| 3 | Non-Missouri Intercompany Claims | Impaired and No Distribution | Deemed to Reject |
| 4 | Equity Interests | Impaired and No Distribution | Deemed to Reject |

**B.     Classification and Treatment of Claims and Equity Interests**

1.     Secured Claims (Class 1)

(a)     **Classification**: Class 1 consists of Secured Claims.

11

(b)   **Treatment**: Except to the extent that a holder of an Allowed Secured Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable classification and treatment, each holder of an Allowed Secured Claim shall receive, at the sole option of the Liquidating Trustee, Cash in the full amount of such Allowed Secured Claim or the collateral securing its Allowed Secured Claim, on or as soon as practicable after the latest to occur of (i) the Effective Date; (ii) the first Business Day after the date that is ten (10) Business Days after the date such Claim becomes an Allowed Other Secured Claim; and (iii) the date or dates agreed to by the Liquidating Trustee and the holder of the Allowed Secured Claim.

(c)   **Voting**: Class 1 is Unimpaired pursuant to Bankruptcy Code section 1126(f), therefore, holders of Secured Claims in Class 1 are not entitled to vote to accept or reject this Plan.

2.   General Unsecured Claims (Class 2)

(a)   **Classification**: Class 2 consists of General Unsecured Claims, including the Missouri Intercompany Claims.

(b)   **Treatment**: Except to the extent that a holder of an Allowed General Unsecured Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable classification and treatment, each holder of an Allowed General Unsecured Claim shall receive their Pro Rata share of remaining Cash, provided that distributions to holders of Allowed Missouri Intercompany Claims shall be limited to the extent necessary to permit General Unsecured Claims other than Missouri Intercompany Claims to receive percentage distributions hereunder equaling no less than the percentage distributions received by General Unsecured Claims classified as Bioenergy Class 2 in the Missouri Plan calculated as if the Debtor was substantively consolidated with the Missouri Bioenergy Debtors. The Kansas KEIP, which amount, for the avoidance of doubt, shall not exceed the aggregate amount of $354,520.00, shall be paid prior to any distribution to General Unsecured Claims. Distributions to holders of Allowed General Unsecured Claims shall be made as soon as practicable as the Liquidating Trustee may determine in its sole discretion.

(c)   **Voting**: Class 2 is Impaired and, therefore, only holders of General Unsecured Claims, including the Missouri Intercompany Claims, in Class 2 are entitled to vote to accept or reject the Plan.

3.   Non-Missouri Intercompany Claims (Class 3)

(a)   **Classification**: Class 3 consists of Non-Missouri Intercompany Claims, excluding the Missouri Intercompany Claims.

(b)   **Treatment**: Class 3 is Impaired and will receive no Distribution under the Plan.

\\NY - 045867/000001 - 7769820 v10

(c)     **Voting**: Class 3 Holders of the Intercompany Claims will receive no Distribution under the Plan and therefore, holders of Intercompany Claims in Class 3 are deemed to have rejected the Plan and are not entitled to vote on the Plan.

4.     Equity Interests (Class 4)

(a)     **Classification**: Class 4 consists of Equity Interests.

(b)     **Treatment**: Class 4 is Impaired and will receive no Distribution under the Plan. All equity interests in the Debtor shall be deemed cancelled upon the Effective Date.

(c)     **Voting**: Class 4 will receive no Distribution under the Plan and therefore, holders of Equity Interests in Class 4 are deemed to have rejected the Plan and are not entitled to vote on the Plan.

## C.     Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtor's rights with respect to any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

## D.     Nonconsensual Confirmation

If any Impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in section 1126 of the Bankruptcy Code, the Missouri Liquidating Trustee reserves the right to amend the Plan or to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both. With respect to Impaired Classes that are deemed to reject the Plan, the Missouri Liquidating Trustee intends to request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code notwithstanding the deemed rejection of the Plan by such Class of Claims.

## ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

## A.     Establishment of Liquidating Trust

On the Effective Date, the Liquidating Trustee shall sign the Liquidating Trust Agreement and, in his capacity as Liquidating Trustee, accept all Liquidating Trust Assets on behalf of the beneficiaries thereof, and be authorized to obtain, seek the turnover, liquidate, and collect all of the Liquidating Trust Assets not in his or her possession. The Liquidating Trust will then be deemed created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date. The Liquidating Trust shall be established for the purposes of (i) liquidating any non-Cash Liquidating Trust Assets; (ii) prosecuting and resolving the Causes of Action; (iii) maximizing recovery of the Liquidating Trust Assets for the benefit of the beneficiaries thereof; and (iv) distributing the proceeds of the Liquidating Trust Assets to the beneficiaries in accordance with this Plan and the Liquidating Trust Agreement, with no

\\NY - 045867/000001 - 7769820 v10

objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary for, and consistent with, the liquidating purpose of the Liquidating Trust.

## B.     Appointment of the Liquidating Trustee

The Liquidating Trustee shall be appointed by the Plan Proponent pursuant to this Plan and the Confirmation Order. It is contemplated that Drivetrain, LLC, the Liquidating Trustee in the Missouri Chapter 11 Cases and an experienced liquidating trustee, will be the Liquidating Trustee in this Chapter 11 Case. Following appointment, the Liquidating Trustee shall have the same powers as the board of directors and officers of the Debtor, subject to the provisions hereof (and all bylaws, articles of incorporation and related corporate documents are deemed amended by this Plan to permit and authorize the same). In the event of resignation or removal, death or incapacity of the Liquidating Trustee, the Plan Proponent shall designate another Person or Entity to serve as Liquidating Trustee and thereupon the successor Liquidating Trustee, without any further act or need for an order of the Bankruptcy Court, shall become fully vested with all of the rights, powers, duties and obligations of the predecessor; provided, however, that the Liquidating Trustee shall be deemed removed on the date the Chapter 11 Case is closed, and no successor thereto shall be designated. The Liquidating Trustee shall be entitled to compensation payable from the Liquidating Trust Assets as set forth in the Liquidating Trust Agreement.

## C.     Beneficiaries of Liquidating Trust

The holders of General Unsecured Claims against the Debtor entitled to Distributions shall be the beneficiaries of the Liquidating Trust. Such beneficiaries shall be bound by the Liquidating Trust Agreement. The interests of the beneficiaries in the Liquidating Trust shall be uncertificated and nontransferable except upon death of the interest holder or by operation of law.

## D.     Vesting and Transfer of Liquidating Trust Assets to the Liquidating Trust

Pursuant to Bankruptcy Code section 1141(b), the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Liens, Claims and Interests, except as otherwise specifically provided in this Plan or in the Confirmation Order; provided, however, that the Liquidating Trustee may abandon or otherwise not accept any non-Cash Liquidating Trust Assets that the Liquidating Trustee believes, in good faith, have no value to the Liquidating Trust. Any non-Cash Liquidating Trust Assets that the Liquidating Trustee so abandons or otherwise does not accept shall not be property of the Liquidating Trust. The Liquidating Trust Assets include claims against third parties. These claims include, but are not limited to, preference, fraudulent transfer and other avoidance claims pursuant to chapter 5 of the Bankruptcy Code and state law counterparts. These claims will be preserved and transferred to the Liquidating Trust.

## E.     Liquidating Trust Expenses

Subject to the provisions of the Liquidating Trust Agreement, all costs, expenses and obligations incurred by the Liquidating Trustee in administering this Plan, the Liquidating Trust, or in any manner connected, incidental or related thereto, in effecting distributions from, as applicable, the Liquidating Trust shall be a charge against the Liquidating Trust Assets

\\NY - 045867/000001 - 7769820 v10

remaining from time to time in the hands of the Liquidating Trustee. Such expenses shall be paid in accordance with the Liquidating Trust Agreement.

## F. Role of the Liquidating Trustee

1.        The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust and the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect the Liquidating Trust Assets; (b) pay taxes or other obligations incurred by the Liquidating Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants to advise and assist in the reasonable administration, prosecution and distribution of Liquidating Trust Assets; (d) calculate and implement Distributions of Liquidating Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Liquidating Trust Agreement, Causes of Action vested in the Liquidating Trust; (f) resolve issues involving Claims and Interests in accordance with this Plan; and (g) undertake all administrative functions of the Debtor's Chapter 11 Case, including the payment of fees payable to the United States Trustee and the ultimate closing of the Debtor's Chapter 11 Case. The Liquidating Trust is the successor to the Debtor and its Estate.

2.        On the Effective Date, the Liquidating Trust shall: (a) take possession of all books, records, and files of the Debtor and its Estate; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trust determines, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or required.

3.        The Liquidating Trustee may invest Cash in the Liquidating Trust (including any earnings thereon or proceeds therefrom) in any manner permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

4.        The Liquidating Trust shall have the right to object to Claims not otherwise Allowed in connection with post-Effective Date Claims allowance process.

5.        In no event later than thirty (30) Business Days after the end of the first full month following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidating Trust has been distributed in accordance with this Plan, the Liquidating Trustee shall file with the Bankruptcy Court a report setting forth the amounts, recipients and dates of all Distributions made by the Liquidating Trustee under this Plan through each applicable reporting period.

6.        The Liquidating Trustee shall file tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Plan. The Liquidating Trust shall also annually (for tax years in which Distributions from the Liquidating Trust are made) send to each beneficiary a separate statement setting forth the beneficiary's share of items of income, gain, loss, deduction or credit and all such holders shall

\\NY - 045867/000001 - 7769820 v10

report such items on their federal income tax returns; provided, however, that no such statement need be sent to any Class that is not expected to receive any Distribution from the Liquidating Trust. The Liquidating Trust's taxable income, gain, loss, deduction or credit will be allocated to the Liquidating Trust's beneficiaries in accordance with their relative beneficial interests in the Liquidating Trust. As soon as practicable after the Effective Date, the Liquidating Trust shall make a good faith valuation of assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for all federal income tax purposes. The Liquidating Trust shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit for taxing purposes. The Liquidating Trust may request an expedited determination of taxes of the Debtor or of the Liquidating Trust under Bankruptcy Code section 505(b) for all tax returns filed for, or on behalf of, the Debtor and the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust. The Liquidating Trust shall be responsible for filing all federal, state, and local tax returns for the Debtor and the Liquidating Trust. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.

7.     The Liquidating Trust shall be responsible for payments of all Allowed tax obligations of the Debtor, and any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets.

## G.     Preservation of Right to Conduct Investigations

The preservation for the Liquidating Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the liquidation and administration of the Liquidating Trust Assets. Accordingly, any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Debtor or the Creditors' Committee prior to the Effective Date shall vest with the Liquidating Trust and shall continue until dissolution of the Liquidating Trust.

## H.     Prosecution and Resolution of Causes of Action

1.     From and after the Effective Date, prosecution and settlement of all Causes of Action transferred to the Liquidating Trust shall be the sole responsibility of the Liquidating Trust pursuant to this Plan and the Confirmation Order. From and after the Effective Date, the Liquidating Trust shall have exclusive rights, powers, and interests of the Debtor's Estate to pursue, settle or abandon such Causes of Action as the sole representative of the Debtor's Estate pursuant to Bankruptcy Code section 1123(b)(3). Proceeds recovered from all Causes of Action will be deposited into the Liquidating Trust and will be distributed by the Liquidating Trustee to the beneficiaries in accordance with the provisions of the Plan and Liquidating Trust Agreement. All Causes of Action that are not expressly released or waived under this Plan are reserved and preserved and vest in the Liquidating Trust in accordance with this Plan. No Person may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Liquidating Trustee will not pursue any and all available Causes of Action against such Person. The Liquidating Trustee expressly reserves all Causes of Action, except for any Causes of Action against any Person that are

16

expressly released or waived under this Plan, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of confirmation or consummation of this Plan. No claims or Causes of Action against the Released Parties shall be transferred to the Liquidating Trust, the Liquidating Trustee shall not have standing to pursue such claims or Causes of Action, and all such claims and Causes of Action shall be waived, released and discharged pursuant to the Plan.

2.      Settlement by the Liquidating Trust of any Cause of Action transferred to the Liquidating Trust shall require: (i) approval only of the Liquidating Trustee if the amount claimed by the Liquidating Trust against a defendant is less than five hundred thousand dollars ($500,000); and (ii) approval of the Liquidating Trustee and the Bankruptcy Court, upon notice and a hearing, if the amount claimed by the Liquidating Trust against a defendant is unliquidated or equals to or exceeds five hundred thousand dollars ($500,000).

## I.      Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets

For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution from the Debtor's Estate of an undivided interest in each of the Liquidating Trust Assets (to the extent of the value of their respective share in the applicable assets) and then contributed such interests to the Liquidating Trust, and the Liquidating Trust's beneficiaries will be treated as the grantors and owners thereof.

## J.      Limitation of Liability

No recourse will ever be had, directly or indirectly, against the Liquidating Trustee, its members, officers, directors, employees, professionals, representatives, agents, successors or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Trust under this Plan or by reason of the creation of any indebtedness by the Liquidating Trust or the Liquidating Trustee under this Plan. All such liabilities under this Plan will be enforceable only against, and will be satisfied only out of, the Liquidating Trust Assets. The Liquidating Trustee and its agents shall not be deemed to be the agent for any holder of a Claim in connection with Distributions made under this Plan. The Liquidating Trust and the Liquidating Trustee and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do hereunder in good faith and in the exercise of their sound judgment; provided, however, that this section will not apply to any gross negligence or willful misconduct by the Liquidating Trust and the Liquidating Trustee or their respective officers, directors, employees, professionals, representatives, agents, successors or assigns.

\\NY - 045867/000001 - 7769820 v10

### K.  Term of Liquidating Trust

The Liquidating Trustee shall be discharged and the Liquidating Trust shall be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the Liquidating Trust Assets have been liquidated, (iii) all duties and obligations of the Liquidating Trustee under the Liquidating Trust Agreement have been fulfilled, (iv) all Distributions required to be made by the Liquidating Trust under this Plan and the Liquidating Trust Agreement have been made, and (v) the Debtor's Chapter 11 Case has been closed; provided, however, that in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the third anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension not to exceed one (1) year is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

### L.  Retention of Professionals by Liquidating Trust

The Liquidating Trustee may retain and compensate attorneys and other professionals to assist in its duties on such terms (including on a contingency or hourly basis) as it deems reasonable and appropriate without Bankruptcy Court approval.

### M.  Conflicts Between the Liquidating Trust Agreement and the Plan

In the event of any inconsistencies or conflict between the Liquidating Trust Agreement and this Plan, the terms and provisions of this Plan shall control.

### N.  Cancellation of Existing Securities and Agreements

Except for purposes of evidencing a right to Distributions under the Plan or as otherwise provided hereunder, on the Effective Date, any and all agreements and other documents evidencing Claims or rights of any holder of a Claim or Equity Interest against the Debtor, including, but not limited to, all indentures, notes, bonds and share certificates evidencing such Claims and Equity Interests and any agreements or guarantees related thereto shall be cancelled, terminated, deemed null and void and satisfied, as against the Debtor but not as against any other Person.

### O.  Operations of the Debtor Between the Confirmation Date and the Effective Date

The Debtor shall continue to operate as a debtor in possession during the period from the Confirmation Date through and until the Effective Date, and as a liquidating estate on and after the Effective Date. The retention and employment of the Professionals retained by the Debtor shall terminate as of the Effective Date, provided, however, that the Debtor shall be deemed to exist, and its Professionals shall be retained, after such date only with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, (b) motions seeking the enforcement of the provisions of the Plan or the Confirmation Order, and (c) such other matters as may be determined by the Debtor and the Liquidating Trustee, including, without limitation, the filing and prosecuting of objections to Claims solely with respect to Administrative Claims, Priority Tax Claims, and Other Priority Claims. On the Effective Date, the Debtor's directors and officers shall be terminated automatically without the need for any corporate action or approval

18

and without the need for any corporate filings, and shall have no continuing obligations to the Debtor following the occurrence of the Effective Date.

## P.    Automatic Stay

The automatic stay provided for under section 362 of the Bankruptcy Code shall remain in effect in the Chapter 11 Case until the Effective Date.

## Q.    The Creditors' Committee

Upon the Effective Date, the Creditors' Committee shall dissolve, and its members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Case. The retention and employment of the Professionals retained by the Creditors' Committee shall terminate as of the Effective Date provided, however, that the Creditors' Committee shall exist, and its Professionals shall be retained, after such date with respect to applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and motions seeking the enforcement of the provisions of the Plan or the Confirmation Order, including, to the extent necessary, to appoint a successor Liquidating Trustee.

## R.    Books and Records

As part of the appointment of the Liquidating Trustee, to the extent not already transferred on the Effective Date, the Debtor shall transfer dominion and control over all of its Books and Records to the Liquidating Trustee in whatever form, manner or media those Books and Records existed immediately prior to the transfer thereof to the Liquidating Trustee. The Liquidating Trustee may abandon all such Books and Records on or after ninety (90) days from the Effective Date, provided, however, that the Liquidating Trustee shall not dispose or abandon any Books and Records that are reasonably likely to pertain to pending litigation in which the Debtor or its current or former officers or directors are a party or that pertain to General Unsecured Claims without further order of the Bankruptcy Court. Pursuant to section 554 of the Bankruptcy Code, this Article IV.R shall constitute a motion and notice, so that no further notice or Bankruptcy Court filings are required to effectuate the aforementioned abandonment of the Books and Records of the Debtor.

## S.    D&O Insurance Policies

No prepaid D&O Insurance Policy shall be cancelled, and the Debtor's directors, officers and employees who have valid claims against the D&O Insurance Policies for indemnification, defense, reimbursement, or limitation of liability may be paid from the D&O Insurance Policies to the extent of the coverage provided by the D&O Insurance Policies, if any. As such, and notwithstanding anything in this Plan to the contrary, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the D&O Insurance Policies, to the extent the contract(s) providing for such is determined to be an executory contract, shall be deemed assumed by the Debtor.

19

# ARTICLE V.

## PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS

**A.      Voting of Claims**

Each holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article III of this Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court. For purposes of calculating the number of Allowed Claims in a Class of Claims that have voted to accept or reject the Plan under section 1126(c) of the Bankruptcy Code, all Allowed Claims in such Class held by one Entity or any Affiliate thereof shall be aggregated and treated as one Allowed Claim in such Class. For purposes of any Claim in any Impaired Class that is Disputed as to its amount only, the holder of such Claim shall be entitled to vote on the Plan as if such holder held an Allowed Claim in an amount equal to the undisputed portion of such Claim.

**B.      Distribution Dates**

Distributions to holders of Claims shall be made as provided in Articles II and III herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**C.      Disbursing Agent**

All Distributions under the Plan by the Liquidating Trustee shall be made by the Liquidating Trustee as Disbursing Agent or such other entity designated by the Liquidating Trustee as Disbursing Agent.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all Distributions contemplated by the Plan, (c) employ professionals to represent it with respect to its responsibilities, and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agent shall only be required to act and make Distributions in accordance with the terms of the Plan and shall have no (x) liability for actions taken in accordance with the Plan or in reliance upon information provided to them in accordance with the Plan or (y) obligation or liability for Distributions under the Plan to any party who does not hold an Allowed Claim at the time of Distribution or who does not otherwise comply with the terms of the Plan.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Liquidating Trustee acting as the Disbursing Agent (including, without

limitation, reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash from the Liquidating Trust Assets.

## D.     Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date. The Liquidating Trustee shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. In making any Distribution with respect to any Claim, the Liquidating Trustee shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that was known to the Debtor as of the Record Date and is available to the Liquidating Trustee.

## E.     Delivery of Distributions

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made by the Disbursing Agent at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim filed by such holder or (b) the last known address of such holder if no proof of Claim is filed or if the Liquidating Trustee has not been notified in writing of a change of address.

## F.     Undeliverable and Unclaimed Distributions

In the event that any Distribution to any holder of an Allowed Claim made by the Liquidating Trustee is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder; provided, however, that all Distributions to holders of Allowed Claims made by the Liquidating Trustee that are unclaimed for a period of ninety (90) days after the date of the first attempted Distribution shall have its, his or her Claim for such undeliverable Distribution deemed satisfied and will be forever barred from asserting any such Claim against the Debtor or its property. Any Distributions which are undeliverable or have not been negotiated within the time period set forth above shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Debtor's Estate. The Liquidating Trustee shall have no further obligation to make any Distribution to the holder of such Claim on account of such Claim, and any entitlement of any holder of such Claim to any such Distributions shall be extinguished and forever barred; provided, however, that the holder of such Claim may receive future Distributions on account of such Claim by contacting the Liquidating Trustee at some point prior to the final Distribution.

\\NY - 045867/000001 - 7769820 v10

## G.    Manner of Cash Payments Under the Plan

Except as otherwise provided herein, Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Liquidating Trustee.

## H.    Compliance with Tax Requirements

The Disbursing Agent may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or Distribution on account of Claims. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such holders of the Claims. The Disbursing Agent shall be authorized to collect such tax information from the holders of Claims (including social security numbers or other tax identification numbers) as it in its sole discretion deems necessary to effectuate the Plan. In order to receive Distributions under the Plan, all holders of Claims will need to identify themselves to the Disbursing Agent and provide all tax information the Disbursing Agent deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable to each holder). The Disbursing Agent may refuse to make a Distribution to any holder of a Claim that fails to furnish such information within the time period specified by the Disbursing Agent and such Distribution shall be deemed an unclaimed Distribution under the Plan, and, provided further that, if the Disbursing Agent fails to withhold in respect of amounts received or distributable with respect to any such holder and such Disbursing Agent is later held liable for the amount of such withholding, such holder shall reimburse the Disbursing Agent for such liability. Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, and (b) no Distributions shall be required to be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such tax obligations or has, to the Disbursing Agent's satisfaction, established an exemption therefrom.

## I.    No Payments of Fractional Dollars

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

## J.    Interest on Claims

Except to the extent provided in section 506(b) of the Bankruptcy Code, the Plan, or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims, and no holder of an Allowed Claim shall be entitled to interest accruing on any Claim from and after the Petition Date.

22

## K.  No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of such Claim.

## L.  Setoff and Recoupment

The Liquidating Trustee may setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that the Debtor or the Estate may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the Estate or the Liquidating Trustee of any right of setoff or recoupment that any of them may have against the holder of any Claim. Any such setoffs or recoupments may be challenged in Bankruptcy Court. Notwithstanding any provision in the Plan to the contrary, nothing herein shall bar any creditor from asserting its setoff or recoupment rights to the extent permitted under section 553 or any other provision of the Bankruptcy Code; provided that such setoff or recoupment rights are timely asserted; provided further that all rights of the Debtor, its Estate and the Liquidating Trustee with respect thereto are reserved.

## M.  De Minimis Distributions; Charitable Donation

Notwithstanding anything to the contrary therein, the Liquidating Trustee shall not be required to make a Distribution to any Creditor if the dollar amount of the Distribution is less than $25 or otherwise so small that the cost of making that Distribution exceeds the dollar amount of such Distribution. On or about the time that the final Distribution is made, the Liquidating Trustee may make a charitable donation with undistributed funds if, in the reasonable judgment of the Liquidating Trustee, the cost of calculating and making the final Distribution of the remaining funds is excessive in relation to the benefits to the or holders of Claims who would otherwise be entitled to such Distributions, and such charitable donation is provided to an entity not otherwise related to the Debtor or the Liquidating Trustee.

## N.  United States Trustee Fees

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtor. On and after the Effective Date, the Liquidating Trustee shall pay any and all such fees payable by the Debtor, when due and payable, and shall file with the Bankruptcy Court quarterly reports for the Debtor, in a form reasonably acceptable to the U.S. Trustee. The Debtor shall remain obligated to pay quarterly fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

## O.  Withholding from Distributions

Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from Distributions pursuant to the Plan. The Liquidating Trustee may withhold from amounts distributable pursuant to the Plan to any Person or Entity any and all amounts, determined in the sole and reasonable discretion of the Liquidating Trustee,

\\NY - 045867/000001 - 7769820 v10

required to be withheld by any law, regulation, rule, ruling, directive, or other governmental requirement.

## P.  No Distributions on Late-Filed Claims

Except as otherwise provided in a Final Order of the Bankruptcy Court, any Claim as to which a proof of Claim was required to be filed and was first filed after the applicable bar date in the Chapter 11 Case, including, without limitation, the General Bar Date and any bar date established in the Plan or in the Confirmation Order, shall automatically be deemed a late-filed Claim that is disallowed in the Chapter 11 Case, without the need for (a) any further action by the Liquidating Trustee or (b) an order of the Bankruptcy Court. Nothing in this paragraph is intended to expand or modify the applicable bar dates or any orders of the Bankruptcy Court relating thereto.

## ARTICLE VI.

## DISPUTED CLAIMS

## A.  Disputed Claims Reserve

After the Effective Date, the Disputed Claims Reserve shall be managed by the Liquidating Trustee for the treatment of Disputed Claims. On each Distribution date after the Effective Date in which the Liquidating Trustee makes Distributions to holders of Allowed Claims, the Liquidating Trustee shall retain on account of Disputed Claims an amount the Liquidating Trustee estimates is necessary to fund the Pro Rata share of such Distributions to holders of Disputed Claims if such Claims were Allowed, with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Liquidating Trustee. Cash retained on account of such Disputed Claims shall be retained in the Disputed Claims Reserve for the benefit of the holders of Disputed Claims pending a determination of their entitlement thereto under the terms of the Plan. If any Disputed Claim is disallowed or Allowed in an amount that is lower than the aggregate assets retained on account of such Disputed Claim, then the Liquidating Trustee shall, within fifteen (15) days after such disallowance or allowance, return the assets that exceed the Allowed amount of such Claim to the Debtor's Estate.

## B.  Resolution of Disputed Claims

The Liquidating Trustee shall have the right to make and file objections to Claims in the Bankruptcy Court. Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, all Disputed Claims shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

## C.  Objection Deadline

All objections to Disputed Claims shall be filed no later than the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing, with notice only to those parties entitled to notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002.

\\NY - 045867/000001 - 7769820 v10

## D.    Estimation of Claims

At any time, the Liquidating Trustee may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Liquidating Trustee or the Debtor have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Claim, the Liquidating Trustee may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## E.    No Distributions Pending Allowance

Notwithstanding any other provision in the Plan, if any portion of a Claim is disputed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. Upon allowance, a holder of the Allowed Disputed Claim shall receive any Distributions that would have been made up to the date of allowance to such holder under the Plan had the Disputed Claim been allowed on the Effective Date.

## F.    Resolution of Claims

On and after the Effective Date, the Liquidating Trustee shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

## G.    Treatment of Missouri Intercompany Claims

Notwithstanding anything to the contrary herein or in the Confirmation Order or any other ancillary document, the Missouri Intercompany Claims shall constitute Allowed Claims for all purposes, including, without limitation, voting, confirmation, and Distribution, and shall not be subject to any setoff or recoupment, estimation, dispute, objection, challenge or any other attack.

\\NY - 045867/000001 - 7769820 v10

# ARTICLE VII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.      Assumption or Rejection of Executory Contracts and Unexpired Leases**

In accordance with sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any Person or Entity shall be deemed rejected by the Debtor as of immediately prior to the Confirmation Date, except for any executory contract or unexpired lease (i) that has been assumed or rejected by an order of the Bankruptcy Court entered prior to the Effective Date or (ii) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Effective Date. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of rejection under section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejection is in the best interests of the Debtor, its Estate, and all parties in interest in the Chapter 11 Case.

**B.      Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article VII.A herein, must be filed with the Bankruptcy Court and served on the Debtor and the Liquidating Trustee no later than thirty (30) days after service of notice of the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A herein for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtor, its Estate, the Liquidating Trustee, their respective successors and assigns, and their respective assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.E herein. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III herein.

**C.      Indemnification and Reimbursement**

Subject to the occurrence of the Effective Date, all Allowed Claims against the Debtor for indemnification, defense, reimbursement, or limitation of liability of current or former directors, officers, or employees of the Debtor against any Claims, costs, liabilities or causes of action as provided in the Debtor's articles of organization, bylaws, other organizational documents, or applicable law, shall, to the extent such indemnification, defense, reimbursement, or limitation is owed in connection with one or more events or omissions occurring before the Petition Date, be (i) paid only to the extent of any applicable insurance coverage, and (ii) to the extent a proof of Claim has been timely filed and is Allowed, treated as Allowed General Unsecured Claims to the extent such Claims are not covered by any applicable insurance, including deductibles. Nothing contained herein shall affect the rights of directors, officers or employees under any insurance policy or coverage with respect to such Claims, costs, liabilities or Causes of Action or limit the rights of the Debtor, the Liquidating Trustee or the Debtor's

\\NY - 045867/000001 - 7769820 v10

Estate to object to, seek to subordinate or otherwise contest or challenge Claims or rights asserted by any current or former officer, director or employee of the Debtor.

## ARTICLE VIII.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A.    Conditions Precedent**

The following are conditions precedent to the Effective Date that must be satisfied or waived:

1.    The Bankruptcy Court shall have entered the Confirmation Order.

2.    There shall be no stay or injunction in effect with respect to the Confirmation Order, which such Confirmation Order shall contain approval of the releases provided for herein.

3.    The appointment of the Liquidating Trustee shall have been confirmed by order of the Bankruptcy Court.

4.    All agreements and instruments that are exhibits to the Plan shall be in a form acceptable to the Missouri Liquidating Trustee, and have been duly executed and delivered.

**B.    Waiver**

Notwithstanding the foregoing conditions in Article VIII.A, the Missouri Liquidating Trustee reserves, in its sole discretion, the right to waive the occurrence of or modify any of the foregoing conditions precedent. Any such written waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan; provided, however, that the Creditors' Committee shall have the right to be consulted on and consent to any proposed modification of the Plan, the Plan Supplement or the Confirmation Order. Any actions required to be taken on the Effective Date or Confirmation Date (as applicable) shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

**C.    Notice of Effective Date**

The Missouri Liquidating Trustee shall file with the Bankruptcy Court a notice of occurrence of the Effective Date within seven (7) days after the conditions in Article VIII.A have been satisfied or waived pursuant to Article VIII.B.

\\NY - 045867/000001 - 7769820 v10

# ARTICLE IX.

## INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS

### A.      Compromise and Settlement

Pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided under this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims and Equity Interests. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtor, the Estate and holders of Claims and Equity Interests.

### B.      Releases

1.      <u>Releases by the Debtor and its Estate.</u> Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, the Debtor and its Representatives and the Estate (collectively, the "*Debtor Releasing Parties*") shall be deemed to have provided a full, complete, unconditional, and irrevocable release to the Released Parties (and each such Released Party so released shall be deemed released by the Debtor and its Representatives, the Estate, and the Creditors' Committee and its members but solely in their capacity as members of the Creditors' Committee and not in their individual capacities), from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstance existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor, including, without limitation, those that the Debtor would have been legally entitled to assert or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of the Debtor or the Estate, including those in any way related to the Chapter 11 Case or the Plan; <u>provided that</u> the foregoing release shall not prohibit the Liquidating Trustee from asserting any and all defenses and counterclaims in respect of any Disputed Claim asserted by any of the Released Parties; and <u>provided further that</u> the releases granted to the Non-Missouri Affiliates under this Article IX.B.1 are expressly conditioned upon the subordination of the Non-Missouri Intercompany Claims to General Unsecured Claims for all purposes, including distributions. If the Non-Missouri Intercompany Claims are not subordinated to General Unsecured Claims for all purposes, including distributions, then the releases granted to the Non-Missouri Affiliates under this Article IX.B.1 shall be deemed null and void. Notwithstanding the above, the Releases by the Debtor Releasing Parties provided pursuant to this Article IX.B shall not affect any Causes of Action and any other debts, obligations, rights, suits, judgments, damages, actions, remedies and liabilities arising after the Effective Date and based on any act or omission, transaction, or other occurrence or circumstances taking place after the Effective

\\NY - 045867/000001 - 7769820 v10

Date; <u>provided further that</u> nothing set forth in the preceding proviso shall in any way limit the exculpation provisions set forth in XIII.C below.

2.      <u>Releases by Holders of Claims.</u> Except as otherwise provided herein (including, without limitation, the rights accorded the Missouri Intercompany Claims under this Plan), each Person, other than the Debtor, who votes to accept the Plan and does not mark such ballot to indicate a refusal to grant the release provided for in this paragraph, shall be deemed to fully, completely, unconditionally, irrevocably, and forever release the Released Parties of and from any and all Claims and Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor and its Representatives, whether direct, derivative, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, Disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise.

3.      Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth above under Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action released by this Plan; (b) in the best interests of the Debtor and all holders of Claims and Equity Interests; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to the assertion of any Claim or Cause of Action thereby released.

## C.      Exculpation

Notwithstanding anything contained in the Plan to the contrary, the Released Parties shall neither have nor incur any liability relating to this Chapter 11 Case to any Entity for any and all Claims and Causes of Action arising after the Petition Date and through the Effective Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release, other agreement or document created or entered into in connection with the Plan, or any other post-petition act taken or omitted to be taken in connection with the Chapter 11 Case; <u>provided, however,</u> that the foregoing provisions of this Article IX.C shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

## D.      Preservation of Causes of Action

1.      Unless a Cause of Action against a holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order) of the Bankruptcy Court, the Debtor and its Estate expressly reserve such Cause of Action for later adjudication or administration by the Liquidating Trustee (including,

without limitation, Causes of Action not specifically identified or described in the Plan or elsewhere or of which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances which may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan or Confirmation Order, except where such Causes of Action have been released in the Plan or any other Final Order (including the Confirmation Order). In addition, the Debtor and its Estate expressly reserve the right of the Liquidating Trustee to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

2.     Subject to the immediately preceding paragraph, any Entity to whom the Debtor has incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor, or leased equipment or property from the Debtor should assume that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (a) such Entity has filed a proof of Claim against the Debtor in the Chapter 11 Case; (b) the Debtor has objected to any such Entity's proof of Claim; (c) any such Entity's Claim was included in the Schedules; (d) the Debtor has objected to any such Entity's scheduled Claim; or (e) any such Entity's scheduled Claim has been identified by the Debtor as disputed, contingent or unliquidated.

## E.     Injunction

1.     From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim or Equity Interest, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or satisfied or to be released or satisfied pursuant to the Plan or the Confirmation Order.

2.     Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to this Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to this Plan or the Confirmation Order.

3.     The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity

\\NY - 045867/000001 - 7769820 v10

Interests against the Debtor or any of its assets or properties solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to this Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to this Plan or the Confirmation Order. On the Effective Date, all such Claims against, and Equity Interests in, the Debtor shall be satisfied and released in full.

4.     Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Persons and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released pursuant to the Plan or Confirmation Order, from:

(a)     commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns and their assets and properties;

(b)     enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns and their assets and properties;

(c)     creating, perfecting or enforcing any encumbrance of any kind against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns and their assets and properties; and

(d)     commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder.

## F.     Releases of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estate distributed under the Plan shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the Debtor.

## ARTICLE X.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities, including, without limitation, the Liquidating Trustee, with respect to all matters related to the Chapter 11 Case, the Debtor and the Plan as is legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest against the Debtor, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims;

2.    grant, deny or otherwise resolve any and all applications of Professionals or Persons retained in the Chapter 11 Case by the Debtor or the Creditors' Committee for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.    resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired leases to which the Debtor is party or with respect to which the Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4.    ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan, including by resolving any disputes regarding the Debtor's entitlement to recover assets held by third parties;

5.    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Liquidating Trustee after the Effective Date;

6.    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

7.    resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

8.    issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

9.    enforce Article IX.A, Article IX.B, Article IX.C, Article IX.D and Article IX.E hereof;

10.    resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX herein, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

11.    resolve any cases, controversies, suits or disputes with respect to settlement of the Missouri Intercompany Claims;

\\NY - 045867/000001 - 7769820 v10

12.     enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

13.     resolve any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

14.     enter an order and a Final Decree closing the Chapter 11 Case.

## ARTICLE XI.

## MISCELLANEOUS PROVISIONS

### A.     Modification of the Plan

1.     Preconfirmation Amendment

The Missouri Liquidating Trustee may modify the Plan, subject to section 1127 of the Bankruptcy Code, at any time prior to the entry of the Confirmation Order provided that the Plan, as modified, meets applicable Bankruptcy Code requirements.

2.     Postconfirmation Amendment Not Requiring Resolicitation

After the entry of the Confirmation Order, the Missouri Liquidating Trustee may modify the Plan, subject to section 1127 of the Bankruptcy Code, to remedy any defect or omission or to reconcile any inconsistencies in the Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan; provided that the Missouri Liquidating Trustee obtain approval of the Bankruptcy Court for such modification, after notice and a hearing. Any waiver under Article VIII.B. of this Plan shall not be considered to be a modification of the Plan.

### B.     Revocation or Withdrawal of the Plan

The Missouri Liquidating Trustee reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans. If the Missouri Liquidating Trustee revokes or withdraws the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission of any sort by the Debtor or any other Entity.

### C.     Binding Effect

On the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtor and such holder's respective successors and assigns, whether or

not the Claim or Equity Interest of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a Distribution under the Plan.

### D.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### E.    Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, unless otherwise stated, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the principles of conflict of laws thereof.

### F.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Effective Date occurs. Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by the Missouri Liquidating Trustee or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

### G.    Article 1146 Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

### H.    Section 1125(e) Good Faith Compliance

Confirmation of the Plan shall act as a finding by the Bankruptcy Court that the Missouri Liquidating Trustee and its Representatives have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

### I.    Further Assurances

The Debtor, the Liquidating Trustee, all holders of Claims receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

\\NY - 045867/000001 - 7769820 v10

**J.      Service of Documents**

Any pleading, notice or other document required by the Plan to be served on or delivered to the Missouri Liquidating Trustee shall be sent by first class U.S. mail, postage prepaid as follows:

**To the Missouri Liquidating Trustee:**

Drivetrain, LLC
630 Third Avenue, 21st Floor
New York, NY, 10017
Attention:      Alan J. Carr
                    Tim Daileader
E-mail address: acarr@drivetrainadvisors.com
                    tdaileader@drivetrainadvisors.com

*with a copy to:*

Hogan Lovells US LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
Attention:      Christopher R. Donoho, III
                    Ronald J. Silverman
E-mail address: chris.donoho@hoganlovells.com
                    ronald.silverman@hoganlovells.com

**To the Debtor:**

Abengoa Bioenergy of Biomass of Kansas, LLC
16150 Main Circle Drive, Suite 300
Chesterfield, Missouri 63017
Attention: General Counsel
E-mail address: jeffrey.bland@abengoa.com

*with a copy to:*

DLA Piper LLP (US)
1717 Main St., Suite 4600
Dallas, Texas 75201
Fax no.: (972) 813-6267
Attention:  Vincent P. Slusher
                David E. Avraham
E-mail address:vince.slusher@dlapiper.com

35

david.avraham@dlapiper.com

-and-

Armstrong Teasdale LLP
2345 Grand Blvd.
Suite 1500
Kansas City, Missouri 64108
Attention: Christine L. Schlomann
Email address: cschlomann@armstrongteasdale.com

## K.    Filing of Additional Documents

On or before the Effective Date, the Missouri Liquidating Trustee may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## L.    No Stay of Confirmation Order

The Missouri Liquidating Trustee shall request that the Bankruptcy Court waive stay of enforcement of the Confirmation Order otherwise applicable, including pursuant to Federal Rules of Bankruptcy Procedure 3020(e), 6004(h) and 7062.

36

Dated: July 19, 2017                    Missouri Liquidating Trustee

By:    */s/ Timothy Daileader*
          Name:   Timothy Daileader
          Title:    Authorized Signatory

**Exhibit 2**
Recovery Analysis

\\NY - 045867/000001 - 7840945 v11

# Exhibit 2
## Recovery Analysis

Pursuant to the Missouri Liquidating Trustee's Plan of Liquidation, *"Allowed General Unsecured Claim[s] shall receive their Pro Rata share of remaining Cash, provided that distributions to holders of Allowed Missouri Intercompany Claims shall be limited to the extent necessary to permit General Unsecured Claims other than Missouri Intercompany Claims to receive percentage distributions hereunder equaling no less than the percentage distributions received by General Unsecured Claims classified as Bioenergy Class 2 in the Missouri Plan calculated as if the Debtor was substantially consolidated with the Missouri Bioenergy Debtors."*

The chart below sets forth (A) estimated distributions to general unsecured creditors in the Missouri Chapter 11 cases (exclusive of any recovery on claims against the Debtor), (B) estimated distributions to general unsecured creditors in this Chapter 11 case assuming that Missouri Intercompany Claims are allowed in full with pro rata treatment (C) estimated distributions to general unsecured creditors assuming the assets and claims of the Debtor and the Missouri Bioenergy Debtors are combined (excluding the Missouri Intercompany Claims), and (D) estimated distributions to general unsecured creditors in this Chapter 11 case pursuant to the Plan, including an illustrative estimated reduction in Missouri Intercompany Claims (using the stated assumptions).

| | A | B | C | D |
|---|---|---|---|---|
| | Estimated Recovery in Missouri | ABBK Assets & Claims | Illustrative Pro Forma Recovery on a Combined Basis | Plan Recovery Including Illustrative Reduction in Missouri Intercompany Claims |
| Missouri Distributable Cash | $ 106.3 [1] | $ - | $ 106.3 | $ - |
| Missouri Note from Spain | 10.0 | - | 10.0 [2] | - |
| ABBK Distributable Cash | - | 19.0 | 19.0 [3] | 19.0 |
| **Proceeds Available to GUCs** | **116.3** | **19.0** | **135.3** | **19.0** |
| | | | | |
| Missouri Bioenergy Class 2 Creditors | 385.0 | - | 385.0 [4] | - |
| ABBK Class 2 Third Party Creditors | - | 30.2 | 30.2 [5] | 30.2 |
| ABBK Class 2 Intercompany Claims | - | 69.5 [6] | - | 28.1 [7] |
| **Total GUCs** | **$ 385.0** | **$ 99.7** | **$ 415.2** | **$ 58.3** |
| *Recovery* | *30.2%* [8] | *19.1%* | *32.6%* | *32.6%* |

| | | |
|---|---|---|
| Total Missouri Intercompany Claims | $ | 69.5 |
| Less: Estimated Allowed Missouri Intercompany Claims | | (28.1) |
| Estimated Voluntarily Waived Missouri Intercompany Claims | $ | 41.4 | 60% |

**Notes:**

(1) Case 16-41161, Dkt. 1071, Missouri Disclosure Statement, page 143. "General Unsecured Claims Recoveries from Proceeds" under Chapter 11. Exclusive of recovery on intercompany claims against the Debtor, but reflecting the $2M COFIDES settlement.

(2) Case 16-41161, Dkt. 1071, Missouri Disclosure Statement, page 143. "General Unsecured Claims Other Recoveries" under Chapter 11. Illustratively assumes high end of note value range.

(3) Case 16-10446, Dkt. 969, page 367, Exhibit 7. "Estimated Proceeds Available for General Unsecured Claims", excluding $771K of Trustee Fees.

(4) Case 16-41161, Dkt. 1071, Missouri Disclosure Statement, page 143. "Estimated General Unsecured Claims" under Chapter 11.

(5) Case 16-10446, Dkt. 969, page 367, Exhibit 7. Estimated "Other General Unsecured Creditors."

(6) First Amended Disclosure Statement for Missouri Liquidating Trustee's First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code, Article IV. J.

(7) A total of $69.5M of intercompany claims have been asserted by Abengoa Bioenergy Company, LLC; Abengoa Bioenergy Trading US, LLC; Abengoa Bioenergy Outsourcing, LLC; and Abengoa Bioenergy Engineering & Construction, LLC against the Debtor. Pursuant to the Plan, the Missouri Intercompany Claims will voluntarily waive distributions as set forth in the Plan (see Note above). Assuming an estimated 32.6% recovery for the Debtor's general unsecured creditors, that results in an effective waiver of $41.4M of the $69.5M of Missouri Intercompany Claims. This is calculated as: ($19.0M ABBK Distributable Cash / 32.6% Recovery) - ($30.2M Third Party Creditors).

(8) Case 16-41161, Dkt. 1071, Missouri Disclosure Statement, page 143. "General Unsecured Claims Recovery %" is 30.7% under Chapter 11. The 30.2% recovery reflects the impact of the $2M COFIDES settlement which is documented under Case 16-41161, Dkt. 1443, Confirmation Order, Section 20. C.

**Exhibit 3**
Letter from Missouri Liquidating Trustee

64



**To all Creditors of:**

**In re Abengoa Bioenergy Biomass of Kansas, LLC, *et al.*, (the "<u>Debtor</u>"), Case No. 16-10446, United States Bankruptcy Court for the District of Kansas**

Dear Creditors:

We are Drivetrain, LLC, acting in its capacity as the liquidating trustee of Abengoa (MO), the representative for the creditor interests in that case. We write to you to explain why we are proposing an alternative plan and why we think you should support it. This letter is our attempt to do so, and to encourage you to vote for our plan. The United States Bankruptcy Court for the District of Kansas has authorized the solicitation of your vote on the *Missouri Liquidating Trustee's First Amended Plan of Liquidation pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 968] (the "<u>LT Plan</u>"). The LT Plan is different than, and we think superior to, the Debtor's Plan[1] that was previously sent to creditors for their vote, <u>because it provides a higher recovery to general unsecured creditors</u>.

Our LT Plan is superior for several simple reasons:

- **First, it is fair.** The LT Plan provides Kansas general unsecured creditors a recovery equal to that which similarly situated general unsecured creditors will receive under the plan already approved in the Missouri Chapter 11 cases of Kansas' sister companies. If the LT Plan is approved, that recovery is estimated to be approximately 33%.

- **Second, it gives you a <u>higher recovery</u>.** The Missouri Liquidating Trustee believes that any alternative plan or other scenario will result in a materially lower recovery to Kansas general unsecured creditors. That is because the Debtor's Plan proposes to provide no distribution to the $69 million of claims held by the Debtor's sister companies who are in the Missouri Chapter 11 cases (the "<u>Missouri Claims</u>"). The Missouri Liquidating Trustee has objected to the Debtor's Plan and believes that those $69 million of claims will be recognized, severely diluting recoveries to the approximately $30 million of other claims. The resulting *pro rata* distribution (*i.e.*, where all general unsecured claims receive the same percentage recovery) to Kansas creditors once the Missouri Claims are allowed is estimated to be approximately 19%. **Thus, the Missouri Liquidating Trustee believes that general unsecured creditor recoveries under the Debtor's Plan are estimated to be 14 cents lower than the recovery under the LT Plan.** Although the Debtor and the Official

---

[1] Capitalized terms not otherwise defined have the meaning ascribed to them in the LT Plan or the Disclosure Statement, as applicable.

Committee of Unsecured Creditors in this Chapter 11 Case (the "Kansas UCC") do not agree that the Missouri Claims will be recognized, the Missouri Liquidating Trustee believes that will be the case.

- **Third, you will get your money sooner.** If the Missouri Claims are contested, the Missouri Liquidating Trustee will be forced to litigate those claims as well as pursue its previously filed objection to the Debtor's Plan. Thus, in the event that creditors do not vote to approve the LT Plan, litigation over the allowance of the Missouri Claims will substantially delay distributions to Kansas general unsecured creditors, perhaps for years given the appeal processes, while the determination of the Missouri Claims winds its way through the courts.

We would also note that, although the Debtor's Plan stated an estimated recovery of 95% to Kansas general unsecured creditors, the Missouri Liquidating Trustee believes that is materially overstated. Thus, even if the Debtor's Plan is successful in denying the Missouri Claims any recovery (which the Missouri Liquidating Trustee does not believe will be the case), the Missouri Liquidating Trustee believes that based on both updated cash amounts available for unsecured creditors and on scheduled and filed claims, Kansas general unsecured creditors would at best receive an estimated 63% recovery, which would in practice be diluted further by litigation costs. Again, however, the Missouri Liquidating Trustee does not believe that the Missouri Claims can be ignored and that once allowed, Kansas general unsecured creditors will receive an estimated 19% (prior to reductions for litigation costs), not 95% or even 63%.[2]

The LT Plan provides an estimated recovery of 33% to Kansas general unsecured creditors—which is more than Kanas general unsecured creditors would recover in a straight *pro rata* plan—because the Missouri Liquidating Trustee believes that the facts and the law supports equality of distributions among the creditors of the Debtor and its sister Missouri companies. Thus, based on the relevant facts and the law, and as a matter of compromise, the Missouri Liquidating Trustee is prepared to offer Kansas general unsecured creditors the estimated 33% recovery, as opposed to seeking to leave Kansas general unsecured creditors with the 19% recovery (prior to reductions for litigation costs) that they would be entitled to in a *pro rata* distribution. Once approved and effective, the LT Plan has the additional benefit of providing quicker distributions to creditors, as funds will not be required to be held in reserve pending the outcome of litigation over the allowance of the Missouri Claims.

---

[2] Even if only HALF of the Missouri Claims were allowed, under a *pro rata* distribution scenario, Kansas general unsecured creditors can expect no better than a 30% recovery (prior to reductions for litigation costs)—still less than the estimated recovery under the LT Plan.

2

Accordingly, the Missouri Liquidating Trustee urges creditors to vote for the LT Plan: it provides a higher and quicker distribution than available under the alternative of the Debtor's Plan. Creditors should return their ballots by voting for or against the LT Plan, but also select WHICH of the Plans they prefer, even if they have already voted for the Debtor's Plan when that plan was solicited earlier.

This Solicitation Package contains the following items on the enclosed CD:

1. The Disclosure Statement with exhibits;

2. The LT Plan;

3. A copy of the order (the "Solicitation Procedures Order"), of the Bankruptcy Court regarding the Disclosure Statement and the LT Plan; and

4. A ballot for voting on the LT Plan including indicating whether a creditor prefers the LT Plan or the Debtor's Plan, and instructions for completing such ballot;

If you have any questions regarding the Plan or this Solicitation Package, please contact counsel for the Missouri Liquidating Trustee: Hogan Lovells US LLP, 875 Third Avenue, New York, New York 10022 (Attn.: M. Shane Johnson), (212) 918-3775 or shane.johnson@hoganlovells.com.

In addition, copies of the Plan and the Disclosure Statement may be obtained from the Bankruptcy Court's website, www.ksb.uscourts.gov, for a fee. A PACER login and password are required to access documents on the Bankruptcy Court's website, and these can be obtained through the PACER Service Center at www.pacer.gov.

Sincerely,

**DRIVETRAIN, LLC**

Alan J. Carr
Tim Daileader
630 Third Avenue, 21st Floor
New York, NY, 10017
Telephone: (212) 856- 9700
acarr@drivetrainadvisors.com
tdaileader@drivetrainadvisors.com

3

**<u>Exhibit 4</u>**
Solicitation Procedures Order

\\NY - 045867/000001 - 7840945 v11

In the United States Bankruptcy Court for the District of Kansas
In re:, Case No. 16-10446
Order and Notice to Creditors and Parties in Interest in a Chapter 11 Case
Page 1

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

IN RE:

**ABENGOA BIOENERGY BIOMASS**      **Case Number: 16-10446**
**OF KANSAS, LLC**      **Chapter 11**

**Debtor(s)**

## [PROPOSED] ORDER AND COMBINED NOTICE TO
## CREDITORS AND PARTIES IN INTEREST IN A CHAPTER 11 CASE

To the debtor, plan proponent, creditors, and other parties in interest:

Disclosure Statements and two competing Plans of Liquidation have now been filed in this case under §§ 1121 and 1125 and Fed. R. Bankr. P. 3016 and 3017. *The competing Plans of Liquidation are being separately balloted. Creditors and parties in interest must cast their vote on each ballot to have their vote counted on each competing Plan of Liquidation and to vote on their plan preference.*

Debtor filed its First Amended Disclosure Statement (Doc. 863-1) ("Debtor's Disclosure Statement") and its Plan of Liquidation dated April 14, 2017 (Doc. 811) ("Debtor's Plan"). Following a hearing on May 22, 2017, Debtor's Disclosure Statement was approved as containing adequate information and the Court set the evidentiary hearing on confirmation of Debtor's Plan for August 8-9, 2017, authorizing Debtor to ballot its Plan. July 7, 2017 was the last day for receipt of ballots. Balloting of Debtor's Plan has therefore been completed.

On July 7, 2017, plan proponent Drivetrain, LLC, the Missouri Liquidating Trustee for the chapter 11 cases of Abengoa Bioenergy US Holding, LLC, *et al.,* Case No. 16-41161-659 (Bankr. E.D. Mo.) filed a competing Plan of Liquidation (Doc. 932) and on July 19, 2017 filed its First Amended Plan of Liquidation (Doc. 968) (the "Missouri Liquidating Trustee's Plan", and collectively with the Debtor's Plan, the "Competing Plans") and its Disclosure Statement (Doc. 969). On July 27, 2017, the Missouri Liquidating Trustee filed its First Amended Disclosure Statement (Doc. •) (the "Missouri Liquidating Trustee's Disclosure Statement"). The scheduling set forth below pertains to the Missouri Liquidating Trustee's Plan and Disclosure Statement. The Missouri Liquidating Trustee's Plan will be separately balloted as set forth herein, *but the ballot form shall also include a provision for creditors and parties in interest to vote their preference for the Debtor's Plan or the Missouri Liquidating Trustee's Plan.*

IT IS ORDERED and NOTICE IS HEREBY GIVEN, that

    1.    The Court has reviewed the Missouri Liquidating Trustee's Disclosure Statement and approves the Disclosure Statement as containing adequate information.

In the United States Bankruptcy Court for the District of Kansas
In re:, Case No. 16-10446
Order and Notice to Creditors and Parties in Interest in a Chapter 11 Case
Page 2

2.  An evidentiary hearing on the confirmation of the two Competing Plans will be held at the United States Courthouse, 401 North Market, Courtroom 150, Wichita, Kansas on [•], **2017**.

3.  Objections to the Missouri Liquidating Trustee's Plan shall be filed with the Clerk of the Bankruptcy Court on or before [•], **2017 at 5:00 p.m. CDT** and served on the Missouri Liquidating Trustee, Debtor, the Official Committee of Unsecured Creditors, and the United States Trustee pursuant to Fed. R. Bankr. P. 3020(b)(1).

4.  **[•], 2017 at 5:00 p.m. CDT** is fixed as the last day for receipt of acceptances or rejections of the Missouri Liquidating Trustee's Plan and for voting a plan preference. All ballots must be received by the Attorney for the Missouri Liquidating Trustee:

    HOGAN LOVELLS US LLP
    Christoper R. Donoho, III
    Ronald J. Silverman
    M. Shane Johnson
    Raphaella S. Ricciardi
    875 Third Avenue
    New York, New York 10022
    Telephone: (212) 918-3000
    shane.johnson@hoganlovells.com

    Counsel for the Missouri Liquidating Trustee shall file with the Court a **Certificate of Voting** no later than **4:00 p.m. CDT on** [•], **2017.**

5.  On or before **August [•], 2017,** counsel for the Missouri Liquidating Trustee shall distribute its Disclosure Statement, its Plan, the ballot approved by the Court (conforming to Official Form 314 and including a provision for voting on a plan preference), a cover letter from the Missouri Liquidating Trustee explaining its Plan, a cover letter from the Official Committee of Unsecured Creditors of the Debtor, and all solicitation materials approved by the Court, together with this Order and Combined Notice by mail pursuant to Fed. R. Bankr. P. 2002(b). Because of the size of the Missouri Liquidating Trustee's Plan and Disclosure Statement the Missouri Liquidating Trustee is authorized as an option to send its Plan and Disclosure Statement to creditors by thumb drive or CD. Upon distribution and mailing counsel shall file a Certificate of Mailing listing the names and addresses of those parties to whom distribution and mailing was made.

6.  Requests for copies of the Missouri Liquidating Trustee's Disclosure Statement and Plan shall be sent to:

    HOGAN LOVELLS US LLP
    Christoper R. Donoho, III
    Ronald J. Silverman
    M. Shane Johnson

In the United States Bankruptcy Court for the District of Kansas
In re:, Case No. 16-10446
Order and Notice to Creditors and Parties in Interest in a Chapter 11 Case
Page 3

Raphaella S. Ricciardi
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
shane.johnson@hoganlovells.com

7.      The evidentiary hearing on confirmation of Debtor's Plan is continued to **[•], 2017 at 9:00 a.m CDT** to be heard with confirmation of the Missouri Liquidating Trustee's Plan. **Debtor's counsel shall file with the Court a Certificate of Voting regarding Debtor's Plan no later than 4:00 p.m. CDT on [•], 2017.**

Dated: August [•], 2017                    s/ _____
                                           Hon. Robert E. Nugent
                                           United States Bankruptcy Judge

**<u>Exhibit 5</u>**
Form of Ballot for Class 2 General Unsecured Claims

\\NY - 045867/000001 - 7840945 v11

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

In re:

ABENGOA BIOENERGY BIOMASS OF KANSAS, LLC,

Debtor.

Chapter 11

Case No. 16-10446

## CLASS 2 BALLOT (GENERAL UNSECURED CLAIMS)
## TO ACCEPT OR REJECT THE MISSOURI LIQUIDATING TRUSTEE'S FIRST
## AMENDED PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE LT PLAN IS [•], 2017 AT 5:00 P.M. (PREVAILING CENTRAL TIME).**

**YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THIS DEADLINE IN ORDER TO BE COUNTED.**

This ballot (the "**Ballot**") is submitted to you to solicit your vote to accept or reject the *Missouri Liquidating Trustee's First Amended Plan of Liquidation pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, and/or supplemented, the "**LT Plan**")[1] [Docket No. •], submitted by the Missouri Liquidating Trustee and described in the related disclosure statement (as may be amended, modified, and/or supplemented, the "**Disclosure Statement**") [Docket No. •]. Copies of the LT Plan and the Disclosure Statement may be obtained: (i) by contacting counsel to the Missouri Liquidating Trustee, Hogan Lovells US LLP, c/o M. Shane Johnson, 875 Third Avenue, New York, New York 10022, (212) 918-3775 (email: shane.johnson@hoganlovells.com) or (ii) from the Bankruptcy Court's website, www.ksb.uscourts.gov, for a fee. A PACER login and password are required to access documents on the Bankruptcy Court's website, and these can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov. You should review the Disclosure Statement and the LT Plan before you vote. You may wish to seek legal advice concerning the LT Plan and the classification and treatment of your Claim under the LT Plan.

The LT Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the Holders of at least two-thirds in amount <u>and</u> more than one-half in number of the Allowed Claims in each Class of Claims that actually vote on the LT Plan and by the Holders of at least two-thirds in amount of Allowed Equity Interests in each Class of Equity Interests that actually vote on the LT Plan[2] and if the LT Plan otherwise satisfies the applicable requirements of section 1129(a) under title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"). If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the LT Plan if it finds that the LT Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes rejecting the LT Plan, and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

To have your vote counted, you must complete, sign, and return this Ballot to the following address by first class mail, overnight courier, hand delivery or electronic mail: Thompson Coburn LLP c/o Mark V. Bossi, One US Bank Plaza, St. Louis, Missouri 63101 (email: mbossi@thompsoncoburn.com), so that it is received by the deadline indicated above.

---

[1] Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined have the meanings given to them in the LT Plan.

[2] If no Holders of Claims in a particular Class vote to accept or reject the LT Plan, the LT Plan shall be deemed accepted by the Holders of such Claims in such Class.

## NOTICE REGARDING CERTAIN RELEASE, EXCULPATION AND INJUNCTION PROVISIONS IN THE LT PLAN

PLEASE BE ADVISED THAT THE LT PLAN CONTAINS CERTAIN RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, INCLUDING:

Article IX.B.2 of the LT Plan contains the following releases by Holders of Claims:

**Except as otherwise provided herein (including, without limitation, the rights accorded the Missouri Intercompany Claims under this Plan), each Person, other than the Debtor, who votes to accept the Plan and does not mark such ballot to indicate a refusal to grant the release provided for in this paragraph, shall be deemed to fully, completely, unconditionally, irrevocably, and forever release the Released Parties of and from any and all Claims and Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor and its Representatives, whether direct, derivative, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, Disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise.**

**OTHER RELEASE, EXCULPATION AND INJUNCTION PROVISIONS ARE FOUND IN ARTICLE IX OF THE LT PLAN. YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE LT PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**PLEASE READ THE ATTACHED VOTING INFORMATION AND INSTRUCTIONS BEFORE COMPLETING THIS BALLOT.**

---

**PLEASE COMPLETE ITEMS 1, 2, 3, AND 4. IF THIS BALLOT IS NOT SIGNED ON THE APPROPRIATE LINES, THIS BALLOT WILL NOT BE VALID OR COUNTED AS HAVING BEEN CAST.**

---

**Item 1. Class Vote.** The undersigned, a Holder of a Class 2 Claim against the above-captioned Debtor, in the voting amount set forth below, votes to (check <u>one</u> box only). You may vote to accept or reject the LT Plan even if you previously voted to accept or reject the Debtor's Plan (as defined below).

☐ **Accept** the LT Plan.          ☐ **Reject** the LT Plan.

Voting Amount: $ _____

**Item 2. Optional Release Election.** Check this box if you elect <u>not</u> to grant the releases contained in Article IX.B.2 of the LT Plan. Election to withhold consent is at your option. If you do not check the box below opting out of the release provisions in Article IX.B.2 of the LT Plan, you will be deemed to consent to the releases set forth in Article IX.B.2 of the LT Plan with respect to the Released Parties.

☐          The undersigned elects <u>not</u> to grant the releases contained in Article IX.B.2 of the LT Plan.

**Item 3. Preference for LT Plan or Debtor's Plan.** On April 14, 2017, the Debtor filed its *Plan of Liquidation pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 811] (the "**Debtor's Plan**"), which the Debtor has separately sent to creditors to vote on along with the *First Amended Disclosure Statement for Debtor's Plan of Liquidation dated as of April 14, 2017 pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 863]. Please indicate below which plan you prefer (check <u>one</u> box only):

☐ **I prefer the LT Plan.**          ☐ **I prefer the Debtor's Plan.**

**Item 4. Acknowledgments.** By signing and returning this Ballot, the undersigned acknowledges receipt of the Disclosure Statement (including the exhibits thereto) and the other applicable solicitation materials and certifies that as of the Voting Record Date the undersigned is the Holder of the Claim set forth in Item 1 above and has the power and authority to vote to accept or reject the LT Plan. To the extent the undersigned is voting on behalf of an actual Holder of the Claim set forth in Item 1 above, the undersigned certifies that it has the requisite authority to do so and will submit evidence of the same upon request. The undersigned also acknowledges that the solicitation and tabulation of votes on the LT Plan is subject to the terms and conditions of the Disclosure Statement. The undersigned understands that an otherwise properly completed, executed and timely returned Ballot that does not indicate either acceptance or rejection of the LT Plan or indicates both acceptance and rejection of the LT Plan will not be counted.

_____

Name of Creditor

_____

Signature

_____

If by Authorized Agent, Name and Title

_____

Name of Institution

_____

Street Address

_____

City, State, Zip Code

_____

Taxpayer Identification Number

_____

Telephone Number

_____

Email Address

_____

Date Completed

**Exhibit 6**
Summary of Missouri Plan Creditor Treatment

\\NY - 045867/000001 - 7840945 v11

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In re:<br><br>ABENGOA BIOENERGY BIOMASS OF KANSAS, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 16-10446 |

## SUMMARY OF MISSOURI PLAN CREDITOR TREATMENT

On February 24, 2016, ABUS,[1] ABO, ABT, ABEC, ABNE, and ABC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Missouri Bankruptcy Court, jointly administered under Case No. 16-41161-659. ABMR, ABF, ABM, AB Ops, ABI, and ABIL filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Missouri Bankruptcy Court on June 12, 2016.

On August 22, 2016, the Missouri Debtors sold five ethanol plants at an auction for the following amounts:

- Ethanol Plants located in Madison, Illinois and Mount Vernon, Indiana (the "Maple Plants") to Green Plains Inc. for $200 million, plus certain working capital items;
- Ethanol Plant located in Ravenna, Nebraska (the "Ravenna Plant") to KE Holdings, LLC for $115 million, plus certain working capital items;
- Ethanol Plant located in York, Nebraska (the "York Plant") to Green Plains Inc. for $37.375 million, plus certain working capital items; and
- Ethanol Plant located in Colwich, Kansas (the "Colwich Plant") to ICM, Inc. for $3.15 million.

The sale of the Maple Plants and the York Plant closed on September 23, 2016, the sale of the Ravenna Plant closed on September 30, 2016, and the sale of the Colwich Plant closed on October 12, 2016. Proceeds of these sales were used to repay secured debt and certain

---

[1] Capitalized terms not otherwise defined have the meaning ascribed to them in the Plan or the Disclosure Statement, as applicable.

administrative expenses, with the balance available for distribution under the Missouri Plan, and as set forth on Exhibit 2 to the Disclosure Statement (Recovery Analysis).

On March 2, 2017, the Missouri Debtors and the Missouri Committee filed the Missouri Disclosure Statement, which the Missouri Bankruptcy Court approved on that same day [MO Docket No. 1072]. The Missouri Plan proposed the separate substantive consolidation of (i) ABUS, ABO, ABT, ABEC, ABNE, ABC, ABMR, ABF, ABM, and AB Ops (collectively, the "Missouri Bioenergy Debtors") and (ii) ABI and ABIL.

On June 8, 2017, the Missouri Bankruptcy Court entered the Missouri Confirmation Order, which, among other things, approved the Missouri Plan's separate substantive consolidation of the Missouri Bioenergy Debtors and ABI and ABIL. In paragraph II of the Confirmation Order, the Missouri Bankruptcy Court found that "the proposed consolidation structure is necessary and appropriate based on applicable case law because of the interrelationship among the [Missouri] Debtors, the significant benefits that the [Missouri] Plan provides to creditors in comparison to any potential harm that would result from confirmation of the [Missouri] Plan, and because creditors would be harmed if the [Missouri] Plan were not confirmed."

Below is a summary of the treatment of the Missouri Bioenergy Debtors' creditors under the Missouri Plan, with the treatment of general unsecured creditors bolded.

## Treatment of Missouri Bioenergy Debtors' Creditors

| Class | Type of Claim or Equity Interest | Treatment | Estimated Total Claims[2] | Estimated Percentage Recovery | Voting Status |
|---|---|---|---|---|---|
| -- | DIP Claims | To the extent not already satisfied prior to the date hereof, the DIP Claims shall be deemed Allowed Claims under the Plan. The DIP Claims shall be satisfied in full, on the Effective Date, by the termination of all commitments under the DIP Credit Agreements, as applicable, and indefeasible payment in full in Cash of all outstanding obligations thereunder. Until so satisfied in full, the DIP Lenders shall retain all rights, Claims, and Liens available pursuant to the applicable DIP Credit Agreement and applicable DIP Order. | $0 | 100% | Nonvoting |
| -- | Allowed Administrative Claims (other than claims for Accrued Professional Compensation) | Paid in full, in Cash, from the assets of the Debtors' Estates: (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (3) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the GUC Liquidating Trustee, as applicable; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided, however*, that Administrative Claims do not include Administrative Claims filed after the Initial Administrative Claims Bar Date or the Final Administrative Claims Bar Date or Administrative Claims filed or asserted pursuant to section 503(b)(9) of the Bankruptcy Code after the General Bar Date, unless the Debtors or the GUC Liquidating Trustee, as applicable and in their respective discretion, choose to treat those Claims as Administrative Claims. | Undetermined | 100% | Nonvoting |
| -- | Allowed Claims for Accrued Professional Compensation | Paid in full, in Cash, without interest. | Undetermined | 100% | Nonvoting |
| -- | Allowed Priority Tax Claims | Paid in full, in Cash, from the assets of the Debtors' Estates, each Holder of an Allowed Priority Tax Claim, in satisfaction of any Allowed Priority Tax Claim, the full unpaid amount of Allowed Priority Tax Claims, on the later of (i) the Effective Date, (ii) the date an Allowed Priority Tax Claim becomes Allowed or as soon as practicable thereafter, and (iii) the date an Allowed Priority Tax Claim is payable under applicable non-bankruptcy law. | Undetermined | 100% | Nonvoting |

---

[2] The "Estimated Total Claims" reflect the face amount asserted with respect to such Claims. The "Estimated Percentage Recovery" reflects the estimated percentage distribution on account of the Debtors' estimated amount of allowable Claims; *provided, however*, that nothing contained herein shall be construed as an admission as to the validity, amount, or priority of any such Claim.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Total Claims[2] | Estimated Percentage Recovery | Voting Status |
|---|---|---|---|---|---|
| -- | Allowed Other Priority Claims | Paid in full, in Cash, from the assets of the Debtors' Estates, each Holder of an Allowed Other Priority Claim, in satisfaction of an Allowed Other Priority Claim, the full unpaid amount of an Allowed Other Priority Claim, on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date an Allowed Other Priority Claim becomes Allowed or as soon as practicable thereafter, and (iii) the date an Allowed Other Priority Claim is payable under applicable non-bankruptcy law. | Undetermined | 100% | Nonvoting |
| 1 | Other Secured Claims | On or as soon as practicable after the Effective Date, to the extent any Other Secured Claims exist, they will either be paid in full or they will receive the Debtors' assets in which the Holder of an Other Secured Claim has an interest. | $643,000 | 100% | Deemed to Accept |
| **2** | **General Unsecured Claims** | **On or as soon as practicable after the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Bioenergy General Unsecured Claims Fund [consisting of the Cash and other Assets of the Bioenergy Debtors except for the $32.5 million for the MRA Guarantee Claims], except to the extent that a Holder of an Allowed General Unsecured Claim has been paid prior to the Effective Date or agrees to a less favorable classification and treatment.** | **$385,000,000** | **30.7%[3]** | **Entitled to Vote** |
| 3 | MRA Guarantee Claims | On or as soon as practicable after the Effective Date, and subject to the rights, if any, of the Note Agents to assert their Charging Liens under each indenture governing the Notes, each Holder of an Allowed MRA Guarantee Claim shall receive (i) the payment of the fees, costs, and expenses of Société Générale S.A. and the Note Agents under the Notes associated with the Chapter 11 Cases but only to the extent that such fees are not otherwise paid by the Parent; provided, however, that if the GUC Liquidating Trustee makes such payment, and the Master Restructuring Agreement provides for such payment as Administration Costs (as defined in the Master Restructuring Agreement), the Note Agents and Société Générale S.A. shall assign to the GUC Liquidating Trust all rights and remedies, if any, under the Master Restructuring Agreement solely with respect thereto (and such rights and remedies shall not be amended or otherwise changed without the consent of the Creditors' Committee or the GUC Liquidating Trustee), (ii) its Pro Rata share of the MRA Guarantee Claims Fund, and (iii) releases of the Parent and any other Go Forward Companies as provided in Article IX.B. Notwithstanding anything to the contrary, the MRA Guarantee Claims shall constitute Allowed Claims for all purposes, including, without limitation, voting, confirmation, and | $6,519,619,000[4] | 0.5% | Entitled to Vote |

---

[3] The Bioenergy General Unsecured Claims Fund includes the rights to Claims against European Affiliates under the treatment afforded under the Spanish Master Restructuring Agreement. These Claims come in the form of a note receivable with a face value of approximately $19.5 million. Recoveries against this note are estimated to have a present value of $10 million to take into account uncertainty of collection and the time value of money. Recoveries under the note may be as low as $0. Accordingly, the range of recoveries based upon the potential value of the note is between 28.1% and 30.7%. The settlement with Cofides approved pursuant to the Missouri Confirmation Order reduced the 30.7% estimated distribution slightly.

[4] This amount is based on the Debtors' Books and Records and subject to further adjustment.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Total Claims[2] | Estimated Percentage Recovery | Voting Status |
|---|---|---|---|---|---|
| | | Distribution. For the avoidance of doubt, and notwithstanding anything to the contrary, the MRA Guarantee Claims Fund and any other Assets that constitute part of the treatment for, and will be distributed to satisfy, the MRA Guarantee Claims under the Plan shall be for the sole benefit of Holders of MRA Guarantee Claims and shall not be used for any other purpose. | | | |
| 4A | Intercompany Claims by Non-Debtor Affiliates | Holders of Intercompany Claims by Non-Debtor Affiliates, except for any intercompany claim held by Abengoa Bioenergy Biomass of Kansas, LLC, will receive no distribution under the Plan. | Undetermined | 0% | Deemed to Reject |
| 4B | Intercompany Claims by Debtor Affiliates | Holders of Intercompany Claims by Debtor Affiliates will receive no distribution under the Plan. | Undetermined | 0% | Deemed to Reject |
| 5 | Equity Interests | Upon the Effective Date, all Equity Interests shall be deemed cancelled. | N/A | 0% | Deemed to Reject |

**Exhibit 7**
Liquidation Analysis

68

\\NY - 045867/000001 - 7840945 v11

Case 16-10446    Doc# 978    Filed 07/27/17    Page 137 of 280

| Liquidation Analysis | |
|---|---|
| **In $ 000s** | **Missouri Liquidating Trustee's Chapter 7 Liquidation Analysis** |
| | *As of September 30, 2017* |
| Cash on Hand | $25,709 [A] |
| Other Asset Recoveries | - [B] |
| Total Estimated Proceeds | 25,709 |
| Corporate and Professional Wind Down Costs | (2,303) [C] |
| Accrued & Unpaid Professional Fees | (561) [D] |
| Chapter 7 Trustee Fees | (771) [E] |
| Total Estimated Wind Down Expenses | (3,635) |
| US Department of Energy ("DOE") Settlement | (3,400) [F] |
| **Estimated Proceeds Available for Distribution** | **18,674** |
| Estimated Administrative Claims | 100 [G] |
| % Recovery to Administrative Claims | 100.0% |
| **Estimated Proceeds Available for Priority and General Unsecured Claims** | **18,574** |
| Estimated Priority Claims | 335 [G] |
| % Recovery to Priority Claims | 100.0% |
| **Estimated Proceeds Available for General Unsecured Claims ("GUCs")** | **$18,239** |
| Estimated GUCs *(see detail below)* | $99,721 |
| % Recovery to GUCs | 18.3% |
| ***Estimated GUCs Detail:*** | |
| *Missouri Intercompany Claims Against* | |
| *Abengoa Bioenergy Biomass of Kansas LLC ("ABBK"):* | *69,505* [H] |
| *Other General Unsecured Creditors:* | *30,216* [I] |

## General Notes

1. This analysis has used values provided by the Debtor, information derived from the Debtor's liquidation analysis, as well as public sources and, consequently, does not express an opinion or any other form of assurance with respect to those values.

2. This analysis is an estimate of the proceeds that may be generated as a result of a hypothetical Chapter 7 liquidation of the assets of the Debtor. Underlying the liquidation analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive, and operational uncertainties, and contingencies beyond the control of the Debtor or a Chapter 7 trustee. Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation values of the assets will result in an accurate estimate of the proceeds that would be realized were the Debtor to undergo an actual liquidation. No value was assigned to additional proceeds that might result from the sale of certain items with intangible value. therefore, the actual liquidation value of the Debtor's assets could vary materially from the estimates provided herein.

3. This analysis considers the effect that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, including the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a Chapter 7 trustee. There will likely be additional expenses which have not been quantified for the purposes of this analysis (e.g. advisors to the trustee, litigation costs, and additional case duration). THE MISSOURI LIQUIDATING TRUSTEE HAS DETERMINED THAT CONFIRMATION OF THE PROPOSED CHAPTER 11 PLAN WILL PROVIDE MORE VALUE TO THE DEBTOR'S ESTATES THAN WOULD BE PROVIDED PURSUANT TO A LIQUIDATION OF THE DEBTOR UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

4. The Missouri Liquidating Trustee reserves all rights to supplement, modify, or amend the analysis set forth herein.

## Specific Notes

(A) Cash available as of June 30, 2017. See Dkt. 945.

(B) The Debtor estimates no additional value from the disposal of other assets.

(C) Reflects the Debtor's 3-month estimated corporate and professional wind-down costs.

(D) Accrued and unpaid professional fees consist of professional fees for: DLA: $42K for March, $57.7K for April, $92.4K for May, and an illustrative estimate of $92.4K for June (see Dkt. 938, 939, 941); Armstrong Teasdale: $23.5K for February, $15.5K for March, and an illustrative estimate of $20K for April, May, and June (see Dkt. 954, 956); Baker & Hostetler: $52.5K for May, $124.7K for June (see Dkt. 946, 962).

(E) Chapter 7 trustee fees are assumed to be 3% of total asset value.

(F) It is understood that an agreement in principle has been reached with the DOE for proof of claim #81-1. This agreement will be documented in the near future. It is understood that the DOE will receive $3.4M of cash and will not receive a general unsecured claim.

(G) Estimated amount from the Debtor's Disclosure Statement (Dkt. 863).

(H) Includes all filed Missouri Intercompany claims.

(I) Includes $30.651M of filed (or scheduled, if not filed) 3rd party claims, less the Debtor's estimate for Administrative ($100K) and Priority ($335K) Claims.

**EXHIBIT B**

**Redline of the Missouri Liquidating Trustee's First Amended
Disclosure Statement to the Missouri Liquidating Trustee's Disclosure Statement**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re:<br><br>ABENGOA BIOENERGY BIOMASS OF KANSAS, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 16-10446 |

## FIRST AMENDED DISCLOSURE STATEMENT FOR
## MISSOURI LIQUIDATING TRUSTEE'S FIRST AMENDED PLAN
## OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**DRIVETRAIN, LLC**

Alan J. Carr
Tim Daileader
630 Third Avenue, 21st Floor
New York, NY, 10017
Telephone: (212) 856- 9700
acarr@drivetrainadvisors.com
tdaileader@drivetrainadvisors.com

*Missouri Liquidating Trustee*

**THOMPSON COBURN LLP**

Mark V. Bossi, Esq. (KS #13719)
One US Bank Plaza
St. Louis, Missouri 63101
Telephone: (314) 552-6000
Facsimile: (314) 552-7000
mbossi@thompsoncoburn.com

- and-

**HOGAN LOVELLS US LLP**

Christopher R. Donoho, III (admitted *pro hac vice*)
Ronald J. Silverman (admitted *pro hac vice*)
M. Shane Johnson (admitted *pro hac vice*)
Raphaella S. Ricciardi (admitted *pro hac vice*)
Hogan Lovells US LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
chris.donoho@hoganlovells.com
ronald.silverman@hoganlovells.com
shane.johnson@hoganlovells.com
raphaella.ricciardi@hoganlovells.com

*Counsel to the Missouri Liquidating Trustee*

Dated: July 1927, 2017

\\NY - 045867/000001 - 7840945 v611

THIS DOCUMENT IS A DRAFT PROPOSED DISCLOSURE STATEMENT AND IS SUBJECT TO CHANGE. IT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT UNDER SECTION 1125 OF THE BANKRUPTCY CODE. THE MISSOURI LIQUIDATING TRUSTEE IS NOT SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.

## DISCLAIMER

IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE MISSOURI LIQUIDATING TRUSTEE URGES YOU TO VOTE TO ACCEPT THE PLAN.

**EACH HOLDER OF A CLAIM AGAINST THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND BANKRUPTCY CODE SECTION 1125. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTOR, ITS PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.[1]**

**THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE PLAN. NO SOLICITATIONS FOR OR AGAINST THE PLAN MAY BE MADE EXCEPT THROUGH THIS DISCLOSURE STATEMENT.**

**THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. ALTHOUGH THE MISSOURI LIQUIDATING TRUSTEE BELIEVES AND HAS MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NONBANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT SHALL NOT BE**

---

[1] Information and statements herein that are also contained in the Debtor's Disclosure Statement were approved by the Bankruptcy Court as containing adequate information on May 23, 2017 [Docket No. 872]. The Missouri Liquidating Trustee relies on this information and has not performed any independent review.

\\NY - 045867/000001 - 7840945 v611

CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTOR AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSES PERFORMED BY THE MISSOURI LIQUIDATING TRUSTEE AND ITS PROFESSIONALS UTILIZING IN PART INFORMATION SUPPLIED BY THE DEBTOR. ALTHOUGH THE MISSOURI LIQUIDATING TRUSTEE HAS MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE MISSOURI LIQUIDATING TRUSTEE CANNOT MAKE ANY

REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER BUT RATHER AS THE MISSOURI LIQUIDATING TRUSTEE'S STATEMENT OF THE STATUS OF THE RESPECTIVE MATTER.

THE MISSOURI LIQUIDATING TRUSTEE RECOMMENDS THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN. IT IS THE OPINION OF THE MISSOURI LIQUIDATING TRUSTEE THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE MISSOURI LIQUIDATING TRUSTEE BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................... 1

    A.    Overview of Chapter 11 and the Plan Confirmation Process. ............ ~~2~~3

    B.    Recommendation of the Missouri Liquidating Trustee and Plan Overview. ............ ~~2~~4

    C.    Summary of Classification and Treatment of Claims Under the Plan. ............ ~~2~~4

    D.    Summary of Voting Requirements for Plan Confirmation. ............ ~~3~~4

II.    BACKGROUND INFORMATION REGARDING THE DEBTOR ............ ~~5~~6

    A.    DOE Award and Loan ............ ~~6~~8

    B.    The Debtor should be Substantively Consolidated with the Missouri Bioenergy Debtors because the Debtor Operated within Abengoa's Bioenergy Group ............ ~~8~~9

III.    EVENTS LEADING TO THE CHAPTER 11 FILING ............ ~~10~~11

    A.    Economic Challenges of the Bioenergy Business ............ ~~10~~11

    B.    Economic Challenges of the Global Abengoa Business and Abengoa's Global Restructuring ............ ~~10~~11

    C.    Abengoa's Financial Position and the Gonvarri Investment Agreement ............ ~~10~~12

    D.    The Spanish Proceedings ............ ~~11~~12

    E.    The Delaware Chapter 11 Cases ............ ~~12~~13

    F.    The Missouri Chapter 11 Cases ............ ~~12~~14

IV.    MATERIAL EVENTS OF THE CHAPTER 11 CASE ............ ~~13~~15

    A.    Involuntary Petition, Request to Transfer Venue, and Appeals Processes. ............ ~~13~~15

    B.    Conversion to Chapter 11 and Entry of Certain Orders. ............ ~~14~~16

    C.    Schedules and Statements. ............ ~~14~~16

    D.    Retention and Employment of the Debtor's Bankruptcy Professionals. ............ ~~15~~16

i

| | | | |
|---|---|---|---|
| E. | DIP Financing. | | ~~15~~16 |
| F. | Appointment of Creditors' Committee. | | ~~15~~17 |
| G. | Key Employee Retention Plan and Incentive Plan. | | ~~15~~17 |
| H. | Exclusivity Extensions. | | ~~16~~18 |
| I. | Sale of Substantially All of the Debtor's Assets. | | ~~16~~18 |
| J. | Claims Process and Bar Dates. | | ~~18~~20 |
| K. | Lienholder Claims, Litigation and Settlements. | | ~~20~~21 |
| L. | Debtor's Plan | | ~~20~~22 |
| V. | THE CHAPTER 11 PLAN | | ~~21~~23 |
| A. | Treatment of Claims and Equity Interests Under the Plan. | | ~~21~~23 |
| B. | Means for Implementation of the Plan. | | ~~24~~26 |
| C. | Provisions Governing Voting And Distributions. | | ~~31~~32 |
| D. | Disputed Claims. | | ~~35~~36 |
| E. | Treatment of Executory Contracts and Unexpired Leases. | | ~~37~~38 |
| F. | Conditions Precedent to the Effective Date. | | ~~38~~39 |
| G. | Indemnification, Release, Injunctive and Related Provisions. | | ~~39~~40 |
| H. | Retention of Jurisdiction. | | ~~43~~44 |
| I. | Miscellaneous Provisions. | | ~~44~~45 |
| VI. | RISK FACTORS IN CONNECTION WITH THE PLAN | | ~~47~~49 |
| A. | Bankruptcy Considerations. | | ~~47~~49 |
| B. | No Duty to Update Disclosures. | | ~~48~~50 |
| C. | Representations Outside this Disclosure Statement. | | ~~49~~50 |
| D. | No Admission. | | ~~49~~50 |
| E. | Tax and Other Related Considerations. | | ~~49~~50 |
| VII. | PLAN CONFIRMATION AND CONSUMMATION | | ~~49~~50 |

\\NY - 045867/000001 - 7840945 v~~6~~11

A.    The Confirmation Hearing. ........................................................ 4950

B.    Plan Confirmation Requirements Under the Bankruptcy Code. ........................ 5051

VIII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
       PLAN ........................................................................ 5354

A.    The Debtor's Plan 53 compared to the Missouri Liquidating Trustee's Plan     54

B.    Chapter 7 Liquidation. ........................................................ 5455

C.    Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code. ................ 5556

D.    Dismissal of the Debtor's Chapter 11 Case. .................................... 5556

IX.   CERTAIN FEDERAL TAX CONSEQUENCES .............................................. 5556

A.    General. ...................................................................... 5657

B.    U.S. Federal Income Tax Treatment With Respect to the Liquidating Trust. ...... 5758

C.    U.S. Federal Income Tax Treatment With Respect to Holders of Allowed
       Claims that are Beneficiaries of the Liquidating Trust. ...................... 5859

X.    RECOMMENDATION AND CONCLUSION .................................................. 5960

Case 16-10446    Doc# 978    Filed 07/27/17    Page 148 of 280

**EXHIBITS**

Exhibit 1    Missouri Liquidating Trustee's First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code

Exhibit 2    Recovery Analysis

Exhibit 2̶3    Letter from Missouri Liquidating Trustee

Exhibit 3̶4    Solicitation Procedures Order

Exhibit 4̶5    Form of Ballot for Class 2 General Unsecured Claims

E̶x̶h̶i̶b̶i̶t̶ ̶5̶    M̶i̶s̶s̶o̶u̶r̶i̶ ̶D̶i̶s̶c̶l̶o̶s̶u̶r̶e̶ ̶S̶t̶a̶t̶e̶m̶e̶n̶t̶

Exhibit 6    Summary of Missouri C̶o̶n̶f̶i̶r̶m̶a̶t̶i̶o̶n̶ ̶O̶r̶d̶e̶r̶ ̶a̶n̶d̶ ̶P̶l̶a̶n̶s̶ ̶o̶f̶ ̶L̶i̶q̶u̶i̶d̶a̶t̶i̶o̶n̶Plan Creditor Treatment

Exhibit 7    Liquidation Analysis

## I.    INTRODUCTION

Drivetrain, LLC is the liquidating trustee (the "***Missouri Liquidating Trustee***") appointed pursuant to the plans of liquidation approved in the Chapter 11 cases of the Debtor's bioenergy business affiliates that were pending, and have now been confirmed, in St. Louis, Missouri (as described in more detail in Article III.F. below). The Missouri Liquidating Trustee asserts intercompany books and records claims on behalf of affiliates of the Debtor against the Debtor (as described in more detail in Article IV.J below).   The Missouri Liquidating Trustee submits this disclosure statement (the "***Disclosure Statement***"), pursuant to section 1125 of title 11 of the United States Code (the "***Bankruptcy Code***") and Rule 3017 of the Federal Rules of Bankruptcy Procedure, as now in effect or as hereafter amended (the "***Bankruptcy Rules***"), in connection with the solicitation of votes on its proposed *Missouri Liquidating Trustee's First Amended Plan of Liquidation pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 968] (the "***Plan***") and attached hereto as **Exhibit 1**.

The Missouri Liquidating Trustee believes that confirmation and implementation of the Plan is in the best interests of the Debtor's Estate, Creditors and all other interested parties because the Plan provides an estimated recovery of 33% to General Unsecured Claims compared with an estimated 19% recovery if the Missouri Intercompany Claims **(as defined in Article IV.J below)** are allowed in full and receive *pro rata* treatment~~ To that end~~**, which the Missouri Liquidating Trustee believes is otherwise legally appropriate. *See* Recovery Analysis, attached hereto as Exhibit 2, which provides information regarding estimated distributions to general unsecured creditors in the Missouri Chapter 11 Cases (as defined below in Article III.F) (estimated 30.2% exclusive of any recovery on claims against the Debtor), estimated distributions to general unsecured creditors in this Chapter 11 Case assuming that Missouri Intercompany Claims are allowed in full with *pro rata* treatment (estimated 19%), and estimated distributions to general unsecured creditors in this Chapter 11 Case pursuant to the terms of the Missouri Liquidating Trustee's Plan (estimated 33%). The Debtor and the Creditors' Committee disagree with the Missouri Liquidating Trustee's position that the Plan delivers an outcome for general unsecured creditors that is superior to legally permissible alternatives.**

To help explain the "dueling plan" dynamic further, the Missouri Liquidating Trustee has also included with this solicitation package a letter (also attached hereto as **Exhibit 2̶3**) describing the differences between its Plan and the Debtor's Plan (as defined below in Article IV.L below). The Missouri Liquidating Trustee encourages you to read that letter carefully as it is a concise explanation of differences between the ~~need for~~plans and ~~appropriateness of~~why the Missouri Liquidating Trustee's Plan is appropriate. The Debtor and the Creditors' Committee do not agree with the Missouri Liquidating Trustee's conclusions in the letter.

The Debtor's Plan proposes to give zero recovery to the $69,504,933.16 of filed Missouri Intercompany Claims. The Missouri Liquidating Trustee believes that is not permissible and cannot be approved and accordingly has objected to the Debtor's Plan. Conversely, the Missouri Liquidating Trustee's Plan allows the Missouri Intercompany Claims to receive a recovery, but voluntarily limits that recovery to an amount that is less than what

such claims would receive if given *pro rata* treatment with other general unsecured claims. Specifically, the Plan limits recovery on Missouri Intercompany Claims to such an extent as is necessary to permit other general unsecured claims of the Debtor to receive the same percentage recovery that general unsecured creditors in the Missouri Chapter 11 Cases will receive assuming that the assets and liabilities of the Missouri Bioenergy Debtors and the Debtor were combined. The Plan does not provide for transfer of assets from the Missouri Bioenergy Debtors to the Debtor but rather provides enhanced recovery to the Debtor's general unsecured creditors (other than the Missouri Intercompany Claims) by limiting the recovery on the Missouri Intercompany Claims compared to the *pro rata* recovery on Missouri Intercompany Claims that the Missouri Liquidating Trustee believes is otherwise appropriate. The Missouri Liquidating Trustee believes that the Plan recovery is significantly higher than the recovery available to the Debtor's general unsecured creditors if the Missouri Intercompany Claims receive *pro rata* treatment with other general unsecured creditors and no such combination is effected: estimated to be 33% compared with 19% if the Missouri Intercompany Claims are allowed in full with *pro rata* treatment and no such combination is effected. *See* Exhibit 2 (Recovery Analysis). The Missouri Liquidating Trustee believes this settlement is fair to both estates and the general unsecured creditors of both because as explained herein, the Debtor operated within Abengoa's U.S. bioenergy group and the Missouri Liquidating Trustee believes the only reason it was not legally consolidated with the Missouri Bioenergy Debtors is that its case was filed in a different jurisdiction. As a technical matter, the Plan does not propose to legally consolidate the Debtor with the Missouri Bioenergy Debtors; instead, it compromises and limits the Missouri Intercompany Claims to provide the Debtor's General Unsecured Claims with the same recovery that the Missouri Bioenergy Debtors' general unsecured creditors would receive if such consolidation had occurred.

Section 2.2(a) of the Missouri Liquidating Trust Agreement specifically authorizes the Missouri Liquidating Trustee to exercise all power and authority that could have been exercised by the Missouri Debtors, "including, without limitation, in connection with the Abengoa Bioenergy Biomass of Kansas, LLC Chapter 11 case pending in the United States Bankruptcy Case for the District of Kansas." *See also* Missouri Liquidating Trust Agreement, §§ 2.2(k), 2.2(m) (authorizing the Missouri Liquidating Trustee to "appear for all purposes in the ABBK Case as successor to the [Missouri] Debtors"), and Ex. A (Power of Attorney). Furthermore, the Missouri Liquidating Trustee is authorized to undertake this settlement by the Missouri Plan and the Missouri Liquidating Trust Agreement (as defined in Article III.F below) approved in the Missouri Chapter 11 Cases. *See* Missouri Plan, Article IV.D & F and Missouri Liquidating Trust Agreement, §§ 1.1, 2.2(j) and 3.1.

Furthermore, even if the Missouri Intercompany Claims are disallowed in their entirety, by the Missouri Liquidating Trustee's calculations, the Debtor's General Unsecured Claims would only receive in reality an estimated recovery of 63%, not the 95% recovery included in the Debtor's Disclosure Statement (as defined in Article IV.L) because the Debtor's Disclosure Statement did not take into account the proposed $3.4 million settlement with the Department of Energy, among other things.

This Disclosure Statement and the other documents described herein are being furnished by the Missouri Liquidating Trustee to Creditors in the Debtor's Chapter 11 Case

pending before the United States Bankruptcy Court for the District of Kansas (the "***Bankruptcy Court***"). This Disclosure Statement is intended to provide adequate information of a kind, and in sufficient detail, to enable the Debtor's Creditors to make an informed judgment about the Plan, including whether to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding (i) the Debtor's prepetition operating and financial history; (ii) the Debtor's need for relief under chapter 11 of the Bankruptcy Code; (iii) significant events that have occurred during the Debtor's Chapter 11 Case; (iv) the terms of the Plan; (v) the manner in which distributions will be made under the Plan; (vi) certain effects of confirmation of the Plan; (vii) certain risk factors associated with the Plan; and (viii) the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

This Disclosure Statement is subject to the Bankruptcy Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan. *See* Solicitation Procedures Order, attached hereto as **Exhibit ~~3~~4**. **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. To the extent that the information provided in this Disclosure Statement and the Plan (including any Plan Supplements) conflict, the terms of the Plan (including any Plan Supplements) will control. Terms not otherwise specifically defined herein have the meanings attributed to them in the Plan. Each definition in this Disclosure Statement and in the Plan includes both the singular and plural. Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

A.    **Overview of Chapter 11 and the Plan Confirmation Process.**

Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation or liquidation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets. The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the petition date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a

debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires the plan proponent to prepare, and obtain bankruptcy court approval of, a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical investor of the relevant classes to make an informed judgment regarding the plan. This Disclosure Statement is presented to holders of Claims against the Debtor entitled to vote under section 1125 of the Bankruptcy Code in connection with the Missouri Liquidating Trustee's solicitation of votes on the Plan.

**B. Recommendation of the Missouri Liquidating Trustee and Plan Overview.**

The Missouri Liquidating Trustee believes that the Plan, which provides for, among other things, the creation of a Liquidating Trust for the benefit of the Debtor's Creditors, will allow for a prompt resolution of the Debtor's Chapter 11 Case and will achieve the best possible result for Creditors and other interested parties. The following is a brief overview of the Plan and is qualified by reference to the Plan itself. **The Missouri Liquidating Trustee believes that its Plan will result in a materially higher recovery for creditors than the Debtor's Plan.**

**C. Summary of Classification and Treatment of Claims Under the Plan.**

A brief summary of the Classes established under the Plan, including the treatment and voting rights of each Class, is set forth below. A complete description of the treatment of each class is set forth in Article III of the Plan and section V.A. of this Disclosure Statement. Parties should refer to those sections for a complete description of the proposed treatment for each class.

| Class | Claims & Interest | Status | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------------|--------|-----------|------------------|--------------------|
| 1 | Secured Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 2 | General Unsecured Claims | Impaired | Pro Rata Share of Liquidating Trust Cash | Yes | 33%[2] |
| 3 | Non-Missouri Intercompany Claims | Impaired | No Distribution | No (deemed to reject) | 0% |
| 4 | Equity Interests | Impaired | No Distribution | No (deemed to reject) | 0% |

**D. Summary of Voting Requirements for Plan Confirmation.**

**1. In General.**

---

[2] This estimated recovery assumes Allowed General Unsecured Claims in the amount of $30.2 million.

\\NY - 045867/000001 - 7840945 v611

Creditors should refer only to this Disclosure Statement and the Plan to determine whether to vote to accept or reject the Plan. Under the Bankruptcy Code, only holders of Claims that are "impaired" are entitled to vote to accept or reject the Plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default. An impaired class of creditors votes to accept a plan if the holders of at least two-thirds (2/3) in dollar amount, and more than one-half (1/2) in number, of those creditors that actually cast ballots vote to accept such plan. Those classes that are not impaired are not entitled to vote and are deemed to accept a plan. Those classes that are not entitled to a distribution and will not retain property under a plan are deemed to reject a plan.

A class of interest holders is deemed to accept a plan if the holders of at least two-thirds (2/3) in amount of those interest holders that actually cast ballots vote to accept such plan. A class of interest holders is impaired, not entitled to vote, and deemed to reject the plan if the plan treats such holders by providing that they will retain no property and receive no distributions under the plan.

Any Claim in an Impaired Class that is subject to a pending objection or is scheduled as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing the Claim for the purpose of voting on the Plan.

Pursuant to the Bankruptcy Code, only creditors who actually vote on the Plan will be counted for purposes of determining whether the required number of acceptances have been obtained. Failure to deliver a *properly completed ballot* by the Voting Deadline (as defined below) will result in an abstention; consequently, the vote will neither be counted as an acceptance or rejection of the Plan.

### 2. Impaired Classes Entitled to Vote.

Only the Claims in Class 2 (General Unsecured Claims) are Impaired and are entitled to vote to accept or reject the Plan. *See* Form of Ballot for Class 2 General Unsecured Claims, attached hereto as **Exhibit 45**.

### 3. Unimpaired Classes Deemed to Accept the Plan.

Under Bankruptcy Code section 1126(f), only the Claims in Class 1 (Secured Claims) are Unimpaired and the vote of holders of such Claims in these Classes will not be solicited.

### 4. Certain Classes Are Deemed to Reject the Plan and Do Not Vote.

5

Under Bankruptcy Code section 1126(g), the following Classes will receive no Distributions and are deemed to have rejected the Plan: Class 3 (Non-Missouri Intercompany Claims) and Class 4 (Equity Interests). The vote of holders of such Claims and Equity Interests in these Classes will not be solicited.

### 5.      Voting Deadline.

If a Creditor holds a Claim classified in a voting Class of Claims under the Plan, the Creditor's acceptance or rejection of the Plan is important and must be in writing and submitted on time. The voting deadline is ~~August 18~~[•], 2017 at 5:00 p.m. (prevailing Central Time) (the "***Voting Deadline***").

### 6.      Voting Instructions.

IN ORDER FOR A VOTE TO BE COUNTED, THE BALLOT MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RETURNED TO THE VOTING AGENT BY THE VOTING DEADLINE.

### 7.      Ballots.

Creditors must use only the ballot or ballots sent to them with the notice of this Disclosure Statement. If a Creditor has Claims in more than one Class, it should receive multiple ballots. IF A CREDITOR RECEIVES MORE THAN ONE BALLOT, THEN THE CREDITOR SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM AND SHOULD COMPLETE AND RETURN ALL OF THEM.

### 8.      Additional Information.

If you have any questions about (a) the procedure for voting on your Claim, (b) the package of materials that you have received, (c) the amount of your Claim, (d) obtaining or replacing a ballot, or (e) obtaining an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact M. Shane Johnson, counsel to the Missouri Liquidating Trustee, at (212) 918-3775 or shane.johnson@hoganlovells.com.

## II.      BACKGROUND INFORMATION REGARDING THE DEBTOR

The Debtor in this Chapter 11 Case, Abengoa Bioenergy Biomass of Kansas, LLC, is a limited liability company organized under the laws of the State of Kansas. The Debtor's ultimate parent is Abenoga, S.A. ("***Abengoa***"). Abengoa is a Spanish company founded in 1941 and has been a leading engineering and clean technology company with operations in many countries worldwide. Currently, Abengoa is registered in the Mercantile Register of Seville in volume 573, folio 69, sheet SE-1507. As of the end of 2015, Abengoa was the parent company of approximately 700 other companies around the world, including

577 subsidiaries, 78 associates, 31 joint ventures, and 211 Spanish partnerships (*uniones temporales de empresa*) (collectively, the "**Abengoa Group**" or the "**Company**").

Over the course of the Abengoa Group's 70-year history, it has developed a unique and integrated business model that applies its accumulated engineering expertise to promoting sustainable development solutions, including delivering new methods for generating solar power, developing biofuels, producing potable water from seawater, and efficiently transporting electricity to customers in the following sectors: energy, telecommunications, transport, water, utilities, environmental, industrial, and services. A cornerstone of the Company's business model has been investment in proprietary technologies, particularly in areas with relatively high barriers to entry. The Company supplies engineering projects under the 'turnkey' contract modality and operates assets that generate renewable energy, produce biofuel, manage water resources, desalinate sea water, and treat sewage. The Abengoa Group's business is organized under the following three activities:

- Engineering and construction: includes the traditional engineering activities in the energy and water sectors, with more than 70 years of experience in the market and the development of solar technology. The Abengoa Group is specialized in carrying out complex turnkey projects for thermo-solar plants, solar-gas hybrid plants, conventional generation plants, biofuels plants, and water infrastructures, as well as large-scale desalination plants, and transmission lines, among others.

- Concession-type infrastructures: groups together the Company's extensive portfolio of proprietary concession assets that generate revenues governed by long-term sales agreements, such as take-or-pay contracts, tariff contracts, or power purchase agreements. This activity includes the operation of electric energy generation plants (solar, cogeneration, or wind), desalination plants, and transmission lines. These assets generate low demand risk, and the Company focuses on operating them as efficiently as possible.

- Industrial production: covers Abengoa Group's businesses with a high technological component, such as development of biofuels technology. The Company holds an important leadership position in these activities in the geographical markets in which it operates.

Abengoa initiated the expansion of its global operations in the 1960s, first to South America and then into the United States. With a total investment of $3.3 billion, the United States has become one of Abengoa's largest markets in terms of sales volume, particularly from developing solar, bioethanol, and water projects. Abengoa has achieved a leading position within the renewable energy construction and technology sector in the United States through its efforts in developing commercial scale concentrated solar power and producing advanced biofuels on a commercial scale. Abengoa's US business operations can be organized into the following distinct business units:

- Abengoa's bioenergy companies ("**Bioenergy**"), among other things, had been a leader in the biofuel production sector and, in addition, specialized in the

development of new technologies geared towards the second-generation production of biofuels, and biochemical products;

- Abengoa's engineering, procurement, and construction companies are dedicated to the engineering and construction of electrical, mechanical, and instrumental infrastructures in the energy, industrial, water management, and services sectors, as well as the development of innovative technology for Abengoa's businesses;

- Abengoa's solar companies specialize in the development and operation and maintenance of solar energy plants, mainly using solar thermal technology; and

- Abengoa's water companies specialize in the development and operation and maintenance of facilities aimed at generating, transporting, treating, and managing potable water, including desalination and water treatment, as well as purification plants.

The U.S. operations of the Industrial Production segment consisted of both "first generation" operations and a "second generation" technology development and R&D projects. The first-generation operations largely consisted of production facilities that converted food-based grains (corn, sorghum/milo) into ethanol at several locations throughout the U.S.

## A.    DOE Award and Loan

The second-generation operations consisted of research and development into converting non-food-based matter into ethanol. In 2007, the United States Department of Energy (the "**DOE**") awarded the Debtor that certain Assistance Agreement DE-FC36-07GO17028 (as subsequently amended, the "**ABBK Award**") under the authority of the Energy Policy Act of 2005 (the "**Energy Policy Act**"). The funds provided under the ABBK Award, totaling approximately $95 million, assisted the Debtor in the construction, start-up and commissioning of its 25 million gallon nameplate cellulosic ethanol production facility (the "**Ethanol Plant**"). In addition, the Debtor constructed an electricity cogeneration plant (the "**Cogeneration Plant**") adjacent to the Hugoton Plant, and also owned approximately 400 acres of adjacent land, all located at 1043 Road P., Hugoton, Kansas 67951 in Stevens County (collectively, the "**Hugoton Plant**"). The costs related to the construction of the Hugoton Plant exceeded $850 million, with a portion of those costs covered by the funds from the ABBK Award. However, ultimately the Hugoton Plant was not fully completed and never achieved operational status. As more fully described below, the plant was sold during the course of this Chapter 11 Case.

Additionally, on September 28, 2011, the DOE, acting pursuant to Section 1705 of the Energy Policy Act of 2005, issued a loan guarantee under its Loan Guarantee Program (the "**LGP**"), providing available financing to ABBK up to $132,400,000 related to construction of the Ethanol Plant (the "**LGP Loan**"). Over the life of the LGP Loan, ABBK drew approximately $45 million from the facility. The LGP Loan was repaid in full, inclusive of principal, interest and penalties, prior to the filing of this Chapter 11 Case in March 2015.

The Debtor asserted that unlike the LGP Loan, issued pursuant to the LGP and pursuant to customary loan terms and conditions, the ABBK Award should be characterized as an equity investment in the Debtor, with an aim toward achieving certain objectives under the Energy Policy Act. The ABBK Award contains no repayment terms or payment enforcement rights; no maturity date; no interest provisions; and, in the Debtor's view, no other terms or conditions typical of a loan agreement, in contradistinction to the LGP Loan. Further, the ABBK Award includes certain provisions requiring DOE's oversight and/or approvals.

The DOE asserts, however, that its interest in the Ethanol Plant (and the sale proceeds therefrom) fall outside of the property of the Debtor's estate. On December 28, 2016, the United States of America, on behalf of the DOE, moved to intervene in Adversary Case No. 16-05151, which had been initiated by certain lienholders of the Debtor who have since dismissed their claims [Adversary Case No. 16-05151 Docket No. 56] (the "***DOE Motion to Intervene***"). Attached as Exhibit 1 to the DOE Motion to Intervene is the United States' Complaint in Intervention (the "***DOE Complaint***"). On February 16, 2017, the Court entered an order granting the DOE Motion to Intervene, and deeming the DOE Complaint filed and served as of that date [Adversary Case No. 16-05151 Docket No. 81]. On May 26, 2017, the Debtor filed its Answer to the Complaint [Adversary Case No. 16-05151 Docket No. 128]. That same day the Debtor filed an objection to the DOE's claim [Docket No. 879]. The Creditors' Committed filed its Answer to the Complaint on June 5, 2017 [Adversary Case No. 16-05151 Docket No. 131]. On June 9, 2017, the DOE filed a response to the Debtor's claim objection [Docket No. 898]. On July 12, 2017, the Debtor announced during a court status conference that an agreement in principle to settle the DOE claim had been reached.

In the DOE Complaint, as well as in various pleadings filed by the DOE in this Chapter 11 Case, the DOE alleges that it holds a 27% cost-share interest in the Ethanol Plant, and that the proceeds from the sale of such property fall outside of the property of the Debtor's estate, as defined in section 541 of the Bankruptcy Code. The Debtor disputes both the DOE's alleged cost-share amount as well as the conclusion that the DOE's interest falls outside of estate property.

**B. The Debtor should be Substantively Consolidated with the Missouri Bioenergy Debtors because the Debtor Operated within Abengoa's Bioenergy Group**

**Management**

The Bioenergy Debtors' (as defined below in Article III.F) board of directors and officers were the same or substantially similar. *See* Porras Declaration (as defined below), Ex. B. For example, Javier Garoz Neira and Ignacio García Alvear served as directors and officers for every Bioenergy Debtor and Jeffrey Bland served as the Secretary for every Bioenergy Debtor (including the Debtor) except Abengoa Bioenergy US Holding, LLC ("***ABUS***"). *See id.* Sandra Porras is the Chief Financial Officer for the Debtor and each Bioenergy Debtor. The Bioenergy Debtors were also centrally managed by the St. Louis-based management team who provided all accounting, legal, trading, purchasing, logistics, personnel, financing, regulatory, environmental compliance, business strategy, cash, and risk management services for the bioenergy plants. *See id.* at ¶ 44.

9

**Financial Statements and Budget**

Abengoa Bioenergy Outsourcing, LLC ("*ABO*") prepared financial statements for ABUS that were consolidated to include all of the Bioenergy Debtors. *See id.* at ¶ 45 and Ex. C. And while each of the Bioenergy Debtors' bioenergy plants had an annual budget, those budgets were always integrated to present a consolidated forecast for the Bioenergy Debtors' assets. *See id.* at ¶ 45 and Ex. D.

**Shared Services**

The Bioenergy Debtors that owned biofuel production facilities (such as the Debtor) received management, legal, accounting, trading, and other services from other Bioenergy Debtors (such as ABO, Abengoa Bioenergy Operations, LLC ("*AB Ops*"), and Abengoa Bioenergy Trading US, LLC ("*ABT*")) based on shared services agreements. *See id.* at ¶ 48-52. "Although the services were always provided, the service company sometimes waived the right to receive payment for its services, when, for example, a particular entity had insufficient cash on hand." *Id.* at ¶ 48.

**Employees and Supplies**

The Bioenergy Debtors, including their employees, were centrally managed by a team in St. Louis that routinely redeployed employees from a plant owned by one Bioenergy Debtor to a plant owned by another Bioenergy Debtor based on need. *See id.* at ¶ 55. The resulting travel expenses were charged to the Bioenergy Debtor that owned the employee's "home" plant, rather than the Bioenergy Debtor that owned the plant to which the employee was loaned. *See id.* Spare parts were also commonly utilized on an *ad hoc,* as-needed basis among the Bioenergy Debtors' various bioenergy plants. *See id.*

**Cost of Untangling Bioenergy Debtors**

Due in large measure to the integrated operations of the Bioenergy Debtors, as well as the overall integration of the other Abengoa entities, a substantial number of intercompany claims were created, which would be enormously time consuming, costly, and difficult to unwind and reconcile. *See id.* at ¶ 57; *see also* Wu Declaration (as defined below), ¶ 25 ("the intercompany claims preparation and reconciliation processes . . . can be quite time consuming and litigious") and ¶ 28 ("Generally speaking, creditors would be prejudiced by delays in case administration and closing that would occur if the cases are not consolidated, due to the time that would be required to prepare the inter-company claims and resolve any related litigation."). For example, the Missouri Liquidating Trustee believes that the Missouri Bioenergy Debtors undercharged the Debtor for shared services. And, of course, the Missouri Intercompany Claims are the product of hundreds of intercompany transactions undertaken by Missouri Bioenergy Debtors for the benefit of the Debtor.

Based on this evidence, the Missouri Bankruptcy Court (as defined below) ruled that the Missouri Debtors and the Official Committee of Unsecured Creditors in the Missouri Chapter 11 Cases ~~(as defined below)~~ (the "*Missouri Committee*") "demonstrated that the proposed consolidation structure is necessary and appropriate based on applicable case law

because of the interrelationship among the [Missouri] Debtors, the significant benefits that the [Missouri] Plan provides to creditors in comparison to any potential harm that would result from confirmation of the [Missouri] Plan, and because creditors would be harmed if the [Missouri] Plan were not confirmed." Missouri Confirmation Order, ¶ II.

**Creditors dealt with the Bioenergy Debtors as a single unit**

Prepetition, many of the Missouri Bioenergy Debtors' creditors effectively treated the Missouri Bioenergy Debtors as a single entity. *See* Missouri Plan Memo of Law (as defined below), p. 37. It follows that the Debtor's creditors had similar expectations because as the owner of a bioenergy plant, which was part of a bioenergy conglomerate, the Debtor operated in a similar fashion to Abengoa Bioenergy Company, LLC ("**ABC**") and Abengoa Bioenergy of Nebraska, LLC ("**ABNE**"), who also owned at least one bioenergy plant as part of the same group. This is particularly the case for the Debtor, which was a startup plant in its operational infancy. Upon information and belief, ABC acted as the entity that managed the Bioenergy Debtors' cash and typically would pay the expenses of the other Bioenergy Debtors. *See, e.g.,* Missouri Disclosure Statement (as defined below), Arts. III.C.2.(b) and III.C.3. Thus, creditors would not obtain payment from the other operating Bioenergy Debtors such as the Debtor and instead would seek payment directly from ABC even if they performed services for another Bioenergy Debtor. In particular, upon information and belief, ABC used its bank (PPB) lines in this fashion to pay the expenses of other Bioenergy Debtors, including the Debtor. *See id.* at Art. III.C.3.

Indeed, certain of the Debtor's creditors supplied several bioenergy plants, and upon information and belief, received centralized payments not from the plant owners, but from ABC which served as centralized paymaster for the bioenergy group.

In summary, the entire U.S. Abengoa bioenergy group, which includes the Debtor, operated as a single integrated unit based in Missouri with shared officers and directors that would be difficult and costly to untangle.

## III. EVENTS LEADING TO THE CHAPTER 11 FILING

### A. Economic Challenges of the Bioenergy Business

The year preceding the Chapter 11 Case was marked by enormous disruption in the bioenergy industry. In the year leading up to the Petition Date, the average Crush Spread, a key measure of the profitability of corn ethanol production, based on Chicago Board of Trade (CBOT) corn and ethanol prices was approximately $0.4400/gallon. This compares drastically to the prior twelve-month period, in which Crush Spreads averaged over $0.9194/gallon. As a result of this deterioration in the market, a number of bioenergy facilities were forced to close, while others suffered a dramatic reduction in demand.

For the Debtor, while the initial costs of production of cellulosic ethanol gallons for the Ethanol Plant were higher than the first-generation production referred to above, these higher upfront costs came with production incentives, including (i) the federal cellulosic production credit, which provided a credit of approximately $1.50/gallon produced; and (ii) the

California low-carbon intensity fuel credit, which provided a credit of approximately $1.20/gallon produced. These credits were intended to assist cellulosic ethanol producers in achieving commercial production and profitability.

**B. Economic Challenges of the Global Abengoa Business and Abengoa's Global Restructuring**

At the height of Spain's economic crisis in early 2013, as the Spanish government struggled to pay the interest due on sovereign debt, subsidies for solar and wind power companies were dramatically curtailed. The cutbacks devastated Spain's renewable energy sector and many companies failed. Though Abengoa was able to survive this financial crisis, it was forced to issue substantial new debt to continue its global operations. From 2013 onward, Abengoa entered into or issued syndicated, bilateral, and other debt instruments totaling over $5 billion.

**C. Abengoa's Financial Position and the Gonvarri Investment Agreement**

During 2015, various factors, such as an insufficient upswing in the market in which the Abengoa Group operates and the difficulty of obtaining financing, precluded compliance with the Company's business plan. On July 31 2015, during Abengoa's results presentation for the first six months of 2015, Abengoa lowered its guidance for 2015 corporate free cash flow, which deepened existing market concerns regarding Abengoa's liquidity position, as well as raised concerns with its business partners and other shareholders regarding liquidity. These concerns adversely affected Abengoa's cash position, had a disruptive effect on its operations, contributed to a 27% decline in engineering and construction revenues in the third quarter of 2015 compared to the same period in the prior year, and caused the trading prices of Abengoa's Class A and Class B shares and outstanding bonds to fluctuate significantly during the third quarter and the beginning of the fourth quarter of the 2015 fiscal year.

In light of these developments, on September 24, 2015, as part of its comprehensive action plan aimed at improving its liquidity position and strengthening its corporate governance, Abengoa sought an equity raise to be underwritten by various financial institutions, which Abengoa was unable to secure. Further, Abengoa sought to secure an investment from Gonvarri Corporacion Financiera, S.L. ("*Gonvarri*"), a Gonvarri Steel Industries group company, and Waddell & Reed Investment Management, one of the main shareholders of Abengoa. Unfortunately, the Company was unable to consummate the Gonvarri transaction.

As no other proposal was received from any other potential subscriber that would immediately replace Gonvarri, the Company decided to initiate a refinancing process to try and reach an agreement with its main financial creditors, aimed to establish the framework to carry out such negotiations and provide the Abengoa Group with financial stability in the short and medium term. After a careful assessment of the situation and in order to provide the stability needed to carry out such negotiations with creditors, Abengoa's Board of Directors

further announced on November 25, 2015, that it would continue negotiations with its creditors with the objective of reaching an agreement that ensures the Company's financial viability, under the protection of article 5 bis of the *Ley 22/2003 de 9 de julio, Concursal* (the "***Spanish Insolvency Law***"), a pre-insolvency statute that permits a company to enter into negotiations with certain creditors for restructuring its financial affairs.

D.    **The Spanish Proceedings**

On November 25, 2015, December 3, 15, and 28, 2015, January 27, 2016, and February 1, 2016, Abengoa and certain of its affiliates (collectively, the "***5 bis Companies***") filed notice with the Mercantile Court of Seville, Spain (the "***Spanish Court***") that they had commenced negotiations with their principal creditors in order to reach a global agreement on the refinancing and restructuring of their liabilities to achieve the viability of the Abengoa Group in the short and long term. The Spanish Court issued orders on December 14 and 22, 2015, and January 15, 2016, admitting the notices and granting the 5 bis Companies with the protection under the Spanish Insolvency Law.

The Abengoa Group commenced negotiations with a large and diverse number of its main financial creditors, including a group of lenders that formed a coordinating committee, advised by Sullivan & Cromwell LLP, Uria Menendez Abogados, S.L.P.-C., and KPMG LLP, and an ad hoc committee of bondholders, advised by Clifford Chance LLP and Houlihan Lokey, Inc. The Abengoa Group, advised by Linklaters LLP, DLA Piper LLP (US), Alvarez & Marsal, Lazard Frères & Co., LLC and Madrid-based law firm Cortés, Abogados ("***Cortés***"), engaged with the coordinating committee and the ad hoc committee of bondholders regarding a restructuring, which led to Abengoa, S.A. and certain Delaware Debtors (as defined below) entering into a Standstill Agreement[3] and a Master Restructuring Agreement. Abengoa began preparing a business viability plan and the terms of a possible restructuring.

Alvarez & Marsal prepared a viability plan (the "***Viability Plan***") based on a preliminary review of specific projects, the existing project pipelines, and the most recent information and thinking with respect to asset disposals and financial debt. As part of this evaluation, Alvarez & Marsal evaluated (i) 200 projects, each above €2.5 million that covered 90% of the Abengoa Group's €8.6 billion backlog as of December 31, 2015, and (ii) each business line by region and operating division with the head of each business line.

On December 30, 2015 and January 25, 2016, Alvarez & Marsal presented the Board of Directors of the Abengoa Group with the Viability Plan that defined the structure of the future activity of the Abengoa Group. This Viability Plan was presented to the public in a conference call held on Wednesday, February 17, 2016. In broad general terms, this Viability Plan analyzed the old Abengoa Group, proposed a new business model for a new Abengoa Group, presented both valuation and cash flows, risks and opportunities, and set forth certain

---

[3]    In order to provide the Abengoa Group with sufficient time to solicit and obtain the requisite creditor support for its financial restructuring plan, several Abengoa Group companies asked their financial creditors to adhere to a standstill agreement (the "***Standstill Agreement***") under which those financial creditors would stay certain rights and actions vis-à-vis the relevant Abengoa Group companies during a period of seven months from the date of the Standstill Agreement.

\\NY - 045867/000001 - 7840945 v611

recommendations and conclusions as to the viability of the proposed new Abengoa Group. This plan did not contain a financial restructuring proposal, but was an operational plan.

With respect to the Debtor, generally, and the Hugoton Plant, specifically, the Viability Plan contemplated that Abengoa's second-generation bioenergy business would be sold or restructured as a stand-alone business.

### E. The Delaware Chapter 11 Cases

On March 29, April 6, and April 7, 2016 certain U.S. Abengoa entities in Abengoa's Bioenergy, Solar, and Engineering, Procurement, and Construction groups (collectively, the "*Delaware Debtors*") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "*Delaware Bankruptcy Court*"), Case No. 16-10790 (KJC) (collectively, the "*Delaware Chapter 11 Cases*").

On December 7, 2016, the Delaware Debtors filed the *Debtors' Modified First Amended Plans of Reorganization and Liquidation* [DE Docket No. 990] (the "*Delaware Plan*"). On December 15, 2016, the Delaware Bankruptcy Court entered the *Order Confirming Debtors' Modified First Amended Plans of Reorganization and Liquidation* [DE Docket No. 1042] (the "*Delaware Confirmation Order*"), which, among other things, approved the Delaware Plan's substantive consolidation of the Bioenergy and Maple Liquidating Debtors. *See* Delaware Confirmation Order, ¶ JJ; *see also* Delaware Plan, Arts. III.A.1 and IV.HH.

### F. The Missouri Chapter 11 Cases

On February 24, 2016, ABUS, ABO, ABT, Abengoa Bioenergy Engineering & Construction, LLC ("*ABEC*"), ABNE, and ABC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Missouri, Eastern Division (the "*Missouri Bankruptcy Court*"), jointly administered under Case No. 16-41161-659. Abengoa Bioenergy Meramec Renewable, LLC ("*ABMR*"), Abengoa Bioenergy Funding, LLC ("*ABF*"), Abengoa Bioenergy Maple, LLC ("*ABM*"), AB Ops, Abengoa Bioenergy of Indiana, LLC ("*ABI*"), and Abengoa Bioenergy of Illinois, LLC ("*ABIL*") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Missouri Bankruptcy Court on June 12, 2016 (collectively the "*Missouri Chapter 11 Cases*").

On March 2, 2017, the Missouri Debtors and the Missouri Committee filed the *Third Amended Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code* [MO Docket No. 1071] (the "*Missouri Disclosure Statement*"), ~~attached hereto as **Exhibit 5,**~~ which the Missouri Bankruptcy Court approved on that same day [MO Docket No. 1072]. ~~In support of the~~ *See* Summary of Missouri Plan Creditor Treatment, attached hereto as **Exhibit 6**. A copy of the Missouri Disclosure Statement, Missouri Plan, and Missouri Confirmation Order may be obtained from the website of the Missouri Debtors' claims agent: https://cases.primeclerk.com/Abengoa/. In support of the *Third Amended Joint Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code* [MO Docket No. 1070] (the "*Missouri Plan*") and the proposed separate substantive consolidation of (i) ABUS, ABO, ABT, ABEC, ABNE, ABC, ABMR,

ABF, ABM, and AB Ops (collectively, the "***Missouri Bioenergy Debtors***" and collectively with the Bioenergy and Maple Liquidating Debtors, the "***Bioenergy Debtors***") and (ii) ABI and ABIL (collectively with the Missouri Bioenergy Debtors, the "***Missouri Debtors***") the Missouri Debtors also filed the (a) *Declaration of Christopher K. Wu in Support of Confirmation of the Third Amended Joint Plans of Liquidation under Chapter 11 of the Bankruptcy Code* [MO Docket No. 1306] (the "***Wu Declaration***"), (b) *Declaration of Sandra Porras Serrano in Support of Confirmation of the Third Amended Joint Plans of Liquidation under Chapter 11 of the Bankruptcy Code* [MO Docket No. 1307] (the "***Porras Declaration***"), and (c) *Memorandum of Law (i) in Support of Approval and Confirmation of Third Amended Joint Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code and (ii) in Response to Objections thereto* [MO Docket No. 1431] (the "***Missouri Plan Memo of Law***").

On June 8, 2017, the Missouri Bankruptcy Court entered the *Order Confirming Third Amended Joint Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code* [MO Docket No. 1443] (the "***Missouri Confirmation Order***"), which, among other things, approved the Missouri Plan's separate substantive consolidation of the Missouri Bioenergy Debtors and ABI and ABIL. In paragraph II of the Confirmation Order, ~~which is attached hereto as~~ ~~**Exhibit 6**~~~~,~~ ~~the~~the Missouri Bankruptcy Court found that "the proposed consolidation structure is necessary and appropriate based on applicable case law because of the interrelationship among the [Missouri] Debtors, the significant benefits that the [Missouri] Plan provides to creditors in comparison to any potential harm that would result from confirmation of the [Missouri] Plan, and because creditors would be harmed if the [Missouri] Plan were not confirmed."

Pursuant to the Missouri Confirmation Order and Missouri Plan [MO Docket No. 1070] and the GUC Liquidating Trust Agreement dated June 30, 2017 [MO Docket No. 1439] (the "***Missouri Liquidating Trust Agreement***") approved thereby, Drivetrain, LLC was appointed as Liquidating Trustee for the Missouri Bioenergy Debtors. *See* Missouri Plan, Article IV.E; Missouri Liquidating Trust Agreement, Recitals.

The Missouri Plan's Effective Date (as defined in the Missouri Plan) occurred on July 6, 2017. *See Notice of (i) Entry of Confirmation Order, (ii) Occurrence of Effective Date under the Third Amended Joint Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code, (iii) Deadline to File Requests for Payment of Administrative Claims, (iv) Deadline for Professionals to File Final Fee Applications Pursuant to Sections 328, 330, and 503(b) of the Bankruptcy Code and (v) Deadline to File Claims arising from Rejection of Executory Contracts or Unexpired Leases* [MO Docket No. 1458].

## IV.   MATERIAL EVENTS OF THE CHAPTER 11 CASE

### A.   Involuntary Petition, Request to Transfer Venue, and Appeals Processes.

On March 23, 2016, three creditors (the "***Petitioning Creditors***") asserting then-disputed state law lien claims against the Debtor filed an involuntary petition in the Bankruptcy Court under chapter 7 of the Bankruptcy Code.

On April 25, 2016, the Bankruptcy Court entered an order [Docket No. 69] denying the Debtor's motion to transfer venue of the Chapter 11 Case to the United States Bankruptcy Court for the District of Delaware, where several of the Debtor's affiliates' chapter 11 cases are being administered. Among other things, the Bankruptcy Court held that "ABBK is a Kansas limited liability company organized in 2006 and is part of Abengoa's United States bioenergy group of subsidiaries and affiliates."

On May 2, 2016, the Debtor filed a motion for leave to appeal the denial of transfer of venue directly to the United States Court of Appeal for the 10th Circuit [Docket No. 78] (the "***Motion for Leave***"), a motion to stay this Chapter 11 Case pending appeal [Docket No. 79] ("***Stay Motion***"), and a Notice of Appeal and Statement of Election [Docket No. 81] (the "***Appeal***"). On May 5, 2016, the Debtor filed an emergency motion with the United States Bankruptcy Appellate Panel for the Tenth Circuit (the "***10th Circuit BAP***") to stay this Chapter 11 Case pending decision of the Bankruptcy Court regarding staying the case [10th Cir. BAP Docket No. 4]. On May 6, 2016, the Bankruptcy Court entered an order [Docket No. 97] denying the Stay Motion.

On May 8, 2016, the Debtor filed a supplement [10th Cir. BAP Docket No. 13] to its emergency motion to stay this case pending appeal with the 10th Circuit BAP. On May 16, 2016, the 10th Circuit BAP denied the Debtor's emergency motion for stay of the Chapter 11 Case pending appeal. *See In re Abengoa Bioenergy Biomass of Kansas, LLC*, BAP Appeal No. KS-16-012 (10th Cir. BAP, May 16, 2016) (denying stay pending appeal) [10th Cir. BAP Docket No. 25]. On May 26, 2016, the Bankruptcy Court entered an order denying the Motion for Leave. On June 23, 2016, the 10th Circuit BAP entered an order dismissing the Appeal [Docket No. 214; 10th Cir. BAP Docket No. 38], which was agreed to by the Debtor and the appellees.

### B.    Conversion to Chapter 11 and Entry of Certain Orders.

On April 8, 2016, the Bankruptcy Court entered an order [Docket No. 33] converting the case to a case under chapter 11 of the Bankruptcy Code. The Debtor is a debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. While substantially all of the Debtor's assets have been sold, the Debtor remains in possession of its remaining assets and continues to operate its business without interruption. As described in more detail herein, the Debtor has sold substantially all of its assets to a third-party purchaser.

During the course of the Chapter 11 Case, the Bankruptcy Court entered orders that, among other things, permitted the Debtor to make certain payments to employees and continue an expense reimbursement policy [Docket No. 291], and authorized the Debtor to pay certain pre-conversion and post-conversion insurance-related obligations [Docket No. 354]; and

### C.    Schedules and Statements.

On May 20, 2016, the Debtor filed its Schedules and Statement of Financial Affairs [Docket Nos. 120 and 121], which were signed by Sandra Porras Serrano, the Debtor's Chief Financial Officer and the Chief Financial Officer for the Abengoa Group's U.S. bioenergy unit. The Debtor's Schedules listed the intercompany claims held by ABC, ABT, ABEC, and ABO as non-contingent, liquidated, and undisputed. *See id.*

On May 19, 2017, almost one year after the Debtor originally filed its Schedules, the Debtor filed its amended Schedule E/F [Docket No. 859] in order to (i) list the intercompany claims held by ABC, ABT, ABEC, and ABO as contingent, unliquidated and disputed, and (ii) list the DOE's asserted claim as disputed.

### D.    Retention and Employment of the Debtor's Bankruptcy Professionals.

During the Chapter 11 Case, the Bankruptcy Court approved the Debtor's retention and employment of the following Professionals to assist in the administration of the Debtor's Chapter 11 Case: (i) DLA Piper LLP (US), as bankruptcy counsel to the Debtor [Docket No. 260]; (ii) Armstrong Teasdale LLP, as local bankruptcy counsel to the Debtor [Docket No. 261]; (iii) Josh Barker, Esq. as special litigation counsel to the Debtor [Docket No. 579]; and (iv) Ocean Park Advisors, LLC, as investment banker [Docket No. 259].

### E.    DIP Financing.

In the ordinary course of its business, the Debtor required cash on hand to fund its working capital, liquidity needs and other routine payables. In addition, the Debtor required financing to fund its Chapter 11 Case and to explore restructuring alternatives, including a 363 sale of all of its assets. Accordingly, during the course of this Chapter 11 Case, the Debtor sought and obtained approval from the Bankruptcy Court to obtain post-petition financing in the principal aggregate amount of up to $3,690,000 (the "*DIP Financing*") from Reich Brothers Business Solutions, LLC or its designee (the "*DIP Lender*"). On June 24, 2016, the Bankruptcy Court entered a final order approving the DIP Financing (the "*DIP Order*") [Docket No. 217]. On the Closing Date of the sale of substantially all of its assets, and in advance of the Maturity Date under the DIP Order, the Debtor satisfied in full all of its indebtedness and other obligations under the DIP Financing to the DIP Lender.

### F.    Appointment of Creditors' Committee.

On June 14, 2016, an Official Committee of Unsecured Creditors (the "*Creditors' Committee*") was appointed by the United States Trustee [Docket No. 177]. The Creditors' Committee comprises: (i) Stoppel Dirt Inc.; (ii) Equipment Pro, Inc.; and (iii) Western Reserve Water Systems. On August 8, 2016, the Bankruptcy Court approved the retention of Baker & Hostetler LLP as primary counsel to the Creditors' Committee [Docket No. 342] and Robert L. Baer [Docket No. 343] as local counsel to the Creditors' Committee. On September 14, 2016, the Bankruptcy Court approved the retention of MelCap Partners LLC as financial advisor to the Creditors' Committee [Docket No. 427].

\\NY - 045867/000001 - 7840945 v611

### G. Key Employee Retention Plan and Incentive Plan.

On August 25, 2016, the Bankruptcy Court approved the Debtor's key employee retention plan [Docket No. 395] (the "***KERP***"), permitting the Debtor to make certain bonus payments to three key, non-insider employees in order to retain them during the marketing and sale of the Hugoton Plant. The KERP provides that KERP payments would be made as follows: (i) 30% upon entry of the order approving the KERP, and (ii) 70% upon closing of a sale of the Hugoton Plant. To be eligible for each of the payments under the KERP, the employee was required to be an employee of the Debtor on the installment date(s) set forth above. There were three participants in the KERP, with payments totaling $85,486.

Moreover, on October 13, 2016, the Bankruptcy Court entered a stipulated order (the "***KEIP Order***") approving the Debtor's key employee incentive plan (as amended by the KEIP Order, the "***KEIP***") for three eligible insider and non-insider employees. The KEIP provides that KEIP payments would be made upon repayment in full of (i) DIP Financing (the "***Tier 1 Payment***"), and (ii) all allowed mechanic's liens (the "***Tier 2 Payment***"). To be eligible for the KEIP, the participant must (i) be an employee of the Debtor on the milestone dates set forth above, and (ii) execute, without revocation within any statutorily recognized revocation period, a general release of known and unknown claims existing as of the release date in favor of the Debtor and its affiliated persons and entities in a form satisfactory to the Debtor. The total aggregate Tier 1 Payments is $176,349 and the total aggregate Tier 2 Payments is $178,171.

The KEIP Order provides that the KEIP shall not be effective until such time as (i) each of the Debtor's affiliates with scheduled or timely filed claims against the Debtor shall have agreed in writing that its claims will be subordinated, and (ii) with respect to affiliates whose claims are scheduled or otherwise timely filed, the subordination of such claims is approved in the bankruptcy cases in which such affiliates are debtor entities, including: (A) Case No. 16-41161 in the Eastern District of Missouri, (B) Case No. 16-10754 in the District of Delaware, and (C) Case No. 16-10790 in the District of Delaware. To date, no payments under the KEIP have been made.

To be consistent with Article VI.A of the Missouri Plan, the Plan provides that despite the KEIP Order, the KEIP, which amount, for the avoidance of doubt, shall not exceed the aggregate amount of $354,520.00, shall be paid prior to any distribution to the General Unsecured Claims.

### H. Exclusivity Extensions.

On October 1, 2016, the Bankruptcy Court entered an order [Docket No. 407] granting the Debtor's request, pursuant to section 1121(d) of the Bankruptcy Code, to extend the Debtor's exclusivity period to file a plan of reorganization and solicit acceptances thereof to December 6, 2016 and February 2, 2017, respectively (together, the "***Exclusivity Periods***"). On December 21, 2016, the Bankruptcy Court entered an order [Docket No. 641] further extending the Exclusivity Periods to March 6, 2017 and May 8, 2017, respectively. On March 7, 2017, the Bankruptcy Court entered an order [Docket No. 762] further extending the

Exclusivity Periods to April 20, 2017 and June 22, 2017, respectively. The Debtor's exclusivity lapsed on June 22, 2017 prior to the filing of the Plan.

## I.     Sale of Substantially All of the Debtor's Assets.

In an exercise of due diligence and following extensive consultation with its advisors, the Debtor determined that maximizing the value of its estate would be best accomplished through a sale, free and clear of liabilities, of the Debtor's assets. On July 12, 2016, the Bankruptcy Court approved the Debtor's engagement of Ocean Park Advisors, LLC ("*OPA*"), *nunc pro tunc* to April 19, 2016, as the Debtor's investment banker to assist in the marketing and sale of its assets [Docket No. 259].

The Debtor, OPA, and the Debtor's other professionals undertook extensive marketing efforts to identify potential purchasers of substantially all of the Debtor's assets, the centerpiece of which was the Hugoton Plant. Specifically, OPA began marketing the Hugoton Plant during the week of June 20, 2016 and contacted a wide range of strategic and financial investors in connection with the potential sale. In total, OPA contacted 212 potential buyers and 28 intermediaries, of which 60 executed (comprising 48 distinct parties) a non-disclosure agreement with the Debtor to gain access to confidential and supplemental diligence information in a virtual data room. In addition, OPA arranged 24 total site visits (from 18 distinct parties) to the Hugoton Plant.

Subsequently, the Debtor received eight non-binding letters of intent. In consultation with OPA and the Debtor's other professionals, the Debtor analyzed and considered the various bid packages. The Debtor ultimately entered into a stalking horse purchase agreement, dated October 12, 2016, with Shell Oil Company ("*Shell*"), for the purchase and sale of the Hugoton Plant for $26 million.

The *Debtor's Motion for Entry of an Order (I) (A) Approving and Authorizing Bidding Procedures in Connection with the Sale Substantially all of the Debtor's Assets, (B) Approving Stalking Horse Protections, (C) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Notice Thereof, and (II) (A) Authorizing the Sale of Substantially all of the Debtor's Assets Free and Clear of All Liens, (B) Approving The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [Docket No. 467] (the "*Sale Motion*") set forth certain bidding procedures that would govern: (i) the bidding process for the sale of the Debtor's assets (the "*Sale*"), and (ii) procedures for the assumption and assignment of certain of the Debtor's executory contracts and unexpired leases. On October 14, 2016, the Bankruptcy Court entered an Order [Docket No. 481] (the "*Bid Procedures Order*") approving, among other things, the bidding procedures requested in the Sale Motion.

Following entry of the Bid Procedures Order, OPA led an exhaustive re-marketing process ahead of the final bid deadline of November 18, 2016. The re-marketing process resulted in one additional qualified bid package from Synata Bio, Inc. ("*Synata*"). The Debtor invited Shell and Synata to attend an auction on November 21, 2016 at the offices of the Debtor's co-counsel, Armstrong Teasdale LLP in St. Louis, Missouri. At the close of the

auction, Synata was determined to be the successful bidder of substantially all of the Debtor's assets (the "***Purchased Assets***") for a purchase price of $48.5 million, plus an agreement by Synata to use best efforts to enter into either (a) an agreement with the DOE pursuant to which the Debtor's rights and obligations related to the ABBK Award would be assumed and assigned to Synata, or (b) a novation of the ABBK Award.

On October 13, 2016, the DOE objected to the Debtor's bidding procedures motion [Docket No. 477], arguing that, pursuant to the ABBK Award, the Debtor was not entitled to sell the Ethanol Plant without accounting for "DOE's cost-share percentage with respect to property interests [of the DOE] in the [Ethanol Plant] and any proceeds from a Sale." *Id.*, ¶ 7. Further, on November 10, 2016, the DOE objected to the Sale [Docket No. 528] (the "***DOE Sale Objection***"), arguing that the Ethanol Plant could not be considered estate property due, in part, to "DOE's comprehensive control over its financial assistance awards[.]" *See* DOE Sale Objection, ¶ 6.

On November 19, 2016, the Debtor filed its response to the DOE Sale Objection [Docket No. 546] (the "***Debtor's Response***"), noting that the DOE had an investment interest in the Ethanol Plant, "much like any investor ... has in an entrepreneur[]" but that the DOE did not "control" the Debtor in any meaningful way. *See* Debtor's Response, ¶ 15. As further described in Article II above, and for the reasons fully set forth in the Debtor's Response, the Debtor believes that the ABBK Award, unlike the fully repaid LGP Loan, may be characterized as an equity investment in the Debtor, given it was an investment made to further serve the goals and objectives of the United States government.

On November 29, 2016, the Bankruptcy Court entered an order approving the sale and successful bid of the Purchased Assets [Docket No. 578] (the "***Sale Order***"). The sale of the Purchased Assets closed on December 8, 2016 (the "***Closing***"). With respect to the DOE's claimed interest, the Sale Order provided for the DOE's reservation of rights to assert its alleged cost-share interest in the Ethanol Plant, but only against the proceeds of the Sale. Specifically, the Sale Order states as follows:

> Under the ABBK Award, the DOE asserts that it provided the Debtor with $95,452,893 (27.24%) of the $350,409,271 necessary for the construction, start-up, and commissioning of the Plant (as defined in the Asset Purchase Agreement). The DOE reserves all rights to seek payment from the Debtor on account of the percentage of DOE's asserted cost-share interest, pursuant to its as-filed proof of claim [Claim No. 81] (the "DOE Claim"), but only against the proceeds of the Sale. Nothing in this Order shall serve as a bar to or waiver of the DOE Claim or right to assert its cost share interest, and, to the extent that the DOE Claim and cost share interest is ultimately determined to be valid, it shall attach to the proceeds of the Sale. For the avoidance of doubt, upon the closing, the DOE Claim ... shall attach to and may be asserted solely against the proceeds of the Sale ... (*See* Sale Order, ¶ 29)

**J.      Claims Process and Bar Dates.**

\\NY - 045867/000001 - 7840945 v611

**Section 341 Meeting of Creditors**. On June 9, 2016, the U.S. Trustee held the meeting of creditors in the Chapter 11 Case pursuant to section 341(a) of the bankruptcy code.

**Bar Dates**. Pursuant to the Bar Date Order [Docket No. 408], the Bankruptcy Court established (i) September 30, 2016, at 4:00 p.m. (CT) as the deadline for creditors (other than governmental units) to file proofs of claim in the Chapter 11 Case (the "*General Bar Date*"); (ii) October 17, 2016, at 5:00 p.m. (CT) as the Initial Administrative Claims Bar Date; and (iii) October 5, 2016, at 4:00 p.m. (CT) as the Governmental Bar Date (the "*Governmental Bar Date*" and collectively, the "*Bar Dates*"). Notice of the Bar Dates was served on all potential creditors of the Debtor's estate on September 3, 2016, and was published in the New York Times on September 8, 2016.

**Intercompany Claims**. Prior to the Petition Date, ABBK and certain of its affiliates (as that term is defined in section 101(2) of the Bankruptcy Code, the "*Affiliates*"), engaged in certain intercompany transactions, including transactions related to the construction, start-up and commissioning of the Hugoton Plant. Certain of those Affiliates are chapter 11 debtors in the Delaware Chapter 11 Cases and the Missouri Chapter 11 Cases, (collectively, the "*Affiliate Cases*").

The Debtor and each of the Affiliates, as the case may be, have filed agreed extensions in this Chapter 11 Case and in the Affiliate Cases, respectively, for the deadline by which the Affiliates and/or the Debtor must file intercompany proofs of claim against one another, while the parties attempt to negotiate a global agreement related thereto (the "*Intercompany Extensions*"). Specifically, in this Chapter 11 Case, on each of October 4, 2016 [Docket No. 456], November 1, 2016 [Docket No. 511], December 16, 2016 [Docket No. 624], January 27, 2017 [Docket No. 693], March 15, 2017 [Docket No. 772], April 27, 2017 [Docket No. 829], May 9, 2017 [Docket No. 843] and May 12, 2017 [Docket No. 849], the Bankruptcy Court entered orders approving the Intercompany Extensions. The deadline for filing Intercompany Claims was May 23, 2017.

On May 23, 2017, certain Missouri Bioenergy Debtors filed the following claims that were signed by Sandra Porras, the Debtor's Chief Financial Officer, in almost the exact amounts that the Debtor had originally scheduled them as non-contingent, liquidated, and undisputed: (i) Proof of Claim No. 93 filed by ABEC in the amount of $1,883,354.84; (ii) Proof of Claim No. 94 filed by ABT in the amount of $10,905,144.17; (iii) Proof of Claim No. 95 filed by ABC in the amount of $55,044,643.41; and (iv) Proof of Claim No. 96 filed by ABO in the amount of $1,671,790.74 (collectively, the "*Missouri Intercompany Claims*").

**The DOE Claim**. On October 4, 2016, one day prior to the Governmental Bar Date, the DOE filed its Proof of Claim [Claim No. 81-1] (the "*DOE Claim*"), alleging an unliquidated interest in the Debtor's property. The DOE Claim is further described in paragraph 29 of the Sale Order, as quoted in Section IV.I above.

The Court may reach one of at least three (3) determinations with respect to the DOE's Claim, each of which would lead to an alternative recovery for creditors in this Chapter 11 Case:

1. The Court may determine that, with respect to the ABBK Award, and unlike the LGP Loan, the DOE holds an equity interest in the Debtor's estate. In the event the Court makes such a determination, the unsecured creditors' recoveries will be substantially similar to those set forth herein and in the Plan.

2. The Court may determine that the funds against which the DOE asserts an interest are not property of the estate. In the event the Court makes such a determination, the unsecured creditors' recoveries may be less than half of the projected amounts set forth herein and in the Plan.

3. The Court may determine that the DOE's Claim is no different from a claim of any other unsecured creditor. In the event the Court makes such a determination, any distributions made to Holders of Claims in Class 2 (General Unsecured Creditors) will be made *pari passu* with distributions on account of the DOE's Claim, whatever that amount is determined to be by this Court.

Instead of the uncertainty related to these potential outcomes, the Debtor settled the DOE Claim and related adversary proceeding in exchange for $3.4 million in cash [Docket No. 975].

### K.  Lienholder Claims, Litigation and Settlements.

Prior to the General Bar Date, twenty-three (23) parties asserting state-law mechanic's liens, including the Petitioning Creditors (the "*Lienholders*"), filed secured proofs of claim against the Debtor in the aggregate total amount of $16,849,479.41 (the "*Lienholder Claims*"). Certain of these lienholders were parties to prepetition state-court litigation which was removed to the Bankruptcy Court as an adversary case on September 21, 2016 [Case No. 1605151, Docket No. 2], and others filed adversary complaints against the Debtor in various adversary cases [Case Nos. 16-05090, 16-05104, 16-05116, 16-05117, 16-05118 and 16-05146] (collectively, the "*Adversary Litigation*").

Beginning after the Closing of the Sale, the Debtor and the Lienholders initiated settlement discussions with respect to the Lienholder Claims and the Adversary Litigation. On February 3, 2017, following extensive negotiations between the parties, the Debtor filed a motion to approve settlement agreements with 22 of the 23 Lienholders [Docket No. 700], and, on February 27, 2017, filed a supplemental motion to approve a settlement agreement with the final Lienholder [Docket No. 753] (together, the "*Settlement Motion*"). Pursuant to the Settlement Motion, in exchange for the release of claims against the Debtor (and, in certain cases, its affiliates) and the dismissal of the Adversary Litigation, as applicable, the Debtor, with the support of the Creditors' Committee, made payments on account of the Lienholder Claims for less than 100% on the dollar to each of the Lienholders, resulting in a substantial savings and a source of additional recovery for unsecured creditors under the Plan. On February 14, 2017, the Bankruptcy Court entered an order approving the Settlement Motion with respect to the initial 22 of 23 Lienholders [Docket No. 715] and on April 6, 2017, the

Bankruptcy Court entered a supplemental order approving the Settlement Motion with respect to the final Lienholder [Docket No. 786] (together, the "***Settlement Order***").

      **L.**      **Debtor's Plan**

      On April 14, 2017, the Debtor filed the *Debtor's Plan of Liquidation pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 811] (the "***Debtor's Plan***) and on May 21, 2017 the Debtor filed the *First Amended Disclosure Statement for Debtor's Plan of Liquidation dated as of April 14, 2017 pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 863] (the "***Debtor's Disclosure Statement***"), which Disclosure Statement the Court approved on May 23, 2017 [Docket No. 872]. The confirmation hearing on the Debtor's Plan is currently set for hearing on ~~August 24~~[•], 2017 at 9:00 a.m. Central.

      On July 7, 2017, the Missouri Liquidating Trustee filed an objection to the Debtor's Plan [Docket No. 931] in which it argued that the Debtor's Plan is unconfirmable because it violates (i) section 1129(a)(1) of the Bankruptcy Code because disallowing the Missouri Intercompany Claims without any justification therefore and without any objection having been filed to their proofs of claim violates, *inter alia*, section 502(b) of the Bankruptcy Code; (ii) the "best interests of creditors" test under section 1129(a)(7) of the Bankruptcy Code because the Missouri Intercompany Claims would plainly receive more in a chapter 7 liquidation than under the Debtor's Plan as demonstrated by the Debtor's own Liquidation Analysis attached to the Debtor's Disclosure Statement, (iii) section 1122(a) of the Bankruptcy Code because it gerrymanders the classes to treat Missouri Intercompany Claims dramatically worse than other unsecured creditors, and (iv) section 1129(b)(1) of the Bankruptcy Code because it discriminates unfairly and is not fair and equitable as it provides a purported 95% recovery (not taking into account the proposed DOE settlement) to General Unsecured Claims while providing no recovery at all to the Missouri Intercompany Claims. For additional information about the Debtor's Plan, please see Article VIII.A.

**V.**      **THE CHAPTER 11 PLAN**

      **A.**      **Treatment of Claims and Equity Interests Under the Plan.**

      **THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1.**

      The Claims against the Debtor are divided into Classes according to their seniority and other criteria. The Classes of Claims for the Debtor and the funds and other property to be distributed under the Plan are described more fully below.

**THE MISSOURI LIQUIDATING TRUSTEE BELIEVES THAT THE PLAN AFFORDS CREDITORS THE POTENTIAL FOR THE GREATEST REALIZATION OF THE VALUE OF THE DEBTOR'S ASSETS.**

1.       **Administrative Claims.**

(a)       **Administrative Claims.**

The Liquidating Trustee shall pay, from the Debtor's assets, each holder of an Allowed Administrative Claim, in satisfaction of such Allowed Administrative Claim, the full unpaid amount of such Allowed Administrative Claim in Cash: (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (3) at such time and upon such terms as may be agreed upon by such holder and the Liquidating Trustee; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however, that Administrative Claims do not include Administrative Claims filed after the Administrative Claims Bar Date or Administrative Claims filed or asserted pursuant to section 503(b)(9) of the Bankruptcy Code after the General Bar Date, unless the Liquidating Trustee, in its discretion, chooses to treat such Claims as Administrative Claims.

(b)       **Administrative Claims Bar Date.**

Except as otherwise provided, on or before the Final Administrative Claims Bar Date, any Person or Entity that seeks allowance of an Administrative Claim shall file with the Bankruptcy Court and serve on counsel for (i) the Debtor, (ii) the Creditors' Committee, and (iii) the Liquidating Trustee, any request for payment of an Administrative Claim arising after May 31, 2016. Requests for payment of an Administrative Claim must include at a minimum: (i) the name of the holder seeking allowance of an Administrative Claim; (ii) the amount of the Administrative Claim sought; (iii) the basis asserted for allowance of the Administrative Claim; and (iv) all supporting documentation that justify allowance of the Administrative Claim asserted.

The request for payment of an Administrative Claim will be considered timely filed only if it is filed with the Bankruptcy Court and actually received by parties identified in Article II.A of the Plan by the Final Administrative Claims Bar Date. Requests for payment of Administrative Claims may not be delivered by facsimile, telecopy, or electronic mail transmission.

(c)       **Accrued Professional Compensation Claims.**

The deadline for submission by Professionals for Bankruptcy Court approval of Accrued Professional Compensation shall be sixty (60) days after the Effective Date. Any Professional or other Person or Entity that is required to file and serve a request for approval of Accrued Professional Compensation and fails to timely file and serve such request on or before such date shall be forever barred, estopped and enjoined from asserting such request or

participating in Distributions under the Plan on account thereof. All Professionals employed by the Debtor or the Creditors' Committee, shall provide to the Debtor an estimate of their Accrued Professional Compensation through the Effective Date (including an estimate for fees and expenses expected to be incurred after the Effective Date to prepare and prosecute allowance of final fee applications) before the Effective Date.

**(d)** **Priority Tax Claims.**

The Liquidating Trustee shall pay, from the Debtor's assets, each holder of an Allowed Priority Tax Claim, in satisfaction of such Allowed Priority Tax Claim, the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the later of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law; provided, however that the Liquidating Trustee shall not pay any premium, interest or penalty in connection with such Allowed Priority Tax Claim.

**(e)** **Other Priority Claims.**

The Liquidating Trustee shall pay, from the Debtor's assets, each holder of an Allowed Other Priority Claim, in satisfaction of such Allowed Other Priority Claim, the full unpaid amount of such Allowed Other Priority Claim in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date such Allowed Other Priority Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Other Priority Claim is payable under applicable non-bankruptcy law.

**2.** **Classification of Claims and Equity Interests.**

**(a)** **Classified Claims Against and Equity Interests in the Debtor.**

Except as set forth in the Plan, all Claims against and Equity Interests are placed in a particular Class. The Missouri Liquidating Trustee has not classified Administrative Expense Claims, Accrued Professional Compensation Claims, Priority Tax Claims, or Other Priority Claims.

The following table shows the classification of Claims against and Equity Interests in the Debtor for all purposes, including voting, confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and deems a Claim classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Each Class set forth below is treated under the Plan as a distinct Class for voting and Distribution purposes.

Subject to all other applicable provisions of the Plan (including its Distribution provisions), classified Claims shall receive the treatment described in Article III of the Plan.

The Plan will not provide any Distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties.

| Class | Claims & Interest | Status | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------------|--------|-----------|------------------|--------------------|
| 1 | Secured Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 2 | General Unsecured Claims | Impaired | Pro Rata Share of Liquidating Trust Cash | Yes | 33% |
| 3 | Non-Missouri Intercompany Claims | Impaired | No Distribution | No (deemed to reject) | 0% |
| 4 | Equity Interests | Impaired | No Distribution | No (deemed to reject) | 0% |

### 3.    Treatment of Claims and Equity Interests.

#### (a)    Secured Claims (Class 1).

Except to the extent that a holder of an Allowed Secured Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable classification and treatment, each holder of an Allowed Secured Claim shall receive, at the sole option of the Liquidating Trustee, Cash in the full amount of such Allowed Secured Claim or the collateral securing its Allowed Secured Claim, on or as soon as practicable after the latest to occur of (i) the Effective Date; (ii) the first Business Day after the date that is ten (10) Business Days after the date such Claim becomes an Allowed Other Secured Claim; and (iii) the date or dates agreed to by the Liquidating Trustee and the holder of the Allowed Secured Claim.

#### (b)    General Unsecured Claims (Class 2).

Except to the extent that a holder of an Allowed General Unsecured Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable classification and treatment, each holder of an Allowed General Unsecured Claim shall receive their Pro Rata share of remaining Cash, provided that distributions to holders of Allowed Missouri Intercompany Claims shall be limited to the extent necessary to permit General Unsecured Claims other than Missouri Intercompany Claims to receive percentage distributions hereunder equaling no less than the percentage distributions received by General Unsecured Claims classified as Bioenergy Class 2 in the Missouri Plan calculated as if the Debtor was substantively consolidated with the Missouri Bioenergy Debtors. The Kansas KEIP, which amount, for the avoidance of doubt, shall not exceed the aggregate amount of $354,520.00, shall be paid prior to any distribution to the General Unsecured Claims. Distributions to holders of Allowed General Unsecured Claims shall be made as soon as practicable as the Liquidating Trustee may determine in its sole discretion.

As a result of the Missouri Bioenergy Debtors agreeing to voluntarily reduce the Allowed amount of the Missouri Intercompany Claims as set forth above, it is estimated that the General Unsecured Claims will receive an estimated recovery of 33%, compared to a 19% recovery if the Missouri Intercompany Claims are Allowed in full with *pro rata* treatment. *See*

Introduction at page 1 above and Exhibit 2 (Recovery Analysis) hereto for the bases for, and further explanation of, this estimated recovery.

(c)     **Non-Missouri Intercompany Claims (Class 3).**

Holders of Non-Missouri Intercompany Claims will receive no Distribution under the Plan.

(d)     **Equity Interests (Class 4).**

Holders of Equity Interests will receive no Distribution under the Plan. All equity interests in the Debtor shall be deemed cancelled upon the Effective Date.

B.     **Means for Implementation of the Plan.**

1.     **Establishment of Liquidating Trust.**

On the Effective Date, the Liquidating Trustee shall sign the Liquidating Trust Agreement and, in his capacity as Liquidating Trustee, accept all Liquidating Trust Assets on behalf of the beneficiaries thereof, and be authorized to obtain, seek the turnover, liquidate, and collect all of the Liquidating Trust Assets not in his or her possession. The Liquidating Trust will then be deemed created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date. The Liquidating Trust shall be established for the purposes of (i) liquidating any non-Cash Liquidating Trust Assets; (ii) prosecuting and resolving the obligations incurred by the Liquidating Trustee in administering the Plan and the Liquidating Causes of Action; (iii) maximizing recovery of the Liquidating Trust Assets for the benefit of the beneficiaries thereof; and (iv) distributing the proceeds of the Liquidating Trust Assets to the beneficiaries in accordance with the Plan and the Liquidating Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary for, and consistent with, the liquidating purpose of the Liquidating Trust.

2.     **Appointment of the Liquidating Trustee.**

The Liquidating Trustee shall be appointed by the Plan Proponent pursuant to the Plan and the Confirmation Order. It is contemplated that Drivetrain, LLC, the Liquidating Trustee in the Missouri Chapter 11 Cases and an experienced liquidating trustee, will be the Liquidating Trustee in this Chapter 11 Case. Following appointment, the Liquidating Trustee shall have the same powers as the board of directors and officers of the Debtor, subject to the provisions of the Plan (and all bylaws, articles of incorporation and related corporate documents are deemed amended by the Plan to permit and authorize the same). In the event of resignation or removal, death or incapacity of the Liquidating Trustee, the Plan Proponent shall designate another Person or Entity to serve as Liquidating Trustee and thereupon the successor Liquidating Trustee, without any further act or need for an order of the Bankruptcy Court, shall become fully vested with all of the rights, powers, duties and obligations of the predecessor; provided, however, that the Liquidating Trustee shall be deemed removed on the date the Chapter 11 Case is closed, and no successor thereto shall be designated. The

Liquidating Trustee shall be entitled to compensation payable from the Liquidating Trust Assets as set forth in the Liquidating Trust Agreement.

### 3. Beneficiaries of Liquidating Trust.

The holders of General Unsecured Claims against the Debtor entitled to Distributions shall be the beneficiaries of the Liquidating Trust. Such beneficiaries shall be bound by the Liquidating Trust Agreement. The interests of the beneficiaries in the Liquidating Trust shall be uncertificated and nontransferable except upon death of the interest holder or by operation of law.

### 4. Vesting and Transfer of Liquidating Trust Assets to the Liquidating Trust.

Pursuant to Bankruptcy Code section 1141(b), the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Liens, Claims and Interests, except as otherwise specifically provided in the Plan or in the Confirmation Order; provided, however, that the Liquidating Trustee may abandon or otherwise not accept any non-Cash Liquidating Trust Assets that the Liquidating Trustee believes, in good faith, have no value to the Liquidating Trust. Any non-Cash Liquidating Trust Assets that the Liquidating Trustee so abandons or otherwise does not accept shall not be property of the Liquidating Trust. The Liquidating Trust Assets include claims against third parties. These claims include, but are not limited to, preference, fraudulent transfer and other avoidance claims pursuant to chapter 5 of the Bankruptcy Code and state law counterparts. These claims will be preserved and transferred to the Liquidating Trust.

### 5. Liquidating Trust Expenses.

Subject to the provisions of the Liquidating Trust Agreement, all costs, expenses Trust, or in any manner connected, incidental or related thereto, in effecting distributions from, as applicable, the Liquidating Trust shall be a charge against the Liquidating Trust Assets remaining from time to time in the hands of the Liquidating Trustee. Such expenses shall be paid in accordance with the Liquidating Trust Agreement.

### 6. Role of the Liquidating Trustee.

The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust and the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect the Liquidating Trust Assets; (b) pay taxes or other obligations incurred by the Liquidating Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants to advise and assist in the reasonable administration, prosecution and distribution of Liquidating Trust Assets; (d) calculate and implement Distributions of Liquidating Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Liquidating Trust Agreement, Causes of Action vested in the Liquidating Trust; (f) resolve

\\NY - 045867/000001 - 7840945 v611

issues involving Claims and Interests in accordance with the Plan; and (g) undertake all administrative functions of the Debtor's Chapter 11 Case, including the payment of fees payable to the United States Trustee and the ultimate closing of the Debtor's Chapter 11 Case. The Liquidating Trust is the successor to the Debtor and its Estate.

On the Effective Date, the Liquidating Trust shall: (a) take possession of all books, records, and files of the Debtor and its Estate; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trust determines, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or required.

The Liquidating Trustee may invest Cash in the Liquidating Trust (including any earnings thereon or proceeds therefrom) in any manner permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

The Liquidating Trust shall have the right to object to Claims not otherwise Allowed in connection with post-Effective Date Claims allowance process.

In no event later than thirty (30) Business Days after the end of the first full month following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidating Trust has been distributed in accordance with the Plan, the Liquidating Trustee shall file with the Bankruptcy Court a report setting forth the amounts, recipients and dates of all Distributions made by the Liquidating Trustee under the Plan through each applicable reporting period.

The Liquidating Trustee shall file tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with the Plan. The Liquidating Trust shall also annually (for tax years in which Distributions from the Liquidating Trust are made) send to each beneficiary a separate statement setting forth the beneficiary's share of items of income, gain, loss, deduction or credit, and all such holders shall report such items on their federal income tax returns; provided, however, that no such statement need be sent to any Class that is not expected to receive any Distribution from the Liquidating Trust. The Liquidating Trust's taxable income, gain, loss, deduction or credit will be allocated to the Liquidating Trust's beneficiaries in accordance with their relative beneficial interests in the Liquidating Trust. As soon as practicable after the Effective Date, the Liquidating Trust shall make a good faith valuation of assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for all federal income tax purposes. The Liquidating Trust shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit for taxing purposes. The Liquidating Trust may request an expedited determination of taxes of the Debtor or of the Liquidating Trust under Bankruptcy Code section 505(b) for all tax returns filed for, or on behalf of, the Debtor and the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust. The Liquidating Trust shall be responsible for filing all federal, state, and local tax returns for the Debtor and the Liquidating Trust. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal,

state, or local taxing authority, and all distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.

The Liquidating Trust shall be responsible for payments of all Allowed tax obligations of the Debtor, and any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets.

### 7.    Preservation of Right to Conduct Investigations.

The preservation for the Liquidating Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the liquidation and administration of the Liquidating Trust Assets. Accordingly, any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Debtor or the Creditors' Committee prior to the Effective Date shall vest with the Liquidating Trust and shall continue until dissolution of the Liquidating Trust.

### 8.    Prosecution and Resolution of Causes of Action.

From and after the Effective Date, prosecution and settlement of all Causes of Action transferred to the Liquidating Trust shall be the sole responsibility of the Liquidating Trust pursuant to the Plan and the Confirmation Order. From and after the Effective Date, the Liquidating Trust shall have exclusive rights, powers, and interests of the Debtor's Estate to pursue, settle or abandon such Causes of Action as the sole representative of the Debtor's Estate pursuant to Bankruptcy Code section 1123(b)(3). Proceeds recovered from all Causes of Action will be deposited into the Liquidating Trust and will be distributed by the Liquidating Trustee to the beneficiaries in accordance with the provisions of the Plan and Liquidating Trust Agreement. All Causes of Action that are not expressly released or waived under the Plan are reserved and preserved and vest in the Liquidating Trust in accordance with the Plan. No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or this Disclosure Statement to any Cause of Action as any indication that the Liquidating Trustee will not pursue any and all available Causes of Action against such Person. The Liquidating Trustee expressly reserves all Causes of Action, except for any Causes of Action against any Person that are expressly released or waived under the Plan, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of confirmation or consummation of the Plan. No claims or Causes of Action against the Released Parties shall be transferred to the Liquidating Trust, the Liquidating Trustee shall not have standing to pursue such claims or Causes of Action, and all such claims and Causes of Action shall be waived, released and discharged pursuant to the Plan.

Settlement by the Liquidating Trust of any Cause of Action transferred to the Liquidating Trust shall require: (i) approval only of the Liquidating Trustee if the amount claimed by the Liquidating Trust against a defendant is less than five hundred thousand dollars ($500,000); and (ii) approval of the Liquidating Trustee and the Bankruptcy Court, upon

Case 16-10446    Doc# 978    Filed 07/27/17    Page 179 of 280

notice and a hearing, if the amount claimed by the Liquidating Trust against a defendant is unliquidated or equals to or exceeds five hundred thousand dollars ($500,000).

9.      **Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets.**

For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution from the Debtor's Estate of an undivided interest in each of the Liquidating Trust Assets (to the extent of the value of their respective share in the applicable assets) and then contributed such interests to the Liquidating Trust, and the Liquidating Trust's beneficiaries will be treated as the grantors and owners thereof.

10.      **Limitation of Liability.**

No recourse will ever be had, directly or indirectly, against the Liquidating Trustee, its members, officers, directors, employees, professionals, representatives, agents, successors or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Trust under the Plan or by reason of the creation of any indebtedness by the Liquidating Trust or the Liquidating Trustee under the Plan. All such liabilities under the Plan will be enforceable only against, and will be satisfied only out of, the Liquidating Trust Assets. The Liquidating Trustee and its agents shall not be deemed to be the agent for any holder of a Claim in connection with Distributions made under the Plan. The Liquidating Trust and the Liquidating Trustee and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do, hereunder in good faith and in the exercise of their sound judgment; provided, however, that this section will not apply to any gross negligence or willful misconduct by the Liquidating Trust and the Liquidating Trustee or their respective officers, directors, employees, professionals, representatives, agents, successors or assigns.

11.      **Term of Liquidating Trust.**

The Liquidating Trustee shall be discharged and the Liquidating Trust shall be terminated at such time as (a) all Disputed Claims have been resolved, (b) all of the Liquidating Trust Assets have been liquidated, (c) all duties and obligations of the Liquidating Trustee under the Liquidating Trust Agreement have been fulfilled, (d) all Distributions required to be made by the Liquidating Trust under the Plan and the Liquidating Trust Agreement have been made, and (e) the Debtor's Chapter 11 Case has been closed; provided, however, that in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the third anniversary (or the end of any extension period approved by the Bankruptcy Court), determines

31

that a fixed period extension not to exceed one (1) year is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

## 12. Retention of Professionals by Liquidating Trust.

The Liquidating Trustee may retain and compensate attorneys and other professionals to assist in its duties on such terms (including on a contingency or hourly basis) as it deems reasonable and appropriate without Bankruptcy Court approval.

## 13. Conflicts Between the Liquidating Trust Agreement and the Plan.

In the event of any inconsistencies or conflict between the Liquidating Trust Agreement and the Plan, the terms and provisions of the Plan shall control.

## 14. Cancellation of Existing Securities and Agreements.

Except for purposes of evidencing a right to Distributions under the Plan or as otherwise provided hereunder, on the Effective Date, any and all agreements and other documents evidencing Claims or rights of any holder of a Claim or Equity Interest against the Debtor, including, but not limited to, all indentures, notes, bonds and share certificates evidencing such Claims and Equity Interests and any agreements or guarantees related thereto shall be cancelled, terminated, deemed null and void and satisfied, as against the Debtor but not as against any other Person.

## 15. Operations of the Debtor Between the Confirmation Date and the Effective Date.

The Debtor shall continue to operate as a debtor in possession during the period from the Confirmation Date through and until the Effective Date, and as a liquidating estate on and after the Effective Date. The retention and employment of the Professionals retained by the Debtor shall terminate as of the Effective Date, provided, however, that the Debtor shall be deemed to exist, and its Professionals shall be retained, after such date only with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, (b) motions seeking the enforcement of the provisions of the Plan or the Confirmation Order, and (c) such other matters as may be determined by the Debtor and the Liquidating Trustee, including, without limitation, the filing and prosecuting of objections to Claims solely with respect to Administrative Claims, Priority Tax Claims, and Other Priority Claims. On the Effective Date, the Debtor's directors and officers shall be terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and shall have no continuing obligations to the Debtor following the occurrence of the Effective Date.

## 16. Automatic Stay.

The automatic stay provided for under section 362 of the Bankruptcy Code shall remain in effect in the Chapter 11 Case until the Effective Date.

## 17. The Creditors' Committee.

32

Upon the Effective Date, the Creditors' Committee shall dissolve, and its members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Case. The retention and employment of the Professionals retained by the Creditors' Committee shall terminate as of the Effective Date, provided, however, that the Creditors' Committee shall exist, and its Professionals shall be retained, after such date with respect to applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and motions seeking the enforcement of the provisions of the Plan or the Confirmation Order, including, to the extent necessary, to appoint a successor Liquidating Trustee.

### 18. Books and Records.

As part of the appointment of the Liquidating Trustee, to the extent not already transferred on the Effective Date, the Debtor shall transfer dominion and control over all of its Books and Records to the Liquidating Trustee in whatever form, manner or media those Books and Records existed immediately prior to the transfer thereof to the Liquidating Trustee. The Liquidating Trustee may abandon all such Books and Records on or after ninety (90) days from the Effective Date, provided, however, that the Liquidating Trustee shall not dispose or abandon any Books and Records that are reasonably likely to pertain to pending litigation in which the Debtor or its current or former officers or directors are a party, or that pertain to General Unsecured Claims, without further order of the Bankruptcy Court. Pursuant to section 554 of the Bankruptcy Code, Article IV.R of the Plan shall constitute a motion and notice, so that no further notice or Bankruptcy Court filings are required to effectuate the aforementioned abandonment of the Books and Records of the Debtor.

### 19. D&O Insurance Policies.

No prepaid D&O Insurance Policy shall be cancelled, and the Debtor's directors, officers and employees who have valid claims against the D&O Insurance Policies for indemnification, defense, reimbursement, or limitation of liability may be paid from the D&O Insurance Policies to the extent of the coverage provided by the D&O Insurance Policies, if any. As such, and notwithstanding anything in the Plan to the contrary, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the D&O Insurance Policies, to the extent the contract(s) providing for such is determined to be an executory contract, shall be deemed assumed by the Debtor.

### C. Provisions Governing Voting And Distributions.

### 1. Voting of Claims.

Each holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article III of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court. For purposes of calculating the number of Allowed Claims in a Class of Claims that have voted to accept or reject the Plan under section 1126(c) of the Bankruptcy Code, all Allowed Claims in such

Class held by one Entity or any Affiliate thereof shall be aggregated and treated as one Allowed Claim in such Class. For purposes of any Claim in any Impaired Class that is Disputed as to its amount only, the holder of such Claim shall be entitled to vote on the Plan as if such holder held an Allowed Claim in an amount equal to the undisputed portion of such Claim.

### 2. Distribution Dates.

Distributions to holders of Claims shall be made as provided in Articles II and III of the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 3. Disbursing Agent.

All Distributions under the Plan by the Liquidating Trustee shall be made by the Liquidating Trustee, or such other entity designated by the Liquidating Trustee, as disbursing agent (the "*Disbursing Agent*").

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all Distributions contemplated by the Plan, (c) employ professionals to represent it with respect to its responsibilities, and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agent shall only be required to act and make Distributions in accordance with the terms of the Plan and shall have no (x) liability for actions taken in accordance with the Plan or in reliance upon information provided to them in accordance with the Plan or (y) obligation or liability for Distributions under the Plan to any party who does not hold an Allowed Claim at the time of Distribution or who does not otherwise comply with the terms of the Plan.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Liquidating Trustee acting as the Disbursing Agent (including, without limitation, reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash from the Liquidating Trust Assets.

### 4. Record Date for Distributions.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date. The Liquidating Trustee shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. In making any Distribution with respect to any Claim, the Liquidating Trustee shall be entitled instead to recognize and deal with, for

34

all purposes hereunder, only the Entity that is listed on the proof of Claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that was known to the Debtor as of the Record Date and is available to the Liquidating Trustee.

5. **Delivery of Distributions.**

Subject to Bankruptcy Rule 9010 and except as otherwise provided in the Plan, Distributions to the holders of Allowed Claims shall be made by the Disbursing Agent at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim filed by such holder or (b) the last known address of such holder if no proof of Claim is filed or if the Liquidating Trustee has not been notified in writing of a change of address.

6. **Undeliverable and Unclaimed Distributions.**

In the event that any Distribution to any holder of an Allowed Claim made by the Liquidating Trustee is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder; provided, however, that all Distributions to holders of Allowed Claims made by the Liquidating Trustee that are unclaimed for a period of ninety (90) days after the date of the first attempted Distribution shall have its, his or her Claim for such undeliverable Distribution deemed satisfied and will be forever barred from asserting any such Claim against the Debtor or its property. Any Distributions which are undeliverable or have not been negotiated within the time period set forth above shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Debtor's Estate. The Liquidating Trustee shall have no further obligation to make any Distribution to the holder of such Claim on account of such Claim, and any entitlement of any holder of such Claim to any such Distributions shall be extinguished and forever barred; provided, however, that the holder of such Claim may receive future Distributions on account of such Claim by contacting the Liquidating Trustee at some point prior to the final Distribution.

7. **Manner of Cash Payments Under the Plan.**

Except as otherwise provided in the Plan, Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Liquidating Trustee.

8. **Compliance with Tax Requirements.**

The Disbursing Agent may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or Distribution on account of Claims. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such holders of the Claims. The Disbursing Agent shall be authorized to collect such tax information from the holders of Claims (including social security numbers or other tax

identification numbers) as it in its sole discretion deems necessary to effectuate the Plan. In order to receive Distributions under the Plan, all holders of Claims will need to identify themselves to the Disbursing Agent and provide all tax information the Disbursing Agent deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable to each holder). The Disbursing Agent may refuse to make a Distribution to any holder of a Claim that fails to furnish such information within the time period specified by the Disbursing Agent and such Distribution shall be deemed an unclaimed Distribution under the Plan, and, provided further that, if the Disbursing Agent fails to withhold in respect of amounts received or distributable with respect to any such holder and such Disbursing Agent is later held liable for the amount of such withholding, such holder shall reimburse the Disbursing Agent for such liability. Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, and (b) no Distributions shall be required to be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such tax obligations or has, to the Disbursing Agent's satisfaction, established an exemption therefrom.

### 9.     No Payments of Fractional Dollars.

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

### 10.     Interest on Claims.

Except to the extent provided in section 506(b) of the Bankruptcy Code, the Plan, or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims, and no holder of an Allowed Claim shall be entitled to interest accruing on any Claim from and after the Petition Date.

### 11.     No Distribution in Excess of Allowed Amount of Claim.

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of such Claim.

### 12.     Setoff and Recoupment.

The Liquidating Trustee may setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that the Debtor or the Estate may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the Estate or the Liquidating Trustee of any right of setoff or recoupment that any of them may have against the holder of any Claim. Any such setoffs or recoupments may be challenged in Bankruptcy Court. Notwithstanding any provision in the

Plan to the contrary, nothing in the Plan shall bar any creditor from asserting its setoff or recoupment rights to the extent permitted under section 553 or any other provision of the Bankruptcy Code provided that such setoff or recoupment rights are timely asserted; provided further that all rights of the Debtor, its Estate and the Liquidating Trustee with respect thereto are reserved.

### 13. De Minimis Distributions; Charitable Donation.

Notwithstanding anything to the contrary in the Plan, the Liquidating Trustee shall not be required to make a Distribution to any Creditor if the dollar amount of the Distribution is less than $25 or otherwise so small that the cost of making that Distribution exceeds the dollar amount of such Distribution. On or about the time that the final Distribution is made, the Liquidating Trustee may make a charitable donation with undistributed funds if, in the reasonable judgment of the Liquidating Trustee, the cost of calculating and making the final Distribution of the remaining funds is excessive in relation to the benefits to the or holders of Claims who would otherwise be entitled to such Distributions, and such charitable donation is provided to an entity not otherwise related to the Debtor or the Liquidating Trustee.

### 14. United States Trustee Fees.

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtor. On and after the Effective Date, the Liquidating Trustee shall pay any and all such fees payable by the Debtor, when due and payable, and shall file with the Bankruptcy Court quarterly reports for the Debtor, in a form reasonably acceptable to the U.S. Trustee. The Debtor shall remain obligated to pay quarterly fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

### 15. Withholding from Distributions.

Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from Distributions pursuant to the Plan. The Liquidating Trustee may withhold from amounts distributable pursuant to the Plan to any Person or Entity any and all amounts, determined in the sole and reasonable discretion of the Liquidating Trustee, required to be withheld by any law, regulation, rule, ruling, directive, or other governmental requirement.

### 16. No Distributions on Late-Filed Claims.

Except as otherwise provided in a Final Order of the Bankruptcy Court, any Claim as to which a proof of Claim was required to be filed and was first filed after the applicable bar date in the Chapter 11 Case, including, without limitation, the General Bar Date and any bar date established in the Plan or in the Confirmation Order, shall automatically be deemed a late-filed Claim that is disallowed in the Chapter 11 Case, without the need for (a) any further action by the Liquidating Trustee or (b) an order of the Bankruptcy Court. Nothing

in this paragraph is intended to expand or modify the applicable bar dates or any orders of the Bankruptcy Court relating thereto.

### D. Disputed Claims.

#### 1. Disputed Claims Reserve.

After the Effective Date, the Disputed Claims Reserve shall be managed by the Liquidating Trustee for the treatment of Disputed Claims. On each Distribution date after the Effective Date in which the Liquidating Trustee makes Distributions to holders of Allowed Claims, the Liquidating Trustee shall retain on account of Disputed Claims an amount the Liquidating Trustee estimates is necessary to fund the Pro Rata Share of such Distributions to holders of Disputed Claims if such Claims were Allowed, with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Liquidating Trustee. Cash retained on account of such Disputed Claims shall be retained in the Disputed Claims Reserve for the benefit of the holders of Disputed Claims pending a determination of their entitlement thereto under the terms of the Plan. If any Disputed Claim is disallowed or Allowed in an amount that is lower than the aggregate assets retained on account of such Disputed Claim, then the Liquidating Trustee shall, within fifteen (15) days after such disallowance or allowance, return the assets that exceed the Allowed amount of such Claim to the Debtor's Estate.

#### 2. Resolution of Disputed Claims.

The Liquidating Trustee shall have the right to make and file objections to Claims in the Bankruptcy Court. Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, all Disputed Claims shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

#### 3. Objection Deadline.

All objections to Disputed Claims shall be filed no later than the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing, with notice only to those parties entitled to notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002.

#### 4. Estimation of Claims.

At any time, the Liquidating Trustee may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Liquidating Trustee or the Debtor have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court. If the estimated amount

constitutes a maximum limitation on the Claim, the Liquidating Trustee may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 5. No Distributions Pending Allowance.

Notwithstanding any other provision in the Plan, if any portion of a Claim is disputed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. Upon allowance, a holder of the Allowed Disputed Claim shall receive any Distributions that would have been made up to the date of allowance to such holder under the Plan had the Disputed Claim been allowed on the Effective Date.

### 6. Resolution of Claims.

On and after the Effective Date, the Liquidating Trustee shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

### 7. Treatment of Missouri Intercompany Claims

Notwithstanding anything to the contrary herein, in the Plan, or in the Confirmation Order or any other ancillary document, the Missouri Intercompany Claims shall constitute Allowed Claims for all purposes, including, without limitation, voting, confirmation, and Distribution, and shall not be subject to any setoff or recoupment, estimation, dispute, objection, challenge or any other attack.

### E. Treatment of Executory Contracts and Unexpired Leases.

### 1. Assumption or Rejection of Executory Contracts and Unexpired Leases.

In accordance with sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any Person or Entity shall be deemed rejected by the Debtor as of immediately prior to the Confirmation Date, except for any executory contract or unexpired lease (i) that has been assumed or rejected by an order of the Bankruptcy Court entered prior to the Effective Date or (ii) as to which a motion for approval of the assumption of such executory contract or unexpired lease

has been filed and served prior to the Effective Date. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of rejection under section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejection is in the best interests of the Debtor, its Estate, and all parties in interest in the Chapter 11 Case.

### 2. Claims Based on Rejection of Executory Contracts and Unexpired Leases.

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article VII.A of the Plan must be filed with the Bankruptcy Court and served on the Debtor and the Liquidating Trustee no later than thirty (30) days after service of notice of the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A of the Plan for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtor, its Estate, the Liquidating Trustee, their respective successors and assigns, and their respective assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.E of the Plan. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided in the Plan shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III of the Plan.

### 3. Indemnification and Reimbursement.

Subject to the occurrence of the Effective Date, all Allowed Claims against the Debtor for indemnification, defense, reimbursement, or limitation of liability of current or former directors, officers, or employees of the Debtor against any Claims, costs, liabilities or causes of action as provided in the Debtor's articles of organization, bylaws, other organizational documents, or applicable law, shall, to the extent such indemnification, defense, reimbursement, or limitation is owed in connection with one or more events or omissions occurring before the Petition Date, be (a) paid only to the extent of any applicable insurance coverage, and (b) to the extent a proof of Claim has been timely filed and is Allowed, treated as Allowed General Unsecured Claims to the extent such Claims are not covered by any applicable insurance, including deductibles. Nothing contained in the Plan shall affect the rights of directors, officers or employees under any insurance policy or coverage with respect to such Claims, costs, liabilities or Causes of Action or limit the rights of the Debtor, the Liquidating Trustee or the Debtor's Estate to object to, seek to subordinate or otherwise contest or challenge Claims or rights asserted by any current or former officer, director or employee of the Debtor.

### F. Conditions Precedent to the Effective Date.

### 1. Conditions Precedent.

The following are conditions precedent to the Effective Date that must be satisfied or waived:

(a)     The Bankruptcy Court shall have entered the Confirmation Order.

(b)     There shall be no stay or injunction in effect with respect to the Confirmation Order, which such Confirmation Order shall contain approval of the releases provided for in the Plan.

(c)     The appointment of the Liquidating Trustee shall have been confirmed by order of the Bankruptcy Court.

(d)     All agreements and instruments that are exhibits to the Plan shall be in a form acceptable to the Missouri Liquidating Trustee, and have been duly executed and delivered.

**2.     Waiver.**

Notwithstanding the foregoing conditions in Article VIII.A of the Plan, the Missouri Liquidating Trustee reserves, in its sole discretion, the right to waive the occurrence of or modify any of the foregoing conditions precedent. Any such written waiver of a condition precedent set forth in Article VIII.B of the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan; provided, however, that the Creditors' Committee shall have the right to be consulted on and consent to any proposed modification of the Plan, the Plan Supplement or the Confirmation Order. Any actions required to be taken on the Effective Date or Confirmation Date (as applicable) shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

**3.     Notice of Effective Date.**

The Missouri Liquidating Trustee shall file with the Bankruptcy Court a notice of occurrence of the Effective Date within seven (7) days after the conditions in Article VIII of the Plan have been satisfied or waived pursuant to Article VIII.B of the Plan.

**G.     Indemnification, Release, Injunctive and Related Provisions.**

**1.     Compromise and Settlement.**

Pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtor, the Estate and holders of Claims and Equity Interests.

**2.     Releases by the Debtor and its Estate.**

41

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, the Debtor and its Representatives and the Estate (collectively, the "*Debtor Releasing Parties*") shall be deemed to have provided a full, complete, unconditional, and irrevocable release to the Released Parties (and each such Released Party so released shall be deemed released by the Debtor and its Representatives, the Estate, and the Creditors' Committee and its members but solely in their capacity as members of the Creditors' Committee and not in their individual capacities), from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstance existing or taking place prior to or on the Effective Date, arising from or related in any way to the Debtor, including, without limitation, those that the Debtor would have been legally entitled to assert or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of the Debtor or the Estate, including those in any way related to the Chapter 11 Case or the Plan; provided that the foregoing release shall not prohibit the Liquidating Trustee from asserting any and all defenses and counterclaims in respect of any Disputed Claim asserted by any of the Released Parties; and provided further that the releases granted to the Non-Missouri Affiliates under Article IX.B.1 of the Plan are expressly conditioned upon the subordination of the Non-Missouri Intercompany Claims to General Unsecured Claims for all purposes, including distributions. If the Non-Missouri Intercompany Claims are not subordinated to General Unsecured Claims for all purposes, including distributions, then the releases granted to the Non-Missouri Affiliates in Article IX.B.1 of the Plan shall be deemed null and void. Notwithstanding the above, the Releases by the Debtor Releasing Parties provided pursuant to Article IX.B of the Plan shall not affect any Causes of Action and any other debts, obligations, rights, suits, judgments, damages, actions, remedies and liabilities arising after the Effective Date and based on any act or omission, transaction, or other occurrence or circumstances taking place after the Effective Date; provided further that nothing set forth in the preceding proviso shall in any way limit the exculpation provisions set forth in IX.C of the Plan.

3.      **Releases by Holders of Claims.**

Except as otherwise provided in the Plan (including, without limitation, the rights accorded the Missouri Intercompany Claims), each Person, other than the Debtor, who votes to accept the Plan and does not mark such ballot to indicate a refusal to grant the release provided for in this paragraph, shall be deemed to fully, completely, unconditionally, irrevocably, and forever release the Released Parties of and from any and all Claims and Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract,

violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor and its Representatives, whether direct, derivative, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, Disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in Article IX.B.2 of the Plan under Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action released by the Plan; (b) in the best interests of the Debtor and all holders of Claims and Equity Interests; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to the assertion of any Claim or Cause of Action thereby released.

4.      Exculpation.

Notwithstanding anything contained in the Plan to the contrary, the Released Parties shall neither have nor incur any liability relating to the Chapter 11 Case to any Entity for any and all Claims and Causes of Action arising after the Petition Date and through the Effective Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release, other agreement or document created or entered into in connection with the Plan, or any other post-petition act taken or omitted to be taken in connection with the Chapter 11 Case; provided, however, that the foregoing provisions of Article IX.C of the Plan shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

5.      Preservation of All Causes of Action Not Expressly Settled or Released.

Unless a Cause of Action against a holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order) of the Bankruptcy Court, the Debtor and its Estate expressly reserve such Cause of Action for later adjudication or administration by the Liquidating Trustee (including, without limitation, Causes of Action not specifically identified or described in the Plan or elsewhere or of which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances which may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan or

Confirmation Order, except where such Causes of Action have been released in the Plan or any other Final Order (including the Confirmation Order). In addition, the Debtor and its Estate expressly reserve the right of the Liquidating Trustee to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to whom the Debtor has incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor, or leased equipment or property from the Debtor should assume that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (a) such Entity has filed a proof of Claim against the Debtor in the Chapter 11 Case; (b) the Debtor has objected to any such Entity's proof of Claim; (c) any such Entity's Claim was included in the Schedules; (d) the Debtor has objected to any such Entity's scheduled Claim; or (e) any such Entity's scheduled Claim has been identified by the Debtor as disputed, contingent or unliquidated.

### 6. Injunction.

From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim or Equity Interest, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or satisfied or to be released or satisfied pursuant to the Plan or the Confirmation Order.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to the Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to the Plan or the Confirmation Order.

The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests against the Debtor or any of its assets or properties solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to the Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to the Plan or the Confirmation Order. On the Effective Date, all such Claims against, and Equity Interests in, the Debtor shall be satisfied and released in full.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Persons and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released pursuant to the Plan or Confirmation Order, from:

(a)       commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns and their assets and properties;

(b)       enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns and their assets and properties;

(c)       creating, perfecting or enforcing any encumbrance of any kind against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns and their assets and properties; and

(d)       commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled under the Plan.

### 7.       Releases of Liens.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estate distributed under the Plan shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the Debtor.

### H.       Retention of Jurisdiction.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities, including, without limitation, the Liquidating Trustee, with respect to all matters related to the Chapter 11 Case, the Debtor and the Plan as is legally permissible, including, without limitation, jurisdiction to:

1.       allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest against the Debtor, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims;

2.       grant, deny or otherwise resolve any and all applications of Professionals or Persons retained in the Chapter 11 Case by the Debtor or the Creditors' Committee for

allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

        3.      resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired leases to which the Debtor is party or with respect to which the Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

        4.      ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan, including by resolving any disputes regarding the Debtor's entitlement to recover assets held by third parties;

        5.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Liquidating Trustee after the Effective Date;

        6.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

        7.      resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

        8.      issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

        9.      enforce Article IX.A, Article IX.B, Article IX.C, Article IX.D and Article IX.E of the Plan;

        10.    resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

        11.    resolve any cases, controversies, suits or disputes with respect to settlement of the Missouri Intercompany Claims;

        12.    enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

        13.    resolve any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument,

release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement;

           14.      enter an order and a Final Decree closing the Chapter 11 Case.

**I.**    **Miscellaneous Provisions.**

        **1.**    **Modification of the Plan.**

                **(a)**    **Preconfirmation Amendment.**

The Missouri Liquidating Trustee may modify the Plan, subject to section 1127 of the Bankruptcy Code, at any time prior to the entry of the Confirmation Order provided that the Plan, as modified, and the Disclosure Statement pertaining thereto meet applicable Bankruptcy Code requirements.

                **(b)**    **Postconfirmation Amendment Not Requiring Resolicitation.**

After the entry of the Confirmation Order, the Missouri Liquidating Trustee may modify the Plan, subject to section 1127 of the Bankruptcy Code, to remedy any defect or omission or to reconcile any inconsistencies in the Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan; provided that the Missouri Liquidating Trustee obtain approval of the Bankruptcy Court for such modification, after notice and a hearing. Any waiver under Section VIII.B. of the Plan shall not be considered to be a modification of the Plan.

        **2.**    **Revocation or Withdrawal of the Plan.**

The Missouri Liquidating Trustee reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans. If the Missouri Liquidating Trustee revokes or withdraws the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtor or any other Entity; or (iii) constitute an admission of any sort by the Debtor or any other Entity.

        **3.**    **Binding Effect.**

On the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtor and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a Distribution under the Plan.

## 4. Successors and Assigns.

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

## 5. Governing Law.

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, unless otherwise stated, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to the principles of conflict of laws thereof.

## 6. Reservation of Rights.

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless and until the Effective Date occurs. Neither the filing of the Plan, any statement or provision contained in the Plan, nor the taking of any action by the Missouri Liquidating Trustee or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (a) the Debtor with respect to the holders of Claims or Equity Interests or other parties in interest; or (b) any holder of a Claim or other party in interest prior to the Effective Date.

## 7. Section 1146 Exemption.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

## 8. Section 1125(e) Good Faith Compliance.

Confirmation of the Plan shall act as a finding by the Bankruptcy Court that the Missouri Liquidating Trustee and its Representatives have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

## 9. Further Assurances.

The Debtor, the Liquidating Trustee, all holders of Claims receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be

48

necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### 10.    Service of Documents.

Any pleading, notice or other document required by the Plan to be served on or delivered to the Missouri Liquidating Trustee shall be sent by first class U.S. mail, postage prepaid as follows:

**To the Missouri Liquidating Trustee:**

> Drivetrain, LLC
> 630 Third Avenue, 21st Floor
> New York, NY, 10017
> Attention:    Alan J. Carr
>                      Tim Daileader
> E-mail address: acarr@drivetrainadvisors.com
>                         tdaileader@drivetrainadvisors.com

> *with a copy to:*

> Hogan Lovells US LLP
> 875 Third Avenue
> New York, New York 10022
> Telephone: (212) 918-3000
> Attention:    Christopher R. Donoho, III
>                      Ronald J. Silverman
> E-mail address: chris.donoho@hoganlovells.com
>                         ronald.silverman@hoganlovells.com

**To the Debtor:**

> Abengoa Bioenergy of Biomass of Kansas, LLC
> 16150 Main Circle Drive, Suite 300
> Chesterfield, Missouri 63017
> Attention: General Counsel
> E-mail address: jeffrey.bland@abengoa.com

> *with a copy to:*

> DLA Piper LLP (US)
> 1717 Main St., Suite 4600
> Dallas, Texas 75201

Fax no.: (972) 813-6267
Attention: Vincent P. Slusher
David E. Avraham
E-mail address:vince.slusher@dlapiper.com
david.avraham@dlapiper.com

-and-

Armstrong Teasdale LLP
2345 Grand Blvd.
Suite 1500
Kansas City, Missouri 64108
Attention: Christine L. Schlomann
Email address: cschlomann@armstrongteasdale.com

### 11. Filing of Additional Documents.

On or before the Effective Date, the Debtor may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 12. No Stay of Confirmation Order.

The Debtor shall request that the Bankruptcy Court waive stay of enforcement of the Confirmation Order otherwise applicable, including pursuant to Federal Rules of Bankruptcy Procedure 3020(e), 6004(h) and 7062.

## VI. RISK FACTORS IN CONNECTION WITH THE PLAN

The holders of Claims against the Debtor should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A. Bankruptcy Considerations.

Although the Missouri Liquidating Trustee believes the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent set forth in Article VIII.A of the Plan, and there can be no assurance that such conditions will be satisfied or waived. In the event the conditions precedent described in Article VIII.A of the Plan have not been satisfied, or waived (to the extent possible) by the Missouri Liquidating Trustee as of the Effective Date, then the

50

Confirmation Order will be vacated, no Distributions will be made pursuant to the Plan, and the Debtor and all holders of Claims and Equity Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Missouri Liquidating Trustee believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Equity Interests encompass Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Plan provides that certain Classes are to receive a Pro Rata share of Liquidating Trust Assets, which will be generated, in part, by the liquidation of certain assets and the prosecution of certain Causes of Action. The potential recoveries from such actions, however, are unknown. In addition, there can be no assurance that the Liquidating Trust Assets will be sufficient to pay the fees and expenses of the Liquidating Trustee and/or the professionals employed in connection therewith or make any Distributions to the beneficiaries.

The Plan provides for no Distribution to certain Classes as specified in Article III of the Plan. The Bankruptcy Code conclusively deems these Classes to have rejected the Plan. Pursuant to section 1129(a)(10) of the Bankruptcy Code, notwithstanding the fact that these Classes are deemed to have rejected the Plan, the Bankruptcy Court may confirm the Plan if at least one Impaired Class votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class). As to each Impaired Class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these Classes. The Missouri Liquidating Trustee believes that the Plan satisfies these requirements.

**B.      No Duty to Update Disclosures.**

The Missouri Liquidating Trustee has no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Missouri Liquidating Trustee is required to do so pursuant to an order of the Bankruptcy Court. Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

**C.      Representations Outside this Disclosure Statement.**

This Disclosure Statement contains representations concerning or related to the Debtor and the Plan that are authorized by the Bankruptcy Code and the Bankruptcy Court. Please be advised that any representations or inducements outside this Disclosure Statement and any related documents which are intended to secure your acceptance or rejection of the

Plan should not be relied upon by holders of Claims or Equity Interests that are entitled to vote to accept or reject the Plan.

**D.      No Admission.**

The information and representations contained herein shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan on the Debtor or holders of Claims and Equity Interests.

**E.      Tax and Other Related Considerations.**

A discussion of potential tax consequences of the Plan is provided in section IX hereof; however, the content of this Disclosure Statement is not intended and should not be construed as tax, legal, business or other professional advice. Holders of Claims and/or Equity Interests should seek advice from their own independent tax, legal or other professional advisors based on their own individual circumstances.

**VII.   PLAN CONFIRMATION AND CONSUMMATION**

**A.      The Confirmation Hearing.**

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan (the "*Confirmation Hearing*"). The Confirmation Hearing is currently set for ~~August 24~~[•], 2017 at 9:00 a.m. Central. Notice of the Confirmation Hearing (the "*Confirmation Hearing Notice*") will be provided to all known Creditors or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Pursuant to Bankruptcy Code section 1128(b), any party in interest may object to confirmation of a plan of reorganization. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds of the objection, and must be filed with the Bankruptcy Court by ~~August 18~~[•], 2017 at 5:00 p.m. Central, together with proof of service thereof, and served upon: (i) counsel to the Missouri Liquidating Trustee: Hogan Lovells US LLP, 875 Third Avenue, New York, New York 10022 (Attn.: Christopher R. Donoho, III and Ronald J. Silverman); (ii) counsel to the Debtor, DLA Piper LLP (US), 1717 Main Street, Suite 4600, Dallas, TX 75201 (Attn: Vincent P. Slusher and David E. Avraham), and Armstrong Teasdale LLP, 2345 Grand Boulevard, Suite 1500, Kansas City, Missouri 63105 (Attn.: Christine L. Schlomann, Richard W. Engel, Jr. and Erin M. Edelman); (iii) counsel to the Creditors' Committee, Baker & Hostetler LLP, 127 Public Square, Suite 2000, Cleveland, Ohio 44114 (Attn.: Kelly S. Burgan and Michael A. VanNiel); (iv) the Office of the United States Trustee, 215 Dean A. McGee, 4th Floor, Oklahoma City, OK 73102 (Attn.: Charles S. Glidewell and Charles E. Snyder); and (v) such other parties as the Bankruptcy

Court may order, so as to be *actually received* no later than the date and time designated in the Confirmation Hearing Notice.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan. **UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING CONFIRMATION OF THE PLAN.**

## B. Plan Confirmation Requirements Under the Bankruptcy Code.

In order for the Plan to be confirmed, the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and this Chapter 11 Case. The Bankruptcy Code also requires that: (1) the Plan be accepted by the requisite votes of Creditors except to the extent that confirmation despite dissent is available under Bankruptcy Code section 1129(b); (2) the Plan is feasible (that is, there is a reasonable probability that the Debtor will be able to perform its obligations under the Plan without needing further financial reorganization not contemplated by the Plan); and (3) the Plan is in the "best interests" of all Creditors (that is, Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code). To confirm the Plan, the Bankruptcy Court must find that all of the above conditions are met, unless the applicable provisions of Bankruptcy Code section 1129(b) are employed to confirm the Plan, subject to satisfying certain conditions, over the dissent or deemed rejections of Classes of Claims.

### 1. Best Interests of Creditors.

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (a) accepts the plan or (b) receives or retains under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The Missouri Liquidating Trustee, with the assistance of its professionals, has prepared the Liquidation Analysis attached hereto as **Exhibit 7.** The Liquidation Analysis is based upon a hypothetical liquidation in a chapter 7 case. In preparing the Liquidation Analysis, the Missouri Liquidating Trustee has taken into account the nature, status and underlying value of its assets, the ultimate realizable value of its assets, and the extent to which such assets are subject to liens and security interests. In addition, the Liquidation Analysis also reflects the required time and resources necessary to effectuate an orderly wind down of the Estate.

Based upon the Liquidation Analysis, the Missouri Liquidating Trustee believes that liquidation under chapter 7 would result in smaller distributions, if any, being made to Creditors than those provided for in the Plan because of (a) the likelihood that the Missouri Intercompany Claims would be allowed in full; (b) the likelihood that other assets of the

Debtor would have to be disposed of in a less orderly fashion; (c) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (d) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations. In the opinion of the Missouri Liquidating Trustee, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford the holders of Claims as great a realization potential as afforded to them under the Plan.

Accordingly, the Missouri Liquidating Trustee believes that in a chapter 7 liquidation, holders of Claims would receive less than such holders would receive under the Plan. There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Missouri Liquidating Trustee's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### 2.    Feasibility of the Plan.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a plan proponent must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan. The Debtor has sold substantially all of its assets, and pursuant to the Plan, will transfer the Causes of Action and all remaining unencumbered assets to the Liquidating Trust to be liquidated and distributed to beneficiaries in accordance with the Plan and Liquidating Trust Agreement. Therefore, the Bankruptcy Court's confirmation of the Plan is not likely to be followed by liquidation or the need for any further reorganization.

### 3.    Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, that, except as described below, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. As a general matter under the Bankruptcy Code, a class is "impaired," unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such claim or equity interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the Debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting

cast their ballots in favor of acceptance. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated under the Plan), such Class shall be deemed to have voted to accept the Plan.

### 4.    Section 1129(b).

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class, and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

#### (a)    No Unfair Discrimination.

The "no unfair discrimination" test requires that the plan not provide for unfair treatment with respect to classes of claims or interests that are of equal priority, but are receiving different treatment under the plan.

#### (b)    Fair and Equitable.

The fair and equitable requirement applies to classes of claims of different priority and status, such as secured versus unsecured. The plan satisfies the fair and equitable requirement if no class of claims receives more than 100% of the allowed amount of the claims in such class. Further, if a class of claims is considered a dissenting class ("***Dissenting Class***"), *i.e.*, a Class of Claims that is deemed to reject the Plan because the required majorities in amount and number of votes is not received from the Class, the following requirements apply:

### 5.    Class of Secured Claims.

Each holder of an impaired secured claim either (a) retains its liens on the subject property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (c) receives the "indubitable equivalent" of its allowed secured claim.

### 6.    Class of Unsecured Creditors.

55

Either (a) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the Dissenting Class will not receive any property under the plan.

### 7. Class of Equity Interests.

Either (a) each interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock and (ii) the value of the stock, or (b) the holders of interests that are junior to the interests of the Dissenting Class will not receive any property under the plan.

The Missouri Liquidating Trustee believes the Plan does not "discriminate unfairly" and will satisfy the "fair and equitable" requirement notwithstanding that certain Classes of Equity Interests are deemed to reject the Plan because no Class that is junior to such Class will receive or retain any property on account of the Claims and Equity Interests in such Class and the Plan does not provide for unfair treatment with respect to Classes of Claims or Equity Interests that are of equal priority.

## VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Missouri Liquidating Trustee believes the Plan is in the best interests of its Creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following four alternatives may be available: (i) the Debtor's Plan; (ii) a liquidation of the Debtor's assets pursuant to chapter 7 of the Bankruptcy Code; (iii) an alternative plan of reorganization or liquidation may be proposed and confirmed; or (iv) the Debtor's Chapter 11 Case may be dismissed.

### A. The Debtor's Plan compared to the Missouri Liquidating Trustee's Plan

The Plan proposes to limit the Missouri Intercompany Claims in a manner that would allow the Debtor's General Unsecured Claims to receive the same recovery as the Missouri Bioenergy Debtors' general unsecured claims. The Missouri Liquidating Trustee believes this settlement is fair to both estates and the creditors of both because as explained herein, the Debtor operated within Abengoa's U.S. bioenergy group and the Missouri Liquidating Trustee believes the only reason it was not substantively consolidated with the Missouri Bioenergy Debtors is that its case was filed in a different jurisdiction.

The settlement of the Missouri Intercompany Claims embodied in the Plan would result in a *higher* recovery for the Debtor's General Unsecured Claims compared with a plan that includes the Missouri Intercompany Claims in the class of General Unsecured Claims and provides them a *pro rata* recovery, which the Missouri Liquidating Trustee believes is otherwise necessary to confirm the Debtor's Plan. The Debtor and the Creditors' Committee disagree and believe the Debtor's Plan is confirmable. If the Missouri Intercompany Claims are allowed the Debtor's General Unsecured Claims would only receive an estimated recovery of 19%. Even if the Missouri Intercompany are disallowed in their entirety the Debtor's General

Unsecured Claims would only receive an estimated recovery of ~~62~~63%, not the overstated 95% recovery included in the Debtor's Disclosure Statement, and recoveries other than under the Plan are likely to be lower in reality as they do not include any additional costs or time associated with litigating the Missouri Intercompany Claims, including potential appeals of those claims. Based on the most current available information, assets available for distribution to General Unsecured Claims is lower than the Debtor's Plan's assumptions and the Missouri Liquidating Trustee's review of the scheduled and filed General Unsecured Claims is higher than the Debtor's Plan's assumptions.

The Missouri Disclosure Statement estimated that the Missouri Bioenergy Debtors' general unsecured creditors would receive a recovery between 28.1% and 30.7%, which did not include any proceeds from the Debtor's assets. *See* Missouri Disclosure Statement, p. 11 fn. 8. If the Missouri Intercompany Claims are allowed in full in the total amount of $69,504,933.16 and included in the Debtor's class of General Unsecured Claims (Class 2) then the Debtor's General Unsecured Claims would only recover approximately 19% ~~pursuant to the terms of the Debtor's Plan~~. However, under the Plan proposed by the Missouri Liquidating Trustee the Debtor's general unsecured creditors would receive an estimated recovery of 33%—more than 10% higher than they would receive if Missouri Intercompany Claims would be accorded normal *pro rata* treatment under the Debtor's Plan. *See* Exhibit 2 (Recovery Analysis).

The Plan also proposes that Drivetrain, LLC, who is currently the Liquidating Trustee in the Missouri Chapter 11 Cases, will be the Liquidating Trustee in this Chapter 11 Case, which will be more efficient than appointing a new trustee that is unfamiliar with the Abengoa Group. Drivetrain, LLC is an experienced independent fiduciary who as the Liquidating Trustee for both estates will be able to ensure that distributions to general unsecured creditors will be the same in Kansas and Missouri. Thus, the Missouri Liquidating Trustee believes that the Plan is a better alternative than the Debtor's Plan.

**B.      Chapter 7 Liquidation.**

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Debtor's Chapter 11 Case may be converted to a liquidation case under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed, pursuant to applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. The Missouri Liquidating Trustee believes that such a liquidation would result in smaller distributions being made to the Debtor's creditors than those provided for in the Plan because (a) the likelihood that the Missouri Intercompany Claims would be allowed in full; (b) the likelihood that other assets of the Debtor would have to be disposed of in a less orderly fashion; (c) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (d) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations. The Missouri Liquidating Trustee has found that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is

\\NY - 045867/000001 - 7840945 v611

not less than such holder would receive pursuant to liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

### C. Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code.

If the Plan is not confirmed, the Missouri Liquidating Trustee may propose a different plan, which might involve an alternative means for the liquidation of the Debtor's assets. However, the Missouri Liquidating Trustee believes that the terms of the Plan provide for an orderly and efficient liquidation of the Debtor's assets and will result in the realization of the most value for holders of Claims against the Debtor's Estate.

### D. Dismissal of the Debtor's Chapter 11 Case.

Dismissal of the Debtor's Chapter 11 Case would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*. Upon dismissal of the Debtor's Chapter 11 Case, the Debtor would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the various creditors of the Debtor, and possibly resulting in costly and protracted litigation in various jurisdictions. Dismissal will also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtor. The Missouri Liquidating Trustee believes that these actions could lead ultimately to the liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code. Therefore, the Missouri Liquidating Trustee believes that dismissal of the Debtor's Chapter 11 Case is not a preferable alternative to the Plan.

## IX. CERTAIN FEDERAL TAX CONSEQUENCES

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN,**

**AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

        **A.**      **General.**

        The following discussion summarizes certain material U.S. federal income tax consequences to the Debtor, the Liquidating Trust and holders entitled to vote on the Plan. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "*IRC*"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "*Service*"). There can be no assurance that the Service will not take a contrary view, no ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

        Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to holders of Claims, the Liquidating Trust or the Debtor. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

        The following summary is for general information only. The tax treatment of a holder may vary depending upon such holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a holder, including any alternative minimum tax consequences and does not address the tax consequences to a holder that has made an agreement to resolve its claim in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, holders that have a "functional currency" other than the United States dollar and holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by holders as "capital assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

        The tax treatment of holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the holder in exchange for the Claim and whether the holder receives Distributions under the Plan in more than one taxable year; (iii) whether the holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or

prior years; (viii) whether the holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the holder. Therefore, each holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such holder of the transactions contemplated by the Plan.

**B.     U.S. Federal Income Tax Treatment With Respect to the Liquidating Trust.**

It is intended that the Liquidating Trust will be treated as a "grantor trust" for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. The Service, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Debtor is not requesting a private letter ruling regarding the status of the Liquidating Trust as a grantor trust. Consistent with the requirements of Revenue Procedure 94-45, however, the Liquidating Trust Agreement requires all relevant parties to treat, for federal income tax purposes, the transfer of the Debtor's assets to the Liquidating Trust as (i) a transfer of such assets to the beneficiaries of the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets) followed by (ii) a transfer of such assets by such beneficiaries to the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets), with the beneficiaries of the Liquidating Trust being treated as the grantors and owners of the Liquidating Trust. Each beneficiary of the Liquidating Trust will generally recognize gain (or loss) in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in such Claim. The amount realized for this purpose should generally equal the amount of cash and the fair market value of any other assets received or deemed received for U.S. federal income tax purposes under the Plan in respect of such holder's Claim. A holder that is deemed to receive for U.S. federal income tax purposes a non-cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of its deemed receipt.

The Plan and the Liquidating Trust Agreement generally provide that the beneficiaries of the Liquidating Trust must value the assets of the Liquidating Trust consistently with the values determined by the Liquidating Trustee for all U.S. federal, state, and local income tax purposes. As soon as possible after the Effective Date, the Liquidating Trustee shall make a good faith valuation of the assets transferred to the Liquidating Trust.

Consistent with the treatment of the Liquidating Trust as a grantor trust, the Liquidating Trust Agreement and the Plan will require each holder to report on its U.S. federal income tax return its allocable share of the Liquidating Trust's income. Therefore, a holder may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Liquidating Trust whether or not the Liquidating Trust has made any distributions to such holder. The character of items of income, gain, deduction, and credit to any holder and the

ability of such holder to benefit from any deduction or losses will depend on the particular situation of such holder.

In general, a distribution of underlying assets from the Liquidating Trust to a beneficiary thereof may not be taxable to such holder because such holders are already regarded for U.S. federal income tax purposes as owning such assets. Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the Liquidating Trust.

The Liquidating Trustee will file with the Service tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and will also send to each holder a separate statement setting forth such holder's share of items of Liquidating Trust income, gain, loss, deduction, or credit. Each such holder will be required to report such items on its U.S. federal income tax return.

The discussion above assumes that the Liquidating Trust will be respected as a grantor trust for U.S. federal income tax purposes. If the Service were to successfully challenge such classification, the U.S. federal income tax consequences to the Liquidating Trust and the beneficiaries of the Liquidating Trust could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Liquidating Trust).

**C.     U.S. Federal Income Tax Treatment With Respect to Holders of Allowed Claims that are Beneficiaries of the Liquidating Trust.**

Holders of Allowed Claims as of the Effective Date that are beneficiaries of the Liquidating Trust should be treated as receiving from the Debtor their respective shares of the applicable assets of the Liquidating Trust in satisfaction of their Allowed Claims, and simultaneously transferring such assets to the Liquidating Trust. Accordingly, a holder of such Claim should generally recognize gain or loss in an amount equal to the amount deemed realized on the Effective Date (as described above) less its adjusted tax basis of its Claim. Additionally, such holders should generally recognize their allocable share of income, gain, loss and deductions recognized by the Liquidating Trust on an annual basis.

Because a holder's ultimate share of the assets of the Liquidating Trust based on its Allowed Claim will not be determinable on the Effective Date due to, among other things, the existence of Disputed Claims and the value of the assets at the time of actual receipt not being ascertainable on the Effective Date, such holder should recognize additional or offsetting gain or loss if, and to the extent that, the aggregate amount of cash and fair market value of the assets of the Liquidating Trust ultimately received by such holder is greater than or less than the amount used in initially determining gain or loss in accordance with the procedures described in the preceding paragraph. It is unclear when a holder of an Allowed Claim that is a beneficiary of the Liquidating Trust should recognize, as an additional amount received for purposes of computing gain or loss, an amount attributable to the disallowance of a Disputed Claim.

\\NY - 045867/000001 - 7840945 v611

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim; (ii) the tax status of the holder of the Claim; (iii) whether the Claim has been held for more than one year; (iv) the extent to which the holder previously claimed a loss or bad debt deduction with respect to the Claim; and (v) whether the Claim was acquired at a market discount. A holder that purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the IRC. Under those rules (subject to a *de minimis* exception), assuming that such holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

It is possible that the Service may assert that any loss should not be recognizable until the Liquidating Trustee makes its final distribution of the assets of the Liquidating Trust. Holders should consult their tax advisors regarding the possibility that the recognition of gain or loss may be deferred until the final distribution of the assets of the Liquidating Trust.

Although not free from doubt, holder of Disputed Claims should not recognize any gain or loss on the date that the Liquidating Trust Assets are transferred to the Liquidating Trust, but should recognize gain or loss in an amount equal to: (i) the amount of cash and the fair market value of any other property actually distributed to such holder less (ii) the adjusted tax basis of its Claim. It is possible, however, that such holders may be required to recognize the fair market value of such holder's allocable share of the Liquidating Trust Assets, as an amount received for purposes of computing gain or loss, either on the Effective Date or the date such holder's Claim becomes an Allowed Claim.

Holders of Allowed Claims will be treated as receiving a payment of interest (includible in income in accordance with the holder's method of accounting for tax purposes) to the extent that any cash or other property received (or deemed received) pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of cash or other property should be attributable to accrued but unpaid interest is unclear. Each holder should consult its tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any). A holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

## X.    RECOMMENDATION AND CONCLUSION

The Missouri Liquidating Trustee believes that the Plan is in the best interests of its Estate, Creditors and other interested parties and urges the holders of Impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their ballots.

Dated: July ~~19~~27, 2017                    Missouri Liquidating Trustee

                                        By:    */s/ Timothy Daileader*
                                               Name:    Timothy Daileader
                                               Title:    Authorized Signatory

\\NY - 045867/000001 - 7840945 v6̶11̶

**Exhibit 1**
Missouri Liquidating Trustee's First Amended
Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re: | Chapter 11 |
| ABENGOA BIOENERGY BIOMASS OF KANSAS, LLC, | Case No. 16-10446 |
| Debtor. | |

## MISSOURI LIQUIDATING
## TRUSTEE'S FIRST AMENDED PLAN OF LIQUIDATION
## <u>PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE</u>

**DRIVETRAIN, LLC**

Alan J. Carr
Tim Daileader
630 Third Avenue, 21st Floor
New York, NY, 10017
Telephone: (212) 856- 9700
acarr@drivetrainadvisors.com
tdaileader@drivetrainadvisors.com

**THOMPSON COBURN LLP**

Mark V. Bossi, Esq. (KS #13719)
One US Bank Plaza
St. Louis, Missouri 63101
Telephone: (314) 552-6000
Facsimile: (314) 552-7000
mbossi@thompsoncoburn.com

- and -

**HOGAN LOVELLS US LLP**

Christopher R. Donoho, III (admitted *pro hac vice*)
Ronald J. Silverman (admitted *pro hac vice*)
M. Shane Johnson (admitted *pro hac vice*)
Raphaella S. Ricciardi (admitted *pro hac vice*)
Hogan Lovells US LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
chris.donoho@hoganlovells.com
ronald.silverman@hoganlovells.com
shane.johnson@hoganlovells.com
raphaella.ricciardi@hoganlovells.com

*Missouri Liquidating Trustee*

*Counsel to the Missouri Liquidating Trustee*

Dated: July 19, 2017

\\NY - 045867/000001 - 7769820 v10

**Table of Contents**

Page

ARTICLE I. DEFINED TERMS AND RULES OF INTERPRETATION ..................................1
    A.    Defined Terms ..........................................................................................1
    B.    Rules of Interpretation..............................................................................8
    C.    Exhibits....................................................................................................9

ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS ................................................9
    A.    Administrative Claims .............................................................................9
    B.    Administrative Claims Bar Date...............................................................9
    C.    Accrued Professional Compensation Claims .........................................10
    D.    Priority Tax Claims.................................................................................10
    E.    Other Priority Claims .............................................................................10

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
INTERESTS ..........................................................................................................................11
    A.    Summary ................................................................................................11
    B.    Classification and Treatment of Claims and Equity Interests ...............11
    C.    Special Provision Governing Unimpaired Claims.................................13
    D.    Nonconsensual Confirmation .................................................................13

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN.......................................13
    A.    Establishment of Liquidating Trust .......................................................13
    B.    Appointment of the Liquidating Trustee................................................14
    C.    Beneficiaries of Liquidating Trust.........................................................14
    D.    Vesting and Transfer of Liquidating Trust Assets to the Liquidating Trust .........14
    E.    Liquidating Trust Expenses....................................................................14
    F.    Role of the Liquidating Trustee..............................................................15
    G.    Preservation of Right to Conduct Investigations ...................................16
    H.    Prosecution and Resolution of Causes of Action ..................................16
    I.    Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets ...............17
    J.    Limitation of Liability............................................................................17
    K.    Term of Liquidating Trust .....................................................................18
    L.    Retention of Professionals by Liquidating Trust...................................18
    M.    Conflicts Between the Liquidating Trust Agreement and the Plan .......18
    N.    Cancellation of Existing Securities and Agreements.............................18

| | O. | Operations of the Debtor Between the Confirmation Date and the Effective Date | 18 |
|---|---|---|---|
| | P. | Automatic Stay | 19 |
| | Q. | The Creditors' Committee | 19 |
| | R. | Books and Records | 19 |
| | S. | D&O Insurance Policies | 19 |

ARTICLE V. PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS ..................... 20

| | A. | Voting of Claims | 20 |
|---|---|---|---|
| | B. | Distribution Dates | 20 |
| | C. | Disbursing Agent | 20 |
| | D. | Record Date for Distributions | 21 |
| | E. | Delivery of Distributions | 21 |
| | F. | Undeliverable and Unclaimed Distributions | 21 |
| | G. | Manner of Cash Payments Under the Plan | 22 |
| | H. | Compliance with Tax Requirements | 22 |
| | I. | No Payments of Fractional Dollars | 22 |
| | J. | Interest on Claims | 22 |
| | K. | No Distribution in Excess of Allowed Amount of Claim | 23 |
| | L. | Setoff and Recoupment | 23 |
| | M. | De Minimis Distributions; Charitable Donation | 23 |
| | N. | United States Trustee Fees | 23 |
| | O. | Withholding from Distributions | 23 |
| | P. | No Distributions on Late-Filed Claims | 24 |

ARTICLE VI. DISPUTED CLAIMS ..................... 24

| | A. | Disputed Claims Reserve | 24 |
|---|---|---|---|
| | B. | Resolution of Disputed Claims | 24 |
| | C. | Objection Deadline | 24 |
| | D. | Estimation of Claims | 25 |
| | E. | No Distributions Pending Allowance | 25 |
| | F. | Resolution of Claims | 25 |
| | G. | Treatment of Missouri Intercompany Claims | 25 |

ARTICLE VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................... 26

| | A. | Assumption or Rejection of Executory Contracts and Unexpired Leases | 26 |
|---|---|---|---|
| | B. | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 26 |

\\NY - 045867/000001 - 7769820 v10

|   | C.  | Indemnification and Reimbursement | 26 |

ARTICLE VIII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ........................ 27

|   | A.  | Conditions Precedent | 27 |
|   | B.  | Waiver | 27 |
|   | C.  | Notice of Effective Date | 27 |

ARTICLE IX. INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED
PROVISIONS ........................ 28

|   | A.  | Compromise and Settlement | 28 |
|   | B.  | Releases | 28 |
|   | C.  | Exculpation | 29 |
|   | D.  | Preservation of Causes of Action | 29 |
|   | E.  | Injunction | 30 |
|   | F.  | Releases of Liens | 31 |

ARTICLE X. RETENTION OF JURISDICTION ........................ 31

ARTICLE XI. MISCELLANEOUS PROVISIONS ........................ 33

|   | A.  | Modification of the Plan | 33 |
|   | B.  | Revocation or Withdrawal of the Plan | 33 |
|   | C.  | Binding Effect | 33 |
|   | D.  | Successors and Assigns | 34 |
|   | E.  | Governing Law | 34 |
|   | F.  | Reservation of Rights | 34 |
|   | G.  | Article 1146 Exemption | 34 |
|   | H.  | Section 1125(e) Good Faith Compliance | 34 |
|   | I.  | Further Assurances | 34 |
|   | J.  | Service of Documents | 35 |
|   | K.  | Filing of Additional Documents | 36 |
|   | L.  | No Stay of Confirmation Order | 36 |

\\NY - 045867/000001 - 7769820 v10

The Liquidating Trustee for the chapter 11 cases of Abengoa Bioenergy US Holding, LLC, *et al.*, Case No. 16-41161-659 in the United States Bankruptcy Court for the Eastern District of Missouri (the "*Missouri Liquidating Trustee*"), hereby respectfully proposes the following Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code.[1]

# ARTICLE I.

## DEFINED TERMS AND RULES OF INTERPRETATION

### A.    Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*Accrued Professional Compensation*" means, at any given moment, all accrued and unpaid fees and expenses (including, without limitation, fees or expenses Allowed or awarded by a Final Order of the Bankruptcy Court) for legal, financial advisory, accounting, liquidation, and other professional services and reimbursement of expenses of Professionals that are awardable and allowable under sections 328, 330(a), or 331 of the Bankruptcy Code, or otherwise rendered prior to the Effective Date, including in connection with (a) applications filed in accordance with the Bankruptcy Code and Bankruptcy Rules; (b) motions seeking the enforcement of the provisions of the Plan or Confirmation Order, by all Professionals in the Chapter 11 Cases that the Bankruptcy Court has not denied by a Final Order, to the extent that any Allowed fees and expenses have not been paid previously, regardless of whether a fee application has been filed for any amount; and (c) applications for allowance of Administrative Expenses arising under sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(6) of the Bankruptcy Code. To the extent the Bankruptcy Court or any higher court denies by a Final Order any amount of a Professional's fees or expenses, then those amounts shall no longer be Accrued Professional Compensation.

2.    "*Administrative Claims*" means Claims that have been timely and properly filed before the Initial Administrative Claims Bar Date, as set by the Bar Date Order, or the Final Administrative Claims Bar Date, pursuant to the deadline and procedure set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court), as applicable, for costs and expenses of administration under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation: the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor (such as wages, salaries or commissions for services and payments for goods and other services and leased premises). Any fees or charges assessed against the estate of the Debtor under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Claims and shall be paid in accordance with Article V.N of the Plan. Notwithstanding anything to the contrary herein, the filing of an Administrative Claim shall not be required in order to receive payment for any tax liability described in sections 503(b)(1)(B) and (C) in accordance with section 503(b)(1)(D) of the Bankruptcy Code.

---

[1] All capitalized terms not otherwise defined herein shall be subject to the definition of such capitalized terms in Article I.A. hereof.

3.     "*Administrative Expense*" means costs and expenses of administration under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation: the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor (such as wages, salaries or commissions for services and payments for goods and other services and leased premises).

4.     "*Affiliate*" has the meaning in section 101(2) of the Bankruptcy Code.

5.     "*Allowed*" means, with respect to any Claim against the Debtor, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtor in its Schedules filed in the Chapter 11 Case as other than disputed, contingent or unliquidated and as to which the Debtor or other parties-in-interest have not filed an objection by the Claims Objection Bar Date; (b) a Claim filed in the Chapter 11 Case and that either is not Disputed or has been allowed by a Final Order; or (c) a Claim filed in the Chapter 11 Case that is allowed: (i) in any stipulation of amount and nature of Claim executed prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation or written agreement with the Liquidating Trustee, of amount and nature of Claim executed on or after the Effective Date; or (iii) in or pursuant to any contract, instrument or other agreement entered into or assumed in connection herewith; (d) a Claim that is allowed pursuant to the terms of this Plan; (e) a Disputed Claim that the Debtor and/or Liquidating Trustee (as applicable) ultimately determine will not be objected to (such claim being deemed Allowed at the time such determination is made) or (f) notwithstanding any other provision of the Plan to the contrary, the Missouri Intercompany Claims.

6.     "*Bankruptcy Code*" means Articles 101 et seq. of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

7.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Kansas.

8.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, the Local Rules of the United States Bankruptcy Court for the District of Kansas, the Rules of Practice of the United States District Court for the District of Kansas, and general orders and chambers procedures of the Bankruptcy Court, each as applicable to the Chapter 11 Case and as amended from time to time.

9.     "*Bar Date Order*" means that certain order of the Bankruptcy Court dated as of September 1, 2016 [Docket No. 408], establishing September 30, 2016, at 4:00 p.m. (CT) as the General Bar Date for filing proofs of Claim in the Chapter 11 Case, with only those exceptions permitted thereby.

10.    "*Books and Records*" means, with respect to the Debtor, all books and records of the Debtor, including, without limitation, all documents and communications of any kind, whether physical or electronic.

11.    "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)).

2

12.     "*Cash*" means cash and cash equivalents in certified or immediately available U.S. funds, including but not limited to bank deposits, checks and similar items.

13.     "*Causes of Action*" means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including, without limitation, all claims and any avoidance, preference, recovery, subordination or other actions against insiders or any other Entities under the Bankruptcy Code) against any Person or Entity, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the Effective Date.

14.     "*Chapter 11 Case*" means the chapter 11 case with the case number 16-10446 that was commenced when the Bankruptcy Court entered an order converting the Debtor's involuntary case to a voluntary case on the Petition Date.

15.     "*Claim*" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured; or (c) any other claim, as such term is defined in section 101(5) of the Bankruptcy Code.

16.     "*Claims Objection Bar Date*" means the bar date for objecting to proofs of Claim, which shall be one hundred twenty (120) days after the Effective Date; provided, however, that the Liquidating Trustee may seek additional extensions of this date from the Bankruptcy Court, with notice only to those parties entitled to notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002. A party requesting to extend the Claims Objection Bar Date may specify which entities may benefit from such an extension.

17.     "*Class*" means a category of holders of Claims or Equity Interests as set forth in Article III herein and pursuant to section 1122(a) of the Bankruptcy Code.

18.     "*Confirmation Date*" means the date on which the Confirmation Order is entered by the Bankruptcy Court.

19.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

20.     "*Creditor*" shall have the meaning in section 101(10) of the Bankruptcy Code.

21.     "*Creditors' Committee*" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case by the U.S. Trustee, comprised of (i) Stoppel Dirt Inc.; (ii) Equipment Pro, Inc.; and (iii) Western Reserve Water Systems.

\\NY - 045867/000001 - 7769820 v10

22. "*D&O Insurance Policies*" means all primary and excess insurance policies of the Debtor that provide for, among other things, coverage for liability related to the actions or omissions of the Debtor's directors and officers.

23. "*Debtor*" means Abengoa Bioenergy Biomass of Kansas, LLC, a limited liability company organized under the laws of the State of Kansas, and where applicable, the Estate thereof.

24. "*Disbursing Agent*" means the Liquidating Trustee, who is empowered and authorized to make all Distributions pursuant to Article V.C herein.

25. "*Disclosure Statement*" means the *Disclosure Statement for the Missouri Liquidating Trustee's First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 969], prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and any other applicable law, as amended, supplemented or modified from time to time.

26. "*Disputed*" means, with respect to any Claim: (a) listed on the Schedules as unliquidated, disputed or contingent, unless a proof of Claim has been filed in a liquidated, non-contingent amount; (b) as to which the Debtor, the Liquidating Trustee or any other party in interest, has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules; or (c) as otherwise disputed in accordance with applicable bankruptcy or insolvency law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

27. "*Disputed Claims Reserve*" means the reserve funds created pursuant to Article VI.A. herein.

28. "*Distributions*" means the distributions of Cash to be made in accordance with the Plan.

29. "*Effective Date*" means the first Business Day after the Confirmation Date on which the conditions precedent specified in Article VIII of this Plan have been either satisfied or waived. Within five (5) Business days of the Effective Date, notice of the Effective Date shall be filed in the Bankruptcy Court.

30. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

31. "*Equity Interest*" means any equity interest in the Debtor that existed immediately prior to the Petition Date.

32. "*Estate*" means the Debtor's estate created pursuant to section 541 of the Bankruptcy Code upon the conversion of the Chapter 11 Case.

33. "*Final Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days after the Effective Date and is the deadline for a holder of an Administrative Claim to file a request with the Bankruptcy Court for payment of such Administrative Claim in the manner indicated in Article II herein.

\\NY - 045867/000001 - 7769820 v10

34.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

35.     "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to file an appeal, motion for reconsideration or rehearing, or request for a stay has expired with no appeal, motion for reconsideration or rehearing, or request for a stay having been timely filed.

36.     "*General Bar Date*" means September 30, 2016, at 4:00 p.m. (CT) as established in the Bar Date Order.

37.     "*General Unsecured Claims*" means Claims against the Debtor that are not Administrative Claims, Accrued Professional Compensation Claims, Secured Claims, Priority Tax Claims, Other Priority Claims, Non-Missouri Intercompany Claims, or Equity Interests.

38.     "*Impaired*" means "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests.

39.     "*Intercompany Bar Date Order*" means that certain order of the Bankruptcy Court dated as of May 12, 2017 [Docket No. 849], establishing May 23, 2017, at 5:00 p.m. (CT) as the Intercompany Bar Date for filing proofs of Claim in the Chapter 11 Case, with only those exceptions permitted thereby.

40.     "*Intercompany Claims*" means Claims relating to an intercompany transfer of value to the Debtor by an Affiliate of the Debtor.

41.     "*Initial Administrative Claims Bar Date*" means the date by which all persons or entities holding any right to payment constituting an actual, necessary cost or expense of administering the Debtor's Chapter 11 Case or preserving the Estate under sections 503(b) and 507(a)(2) of the Bankruptcy Code (except Claims arising under section 503(b)(9) of the Bankruptcy Code) for the period from the Petition Date through May 31, 2016 have to file a request for payment of an Administrative Claim. The Initial Administrative Claims Bar Date is October 17, 2016, at 5:00 p.m. (CT), as established in the Bar Date Order.

42.     "*Kansas KEIP*" means the Key Employee Incentive Plan approved by the Bankruptcy Court on October 13, 2016 [Docket No. 473].

43.     "*Lien*" shall mean any lien, mortgage, charge, security interest, pledge or other encumbrance against or interest in property to secure payment or performance of a claim, debt or litigation.

44.     "*Liquidating Trust*" means the grantor trust to be created upon the Effective Date for the benefit of the beneficiaries thereof.

45.     "*Liquidating Trust Agreement*" means the agreement, substantially in the form included in the Plan Supplement, governing the operations of the Liquidating Trust, as it may be subsequently modified from time to time.

5

46. "*Liquidating Trust Assets*" means the assets held in the Liquidating Trust comprised of (i) all Causes of Action of the Debtor excluding those expressly waived herein and (ii) all other unencumbered assets of the Debtor's Estate remaining after all required payments have been made pursuant to this Plan, the Confirmation Order and Liquidating Trust Agreement, as applicable.

47. "*Liquidating Trustee*" means Drivetrain, LLC, appointed as of the Effective Date or as soon as reasonably practicable thereafter, as the fiduciary responsible for administering the Liquidating Trust.

48. "*Missouri Bioenergy Debtors*" means Abengoa Bioenergy US Holding, LLC, Abengoa Bioenergy Outsourcing, LLC, Abengoa Bioenergy Trading US, LLC, Abengoa Bioenergy Engineering & Construction, LLC, Abengoa Bioenergy of Nebraska, LLC, Abengoa Bioenergy Company, LLC, Abengoa Bioenergy Meramec Renewable, LLC, Abengoa Bioenergy Funding, LLC, Abengoa Bioenergy Maple, LLC, and Abengoa Bioenergy Operations, LLC, who filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in United States Bankruptcy Court for the Eastern District of Missouri, jointly administered under Case No. 16-41161-659.

49. "*Missouri Debtors*" means the Missouri Bioenergy Debtors, Abengoa Bioenergy of Indiana, LLC, and Abengoa Bioenergy of Illinois, LLC.

50. "*Missouri Intercompany Claims*" means claims filed by certain Missouri Debtors against the Debtor in accordance with the Intercompany Bar Date Order. These consist of the following:  (i) Proof of Claim No. 93 filed by Abengoa Bioenergy Engineering & Construction, LLC in the amount of $1,883,354.84; (ii) Proof of Claim No. 94 filed by Abengoa Bioenergy Trading US, LLC in the amount of $10,905,144.17; (iii) Proof of Claim No. 95 filed by Abengoa Bioenergy Company, LLC in the amount of $55,044,643.41; and (iv) Proof of Claim No. 96 filed by Abengoa Bioenergy Outsourcing, LLC in the amount of $1,671,790.74.

51. "*Missouri Plan*" means the *Third Amended Joint Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code*, dated February 27, 2017, as modified by the *Order Confirming Third Amended Joint Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code*, filed on June 8, 2017 in the United States Bankruptcy Court for the Eastern District of Missouri (Case No. 16-41161-659).

52. "*Non-Missouri Affiliate*" means any Affiliate other than the Missouri Debtors.

53. "*Non-Missouri Intercompany Claims*" means Claims, including without limitation, relating to an intercompany transfer of value to the Debtor, held by a Non-Missouri Affiliate of the Debtor.

54. "*Other Priority Claims*" means Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims.

\\NY - 045867/000001 - 7769820 v10

55. "*Person*" means an individual, partnership, corporation, limited liability company, cooperative, trust, estate, unincorporated organization, association, joint venture, government unit or agency or political subdivision thereof or any other form of legal entity or enterprise.

56. "*Petition Date*" for purposes of this Plan means March 23, 2016, which is the date on which three petitioning creditors three creditors filed an involuntary petition in the Bankruptcy Court under chapter 7 of the Bankruptcy Code.

57. "*Plan*" means this Missouri Liquidating Trustee's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code including exhibits and supplements, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code or the Bankruptcy Rules.

58. "*Plan Proponent*" means the Missouri Liquidating Trustee.

59. "*Plan Supplement*" means the supplement to the Plan containing certain documents and forms of documents specified in the Plan, which documents and forms shall be filed with the Bankruptcy Court no later than seven (7) days prior to the commencement of the hearing on confirmation of the Plan.

60. "*Priority Tax Claims*" means Claims of governmental units of the kind specified in section 507(a)(8) of the Bankruptcy Code.

61. "*Pro Rata*" shall mean the proportion that the amount of a Claim in a particular Class or Classes bears to the aggregate amount of all Claims (including Disputed Claims, but excluding disallowed Claims) in such Class or Classes, unless this Plan provides otherwise.

62. "*Professionals*" means any Person employed in the Chapter 11 Case pursuant to a Final Order in accordance with sections 327, 328 or 1103 of the Bankruptcy Code, and to be compensated for services rendered prior to the Effective Date pursuant to sections 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code.

63. "*Record Date*" means the date that the Disclosure Statement is approved by the Bankruptcy Court.

64. "*Released Parties*" means, collectively, the Debtor, the Debtor's current and former directors and officers, the Debtor's Professionals, the Affiliates, the Creditors' Committee, the members of the Creditors' Committee (solely in their capacity as members of the Creditors' Committee), the Creditors' Committee's Professionals, the Plan Proponent, any counsel or attorneys for the Plan Proponent, and the current and former Representatives of each of the foregoing.

65. "*Representatives*" means, with regard to an Entity (including the Debtor), any investment bankers, financial advisors, consultants, agents and other representatives (including their respective officers, directors, employees, independent contractors, members and professionals).

7

66.     "*Schedules*" mean the schedules of assets and liabilities, schedules of executory contracts and statement of financial affairs filed by the Debtor pursuant to section 521 of the Bankruptcy Code, as may be amended, modified or supplemented from time to time.

67.     "*Secured Claims*" means Claim(s) against the Debtor that are secured by a Lien on property in which the Estate have an interest, which Liens are valid, perfected and enforceable under applicable law or by reason of a Final Order, or that are subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estate' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

68.     "*Tax Code*" means the United States Internal Revenue Code of 1986, as amended.

69.     "*U.S. Trustee*" means the United States Trustee appointed under Article 591 of title 28 of the United States Code to serve in the District of Kansas.

70.     "*Unimpaired*" means not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests.

71.     "*Voting Deadline*" means August 18, 2017 at 5:00 p.m. (prevailing Central Time).

## B.     Rules of Interpretation

1.     For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and the neutral gender; (b) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.     The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed hereby.

3.     All references herein to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

\\NY - 045867/000001 - 7769820 v10

## C. Exhibits

All exhibits and schedules, if any, to the Plan are incorporated into and are part of the Plan as if set forth herein. All exhibits and schedules to the Plan, shall be filed with the Clerk of the Bankruptcy Court not later than seven (7) days prior to the deadline set by the Bankruptcy Court to vote to accept or reject the Plan. Once filed, such exhibits may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court. Holders of Claims or Equity Interests may also obtain a copy of such exhibits, once filed, from counsel to the Missouri Liquidating Trustee by submitting a written request to the following address:

Raphaella S. Ricciardi
Hogan Lovells US LLP
875 Third Avenue
New York, NY, 10022
Telephone: (212) 918-3000
E-mail: raphaella.ricciardi@hoganlovells.com

## ARTICLE II.

## ADMINISTRATIVE AND PRIORITY CLAIMS

## A. Administrative Claims

The Liquidating Trustee shall pay, from the Debtor's assets, each holder of an Allowed Administrative Claim, in satisfaction of such Allowed Administrative Claim, the full unpaid amount of such Allowed Administrative Claim in Cash: (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (3) at such time and upon such terms as may be agreed upon by such holder and the Liquidating Trustee; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however, that Administrative Claims do not include Administrative Claims filed after the Administrative Claims Bar Date or Administrative Claims filed or asserted pursuant to section 503(b)(9) of the Bankruptcy Code after the General Bar Date, unless the Liquidating Trustee, in its discretion, chooses to treat such Claims as Administrative Claims.

## B. Administrative Claims Bar Date

Except as otherwise provided, on or before the Final Administrative Claims Bar Date, any Person or Entity that seeks allowance of an Administrative Claim shall file with the Bankruptcy Court and serve on counsel for (i) the Debtor, (ii) the Creditors' Committee, and (iii) the Liquidating Trustee, any request for payment of an Administrative Claim arising after May 31, 2016. Requests for payment of an Administrative Claim must include at a minimum: (i) the name of the holder seeking allowance of an Administrative Claim; (ii) the amount of the Administrative Claim sought; (iii) the basis asserted for allowance of the Administrative

9

Claim; and (iv) all supporting documentation that justify allowance of the Administrative Claim asserted.

The request for payment of an Administrative Claim will be considered timely filed only if it is filed with the Bankruptcy Court and actually received by the notice parties identified above by the Final Administrative Claims Bar Date. Requests for payment of Administrative Claims may not be delivered by facsimile, telecopy, or electronic mail transmission.

## C.    Accrued Professional Compensation Claims

The deadline for submission by Professionals for Bankruptcy Court approval of Accrued Professional Compensation shall be sixty (60) days after the Effective Date. Any Professional or other Person or Entity that is required to file and serve a request for approval of Accrued Professional Compensation and fails to timely file and serve such request on or before such date shall be forever barred, estopped and enjoined from asserting such request or participating in Distributions under the Plan on account thereof. All Professionals employed by the Debtor or the Creditors' Committee, shall provide to the Debtor an estimate of their Accrued Professional Compensation through the Effective Date (including an estimate for fees and expenses expected to be incurred after the Effective Date to prepare and prosecute allowance of final fee applications) before the Effective Date.

## D.    Priority Tax Claims

The Liquidating Trustee shall pay, from the Debtor's assets, each holder of an Allowed Priority Tax Claim, in satisfaction of such Allowed Priority Tax Claim, the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the later of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law; provided, however that the Liquidating Trustee shall not pay any premium, interest or penalty in connection with such Allowed Priority Tax Claim.

## E.    Other Priority Claims

The Liquidating Trustee shall pay, from the Debtor's assets, each holder of an Allowed Other Priority Claim, in satisfaction of such Allowed Other Priority Claim, the full unpaid amount of such Allowed Other Priority Claim in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date such Allowed Other Priority Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Other Priority Claim is payable under applicable non-bankruptcy law.

\\NY - 045867/000001 - 7769820 v10

# ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.    Summary

1.    This Plan is the Missouri Liquidating Trustee's chapter 11 plan of liquidation. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Missouri Liquidating Trustee has not classified Administrative Claims, Priority Tax Claims or Other Priority Claims.

2.    The following table show the classification of Claims against and Equity Interests in the Debtor for all purposes, including voting, confirmation and Distribution pursuant to this Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. This Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and deems a Claim classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Each Class set forth below is treated under this Plan as a distinct Class for voting and Distribution purposes.

3.    Subject to all other applicable provisions of this Plan (including its Distribution provisions), classified Claims shall receive the treatment described in this Article III. This Plan will not provide any Distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties.

4.    Summary of Classification and Treatment of Classified Claims and Equity Interests.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Secured Claims | Unimpaired | Deemed to Accept |
| 2 | General Unsecured Claims | Impaired | Entitled to Vote |
| 3 | Non-Missouri Intercompany Claims | Impaired and No Distribution | Deemed to Reject |
| 4 | Equity Interests | Impaired and No Distribution | Deemed to Reject |

### B.    Classification and Treatment of Claims and Equity Interests

1.    Secured Claims (Class 1)

(a)    **Classification**: Class 1 consists of Secured Claims.

11

\\NY - 045867/000001 - 7769820 v10

Case 16-10446   Doc# 978   Filed 07/27/17   Page 228 of 280

(b)    **Treatment**: Except to the extent that a holder of an Allowed Secured Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable classification and treatment, each holder of an Allowed Secured Claim shall receive, at the sole option of the Liquidating Trustee, Cash in the full amount of such Allowed Secured Claim or the collateral securing its Allowed Secured Claim, on or as soon as practicable after the latest to occur of (i) the Effective Date; (ii) the first Business Day after the date that is ten (10) Business Days after the date such Claim becomes an Allowed Other Secured Claim; and (iii) the date or dates agreed to by the Liquidating Trustee and the holder of the Allowed Secured Claim.

(c)    **Voting**: Class 1 is Unimpaired pursuant to Bankruptcy Code section 1126(f), therefore, holders of Secured Claims in Class 1 are not entitled to vote to accept or reject this Plan.

2.    General Unsecured Claims (Class 2)

(a)    **Classification**: Class 2 consists of General Unsecured Claims, including the Missouri Intercompany Claims.

(b)    **Treatment**: Except to the extent that a holder of an Allowed General Unsecured Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable classification and treatment, each holder of an Allowed General Unsecured Claim shall receive their Pro Rata share of remaining Cash, provided that distributions to holders of Allowed Missouri Intercompany Claims shall be limited to the extent necessary to permit General Unsecured Claims other than Missouri Intercompany Claims to receive percentage distributions hereunder equaling no less than the percentage distributions received by General Unsecured Claims classified as Bioenergy Class 2 in the Missouri Plan calculated as if the Debtor was substantively consolidated with the Missouri Bioenergy Debtors. The Kansas KEIP, which amount, for the avoidance of doubt, shall not exceed the aggregate amount of $354,520.00, shall be paid prior to any distribution to General Unsecured Claims. Distributions to holders of Allowed General Unsecured Claims shall be made as soon as practicable as the Liquidating Trustee may determine in its sole discretion.

(c)    **Voting**: Class 2 is Impaired and, therefore, only holders of General Unsecured Claims, including the Missouri Intercompany Claims,  in Class 2 are entitled to vote to accept or reject the Plan.

3.    Non-Missouri Intercompany Claims (Class 3)

(a)    **Classification**: Class 3 consists of Non-Missouri Intercompany Claims, excluding the Missouri Intercompany Claims.

(b)    **Treatment**: Class 3 is Impaired and will receive no Distribution under the Plan.

\\NY - 045867/000001 - 7769820 v10

(c) **Voting**: Class 3 Holders of the Intercompany Claims will receive no Distribution under the Plan and therefore, holders of Intercompany Claims in Class 3 are deemed to have rejected the Plan and are not entitled to vote on the Plan.

4.     Equity Interests (Class 4)

(a)     **Classification**: Class 4 consists of Equity Interests.

(b)     **Treatment**: Class 4 is Impaired and will receive no Distribution under the Plan. All equity interests in the Debtor shall be deemed cancelled upon the Effective Date.

(c)     **Voting**: Class 4 will receive no Distribution under the Plan and therefore, holders of Equity Interests in Class 4 are deemed to have rejected the Plan and are not entitled to vote on the Plan.

## C.     Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtor's rights with respect to any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

## D.     Nonconsensual Confirmation

If any Impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in section 1126 of the Bankruptcy Code, the Missouri Liquidating Trustee reserves the right to amend the Plan or to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both. With respect to Impaired Classes that are deemed to reject the Plan, the Missouri Liquidating Trustee intends to request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code notwithstanding the deemed rejection of the Plan by such Class of Claims.

## ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

## A.     Establishment of Liquidating Trust

On the Effective Date, the Liquidating Trustee shall sign the Liquidating Trust Agreement and, in his capacity as Liquidating Trustee, accept all Liquidating Trust Assets on behalf of the beneficiaries thereof, and be authorized to obtain, seek the turnover, liquidate, and collect all of the Liquidating Trust Assets not in his or her possession. The Liquidating Trust will then be deemed created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date. The Liquidating Trust shall be established for the purposes of (i) liquidating any non-Cash Liquidating Trust Assets; (ii) prosecuting and resolving the Causes of Action; (iii) maximizing recovery of the Liquidating Trust Assets for the benefit of the beneficiaries thereof; and (iv) distributing the proceeds of the Liquidating Trust Assets to the beneficiaries in accordance with this Plan and the Liquidating Trust Agreement, with no

\\NY - 045867/000001 - 7769820 v10

objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary for, and consistent with, the liquidating purpose of the Liquidating Trust.

## B.    Appointment of the Liquidating Trustee

The Liquidating Trustee shall be appointed by the Plan Proponent pursuant to this Plan and the Confirmation Order. It is contemplated that Drivetrain, LLC, the Liquidating Trustee in the Missouri Chapter 11 Cases and an experienced liquidating trustee, will be the Liquidating Trustee in this Chapter 11 Case. Following appointment, the Liquidating Trustee shall have the same powers as the board of directors and officers of the Debtor, subject to the provisions hereof (and all bylaws, articles of incorporation and related corporate documents are deemed amended by this Plan to permit and authorize the same). In the event of resignation or removal, death or incapacity of the Liquidating Trustee, the Plan Proponent shall designate another Person or Entity to serve as Liquidating Trustee and thereupon the successor Liquidating Trustee, without any further act or need for an order of the Bankruptcy Court, shall become fully vested with all of the rights, powers, duties and obligations of the predecessor; provided, however, that the Liquidating Trustee shall be deemed removed on the date the Chapter 11 Case is closed, and no successor thereto shall be designated. The Liquidating Trustee shall be entitled to compensation payable from the Liquidating Trust Assets as set forth in the Liquidating Trust Agreement.

## C.    Beneficiaries of Liquidating Trust

The holders of General Unsecured Claims against the Debtor entitled to Distributions shall be the beneficiaries of the Liquidating Trust. Such beneficiaries shall be bound by the Liquidating Trust Agreement. The interests of the beneficiaries in the Liquidating Trust shall be uncertificated and nontransferable except upon death of the interest holder or by operation of law.

## D.    Vesting and Transfer of Liquidating Trust Assets to the Liquidating Trust

Pursuant to Bankruptcy Code section 1141(b), the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Liens, Claims and Interests, except as otherwise specifically provided in this Plan or in the Confirmation Order; provided, however, that the Liquidating Trustee may abandon or otherwise not accept any non-Cash Liquidating Trust Assets that the Liquidating Trustee believes, in good faith, have no value to the Liquidating Trust. Any non-Cash Liquidating Trust Assets that the Liquidating Trustee so abandons or otherwise does not accept shall not be property of the Liquidating Trust. The Liquidating Trust Assets include claims against third parties. These claims include, but are not limited to, preference, fraudulent transfer and other avoidance claims pursuant to chapter 5 of the Bankruptcy Code and state law counterparts. These claims will be preserved and transferred to the Liquidating Trust.

## E.    Liquidating Trust Expenses

Subject to the provisions of the Liquidating Trust Agreement, all costs, expenses and obligations incurred by the Liquidating Trustee in administering this Plan, the Liquidating Trust, or in any manner connected, incidental or related thereto, in effecting distributions from, as applicable, the Liquidating Trust shall be a charge against the Liquidating Trust Assets

\\NY - 045867/000001 - 7769820 v10

remaining from time to time in the hands of the Liquidating Trustee. Such expenses shall be paid in accordance with the Liquidating Trust Agreement.

## F.      Role of the Liquidating Trustee

1.      The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust and the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect the Liquidating Trust Assets; (b) pay taxes or other obligations incurred by the Liquidating Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants to advise and assist in the reasonable administration, prosecution and distribution of Liquidating Trust Assets; (d) calculate and implement Distributions of Liquidating Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Liquidating Trust Agreement, Causes of Action vested in the Liquidating Trust; (f) resolve issues involving Claims and Interests in accordance with this Plan; and (g) undertake all administrative functions of the Debtor's Chapter 11 Case, including the payment of fees payable to the United States Trustee and the ultimate closing of the Debtor's Chapter 11 Case. The Liquidating Trust is the successor to the Debtor and its Estate.

2.      On the Effective Date, the Liquidating Trust shall: (a) take possession of all books, records, and files of the Debtor and its Estate; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trust determines, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or required.

3.      The Liquidating Trustee may invest Cash in the Liquidating Trust (including any earnings thereon or proceeds therefrom) in any manner permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

4.      The Liquidating Trust shall have the right to object to Claims not otherwise Allowed in connection with post-Effective Date Claims allowance process.

5.      In no event later than thirty (30) Business Days after the end of the first full month following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidating Trust has been distributed in accordance with this Plan, the Liquidating Trustee shall file with the Bankruptcy Court a report setting forth the amounts, recipients and dates of all Distributions made by the Liquidating Trustee under this Plan through each applicable reporting period.

6.      The Liquidating Trustee shall file tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Plan. The Liquidating Trust shall also annually (for tax years in which Distributions from the Liquidating Trust are made) send to each beneficiary a separate statement setting forth the beneficiary's share of items of income, gain, loss, deduction or credit and all such holders shall

report such items on their federal income tax returns; <u>provided, however,</u> that no such statement need be sent to any Class that is not expected to receive any Distribution from the Liquidating Trust. The Liquidating Trust's taxable income, gain, loss, deduction or credit will be allocated to the Liquidating Trust's beneficiaries in accordance with their relative beneficial interests in the Liquidating Trust. As soon as practicable after the Effective Date, the Liquidating Trust shall make a good faith valuation of assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for all federal income tax purposes. The Liquidating Trust shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit for taxing purposes. The Liquidating Trust may request an expedited determination of taxes of the Debtor or of the Liquidating Trust under Bankruptcy Code section 505(b) for all tax returns filed for, or on behalf of, the Debtor and the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust. The Liquidating Trust shall be responsible for filing all federal, state, and local tax returns for the Debtor and the Liquidating Trust. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.

7. The Liquidating Trust shall be responsible for payments of all Allowed tax obligations of the Debtor, and any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets.

## G. Preservation of Right to Conduct Investigations

The preservation for the Liquidating Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the liquidation and administration of the Liquidating Trust Assets. Accordingly, any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Debtor or the Creditors' Committee prior to the Effective Date shall vest with the Liquidating Trust and shall continue until dissolution of the Liquidating Trust.

## H. Prosecution and Resolution of Causes of Action

1. From and after the Effective Date, prosecution and settlement of all Causes of Action transferred to the Liquidating Trust shall be the sole responsibility of the Liquidating Trust pursuant to this Plan and the Confirmation Order. From and after the Effective Date, the Liquidating Trust shall have exclusive rights, powers, and interests of the Debtor's Estate to pursue, settle or abandon such Causes of Action as the sole representative of the Debtor's Estate pursuant to Bankruptcy Code section 1123(b)(3). Proceeds recovered from all Causes of Action will be deposited into the Liquidating Trust and will be distributed by the Liquidating Trustee to the beneficiaries in accordance with the provisions of the Plan and Liquidating Trust Agreement. All Causes of Action that are not expressly released or waived under this Plan are reserved and preserved and vest in the Liquidating Trust in accordance with this Plan. No Person may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Liquidating Trustee will not pursue any and all available Causes of Action against such Person. The Liquidating Trustee expressly reserves all Causes of Action, except for any Causes of Action against any Person that are

16

expressly released or waived under this Plan, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of confirmation or consummation of this Plan. No claims or Causes of Action against the Released Parties shall be transferred to the Liquidating Trust, the Liquidating Trustee shall not have standing to pursue such claims or Causes of Action, and all such claims and Causes of Action shall be waived, released and discharged pursuant to the Plan.

2.     Settlement by the Liquidating Trust of any Cause of Action transferred to the Liquidating Trust shall require: (i) approval only of the Liquidating Trustee if the amount claimed by the Liquidating Trust against a defendant is less than five hundred thousand dollars ($500,000); and (ii) approval of the Liquidating Trustee and the Bankruptcy Court, upon notice and a hearing, if the amount claimed by the Liquidating Trust against a defendant is unliquidated or equals to or exceeds five hundred thousand dollars ($500,000).

## I.     Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets

For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution from the Debtor's Estate of an undivided interest in each of the Liquidating Trust Assets (to the extent of the value of their respective share in the applicable assets) and then contributed such interests to the Liquidating Trust, and the Liquidating Trust's beneficiaries will be treated as the grantors and owners thereof.

## J.     Limitation of Liability

No recourse will ever be had, directly or indirectly, against the Liquidating Trustee, its members, officers, directors, employees, professionals, representatives, agents, successors or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Trust under this Plan or by reason of the creation of any indebtedness by the Liquidating Trust or the Liquidating Trustee under this Plan. All such liabilities under this Plan will be enforceable only against, and will be satisfied only out of, the Liquidating Trust Assets. The Liquidating Trustee and its agents shall not be deemed to be the agent for any holder of a Claim in connection with Distributions made under this Plan. The Liquidating Trust and the Liquidating Trustee and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do hereunder in good faith and in the exercise of their sound judgment; provided, however, that this section will not apply to any gross negligence or willful misconduct by the Liquidating Trust and the Liquidating Trustee or their respective officers, directors, employees, professionals, representatives, agents, successors or assigns.

\\NY - 045867/000001 - 7769820 v10

**K.      Term of Liquidating Trust**

The Liquidating Trustee shall be discharged and the Liquidating Trust shall be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the Liquidating Trust Assets have been liquidated, (iii) all duties and obligations of the Liquidating Trustee under the Liquidating Trust Agreement have been fulfilled, (iv) all Distributions required to be made by the Liquidating Trust under this Plan and the Liquidating Trust Agreement have been made, and (v) the Debtor's Chapter 11 Case has been closed; provided, however, that in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the third anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension not to exceed one (1) year is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

**L.      Retention of Professionals by Liquidating Trust**

The Liquidating Trustee may retain and compensate attorneys and other professionals to assist in its duties on such terms (including on a contingency or hourly basis) as it deems reasonable and appropriate without Bankruptcy Court approval.

**M.      Conflicts Between the Liquidating Trust Agreement and the Plan**

In the event of any inconsistencies or conflict between the Liquidating Trust Agreement and this Plan, the terms and provisions of this Plan shall control.

**N.      Cancellation of Existing Securities and Agreements**

Except for purposes of evidencing a right to Distributions under the Plan or as otherwise provided hereunder, on the Effective Date, any and all agreements and other documents evidencing Claims or rights of any holder of a Claim or Equity Interest against the Debtor, including, but not limited to, all indentures, notes, bonds and share certificates evidencing such Claims and Equity Interests and any agreements or guarantees related thereto shall be cancelled, terminated, deemed null and void and satisfied, as against the Debtor but not as against any other Person.

**O.      Operations of the Debtor Between the Confirmation Date and the Effective Date**

The Debtor shall continue to operate as a debtor in possession during the period from the Confirmation Date through and until the Effective Date, and as a liquidating estate on and after the Effective Date. The retention and employment of the Professionals retained by the Debtor shall terminate as of the Effective Date, provided, however, that the Debtor shall be deemed to exist, and its Professionals shall be retained, after such date only with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, (b) motions seeking the enforcement of the provisions of the Plan or the Confirmation Order, and (c) such other matters as may be determined by the Debtor and the Liquidating Trustee, including, without limitation, the filing and prosecuting of objections to Claims solely with respect to Administrative Claims, Priority Tax Claims, and Other Priority Claims. On the Effective Date, the Debtor's directors and officers shall be terminated automatically without the need for any corporate action or approval

\\NY - 045867/000001 - 7769820 v10

and without the need for any corporate filings, and shall have no continuing obligations to the Debtor following the occurrence of the Effective Date.

**P.    Automatic Stay**

The automatic stay provided for under section 362 of the Bankruptcy Code shall remain in effect in the Chapter 11 Case until the Effective Date.

**Q.    The Creditors' Committee**

Upon the Effective Date, the Creditors' Committee shall dissolve, and its members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Case. The retention and employment of the Professionals retained by the Creditors' Committee shall terminate as of the Effective Date provided, however, that the Creditors' Committee shall exist, and its Professionals shall be retained, after such date with respect to applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and motions seeking the enforcement of the provisions of the Plan or the Confirmation Order, including, to the extent necessary, to appoint a successor Liquidating Trustee.

**R.    Books and Records**

As part of the appointment of the Liquidating Trustee, to the extent not already transferred on the Effective Date, the Debtor shall transfer dominion and control over all of its Books and Records to the Liquidating Trustee in whatever form, manner or media those Books and Records existed immediately prior to the transfer thereof to the Liquidating Trustee. The Liquidating Trustee may abandon all such Books and Records on or after ninety (90) days from the Effective Date, provided, however, that the Liquidating Trustee shall not dispose or abandon any Books and Records that are reasonably likely to pertain to pending litigation in which the Debtor or its current or former officers or directors are a party or that pertain to General Unsecured Claims without further order of the Bankruptcy Court. Pursuant to section 554 of the Bankruptcy Code, this Article IV.R shall constitute a motion and notice, so that no further notice or Bankruptcy Court filings are required to effectuate the aforementioned abandonment of the Books and Records of the Debtor.

**S.    D&O Insurance Policies**

No prepaid D&O Insurance Policy shall be cancelled, and the Debtor's directors, officers and employees who have valid claims against the D&O Insurance Policies for indemnification, defense, reimbursement, or limitation of liability may be paid from the D&O Insurance Policies to the extent of the coverage provided by the D&O Insurance Policies, if any. As such, and notwithstanding anything in this Plan to the contrary, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the D&O Insurance Policies, to the extent the contract(s) providing for such is determined to be an executory contract, shall be deemed assumed by the Debtor.

19

# ARTICLE V.

## PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS

**A.    Voting of Claims**

Each holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article III of this Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court. For purposes of calculating the number of Allowed Claims in a Class of Claims that have voted to accept or reject the Plan under section 1126(c) of the Bankruptcy Code, all Allowed Claims in such Class held by one Entity or any Affiliate thereof shall be aggregated and treated as one Allowed Claim in such Class. For purposes of any Claim in any Impaired Class that is Disputed as to its amount only, the holder of such Claim shall be entitled to vote on the Plan as if such holder held an Allowed Claim in an amount equal to the undisputed portion of such Claim.

**B.    Distribution Dates**

Distributions to holders of Claims shall be made as provided in Articles II and III herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**C.    Disbursing Agent**

All Distributions under the Plan by the Liquidating Trustee shall be made by the Liquidating Trustee as Disbursing Agent or such other entity designated by the Liquidating Trustee as Disbursing Agent.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all Distributions contemplated by the Plan, (c) employ professionals to represent it with respect to its responsibilities, and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agent shall only be required to act and make Distributions in accordance with the terms of the Plan and shall have no (x) liability for actions taken in accordance with the Plan or in reliance upon information provided to them in accordance with the Plan or (y) obligation or liability for Distributions under the Plan to any party who does not hold an Allowed Claim at the time of Distribution or who does not otherwise comply with the terms of the Plan.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Liquidating Trustee acting as the Disbursing Agent (including, without

limitation, reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash from the Liquidating Trust Assets.

### D.     Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date. The Liquidating Trustee shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. In making any Distribution with respect to any Claim, the Liquidating Trustee shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that was known to the Debtor as of the Record Date and is available to the Liquidating Trustee.

### E.     Delivery of Distributions

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made by the Disbursing Agent at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim filed by such holder or (b) the last known address of such holder if no proof of Claim is filed or if the Liquidating Trustee has not been notified in writing of a change of address.

### F.     Undeliverable and Unclaimed Distributions

In the event that any Distribution to any holder of an Allowed Claim made by the Liquidating Trustee is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder; provided, however, that all Distributions to holders of Allowed Claims made by the Liquidating Trustee that are unclaimed for a period of ninety (90) days after the date of the first attempted Distribution shall have its, his or her Claim for such undeliverable Distribution deemed satisfied and will be forever barred from asserting any such Claim against the Debtor or its property. Any Distributions which are undeliverable or have not been negotiated within the time period set forth above shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Debtor's Estate. The Liquidating Trustee shall have no further obligation to make any Distribution to the holder of such Claim on account of such Claim, and any entitlement of any holder of such Claim to any such Distributions shall be extinguished and forever barred; provided, however, that the holder of such Claim may receive future Distributions on account of such Claim by contacting the Liquidating Trustee at some point prior to the final Distribution.

## G. Manner of Cash Payments Under the Plan

Except as otherwise provided herein, Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Liquidating Trustee.

## H. Compliance with Tax Requirements

The Disbursing Agent may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or Distribution on account of Claims. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such holders of the Claims. The Disbursing Agent shall be authorized to collect such tax information from the holders of Claims (including social security numbers or other tax identification numbers) as it in its sole discretion deems necessary to effectuate the Plan. In order to receive Distributions under the Plan, all holders of Claims will need to identify themselves to the Disbursing Agent and provide all tax information the Disbursing Agent deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable to each holder). The Disbursing Agent may refuse to make a Distribution to any holder of a Claim that fails to furnish such information within the time period specified by the Disbursing Agent and such Distribution shall be deemed an unclaimed Distribution under the Plan, and, provided further that, if the Disbursing Agent fails to withhold in respect of amounts received or distributable with respect to any such holder and such Disbursing Agent is later held liable for the amount of such withholding, such holder shall reimburse the Disbursing Agent for such liability. Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, and (b) no Distributions shall be required to be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such tax obligations or has, to the Disbursing Agent's satisfaction, established an exemption therefrom.

## I. No Payments of Fractional Dollars

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

## J. Interest on Claims

Except to the extent provided in section 506(b) of the Bankruptcy Code, the Plan, or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims, and no holder of an Allowed Claim shall be entitled to interest accruing on any Claim from and after the Petition Date.

\\NY - 045867/000001 - 7769820 v10

## K.    No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of such Claim.

## L.    Setoff and Recoupment

The Liquidating Trustee may setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that the Debtor or the Estate may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the Estate or the Liquidating Trustee of any right of setoff or recoupment that any of them may have against the holder of any Claim. Any such setoffs or recoupments may be challenged in Bankruptcy Court. Notwithstanding any provision in the Plan to the contrary, nothing herein shall bar any creditor from asserting its setoff or recoupment rights to the extent permitted under section 553 or any other provision of the Bankruptcy Code; provided that such setoff or recoupment rights are timely asserted; provided further that all rights of the Debtor, its Estate and the Liquidating Trustee with respect thereto are reserved.

## M.    De Minimis Distributions; Charitable Donation

Notwithstanding anything to the contrary therein, the Liquidating Trustee shall not be required to make a Distribution to any Creditor if the dollar amount of the Distribution is less than $25 or otherwise so small that the cost of making that Distribution exceeds the dollar amount of such Distribution. On or about the time that the final Distribution is made, the Liquidating Trustee may make a charitable donation with undistributed funds if, in the reasonable judgment of the Liquidating Trustee, the cost of calculating and making the final Distribution of the remaining funds is excessive in relation to the benefits to the or holders of Claims who would otherwise be entitled to such Distributions, and such charitable donation is provided to an entity not otherwise related to the Debtor or the Liquidating Trustee.

## N.    United States Trustee Fees

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtor. On and after the Effective Date, the Liquidating Trustee shall pay any and all such fees payable by the Debtor, when due and payable, and shall file with the Bankruptcy Court quarterly reports for the Debtor, in a form reasonably acceptable to the U.S. Trustee. The Debtor shall remain obligated to pay quarterly fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

## O.    Withholding from Distributions

Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from Distributions pursuant to the Plan. The Liquidating Trustee may withhold from amounts distributable pursuant to the Plan to any Person or Entity any and all amounts, determined in the sole and reasonable discretion of the Liquidating Trustee,

required to be withheld by any law, regulation, rule, ruling, directive, or other governmental requirement.

## P.    No Distributions on Late-Filed Claims

Except as otherwise provided in a Final Order of the Bankruptcy Court, any Claim as to which a proof of Claim was required to be filed and was first filed after the applicable bar date in the Chapter 11 Case, including, without limitation, the General Bar Date and any bar date established in the Plan or in the Confirmation Order, shall automatically be deemed a late-filed Claim that is disallowed in the Chapter 11 Case, without the need for (a) any further action by the Liquidating Trustee or (b) an order of the Bankruptcy Court. Nothing in this paragraph is intended to expand or modify the applicable bar dates or any orders of the Bankruptcy Court relating thereto.

## ARTICLE VI.

## DISPUTED CLAIMS

## A.    Disputed Claims Reserve

After the Effective Date, the Disputed Claims Reserve shall be managed by the Liquidating Trustee for the treatment of Disputed Claims. On each Distribution date after the Effective Date in which the Liquidating Trustee makes Distributions to holders of Allowed Claims, the Liquidating Trustee shall retain on account of Disputed Claims an amount the Liquidating Trustee estimates is necessary to fund the Pro Rata share of such Distributions to holders of Disputed Claims if such Claims were Allowed, with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Liquidating Trustee. Cash retained on account of such Disputed Claims shall be retained in the Disputed Claims Reserve for the benefit of the holders of Disputed Claims pending a determination of their entitlement thereto under the terms of the Plan. If any Disputed Claim is disallowed or Allowed in an amount that is lower than the aggregate assets retained on account of such Disputed Claim, then the Liquidating Trustee shall, within fifteen (15) days after such disallowance or allowance, return the assets that exceed the Allowed amount of such Claim to the Debtor's Estate.

## B.    Resolution of Disputed Claims

The Liquidating Trustee shall have the right to make and file objections to Claims in the Bankruptcy Court. Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, all Disputed Claims shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

## C.    Objection Deadline

All objections to Disputed Claims shall be filed no later than the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing, with notice only to those parties entitled to notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002.

\\NY - 045867/000001 - 7769820 v10

## D. Estimation of Claims

At any time, the Liquidating Trustee may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Liquidating Trustee or the Debtor have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Claim, the Liquidating Trustee may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## E. No Distributions Pending Allowance

Notwithstanding any other provision in the Plan, if any portion of a Claim is disputed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. Upon allowance, a holder of the Allowed Disputed Claim shall receive any Distributions that would have been made up to the date of allowance to such holder under the Plan had the Disputed Claim been allowed on the Effective Date.

## F. Resolution of Claims

On and after the Effective Date, the Liquidating Trustee shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

## G. Treatment of Missouri Intercompany Claims

Notwithstanding anything to the contrary herein or in the Confirmation Order or any other ancillary document, the Missouri Intercompany Claims shall constitute Allowed Claims for all purposes, including, without limitation, voting, confirmation, and Distribution, and shall not be subject to any setoff or recoupment, estimation, dispute, objection, challenge or any other attack.

\\NY - 045867/000001 - 7769820 v10

# ARTICLE VII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**      **Assumption or Rejection of Executory Contracts and Unexpired Leases**

In accordance with sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any Person or Entity shall be deemed rejected by the Debtor as of immediately prior to the Confirmation Date, except for any executory contract or unexpired lease (i) that has been assumed or rejected by an order of the Bankruptcy Court entered prior to the Effective Date or (ii) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Effective Date. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of rejection under section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejection is in the best interests of the Debtor, its Estate, and all parties in interest in the Chapter 11 Case.

**B.**      **Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article VII.A herein, must be filed with the Bankruptcy Court and served on the Debtor and the Liquidating Trustee no later than thirty (30) days after service of notice of the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A herein for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtor, its Estate, the Liquidating Trustee, their respective successors and assigns, and their respective assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.E herein. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III herein.

**C.**      **Indemnification and Reimbursement**

Subject to the occurrence of the Effective Date, all Allowed Claims against the Debtor for indemnification, defense, reimbursement, or limitation of liability of current or former directors, officers, or employees of the Debtor against any Claims, costs, liabilities or causes of action as provided in the Debtor's articles of organization, bylaws, other organizational documents, or applicable law, shall, to the extent such indemnification, defense, reimbursement, or limitation is owed in connection with one or more events or omissions occurring before the Petition Date, be (i) paid only to the extent of any applicable insurance coverage, and (ii) to the extent a proof of Claim has been timely filed and is Allowed, treated as Allowed General Unsecured Claims to the extent such Claims are not covered by any applicable insurance, including deductibles. Nothing contained herein shall affect the rights of directors, officers or employees under any insurance policy or coverage with respect to such Claims, costs, liabilities or Causes of Action or limit the rights of the Debtor, the Liquidating Trustee or the Debtor's

\\NY - 045867/000001 - 7769820 v10

Estate to object to, seek to subordinate or otherwise contest or challenge Claims or rights asserted by any current or former officer, director or employee of the Debtor.

## ARTICLE VIII.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A.    Conditions Precedent**

The following are conditions precedent to the Effective Date that must be satisfied or waived:

1.    The Bankruptcy Court shall have entered the Confirmation Order.

2.    There shall be no stay or injunction in effect with respect to the Confirmation Order, which such Confirmation Order shall contain approval of the releases provided for herein.

3.    The appointment of the Liquidating Trustee shall have been confirmed by order of the Bankruptcy Court.

4.    All agreements and instruments that are exhibits to the Plan shall be in a form acceptable to the Missouri Liquidating Trustee, and have been duly executed and delivered.

**B.    Waiver**

Notwithstanding the foregoing conditions in Article VIII.A, the Missouri Liquidating Trustee reserves, in its sole discretion, the right to waive the occurrence of or modify any of the foregoing conditions precedent. Any such written waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan; provided, however, that the Creditors' Committee shall have the right to be consulted on and consent to any proposed modification of the Plan, the Plan Supplement or the Confirmation Order. Any actions required to be taken on the Effective Date or Confirmation Date (as applicable) shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

**C.    Notice of Effective Date**

The Missouri Liquidating Trustee shall file with the Bankruptcy Court a notice of occurrence of the Effective Date within seven (7) days after the conditions in Article VIII.A have been satisfied or waived pursuant to Article VIII.B.

27

# ARTICLE IX.

## INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS

### A. Compromise and Settlement

Pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided under this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims and Equity Interests. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtor, the Estate and holders of Claims and Equity Interests.

### B. Releases

1. <u>Releases by the Debtor and its Estate.</u> Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, the Debtor and its Representatives and the Estate (collectively, the "*Debtor Releasing Parties*") shall be deemed to have provided a full, complete, unconditional, and irrevocable release to the Released Parties (and each such Released Party so released shall be deemed released by the Debtor and its Representatives, the Estate, and the Creditors' Committee and its members but solely in their capacity as members of the Creditors' Committee and not in their individual capacities), from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstance existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor, including, without limitation, those that the Debtor would have been legally entitled to assert or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of the Debtor or the Estate, including those in any way related to the Chapter 11 Case or the Plan; <u>provided that</u> the foregoing release shall not prohibit the Liquidating Trustee from asserting any and all defenses and counterclaims in respect of any Disputed Claim asserted by any of the Released Parties; and <u>provided further that</u> the releases granted to the Non-Missouri Affiliates under this Article IX.B.1 are expressly conditioned upon the subordination of the Non-Missouri Intercompany Claims to General Unsecured Claims for all purposes, including distributions. If the Non-Missouri Intercompany Claims are not subordinated to General Unsecured Claims for all purposes, including distributions, then the releases granted to the Non-Missouri Affiliates under this Article IX.B.1 shall be deemed null and void. Notwithstanding the above, the Releases by the Debtor Releasing Parties provided pursuant to this Article IX.B shall not affect any Causes of Action and any other debts, obligations, rights, suits, judgments, damages, actions, remedies and liabilities arising after the Effective Date and based on any act or omission, transaction, or other occurrence or circumstances taking place after the Effective

\\NY - 045867/000001 - 7769820 v10

Date; <u>provided further that</u> nothing set forth in the preceding proviso shall in any way limit the exculpation provisions set forth in XIII.C below.

2. <u>Releases by Holders of Claims.</u> Except as otherwise provided herein (including, without limitation, the rights accorded the Missouri Intercompany Claims under this Plan), each Person, other than the Debtor, who votes to accept the Plan and does not mark such ballot to indicate a refusal to grant the release provided for in this paragraph, shall be deemed to fully, completely, unconditionally, irrevocably, and forever release the Released Parties of and from any and all Claims and Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor and its Representatives, whether direct, derivative, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, Disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise.

3. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth above under Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action released by this Plan; (b) in the best interests of the Debtor and all holders of Claims and Equity Interests; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to the assertion of any Claim or Cause of Action thereby released.

**C. Exculpation**

Notwithstanding anything contained in the Plan to the contrary, the Released Parties shall neither have nor incur any liability relating to this Chapter 11 Case to any Entity for any and all Claims and Causes of Action arising after the Petition Date and through the Effective Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release, other agreement or document created or entered into in connection with the Plan, or any other post-petition act taken or omitted to be taken in connection with the Chapter 11 Case; <u>provided, however,</u> that the foregoing provisions of this Article IX.C shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

**D. Preservation of Causes of Action**

1. Unless a Cause of Action against a holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order) of the Bankruptcy Court, the Debtor and its Estate expressly reserve such Cause of Action for later adjudication or administration by the Liquidating Trustee (including,

without limitation, Causes of Action not specifically identified or described in the Plan or elsewhere or of which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances which may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan or Confirmation Order, except where such Causes of Action have been released in the Plan or any other Final Order (including the Confirmation Order). In addition, the Debtor and its Estate expressly reserve the right of the Liquidating Trustee to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

2. Subject to the immediately preceding paragraph, any Entity to whom the Debtor has incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor, or leased equipment or property from the Debtor should assume that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (a) such Entity has filed a proof of Claim against the Debtor in the Chapter 11 Case; (b) the Debtor has objected to any such Entity's proof of Claim; (c) any such Entity's Claim was included in the Schedules; (d) the Debtor has objected to any such Entity's scheduled Claim; or (e) any such Entity's scheduled Claim has been identified by the Debtor as disputed, contingent or unliquidated.

## E.    Injunction

1. From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim or Equity Interest, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or satisfied or to be released or satisfied pursuant to the Plan or the Confirmation Order.

2. Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to this Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to this Plan or the Confirmation Order.

3. The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity

\\NY - 045867/000001 - 7769820 v10

Interests against the Debtor or any of its assets or properties solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to this Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to this Plan or the Confirmation Order. On the Effective Date, all such Claims against, and Equity Interests in, the Debtor shall be satisfied and released in full.

4.      Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Persons and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released pursuant to the Plan or Confirmation Order, from:

(a)      commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns and their assets and properties;

(b)      enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns and their assets and properties;

(c)      creating, perfecting or enforcing any encumbrance of any kind against the Debtor, the Estate, the Liquidating Trustee, the Creditors' Committee, and their successors and assigns and their assets and properties; and

(d)      commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder.

**F.      Releases of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estate distributed under the Plan shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the Debtor.

## ARTICLE X.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities, including, without limitation, the Liquidating Trustee, with respect to all matters related to the Chapter 11 Case, the Debtor and the Plan as is legally permissible, including, without limitation, jurisdiction to:

\\NY - 045867/000001 - 7769820 v10

1.	allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest against the Debtor, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims;

2.	grant, deny or otherwise resolve any and all applications of Professionals or Persons retained in the Chapter 11 Case by the Debtor or the Creditors' Committee for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.	resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired leases to which the Debtor is party or with respect to which the Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4.	ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan, including by resolving any disputes regarding the Debtor's entitlement to recover assets held by third parties;

5.	decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Liquidating Trustee after the Effective Date;

6.	enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

7.	resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

8.	issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

9.	enforce Article IX.A, Article IX.B, Article IX.C, Article IX.D and Article IX.E hereof;

10.	resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX herein, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

11.	resolve any cases, controversies, suits or disputes with respect to settlement of the Missouri Intercompany Claims;

12.     enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

13.     resolve any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

14.     enter an order and a Final Decree closing the Chapter 11 Case.

## ARTICLE XI.

## MISCELLANEOUS PROVISIONS

**A.     Modification of the Plan**

1.     Preconfirmation Amendment

The Missouri Liquidating Trustee may modify the Plan, subject to section 1127 of the Bankruptcy Code, at any time prior to the entry of the Confirmation Order provided that the Plan, as modified, meets applicable Bankruptcy Code requirements.

2.     Postconfirmation Amendment Not Requiring Resolicitation

After the entry of the Confirmation Order, the Missouri Liquidating Trustee may modify the Plan, subject to section 1127 of the Bankruptcy Code, to remedy any defect or omission or to reconcile any inconsistencies in the Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan; provided that the Missouri Liquidating Trustee obtain approval of the Bankruptcy Court for such modification, after notice and a hearing. Any waiver under Article VIII.B. of this Plan shall not be considered to be a modification of the Plan.

**B.     Revocation or Withdrawal of the Plan**

The Missouri Liquidating Trustee reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans. If the Missouri Liquidating Trustee revokes or withdraws the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission of any sort by the Debtor or any other Entity.

**C.     Binding Effect**

On the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtor and such holder's respective successors and assigns, whether or

not the Claim or Equity Interest of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a Distribution under the Plan.

### D. Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### E. Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, unless otherwise stated, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the principles of conflict of laws thereof.

### F. Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Effective Date occurs. Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by the Missouri Liquidating Trustee or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

### G. Article 1146 Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

### H. Section 1125(e) Good Faith Compliance

Confirmation of the Plan shall act as a finding by the Bankruptcy Court that the Missouri Liquidating Trustee and its Representatives have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

### I. Further Assurances

The Debtor, the Liquidating Trustee, all holders of Claims receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

\\NY - 045867/000001 - 7769820 v10

**J.      Service of Documents**

Any pleading, notice or other document required by the Plan to be served on or delivered to the Missouri Liquidating Trustee shall be sent by first class U.S. mail, postage prepaid as follows:

**To the Missouri Liquidating Trustee:**

Drivetrain, LLC
630 Third Avenue, 21st Floor
New York, NY, 10017
Attention:      Alan J. Carr
                        Tim Daileader
E-mail address: acarr@drivetrainadvisors.com
                        tdaileader@drivetrainadvisors.com

*with a copy to:*

Hogan Lovells US LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
Attention:      Christopher R. Donoho, III
                        Ronald J. Silverman
E-mail address: chris.donoho@hoganlovells.com
                        ronald.silverman@hoganlovells.com

**To the Debtor:**

Abengoa Bioenergy of Biomass of Kansas, LLC
16150 Main Circle Drive, Suite 300
Chesterfield, Missouri 63017
Attention: General Counsel
E-mail address: jeffrey.bland@abengoa.com

*with a copy to:*

DLA Piper LLP (US)
1717 Main St., Suite 4600
Dallas, Texas 75201
Fax no.: (972) 813-6267
Attention:  Vincent P. Slusher
                    David E. Avraham
E-mail address:vince.slusher@dlapiper.com

35

david.avraham@dlapiper.com

-and-

Armstrong Teasdale LLP
2345 Grand Blvd.
Suite 1500
Kansas City, Missouri 64108
Attention: Christine L. Schlomann
Email address: cschlomann@armstrongteasdale.com

**K.**      **Filing of Additional Documents**

On or before the Effective Date, the Missouri Liquidating Trustee may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**L.**      **No Stay of Confirmation Order**

The Missouri Liquidating Trustee shall request that the Bankruptcy Court waive stay of enforcement of the Confirmation Order otherwise applicable, including pursuant to Federal Rules of Bankruptcy Procedure 3020(e), 6004(h) and 7062.

36

Dated: July 19, 2017                    Missouri Liquidating Trustee


                                        By:    */s/ Timothy Daileader*
                                               Name:   Timothy Daileader
                                               Title:   Authorized Signatory

**Exhibit 2**
Recovery Analysis

\\NY - 045867/000001 - 7840945 v6 11

**Exhibit 2**
Recovery Analysis

Pursuant to the Missouri Liquidating Trustee's Plan of Liquidation, *"Allowed General Unsecured Claim[s] shall receive their Pro Rata share of remaining Cash, provided that distributions to holders of Allowed Missouri Intercompany Claims shall be limited to the extent necessary to permit General Unsecured Claims other than Missouri Intercompany Claims to receive percentage distributions hereunder equaling no less than the percentage distributions received by General Unsecured Claims classified as Bioenergy Class 2 in the Missouri Plan calculated as if the Debtor was substantially consolidated with the Missouri Bioenergy Debtors."*

The chart below sets forth (A) estimated distributions to general unsecured creditors in the Missouri Chapter 11 cases (exclusive of any recovery on claims against the Debtor), (B) estimated distributions to general unsecured creditors in this Chapter 11 case assuming that Missouri Intercompany Claims are allowed in full with pro rata treatment (C) estimated distributions to general unsecured creditors assuming the assets and claims of the Debtor and the Missouri Bioenergy Debtors are combined (excluding the Missouri Intercompany Claims), and (D) estimated distributions to general unsecured creditors in this Chapter 11 case pursuant to the Plan, including an illustrative estimated reduction in Missouri Intercompany Claims (using the stated assumptions).

| | A | B | C | D |
|---|---|---|---|---|
| | Estimated Recovery in Missouri | ABBK Assets & Claims | Illustrative Pro Forma Recovery on a Combined Basis | Plan Recovery Including Illustrative Reduction in Missouri Intercompany Claims |
| Missouri Distributable Cash | $ 106.3 [1] | $ - | $ 106.3 | $ - |
| Missouri Note from Spain | 10.0 | - | 10.0 [2] | - |
| ABBK Distributable Cash | - | 19.0 | 19.0 [3] | 19.0 |
| **Proceeds Available to GUCs** | **116.3** | **19.0** | **135.3** | **19.0** |
| | | | | |
| Missouri Bioenergy Class 2 Creditors | 385.0 | - | 385.0 [4] | - |
| ABBK Class 2 Third Party Creditors | - | 30.2 | 30.2 [5] | 30.2 |
| ABBK Class 2 Intercompany Claims | - | 69.5 [6] | - | 28.1 [7] |
| **Total GUCs** | $ **385.0** | $ **99.7** | $ **415.2** | $ **58.3** |
| *Recovery* | *30.2%* [8] | *19.1%* | *32.6%* | *32.6%* |

| | | |
|---|---|---|
| Total Missouri Intercompany Claims | $ | 69.5 |
| Less: Estimated Allowed Missouri Intercompany Claims | | (28.1) |
| Estimated Voluntarily Waived Missouri Intercompany Claims | $ | 41.4   60% |

**Notes:**

(1) Case 16-41161, Dkt. 1071, Missouri Disclosure Statement, page 143. "General Unsecured Claims Recoveries from Proceeds" under Chapter 11. Exclusive of recovery on intercompany claims against the Debtor, but reflecting the $2M COFIDES settlement.

(2) Case 16-41161, Dkt. 1071, Missouri Disclosure Statement, page 143. "General Unsecured Claims Other Recoveries" under Chapter 11. Illustratively assumes high end of note value range.

(3) Case 16-10446, Dkt. 969, page 367, Exhibit 7. "Estimated Proceeds Available for General Unsecured Claims", excluding $771K of Trustee Fees.

(4) Case 16-41161, Dkt. 1071, Missouri Disclosure Statement, page 143. "Estimated General Unsecured Claims" under Chapter 11.

(5) Case 16-10446, Dkt. 969, page 367, Exhibit 7. Estimated "Other General Unsecured Creditors."

(6) First Amended Disclosure Statement for Missouri Liquidating Trustee's First Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code, Article IV. J.

(7) A total of $69.5M of intercompany claims have been asserted by Abengoa Bioenergy Company, LLC; Abengoa Bioenergy Trading US, LLC; Abengoa Bioenergy Outsourcing, LLC; and Abengoa Bioenergy Engineering & Construction, LLC against the Debtor. Pursuant to the Plan, the Missouri Intercompany Claims will voluntarily waive distributions as set forth in the Plan (see Note above). Assuming an estimated 32.6% recovery for the Debtor's general unsecured creditors, that results in an effective waiver of $41.4M of the $69.5M of Missouri Intercompany Claims. This is calculated as: ($19.0M ABBK Distributable Cash / 32.6% Recovery) - ($30.2M Third Party Creditors).

(8) Case 16-41161, Dkt. 1071, Missouri Disclosure Statement, page 143. "General Unsecured Claims Recovery %" is 30.7% under Chapter 11. The 30.2% recovery reflects the impact of the $2M COFIDES settlement which is documented under Case 16-41161, Dkt. 1443, Confirmation Order, Section 20. C.

**Exhibit 3**
Letter from Missouri Liquidating Trustee

\\NY - 045867/000001 - 7840945 v6_11



**To all Creditors of:**

**In re Abengoa Bioenergy Biomass of Kansas, LLC,** *et al.***, (the "<u>Debtor</u>"), Case No. 16-10446, United States Bankruptcy Court for the District of Kansas**

Dear Creditors:

We are Drivetrain, LLC, acting in its capacity as the liquidating trustee of Abengoa (MO), the representative for the creditor interests in that case. We write to you to explain why we are proposing an alternative plan and why we think you should support it. This letter is our attempt to do so, and to encourage you to vote for our plan. The United States Bankruptcy Court for the District of Kansas has authorized the solicitation of your vote on the *Missouri Liquidating Trustee's First Amended Plan of Liquidation pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. ~~[X]~~968] (the "<u>LT Plan</u>"). The LT Plan is different than, and we think superior to, the Debtor's Plan[1] that was previously sent to creditors for their vote, <u>because it provides a higher recovery to general unsecured creditors</u>.

Our LT Plan is superior for several simple reasons:

- **First, it is fair.** The LT Plan provides Kansas general unsecured creditors a recovery equal to that which similarly situated general unsecured creditors will receive under the plan already approved in the Missouri Chapter 11 cases of Kansas' sister companies. If the LT Plan is approved, that recovery is estimated to be approximately 33%.

- **Second, it gives you a <u>higher recovery</u>.** The Missouri Liquidating Trustee believes that any alternative plan or other scenario will result in a materially lower recovery to Kansas general unsecured creditors. That is because the Debtor's Plan proposes to provide no distribution to the $69 million of claims held by the Debtor's sister companies who are in the Missouri Chapter 11 cases (the "<u>Missouri Claims</u>"). The Missouri Liquidating Trustee has objected to the Debtor's Plan and believes that those $69 million of claims will be recognized, severely diluting recoveries to the approximately $30 million of other claims. The resulting *pro rata* distribution (*i.e.*, where all general unsecured claims receive the same percentage recovery) to Kansas creditors once the Missouri Claims are allowed is estimated to be approximately 19%. **Thus, the Missouri Liquidating Trustee believes that general unsecured creditor recoveries under the Debtor's Plan are estimated to be 14 cents lower than the recovery under the LT Plan.** Although the Debtor and the Official Committee of Unsecured Creditors in this Chapter 11 Case (the "<u>Kansas UCC</u>") do

---

[1] Capitalized terms not otherwise defined have the meaning ascribed to them in the LT Plan or the Disclosure Statement, as applicable.

not agree that the Missouri Claims will be recognized, the Missouri Liquidating Trustee believes that will be the case.

- **Third, you will get your money sooner.** If the Missouri Claims are contested, the Missouri Liquidating Trustee will be forced to litigate those claims as well as pursue its previously filed objection to the Debtor's Plan. Thus, in the event that creditors do not vote to approve the LT Plan, litigation over the allowance of the Missouri Claims will substantially delay distributions to Kansas general unsecured creditors, perhaps for years given the appeal processes, while the determination of the Missouri Claims winds its way through the courts.

We would also note that, although the Debtor's Plan stated an estimated recovery of 95% to Kansas general unsecured creditors, the Missouri Liquidating Trustee believes that is materially overstated. Thus, even if the Debtor's Plan is successful in denying the Missouri Claims any recovery (which the Missouri Liquidating Trustee does not believe will be the case), the Missouri Liquidating Trustee believes that based on both updated cash amounts available for unsecured creditors and on scheduled and filed claims, Kansas general unsecured creditors would at best receive an estimated ~~62~~63% recovery, which would in practice be diluted further by litigation costs. Again, however, the Missouri Liquidating Trustee does not believe that the Missouri Claims can be ignored and that once allowed, Kansas general unsecured creditors will receive an estimated 19% (prior to reductions for litigation costs), not 95% or even ~~62~~63%.[2]

The LT Plan provides an estimated recovery of 33% to Kansas general unsecured creditors—which is more than Kanas general unsecured creditors would recover in a straight *pro rata* plan—because the Missouri Liquidating Trustee believes that the facts and the law supports equality of distributions among the creditors of the Debtor and its sister Missouri companies. Thus, based on the relevant facts and the law, and as a matter of compromise, the Missouri Liquidating Trustee is prepared to offer Kansas general unsecured creditors the estimated 33% recovery, as opposed to seeking to leave Kansas general unsecured creditors with the 19% recovery (prior to reductions for litigation costs) that they would be entitled to in a *pro rata* distribution. Once approved and effective, the LT Plan has the additional benefit of providing quicker distributions to creditors, as funds will not be required to be held in reserve pending the outcome of litigation over the allowance of the Missouri Claims.

Accordingly, the Missouri Liquidating Trustee urges creditors to vote for the LT Plan: it provides a higher and quicker distribution than available under the alternative of the Debtor's Plan. Creditors should return their ballots by voting for or against the LT Plan, but also select WHICH

---

[2] Even if only HALF of the Missouri Claims were allowed, under a *pro rata* distribution scenario, Kansas general unsecured creditors can expect no better than a 30% recovery (prior to reductions for litigation costs)—still less than the estimated recovery under the LT Plan.

2

of the Plans they prefer, even if they have already voted for the Debtor's Plan when that plan was solicited earlier.

This Solicitation Package contains the following items on the enclosed CD:

1. The Disclosure Statement with exhibits;

2. The LT Plan;

3. A copy of the order (the "Solicitation Procedures Order"), of the Bankruptcy Court regarding the Disclosure Statement and the LT Plan; and

4. A ballot for voting on the LT Plan including indicating whether a creditor prefers the LT Plan or the Debtor's Plan, and instructions for completing such ballot;

5. The Missouri Disclosure Statement; and

6. The Missouri Confirmation Order;

If you have any questions regarding the Plan or this Solicitation Package, please contact counsel for the Missouri Liquidating Trustee: Hogan Lovells US LLP, 875 Third Avenue, New York, New York 10022 (Attn.: M. Shane Johnson), (212) 918-3775 or shane.johnson@hoganlovells.com.

In addition, copies of the Plan and the Disclosure Statement may be obtained from the Bankruptcy Court's website, www.moebksb.uscourts.gov, for a fee. A PACER login and password are required to access documents on the Bankruptcy Court's website, and these can be obtained through the PACER Service Center at www.pacer.gov.

Sincerely,

**DRIVETRAIN, LLC**

Alan J. Carr
Tim Daileader
630 Third Avenue, 21st Floor
New York, NY, 10017
Telephone: (212) 856- 9700
acarr@drivetrainadvisors.com
tdaileader@drivetrainadvisors.com

3

**Exhibit ~~3~~4**
Solicitation Procedures Order

\\NY - 045867/000001 - 7840945 v6_11

In the United States Bankruptcy Court for the District of Kansas
In re:, Case No. 16-10446
Order and Notice to Creditors and Parties in Interest in a Chapter 11 Case
Page 1

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

IN RE:

**ABENGOA BIOENERGY BIOMASS**                    Case ~~No.~~Number: 16-10446
**OF KANSAS, LLC~~,~~**                                           Chapter 11

-----------------------------------------------------------------
                                    **Debtor(s)**
-----------------------------------------------------------------

## [PROPOSED] ORDER AND COMBINED NOTICE TO
## CREDITORS AND PARTIES IN INTEREST ~~APPROVING DISCLOSURE STATEMENT AND HEARING ON CONFIRMATION, OBJECTIONS, AND ACCEPTANCES OR REJECTIONS OF~~IN A CHAPTER 11 ~~PLAN~~CASE

To the ~~debtor(s)~~debtor, plan proponent, creditors, and other parties in interest:

~~A First Amended Plan under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Plan") and Disclosure Statement were filed under 11 U.S.C.~~Disclosure Statements and two competing Plans of Liquidation have now been filed in this case under §§ 1121 and 1125~~,~~ and Fed. R. Bankr. P. 3016 and 3017 ~~on July 19, 2017 (Doc. 968 and Doc. 969 respectively) in the United States Bankruptcy Court for the District of Kansas (the "Court") by~~ *The competing Plans of Liquidation are being separately balloted. Creditors and parties in interest must cast their vote on each ballot to have their vote counted on each competing Plan of Liquidation and to vote on their plan preference.*

Debtor filed its First Amended Disclosure Statement (Doc. 863-1) ("Debtor's Disclosure Statement") and its Plan of Liquidation dated April 14, 2017 (Doc. 811) ("Debtor's Plan"). Following a hearing on May 22, 2017, Debtor's Disclosure Statement was approved as containing adequate information and the Court set the evidentiary hearing on confirmation of Debtor's Plan for August 8-9, 2017, authorizing Debtor to ballot its Plan. July 7, 2017 was the last day for receipt of ballots. Balloting of Debtor's Plan has therefore been completed.

On July 7, 2017, plan proponent Drivetrain, LLC ~~as,~~ the ~~Liquidating Trustee (the "~~Missouri Liquidating Trustee~~") appointed in~~ *In re* for the chapter 11 cases of Abengoa Bioenergy US Holding, LLC ~~in the United States Bankruptcy Court for the Eastern District of Missouri, Eastern Division~~, *et al.,* Case No. 16-41161-659~~.~~ (Bankr. E.D. Mo.) filed a competing Plan of Liquidation (Doc. 932) and on July 19, 2017 filed its First Amended Plan of Liquidation (Doc. 968) (the "Missouri Liquidating Trustee's Plan", and collectively with the Debtor's Plan, the "Competing Plans") and its Disclosure Statement (Doc. 969). On July 27, 2017, the Missouri Liquidating Trustee filed its First Amended Disclosure Statement (Doc. •) (the "Missouri Liquidating Trustee's Disclosure Statement"). The scheduling set forth below pertains to the Missouri Liquidating Trustee's Plan and Disclosure Statement. The Missouri Liquidating Trustee's Plan will be separately balloted as set forth herein, ***but the ballot form shall also include a provision for creditors and parties in interest to vote their preference***

In the United States Bankruptcy Court for the District of Kansas
In re:, Case No. 16-10446
Order and Notice to Creditors and Parties in Interest in a Chapter 11 Case
Page 2

*for the Debtor's Plan or the Missouri Liquidating Trustee's Plan*.

IT IS ORDERED and NOTICE IS HEREBY GIVEN, that

1. The Court ~~hereby preliminarily~~has reviewed the Missouri Liquidating Trustee's Disclosure Statement and approves the Disclosure Statement ~~(Doc. 969)~~ as containing adequate information. ~~The Court also approves the Missouri Liquidating Trustee's proposed Ballot Form submitted as an Exhibit to the Disclosure Statement.~~

2. An evidentiary hearing ~~to consider~~on the confirmation of the ~~Chapter 11 Plan and a final hearing to approve the adequacy of the Disclosure Statement~~two Competing Plans will be held ~~by the Court~~at the United States Courthouse, 401 North Market, ~~Room~~Courtroom 150, Wichita, Kansas on ~~August 24~~[•]**, 2017**~~, commencing at 9:00 a.m. The hearing on the confirmation of the *Debtor's Plan of Liquidation pursuant to Chapter 11 of the Bankruptcy Code* (Doc. 811) is hereby adjourned from August 8-9, 2017 to **August 24, 2017, commencing at 9:00 a.m.**~~.

3. Objections to the ~~Chapter 11 Plan and the Disclosure Statement~~Missouri Liquidating Trustee's Plan shall be filed with the Clerk of the Bankruptcy Court ~~and served on counsel to the debtor: Armstrong Teasdale LLP, 2345 Grand Blvd., Suite 1500, Kansas City, Missouri 64108 (Attn.: Christine L. Schlomann), counsel to the proponent of the plan: Hogan Lovells US LLP, 875 Third Avenue, New York, New York 10022 (Attn.: M. Shane Johnson), and the United States Trustee~~ on or before **~~August 18~~[•], 2017 at 5:00 p.m. CDT** and served on the Missouri Liquidating Trustee, Debtor, the Official Committee of Unsecured Creditors, and the United States Trustee pursuant to Fed. R. Bankr. P. 3020(b)(1).

4. **~~August 18~~[•], 2017 at 5:00 p.m. CDT** is fixed as the last day for receipt ~~and~~of acceptances or rejections of the ~~Chapter 11 Plan~~Missouri Liquidating Trustee's Plan and for voting a plan preference. All ballots must be received by **~~5:00 p.m. on that date to be counted.~~**the Attorney for the Missouri Liquidating Trustee:

   HOGAN LOVELLS US LLP
   Christoper R. Donoho, III
   Ronald J. Silverman
   M. Shane Johnson
   Raphaella S. Ricciardi
   875 Third Avenue
   New York, New York 10022
   Telephone: (212) 918-3000
   shane.johnson@hoganlovells.com

In the United States Bankruptcy Court for the District of Kansas
In re:, Case No. 16-10446
Order and Notice to Creditors and Parties in Interest in a Chapter 11 Case
Page 3

Counsel for the Missouri Liquidating Trustee shall file with the Court a Certificate of Voting no later than **4:00 p.m. CDT on [•], 2017.**

5. On or before ~~July 24~~August [•], **2017,** ~~the plan proponent~~counsel for the Missouri Liquidating Trustee shall distribute ~~the~~its Disclosure Statement ~~and First Amended Plan in accordance with Fed. R. Bankr. P. 3017(a) and (d), together with an appropriate ballot form conforming to the ballot form attached to the Disclosure Statement as an Exhibit for the acceptance or rejection of the Chapter 11~~, its Plan, the ballot approved by the Court (conforming to Official Form 314 and including a provision for voting on a plan ~~and~~preference), a cover letter from the Missouri Liquidating Trustee explaining its ~~Chapter 11~~ Plan, ~~and mail~~a cover letter from the Official Committee of Unsecured Creditors of the Debtor, and all solicitation materials approved by the Court, together with this Order and Combined Notice by mail pursuant to Fed. R. Bankr. P. 2002(b). Because of the size of the ~~Chapter 11~~Missouri Liquidating Trustee's Plan and Disclosure Statement the Missouri Liquidating Trustee is authorized as an option to send ~~the Chapter 11~~its Plan and Disclosure Statement to creditors by thumb drive or CD.

~~6.~~ Upon distribution and mailing~~, the proponent~~ counsel shall file a Certificate of Mailing ~~by July 27, 2017,~~ listing the names and addresses of those parties to whom distribution ~~was made. The Court hereby shortens the requisite 28 days' notice under Rule 2002(b).~~and mailing was made.

6. ~~7.~~Requests for copies of the ~~Disclosure Statement and First Amended Plan shall be mailed to the~~ Missouri Liquidating Trustee's ~~local counsel of record~~Disclosure Statement and Plan shall be sent to:

~~Mark V. Bossi~~
~~Thompson Coburn~~HOGAN LOVELLS US LLP
~~One US Bank Plaza~~

Christoper R. Donoho, III
Ronald J. Silverman
~~St~~M. ~~Louis, Missouri 63101~~Shane Johnson
Raphaella S. Ricciardi
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
shane.johnson@hoganlovells.com

7. The evidentiary hearing on confirmation of Debtor's Plan is continued to [•], **2017 at 9:00 a.m CDT** to be heard with confirmation of the Missouri Liquidating Trustee's Plan. **Debtor's counsel shall file with the Court a Certificate of Voting regarding Debtor's Plan no later than 4:00 p.m. CDT on [•], 2017.**

In the United States Bankruptcy Court for the District of Kansas
In re:, Case No. 16-10446
Order and Notice to Creditors and Parties in Interest in a Chapter 11 Case
Page 4

Dated: July 19, 2017

_____
Hon. Robert E. Nugent
United States Bankruptcy Judge

Dated: August [•], 2017

s/
Hon. Robert E. Nugent
United States Bankruptcy Judge

\\NY - 045867/000001 - 7841493 v36

**<u>Exhibit 45</u>**
Form of Ballot for Class 2 General Unsecured Claims

\\NY - 045867/000001 - 7840945 v611

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In re: | Chapter 11 |
| ABENGOA BIOENERGY BIOMASS OF KANSAS, LLC, | Case No. 16-10446 |
| Debtor. | |

**CLASS 2 BALLOT (GENERAL UNSECURED CLAIMS)**
**TO ACCEPT OR REJECT THE MISSOURI LIQUIDATING TRUSTEE'S FIRST**
**AMENDED PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

> **THE VOTING DEADLINE TO ACCEPT OR REJECT THE LT PLAN IS ~~AUGUST 18~~[•], 2017 AT 5:00 P.M. (PREVAILING CENTRAL TIME).**
>
> **YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THIS DEADLINE IN ORDER TO BE COUNTED.**

This ballot (the "**Ballot**") is submitted to you to solicit your vote to accept or reject the *Missouri Liquidating Trustee's First Amended Plan of Liquidation pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, and/or supplemented, the "**LT Plan**")[1] [Docket No. •], submitted by the Missouri Liquidating Trustee and described in the related disclosure statement (as may be amended, modified, and/or supplemented, the "**Disclosure Statement**") [Docket No. •]. Copies of the LT Plan and the Disclosure Statement may be obtained: (i) by contacting counsel to the Missouri Liquidating Trustee, Hogan Lovells US LLP, c/o M. Shane Johnson, 875 Third Avenue, New York, New York 10022, (212) 918-3775 (email: shane.johnson@hoganlovells.com) or (ii) from the Bankruptcy Court's website, www.ksb.uscourts.gov, for a fee. A PACER login and password are required to access documents on the Bankruptcy Court's website, and these can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov. You should review the Disclosure Statement and the LT Plan before you vote. You may wish to seek legal advice concerning the LT Plan and the classification and treatment of your Claim under the LT Plan.

The LT Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the Holders of at least two-thirds in amount <u>and</u> more than one-half in number of the Allowed Claims in each Class of Claims that actually vote on the LT Plan and by the Holders of at least two-thirds in amount of Allowed Equity Interests in each Class of Equity Interests that actually vote on the LT Plan[2] and if the LT Plan otherwise satisfies the applicable requirements of section 1129(a) under title 11 of the United States Code, 11 U.S.C. §§ 101 et <u>seq.</u> (the "**Bankruptcy Code**"). If the requisite acceptances are not obtained, the Bankruptcy Court nonetheless may confirm the LT Plan if it finds that the LT Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes rejecting the LT Plan, and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

To have your vote counted, you must complete, sign, and return this Ballot to the following address by first class mail, overnight courier, hand delivery or electronic mail: Thompson Coburn LLP c/o Mark V. Bossi, One US Bank Plaza, St. Louis, Missouri 63101 (email: mbossi@thompsoncoburn.com), so that it is received by the deadline indicated above.

---

[1] Capitalized terms used in this Ballot or the attached instructions that are not otherwise defined have the meanings given to them in the LT Plan.
[2] If no Holders of Claims in a particular Class vote to accept or reject the LT Plan, the LT Plan shall be deemed accepted by the Holders of such Claims in such Class.

## <u>NOTICE REGARDING CERTAIN RELEASE, EXCULPATION AND INJUNCTION PROVISIONS IN THE LT PLAN</u>

PLEASE BE ADVISED THAT THE LT PLAN CONTAINS CERTAIN RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, INCLUDING:

Article IX.B.2 of the LT Plan contains the following releases by Holders of Claims:

**Except as otherwise provided herein (including, without limitation, the rights accorded the Missouri Intercompany Claims under this Plan), each Person, other than the Debtor, who votes to accept the Plan and does not mark such ballot to indicate a refusal to grant the release provided for in this paragraph, shall be deemed to fully, completely, unconditionally, irrevocably, and forever release the Released Parties of and from any and all Claims and Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor and its Representatives, whether direct, derivative, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, Disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise.**

**OTHER RELEASE, EXCULPATION AND INJUNCTION PROVISIONS ARE FOUND IN ARTICLE IX OF THE LT PLAN. YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE LT PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**PLEASE READ THE ATTACHED VOTING INFORMATION AND INSTRUCTIONS BEFORE COMPLETING THIS BALLOT.**

**PLEASE COMPLETE ITEMS 1, 2, 3, AND 4. IF THIS BALLOT IS NOT SIGNED ON THE APPROPRIATE LINES, THIS BALLOT WILL NOT BE VALID OR COUNTED AS HAVING BEEN CAST.**

**Item 1. Class Vote.** The undersigned, a Holder of a Class 2 Claim against the above-captioned Debtor, in the voting amount set forth below, votes to (check <u>one </u>box only). You may vote to accept or reject the LT Plan even if you previously voted to accept or reject the Debtor's Plan (as defined below).

☐     **Accept** the LT Plan.          ☐     **Reject** the LT Plan.

Voting Amount: $ _____

**Item 2. Optional Release Election.** Check this box if you elect <u>not </u>to grant the releases contained in Article IX.B.2 of the LT Plan. Election to withhold consent is at your option. If you do not check the box below opting out of the release provisions in Article IX.B.2 of the LT Plan, you will be deemed to consent to the releases set forth in Article IX.B.2 of the LT Plan with respect to the Released Parties.

☐     The undersigned elects <u>not </u>to grant the releases contained in Article IX.B.2 of the LT Plan.

**Item 3. Preference for LT Plan or Debtor's Plan.** On April 14, 2017, the Debtor filed its *Plan of Liquidation pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 811] (the "**Debtor's Plan**"), which the Debtor has separately sent to creditors to vote on along with the *First Amended Disclosure Statement for Debtor's Plan of Liquidation dated as of April 14, 2017 pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 863]. Please indicate below which plan you prefer (check <u>one </u>box only):

☐     **I prefer the LT Plan.**        ☐     **I prefer the Debtor's Plan.**

**Item 4. Acknowledgments.** By signing and returning this Ballot, the undersigned acknowledges receipt of the Disclosure Statement (including the exhibits thereto) and the other applicable solicitation materials and certifies that as of the Voting Record Date the undersigned is the Holder of the Claim set forth in Item 1 above and has the power and authority to vote to accept or reject the LT Plan. To the extent the undersigned is voting on behalf of an actual Holder of the Claim set forth in Item 1 above, the undersigned certifies that it has the requisite authority to do so and will submit evidence of the same upon request. The undersigned also acknowledges that the solicitation and tabulation of votes on the LT Plan is subject to the terms and conditions of the Disclosure Statement. The undersigned understands that an otherwise properly completed, executed and timely returned Ballot that does not indicate either acceptance or rejection of the LT Plan or indicates both acceptance and rejection of the LT Plan will not be counted.

_____
Name of Creditor

_____
Signature

_____
If by Authorized Agent, Name and Title

_____
Name of Institution

_____
Street Address

_____
City, State, Zip Code

_____
Taxpayer Identification Number

_____
Telephone Number

_____
Email Address

_____
Date Completed

**Exhibit 56**

Summary of Missouri Plan Creditor Treatment~~Missouri Disclosure Statement~~

| | |
|---|---|
| In re:<br><br>ABENGOA BIOENERGY BIOMASS OF KANSAS, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 16-10446 |

## SUMMARY OF MISSOURI PLAN CREDITOR TREATMENT

On February 24, 2016, ABUS,[1] ABO, ABT, ABEC, ABNE, and ABC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Missouri Bankruptcy Court, jointly administered under Case No. 16-41161-659. ABMR, ABF, ABM, AB Ops, ABI, and ABIL filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Missouri Bankruptcy Court on June 12, 2016.

On August 22, 2016, the Missouri Debtors sold five ethanol plants at an auction for the following amounts:

- Ethanol Plants located in Madison, Illinois and Mount Vernon, Indiana (the "Maple Plants") to Green Plains Inc. for $200 million, plus certain working capital items;
- Ethanol Plant located in Ravenna, Nebraska (the "Ravenna Plant") to KE Holdings, LLC for $115 million, plus certain working capital items;
- Ethanol Plant located in York, Nebraska (the "York Plant") to Green Plains Inc. for $37.375 million, plus certain working capital items; and
- Ethanol Plant located in Colwich, Kansas (the "Colwich Plant") to ICM, Inc. for $3.15 million.

The sale of the Maple Plants and the York Plant closed on September 23, 2016, the sale of the Ravenna Plant closed on September 30, 2016, and the sale of the Colwich Plant closed on October 12, 2016. Proceeds of these sales were used to repay secured debt and certain

---

[1] Capitalized terms not otherwise defined have the meaning ascribed to them in the Plan or the Disclosure Statement, as applicable.

administrative expenses, with the balance available for distribution under the Missouri Plan, and as set forth on Exhibit 2 to the Disclosure Statement (Recovery Analysis).

On March 2, 2017, the Missouri Debtors and the Missouri Committee filed the Missouri Disclosure Statement, which the Missouri Bankruptcy Court approved on that same day [MO Docket No. 1072]. The Missouri Plan proposed the separate substantive consolidation of (i) ABUS, ABO, ABT, ABEC, ABNE, ABC, ABMR, ABF, ABM, and AB Ops (collectively, the "Missouri Bioenergy Debtors") and (ii) ABI and ABIL.

On June 8, 2017, the Missouri Bankruptcy Court entered the Missouri Confirmation Order, which, among other things, approved the Missouri Plan's separate substantive consolidation of the Missouri Bioenergy Debtors and ABI and ABIL. In paragraph II of the Confirmation Order, the Missouri Bankruptcy Court found that "the proposed consolidation structure is necessary and appropriate based on applicable case law because of the interrelationship among the [Missouri] Debtors, the significant benefits that the [Missouri] Plan provides to creditors in comparison to any potential harm that would result from confirmation of the [Missouri] Plan, and because creditors would be harmed if the [Missouri] Plan were not confirmed."

Below is a summary of the treatment of the Missouri Bioenergy Debtors' creditors under the Missouri Plan, with the treatment of general unsecured creditors bolded.

## Treatment of Missouri Bioenergy Debtors' Creditors

| Class | Type of Claim or Equity Interest | Treatment | Estimated Total Claims[2] | Estimated Percentage Recovery | Voting Status |
|---|---|---|---|---|---|
| -- | DIP Claims | To the extent not already satisfied prior to the date hereof, the DIP Claims shall be deemed Allowed Claims under the Plan. The DIP Claims shall be satisfied in full, on the Effective Date, by the termination of all commitments under the DIP Credit Agreements, as applicable, and indefeasible payment in full in Cash of all outstanding obligations thereunder. Until so satisfied in full, the DIP Lenders shall retain all rights, Claims, and Liens available pursuant to the applicable DIP Credit Agreement and applicable DIP Order. | $0 | 100% | Nonvoting |
| -- | Allowed Administrative Claims (other than claims for Accrued Professional Compensation) | Paid in full, in Cash, from the assets of the Debtors' Estates: (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (3) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the GUC Liquidating Trustee, as applicable; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided, however*, that Administrative Claims do not include Administrative Claims filed after the Initial Administrative Claims Bar Date or the Final Administrative Claims Bar Date or Administrative Claims filed or asserted pursuant to section 503(b)(9) of the Bankruptcy Code after the General Bar Date, unless the Debtors or the GUC Liquidating Trustee, as applicable and in their respective discretion, choose to treat those Claims as Administrative Claims. | Undetermined | 100% | Nonvoting |
| -- | Allowed Claims for Accrued Professional Compensation | Paid in full, in Cash, without interest. | Undetermined | 100% | Nonvoting |
| -- | Allowed Priority Tax Claims | Paid in full, in Cash, from the assets of the Debtors' Estates, each Holder of an Allowed Priority Tax Claim, in satisfaction of any Allowed Priority Tax Claim, the full unpaid amount of Allowed Priority Tax Claims, on the later of (i) the Effective Date, (ii) the date an Allowed Priority Tax Claim becomes Allowed or as soon as practicable thereafter, and (iii) the date an Allowed Priority Tax Claim is payable under applicable non-bankruptcy law. | Undetermined | 100% | Nonvoting |

---

[2] The "Estimated Total Claims" reflect the face amount asserted with respect to such Claims. The "Estimated Percentage Recovery" reflects the estimated percentage distribution on account of the Debtors' estimated amount of allowable Claims; *provided, however*, that nothing contained herein shall be construed as an admission as to the validity, amount, or priority of any such Claim.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Total Claims[2] | Estimated Percentage Recovery | Voting Status |
|---|---|---|---|---|---|
| -- | Allowed Other Priority Claims | Paid in full, in Cash, from the assets of the Debtors' Estates, each Holder of an Allowed Other Priority Claim, in satisfaction of an Allowed Other Priority Claim, the full unpaid amount of an Allowed Other Priority Claim, on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date an Allowed Other Priority Claim becomes Allowed or as soon as practicable thereafter, and (iii) the date an Allowed Other Priority Claim is payable under applicable non-bankruptcy law. | Undetermined | 100% | Nonvoting |
| 1 | Other Secured Claims | On or as soon as practicable after the Effective Date, to the extent any Other Secured Claims exist, they will either be paid in full or they will receive the Debtors' assets in which the Holder of an Other Secured Claim has an interest. | $643,000 | 100% | Deemed to Accept |
| 2 | **General Unsecured Claims** | **On or as soon as practicable after the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Bioenergy General Unsecured Claims Fund [consisting of the Cash and other Assets of the Bioenergy Debtors except for the $32.5 million for the MRA Guarantee Claims], except to the extent that a Holder of an Allowed General Unsecured Claim has been paid prior to the Effective Date or agrees to a less favorable classification and treatment.** | **$385,000,000** | **30.7%[3]** | **Entitled to Vote** |
| 3 | MRA Guarantee Claims | On or as soon as practicable after the Effective Date, and subject to the rights, if any, of the Note Agents to assert their Charging Liens under each indenture governing the Notes, each Holder of an Allowed MRA Guarantee Claim shall receive (i) the payment of the fees, costs, and expenses of Société Générale S.A. and the Note Agents under the Notes associated with the Chapter 11 Cases but only to the extent that such fees are not otherwise paid by the Parent; provided, however, that if the GUC Liquidating Trustee makes such payment, and the Master Restructuring Agreement provides for such payment as Administration Costs (as defined in the Master Restructuring Agreement), the Note Agents and Société Générale S.A. shall assign to the GUC Liquidating Trust all rights and remedies, if any, under the Master Restructuring Agreement solely with respect thereto (and such rights and remedies shall not be amended or otherwise changed without the consent of the Creditors' Committee or the GUC Liquidating Trustee), (ii) its Pro Rata share of the MRA Guarantee Claims Fund, and (iii) releases of the Parent and any other Go Forward Companies as provided in Article IX.B. Notwithstanding anything to the contrary, the MRA Guarantee Claims shall constitute Allowed Claims for all purposes, including, without limitation, voting, confirmation, and | $6,519,619,000[4] | 0.5% | Entitled to Vote |

[3] The Bioenergy General Unsecured Claims Fund includes the rights to Claims against European Affiliates under the treatment afforded under the Spanish Master Restructuring Agreement. These Claims come in the form of a note receivable with a face value of approximately $19.5 million. Recoveries against this note are estimated to have a present value of $10 million to take into account uncertainty of collection and the time value of money. Recoveries under the note may be as low as $0. Accordingly, the range of recoveries based upon the potential value of the note is between 28.1% and 30.7%. The settlement with Cofides approved pursuant to the Missouri Confirmation Order reduced the 30.7% estimated distribution slightly.

[4] This amount is based on the Debtors' Books and Records and subject to further adjustment.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Total Claims[2] | Estimated Percentage Recovery | Voting Status |
|---|---|---|---|---|---|
| | | Distribution. For the avoidance of doubt, and notwithstanding anything to the contrary, the MRA Guarantee Claims Fund and any other Assets that constitute part of the treatment for, and will be distributed to satisfy, the MRA Guarantee Claims under the Plan shall be for the sole benefit of Holders of MRA Guarantee Claims and shall not be used for any other purpose. | | | |
| 4A | Intercompany Claims by Non-Debtor Affiliates | Holders of Intercompany Claims by Non-Debtor Affiliates, except for any intercompany claim held by Abengoa Bioenergy Biomass of Kansas, LLC, will receive no distribution under the Plan. | Undetermined | 0% | Deemed to Reject |
| 4B | Intercompany Claims by Debtor Affiliates | Holders of Intercompany Claims by Debtor Affiliates will receive no distribution under the Plan. | Undetermined | 0% | Deemed to Reject |
| 5 | Equity Interests | Upon the Effective Date, all Equity Interests shall be deemed cancelled. | N/A | 0% | Deemed to Reject |

**Exhibit 6**
Missouri Confirmation Order and Plans of Liquidation

70

**Exhibit 7**
Liquidation Analysis

\\NY - 045867/000001 - 7840945 v611

| Liquidation Analysis | |
|---|---|
| **In $ 000s** | **Missouri Liquidating Trustee's Chapter 7 Liquidation Analysis** |
| | *As of September 30, 2017* |
| Cash on Hand | $25,709 [A] |
| Other Asset Recoveries | - [B] |
| Total Estimated Proceeds | 25,709 |
| Corporate and Professional Wind Down Costs | (2,303) [C] |
| Accrued & Unpaid Professional Fees | (561) [D] |
| Chapter 7 Trustee Fees | (771) [E] |
| Total Estimated Wind Down Expenses | (3,635) |
| US Department of Energy ("DOE") Settlement | (3,400) [F] |
| **Estimated Proceeds Available for Distribution** | **18,674** |
| Estimated Administrative Claims | 100 [G] |
| % Recovery to Administrative Claims | 100.0% |
| **Estimated Proceeds Available for Priority and General Unsecured Claims** | **18,574** |
| Estimated Priority Claims | 335 [G] |
| % Recovery to Priority Claims | 100.0% |
| **Estimated Proceeds Available for General Unsecured Claims ("GUCs")** | **$18,239** |
| Estimated GUCs *(see detail below)* | $99,721 |
| % Recovery to GUCs | 18.3% |

*Estimated GUCs Detail:*

| | |
|---|---|
| *Missouri Intercompany Claims Against* | |
| *Abengoa Bioenergy Biomass of Kansas LLC ("ABBK"):* | *69,505* [H] |
| *Other General Unsecured Creditors:* | *30,216* [I] |

## General Notes

1. This analysis has used values provided by the Debtor, information derived from the Debtor's liquidation analysis, as well as public sources and, consequently, does not express an opinion or any other form of assurance with respect to those values.

2. This analysis is an estimate of the proceeds that may be generated as a result of a hypothetical Chapter 7 liquidation of the assets of the Debtor. Underlying the liquidation analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive, and operational uncertainties, and contingencies beyond the control of the Debtor or a Chapter 7 trustee. Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation values of the assets will result in an accurate estimate of the proceeds that would be realized were the Debtor to undergo an actual liquidation. No value was assigned to additional proceeds that might result from the sale of certain items with intangible value. therefore, the actual liquidation value of the Debtor's assets could vary materially from the estimates provided herein.

3. This analysis considers the effect that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, including the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a Chapter 7 trustee. There will likely be additional expenses which have not been quantified for the purposes of this analysis (e.g. advisors to the trustee, litigation costs, and additional case duration). THE MISSOURI LIQUIDATING TRUSTEE HAS DETERMINED THAT CONFIRMATION OF THE PROPOSED CHAPTER 11 PLAN WILL PROVIDE MORE VALUE TO THE DEBTOR'S ESTATES THAN WOULD BE PROVIDED PURSUANT TO A LIQUIDATION OF THE DEBTOR UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

4. The Missouri Liquidating Trustee reserves all rights to supplement, modify, or amend the analysis set forth herein.

## Specific Notes

(A) Cash available as of June 30, 2017. See Dkt. 945.

(B) The Debtor estimates no additional value from the disposal of other assets.

(C) Reflects the Debtor's 3-month estimated corporate and professional wind-down costs.

(D) Accrued and unpaid professional fees consist of professional fees for: DLA: $42K for March, $57.7K for April, $92.4K for May, and an illustrative estimate of $92.4K for June (see Dkt. 938, 939, 941); Armstrong Teasdale: $23.5K for February, $15.5K for March, and an illustrative estimate of $20K for April, May, and June (see Dkt. 954, 956); Baker & Hostetler: $52.5K for May, $124.7K for June (see Dkt. 946, 962).

(E) Chapter 7 trustee fees are assumed to be 3% of total asset value.

(F) It is understood that an agreement in principle has been reached with the DOE for proof of claim #81-1. This agreement will be documented in the near future. It is understood that the DOE will receive $3.4M of cash and will not receive a general unsecured claim.

(G) Estimated amount from the Debtor's Disclosure Statement (Dkt. 863).

(H) Includes all filed Missouri Intercompany claims.

(I) Includes $30.651M of filed (or scheduled, if not filed) 3rd party claims, less the Debtor's estimate for Administrative ($100K) and Priority ($335K) Claims.