**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

In re:

ABENGOA BIOENERGY BIOMASS OF
KANSAS, LLC,

                             Debtor.

Case No. 16-10446

Chapter 11

**DEBTOR'S MEMORANDUM OF LAW IN (I) SUPPORT OF APPROVAL OF PLAN OF
LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE AND
<u>(II) RESPONSE TO OBJECTION OF MISSOURI LIQUIDATING TRUSTEE</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

RELEVANT BACKGROUND ................................................................................... 5

Background Related to the Plan and Disclosure Statement ........................................ 5

Background Related to the Intercompany Claims ..................................................... 6

THE PLAN COMPLIES WITH THE APPLICABLE PROVISIONS OF THE
BANKRUPTCY CODE AND SHOULD BE CONFIRMED ...................................... 8

    A.    Section 1129(a)(1). ......................................................................... 8

        i.    The Plan Complies with Section 1122 of the Bankruptcy Code. .............. 8

        ii.    The Plan Complies with Section 1123(a) of the Bankruptcy Code. ........ 15

            a.    Section 1123(a)(1):  Designation of Classes of Claims and Equity Interests. ................................................................... 15

            b.    Section 1123(a)(2):  Classes That Are Not Impaired by the Plan. ............................................................................ 16

            c.    Section 1123(a)(3):  Treatment of Classes that Are Impaired by the Plan. ...................................................... 16

            d.    Section 1123(a)(4):  Equal Treatment Within Each Class. .......... 16

            e.    Section 1123(a)(5):  Adequate Means for Implementation. ........ 17

            f.    Section 1123(a)(6):  Prohibitions on the Issuance of Non-Voting Securities. ................................................................ 17

            g.    Section 1123(a)(7):  Provisions Regarding Directors and Officers. ............................................................................ 17

        iii.    The Plan Complies with Section 1123(b) of the Bankruptcy Code. ........ 18

        iv.    The Plan Complies with Section 1123(d) of the Bankruptcy Code. ........ 24

    B.    Section 1129(a)(2). ....................................................................... 24

    C.    Section 1129(a)(3). ....................................................................... 25

    D.    Section 1129(a)(4). ....................................................................... 26

    E.    Section 1129(a)(5). ....................................................................... 27

    F.    Section 1129(a)(6). ....................................................................... 27

    G.    Section 1129(a)(7). ....................................................................... 28

    H.    Section 1129(a)(8). ....................................................................... 29

    I.    Section 1129(a)(9). ....................................................................... 30

    J.    Section 1129(a)(10). ..................................................................... 31

**K.**    Section 1129(a)(11). ............................................................................... 31

**L.**    Section 1129(a)(12). ............................................................................... 32

**M.**    Sections 1129(a)(13), 1129(a)(14), 1129(a)(15) and 1129(a)(16) .................... 32

**N.**    Section 1129(b). ..................................................................................... 33

**O.**    Section 1129(c). ..................................................................................... 35

**P.**    Section 1129(d). ..................................................................................... 35

**Q.**    Section 1129(e). ..................................................................................... 35

EAST\147246528.7

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ebel v. King (In re Ebel)*,
175 Fed. Appx. 230 (10th Cir. 2006) ..................................................................................22

*In re 11,111, Inc.*,
117 B.R. 471 (Bankr. D. Minn. 1990) ...............................................................................14

*In re Barrett Sutherland Acquisition, LLC*,
Case No. 06-21882-rdb, Docket No. 50
(Bankr. D. Kan. June 26, 2007) (Berger, J.) ......................................................................13

*In re Carelinc Nat. Corp.*,
No. 95-16574DAS, 1995 WL 750160 (Bankr. E.D. Pa. Dec. 15, 1995) ..............................13

*In re City of Colo. Springs Creek Gen. Improvement Dist.*,
187 B.R. 683 (Bankr. D. Colo. 1995) .................................................................................9

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) ..................................................................................22

*In re Deming Hospitality, LLC*, No. 11-12-13377 TA, 2013 WL 1397458
(Bankr. D.N.M. Apr. 5, 2013) ...........................................................................................9

*In re Drexel Burnham Lambert Group, Inc.*,
960 F.2d 285 (2d Cir. 1992) ..............................................................................................21

*In re Enron Corp.*,
326 B.R. 497 (S.D.N.Y. 2005) ...........................................................................................21

*In re Experient Corp.*,
535 B.R. 386 (Bankr. D. Colo. 2015) ...........................................................................27, 31

*In re Fox*,
No. 98-20105-11, 2000 Bankr. LEXIS 1713 (Bankr. D. Kan. Aug. 4, 2000) .......................28

*In re Global Water Tech., Inc.*,
311 B.R. 896 (Bankr.D.Colo.2004) ...................................................................................25

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007) ...............................................................................13

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part*, *rev'd in part on other*

*grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636 (2d Cir. 1988)............................................8

*In re Kaiser Steel Corp.*,
105 B.R. 971 (D. Colo. 1989)....................................................................................22

*In re L&T Machining, Inc.*,
Case No. 11-11045-11, Docket Nos. 161, 180
(Bankr. D. Kan. Dec. 28, 2011) (Nugent, J.) ...........................................................13

*In re Lakeside Global II, Ltd.*,
116 B.R. 499 (Bankr. S.D. Tex. 1989) ......................................................................31

*In re LeBlanc*,
622 F.2d 872 (5th Cir. 1980) ....................................................................................13

*In re Lightsquared Inc.*,
513 B.R. 56 (Bankr. S.D.N.Y. 2014)......................................................................9, 10

*In re Midway Gold US, Inc., et al.*,
Case No. 15-16835-MER, 2017 Bankr. LEXIS 3439
(Bankr. D. Colo. Oct. 6, 2017).......................................................................19, 20, 22

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ...........................................................................8

*In re P&J Enterprises, Inc.*,
Case No. 07-22034-11-RDB, Docket Nos. 88, 102
(Bankr. D. Kan. Aug. 12, 2008) (Berger, J.)............................................................13

*In re Paige*,
685 F.3d 1160 (10th Cir. 2012) ......................................................................8, 25, 26

*In re Paige*,
439 B.R. 786, 797-98 (D. Utah 2010) ................................................................. 28-29

*In re Paige*, No. 05-34474, 2007 Bankr. LEXIS 4759,
(Bankr. D. Utah Nov. 13, 2007) ...............................................................................34

*In re Pattni Holdings*,
151 B.R. 628, 631 (Bankr. N.D. Ga. 1992) ......................................................... 13-14

*In re Premier Int'l Holdings Inc.*,
No. 09-12019 (CSS), 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) ...........................21

*In re PWS Holding Co.*,
228 F.3d 224 (3d Cir. 2000)......................................................................................20

iv

*In re Resorts Int'l Inc.*,
    145 B.R. 412 (Bankr. D.N.J. 1990) ...................................................................24

*In re Riviera Drilling & Expl. Co.*,
    No. BR 10-11902, 2012 WL 6719591 (Bankr. D. Colo. Dec. 19, 2012), *aff'd*,
    502 B.R. 863 (10th Cir. BAP 2013) ...........................................................10, 25

*In re Rocky Mountain Land Co. LLC*,
    Case No. 12-21643 HRT, 2014 WL 1338292 (Bankr. D. Colo. April 3, 2014).....................24

*In re Stratford Assocs. Ltd. P'Ship*,
    145 B.R. 689 (Bankr. D. Kan. 1992) ..................................................................9

*In re U.S. Fidelis, Inc.*,
    481 B.R. 503 (Bankr. E.D. Mo. 2012) ...........................................................20, 21

*In re Valley View Shopping Ctr., L.P.*,
    260 B.R. 10 (Bankr. D. Kan. 2001) ....................................................24, 26, 27, 31

*In re W.R. Grace & Co.*,
    446 B.R. 96 (Bankr. D. Del. 2011) ..................................................................20

*In re Wittur Inc.*,
    Case No. 04-B-10334, Docket No. 214
    (Bankr. D. Kan. Sept. 22, 2004) (Nugent, J.) ...................................................13

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993)............................................................................9

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988).........................................................................31

*Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.)*
    779 F.2d 1456 (10th Cir. 1985) .................................................................24, 25

## STATUTES

11 U.S.C. § 101(2) ...........................................................................................2

11 U.S.C. § 101(27) .........................................................................................6

11 U.S.C. § 101(31)(E) .....................................................................................2

11 U.S.C. § 105(a) .........................................................................................21

11 U.S.C. § 365(b)(1) ......................................................................................23

11 U.S.C. § 502(d) ......................................................................................28, 29

v

11 U.S.C. § 507 .......................................................................................................... 32

11 U.S.C. § 507(a)(2) ................................................................................................ 32

11 U.S.C. § 510(c) ..................................................................................................... 28

11 U.S.C. § 542(b) ..................................................................................................... 28

11 U.S.C. § 1114 ........................................................................................................ 32

11 U.S.C. § 1122 .................................................................................................. passim

11 U.S.C. § 1122(a) ............................................................................................ passim

11 U.S.C. § 1123 .......................................................................................................... 8

11 U.S.C. § 1123(a) ................................................................................................... 15

11 U.S.C. § 1123(a)(1) ............................................................................................... 15

11 U.S.C. § 1123(a)(2) ............................................................................................... 15

11 U.S.C. § 1123(a)(3) .......................................................................................... 15, 16

11 U.S.C. § 1123(a)(4) ............................................................................................... 16

11 U.S.C. § 1123(a)(5) ............................................................................................... 16

11 U.S.C. § 1123(a)(6) ............................................................................................... 17

11 U.S.C. § 1123(a)(7) ............................................................................................... 17

11 U.S.C. § 1123(b) ........................................................................................... 17, 18, 22

11 U.S.C. § 1123(b)(1) ............................................................................................... 17

11 U.S.C. § 1123(b)(3) ............................................................................................... 17

11 U.S.C. § 1123(b)(3)(A) .......................................................................................... 22

11 U.S.C. § 1123(b)(6) ............................................................................................... 17

11 U.S.C. § 1123(d) .............................................................................................. 22, 23

11 U.S.C. § 1124 ........................................................................................................ 16

11 U.S.C. § 1125 ........................................................................................................ 24

EAST\147246528.7

11 U.S.C. § 1126(f)...........................................................................................................29

11 U.S.C. § 1129........................................................................................................1, 8

11 U.S.C. § 1129(a).........................................................................................................33

11 U.S.C. § 1129(a)(1).......................................................................................................8

11 U.S.C. § 1129(a)(2)................................................................................................23, 24

11 U.S.C. § 1129(a)(3)................................................................................................24, 25

11 U.S.C. § 1129(a)(4)................................................................................................25, 26

11 U.S.C. § 1129(a)(5)................................................................................................26, 27

11 U.S.C. § 1129(a)(5)(A)(i).............................................................................................26

11 U.S.C. § 1129(a)(5)(A)(ii)............................................................................................26

11 U.S.C. § 1129(a)(6).......................................................................................................27

11 U.S.C. § 1129(a)(7)............................................................................................27, 28, 29

11 U.S.C. § 1129(a)(7)(A)..................................................................................................27

11 U.S.C. § 1129(a)(8).......................................................................................................29

11 U.S.C. § 1129(a)(9).......................................................................................................30

11 U.S.C. § 1129(a)(10)..........................................................................................29, 30, 31

11 U.S.C. § 1129(a)(11)................................................................................................31, 32

11 U.S.C. § 1129(a)(12).....................................................................................................32

11 U.S.C. § 1129(a)(13).....................................................................................................32

11 U.S.C. § 1129(a)(14).....................................................................................................32

11 U.S.C. § 1129(a)(15).....................................................................................................32

11 U.S.C. § 1129(a)(16)................................................................................................32, 22

11 U.S.C. § 1129(a)(c).......................................................................................................24

11 U.S.C. § 1129(b)..................................................................................................29, 30, 33

11 U.S.C. § 1129(b)(2)(B)..................................................................................................33

Case 16-10446    Doc# 1123    Filed 10/18/17    Page 8 of 46

11 U.S.C. § 1129(c) ..................................................................................33, 34

11 U.S.C. § 1129(d) ......................................................................................34

11 U.S.C. § 1129(e) ......................................................................................34

28 U.S.C. § 1930 ...........................................................................................32

Securities Act of 1933 § 5 ............................................................................34

**OTHER AUTHORITIES**

2H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978
    U.S.C.C.A.N. 5963 ................................................................................23

Bankruptcy Rule 9019 ..............................................................................21, 22

H.R. Rep. No. 95-595 (1977)........................................................................8

S. Rep. No. 95-989 (1978) ............................................................................8

Abengoa Bioenergy Biomass of Kansas, LLC ("ABBK" or the "Debtor") hereby submits this Memorandum of Law (this "Memorandum") in support of approval and confirmation of the *Debtor's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code*, dated April 14, 2017 [Docket No. 811] (the "Plan") and in response to the *Objection of Missouri Liquidating Trustee to the Debtor's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 931] (the "Objection") filed by Drivetrain, LLC ("Drivetrain" or the "Missouri Liquidating Trustee").

As demonstrated below, the Plan satisfies the requirements for confirmation under section 1129 of the Bankruptcy Code. Significantly, the Plan has received overwhelming support from holders of Claims[1] entitled to vote to accept or reject the Plan. Accordingly, the Debtor submits that the Plan should be confirmed.

## PRELIMINARY STATEMENT

1.      The Plan is a straightforward plan of liquidation, which the Debtor seeks to confirm following a successful and value maximizing asset sale process. The Plan, filed over six months ago, is overwhelmingly supported by the Debtor's general unsecured creditors (*see* Docket No. 1079), and should be confirmed.

2.      Drivetrain filed a competing liquidating plan, too (*see* Docket No. 968, the "Drivetrain Plan"). However, given the voting results in connection therewith (*see* Docket No. 1093) – *i.e.* 13.2% of "accepting" votes, only one of which such vote would have even counted toward acceptance (given all but one "accepting" vote were made by insiders) – the Drivetrain Plan fails as a matter of law, and cannot be confirmed.

3.      While Drivetrain has insisted on engaging in extensive and expensive litigation and exchanges of discovery over the past several months, most, if not all, of the factual issues

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan.

implicated by such discovery have been rendered moot by the voting on the Drivetrain Plan. In fact, many of the disputed factual issues were never entirely relevant to these proceedings.[2] After all, the Debtor has not objected to the Intercompany Claims nor has it sought to disallow or re-characterize such claims, because it will not need to if the Debtor's Plan is confirmed.

4.     Instead, what has been and continues to remain the <u>sole</u> outstanding issue is whether the Debtor's separate classification and treatment of affiliates' Intercompany Claims from non-affiliates' General Unsecured Claims complies with chapter 11 of the Bankruptcy Code.

5.     The Debtor contends that separately classifying its non-affiliate trade and other creditors from its affiliate creditors is not only permissible and appropriate under the circumstances but is required as a matter of law. Indeed, while section 1122(a) of the Bankruptcy Code imposes no affirmative obligation on a debtor to jointly classify substantially similar claims, it does <u>prohibit</u> jointly classifying dissimilar claims.

6.     Under the Plan, Intercompany Claims are held by "affiliates," as defined in section 101(2) of the Bankruptcy Code, which "affiliates" are, thus, "insiders" per se under section 101(31)(E) of the Bankruptcy Code. The identities of the holders of Intercompany Claims alone makes them dissimilar on their face.

7.     Holders of the Intercompany Claims stand in a vastly different position from holders of General Unsecured Claims for other reasons, as well. The latter provided goods, services and financing directly to the Debtor in the ordinary course of business, without intimate knowledge of the Debtor's financial condition, business operations, and intercompany dealings.

---

[2] While discovery and open factual issues may be relevant in connection with the Debtor's claims filed in the Missouri Cases, those claims are expressly released under the Debtor's plan, and therefore, the factual issues there may be moot, too. Regardless, those are issues not before this Court, and the proceedings here should not be used as a tool to extract information in connection with the Missouri matters.

Non-affiliate general unsecured creditors expected their required repayment on the given terms, and recourse for non-payment. The Debtor's affiliates, on the other hand – many of whom shared officers, directors, and other management functions with the Debtor – were uniquely situated to know the debtor's financial condition and the risks involved when providing services to the Debtor, did not expect repayment from the Debtor unless and until the Debtor's plant became operational, and routinely postponed or forgave repayment of intercompany claims.

8. These same affiliates have accepted similar treatment to that proposed under this Plan in each of the Delaware Plan and Missouri Plan (each as defined in the Objection).[3] Indeed, counsel to the Missouri Liquidating Trustee supported such treatment in the Missouri Plan, which was a joint plan of the Missouri debtors and the Missouri creditors' committee, and argued that separate classification (and disparate treatment) of general unsecured creditors from intercompany affiliates is appropriate under section 1122 of the Bankruptcy Code. *See Memorandum of Law (I) In Support of Approval and Confirmation of Third Amended Joint Plans of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Under Chapter 11 of the Bankruptcy Code and (II) In Response to Objections Thereto*, filed jointly by respective counsel to the Missouri debtors and the Missouri creditors' committee in *In re Abengoa Bioenergy US Holding, LLC, et al.,* Case No. 16-41161-659, Bankr. E.D. Mo. (the "Missouri Cases") at Docket No. 1431 (June 1, 2017).

---

[3] It is also worth noting that in connection with the restructuring of the foreign entities affiliated with the Debtor, such entities obtained approval of a Master Restructuring Agreement that provided Intragroup Creditors would receive a reduced treatment (e.g., 3% of their claim paid without interest in 10 years) and not be able to elect a better treatment (e.g., 30% of the claim paid in notes and the balance paid in equity). Thus, in every insolvency proceeding involving an Abengoa entity, the intercompany claims have been afforded treatment subordinate to the external third-party creditors. Additionally, the largest creditors of the Missouri debtors were owed billions of dollars but settled for $32.5 million of the distributable proceeds from the sale of the Missouri plants, making the significant distributions to other creditors possible. Only one Missouri creditor, Cofides, object to the Missouri Plans, but that objection was resolved such that if the Missouri estates recover any funds from this case, certain proceeds will be paid over to Cofides; this is what has led to Drivetrain's aggressive position in this case. *See* Missouri Cases at Docket No. 1428 and Docket No. 1443 at pp. 27-28, 35.

9. And such treatment makes sense, given the reality described by Drivetrain in its Objection, *i.e.* that the Debtor "operated as one facet among others as part of Abengoa's integrated and interrelated bioenergy group." *See* Objection at p.17. Because of the integrated nature of the companies, and, in turn, the affiliates' superior knowledge to that of ordinary trade creditors with respect to the Debtor's financial condition (and expected repayment risks), there is a clear rational business justification for different treatment.

10. What is more, even a cursory review of the claims register in this case points to the same conclusion. While the Debtor's trade creditors support their proofs of claim with invoices, supplements, addenda and other supporting documentation, each as-filed Intercompany Claim (*see* Claims Register Nos. 93-96) consists only of Official Form 410, with absolutely zero supporting documentation. This is because Intercompany Claims are reflected in the Debtor's records as no more than vague general ledger and journal entries. The nature of the claims is vastly different from the nature of ordinary trade claims. This, among other reasons, is why the Intercompany Claims cannot legally be classified alongside the General Unsecured Claims.

11. Thus, because there are rational and legitimate purposes for separately classifying and treating Intercompany Claims and General Unsecured Claims, as further set forth below, the Debtor's proposed classification scheme is appropriate. That, and the fact that the Intercompany Claims are dissimilar to the General Unsecured Claims and thus cannot be classified together with the General Unsecured Claims under section 1122 of the Bankruptcy Code, supports confirmation of the Plan.

12. In short, as set forth below, the Debtor has satisfied all of the requirements for confirmation of a plan under chapter 11 of the Bankruptcy Code. The Objection should be overruled, and the Plan should be confirmed.

## RELEVANT BACKGROUND

**Background Related to the Plan and Disclosure Statement**

13.     On March 23, 2016, an involuntary chapter 7 proceeding was commenced against ABBK, which was subsequently converted to a voluntary chapter 11, captioned *In re Abengoa Bioenergy Biomass of Kansas LLC*, Case No. 16-10446.

14.     On June 14, 2016, the United States Trustee appointed an official committee of unsecured creditors [Docket No. 177] (the "Creditors' Committee").  No trustee or examiner has been appointed in this chapter 11 case.

15.     On April 14, 2017, the Debtor filed the Plan, and on May 21, 2017, the Debtor filed the *First Amended Disclosure Statement for Debtor's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 863].  On July 7, 2017, Drivetrain filed its Objection to the Plan, which is the sole objection to the Plan.

16.     On September 29, 2017, the Debtor's counsel filed a *Declaration Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtor's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1079] (the "Voting Certification"). The Voting Certification indicates that 29 ballots were received by the Debtor, with 28 accepting votes (or 96.55%) and a nearly 96% acceptance-rate with respect to the dollar amount of claims.

17.     As noted above, the Drivetrain Plan was filed on July 7, 2017 at Docket No. 931. An amended version of the Drivetrain Plan was filed on July 19, 2017 at Docket No. 968. Pursuant to Drivetrain's *Report and Certificate of Voting on Missouri Liquidating Trustee's First Amended Plan of Liquidation Dated July 19, 2017*, the Drivetrain Plan received only 5 of 38 accepting votes, or 13.2%, and thus cannot be confirmed.

18.     As such, the only chapter 11 plan before the Court that can move forward to confirmation is the Debtor's Plan.  The hearing to consider confirmation of the Debtor's Plan is scheduled for October 25-26, 2017.

**Background Related to the Intercompany Claims**

19.     On July 19, 2016 the Debtor filed the *Motion of the Debtor for Entry of an Order Establishing Deadlines and Procedures for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 294] (the "Bar Date Motion").

20.     On September 1, 2016, the Court entered the *Amended* Order *Establishing Deadlines and Procedures for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 408] (the "Bar Date Order") establishing September 30, 2016 as the deadline for each person or entity other than Governmental Units (as defined in section 101(27) of the Bankruptcy Code) to file a proof of claim ("Proof of Claim") against the Debtor for a claim that arose prior to the Petition Date.

21.     On September 30, 2016, subject to Court approval, the Debtor, the Committee and the United States Trustee entered into a stipulation extending the time by which the Debtor's affiliates were required to file a proof of claim against the Debtor in this chapter 11 case to November 1, 2016.  Over the course of the this chapter 11 case, four additional iterations of the stipulation were entered by the Court, the last of which was filed on April 27, 2017 [Docket No. 828] and approved that same day [Docket No. 829], extending the intercompany claims' deadline to June 30, 2017.

22.     Each extension was predicated on mutuality: the Debtor would extend its affiliates' deadline to file claims in this chapter 11 case, and its affiliates, as chapter 11 debtors in Delaware and Missouri, would do the same in their respective cases.  *See* Orders entered in (a) Missouri Cases at Docket Nos. 691, 753, 847, 948, 1116, 1374 and 1388, and (b) *In re Abeinsa*

*Holding Inc., et al.*, Case No. 16-10790-KJC, Bankr. D. Del. (the "Delaware Cases") at Docket Nos. 573, 731, 1032, 1127, 1227, 1299, 1383, and 1476. Once the Delaware affiliates' chapter 11 plan was confirmed (separately classifying, subordinating and releasing intercompany claims), mutuality was only required from the Missouri affiliate debtors.

23.     To be sure, the treatment provided for in the Delaware chapter 11 plan – duplicated by the Missouri affiliates' chapter 11 plan – was always contemplated to be mirrored in the Debtor's Plan, too. This is evident from pleadings filed as early as October 2016, when, for example, the Court entered the *Stipulated Order Approving Key Employee Incentive Plan* [Docket No. 473] (the "KEIP Order"), under which the Court approved the Debtor's proposed key employee incentive plan but only subject to "the subordination of [the Debtor's affiliates'] claims[.]" *See* KEIP Order, ¶ 1(g). No party objected to that concept.

24.     Separately classifying and treating the Debtor's affiliates' claims was simply never a point of controversy in this case or in the affiliates' cases until Drivetrain, without providing any advance notice to the Debtor, filed its competing (and now failed) plan and Objection. Nor would the Debtor have expected as much, given that Drivetrain's predecessors in interest supported such classification in its own chapter 11 plan, which received the requisite votes from the unsecured body of creditors amounting to billions of dollars in claims. As demonstrated below, just as separate classification and treatment was appropriate there, it is equally appropriate here. It would be unjust and inequitable to force the unsecured creditors in this case to share recoveries across estates when all other creditors of the Debtor's US affiliates have not received similar treatment. The Objection should be overruled, and the Plan should be confirmed.

## THE PLAN COMPLIES WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND SHOULD BE CONFIRMED

25.     To obtain confirmation of the Plan, the Debtor must demonstrate, by a preponderance of the evidence, that the Plan satisfies the applicable provisions of section 1129 of the Bankruptcy Code.  *See In re Paige*, 685 F.3d 1160, 1177 (10th Cir. 2012).  As set forth below and based on the record and filings in this chapter 11 case, the Plan satisfies all applicable subsections of section 1129 of the Bankruptcy Code and should be confirmed.

### A.     Section 1129(a)(1).

26.     Section 1129(a)(1) of the Bankruptcy Code requires that a plan "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1).  The legislative history of section 1129(a)(1) indicates that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, governing classification of claims and contents of a plan, respectively.  *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986), *aff'd in part*, *rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636 (2d Cir. 1988).  As demonstrated below, the Plan fully complies with the requirements of the Bankruptcy Code.

### i.     The Plan Complies with Section 1122 of the Bankruptcy Code.

27.     Section 1122 of the Bankruptcy Code provides, in pertinent part, as follows:

> (a) … a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122(a).  This provision is permissive, in that it allows but does not require placing substantially similar claims in the same class, and also restrictive, in that it prohibits placing

dissimilar claims in the same class. *In re City of Colo. Springs Creek Gen. Improvement Dist.*, 187 B.R. 683, 689 (Bankr. D. Colo. 1995) ("Section 1122(a) speaks solely to which claims may not be classified together . . . . [T]here is no requirement that similar claims be classified together.").

28.     Courts generally grant the debtor broad discretion in classifying claims and equity interests under a chapter 11 plan, subject to the requirements of section 1122(a) of the Bankruptcy Code. *Id.* at 687 (Bankr. D. Colo. 1995) ("Generally, § 1122 allows plan proponents broad discretion to classify claims and interests according to the particular facts and circumstances of each case."); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993) (holding that as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper).

29.     As Drivetrain acknowledges in its Objection, even similar claims may be separately classified if classification is based on "legal or factual distinctions" and is not for the purpose of gerrymandering the Plan's voting. *See* Objection at p.12 (citing *In re Stratford Assocs. Ltd. P'Ship*, 145 B.R. 689, 695 (Bankr. D. Kan. 1992));[4] *accord In re Lightsquared Inc.*, 513 B.R. 56, 82-83 (Bankr. S.D.N.Y. 2014) ("Courts that have considered the issue [of classification] ... have concluded that the separate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification.") (collecting cases); *In re Deming Hospitality, LLC*, No. 11-12-13377 TA, 2013 WL 1397458, at *3 (Bankr. D.N.M. Apr. 5, 2013) ("If the plan proponent carries its burden of showing that substantially similar claims

---

[4] Indeed, in that case, the court <u>approved</u> the separate classification of general unsecured claims and limited partners' claims, holding that such a distinction did not constitute inappropriate "gerrymandering."

were not separately classified to gerrymander a consenting class of impaired claims, the Court will make no further inquiry into whether the separate classification of similar claims violates § 1122(a).").

30.     With the exception of Administrative Claims, Accrued Professional Compensation Claims, Priority Tax Claims, and Other Priority Claims, which need not be classified, Article III of the Plan provides for the separate classification of Claims against and Equity Interests in the Debtor based upon differences in the legal nature and/or priority of such Claims and Equity Interests.  *See* Plan, Article III.  The Plan designates the following Classes of Claims and Equity Interests: (a) Class 1 – Secured Claims; (b) Class 2 – General Unsecured Claims; (c) Class 3 – Intercompany Claims; and (d) Class 4 - Equity Interests.  *See id.*

31.     This classification scheme complies with section 1122(a) of the Bankruptcy Code, because the Claims or Equity Interests in each particular Class are substantially similar to the other Claims or Equity Interests, as the case may be, in each such Class.  Furthermore, the classification scheme created by the Plan is based on the similar nature of Claims or Equity Interests contained in each Class, and not on any impermissible classification factor.

32.     The Debtor has a good faith, valid business justification for the classification scheme under the Plan, particularly with respect to the separate classification of the Debtor's trade and other non-affiliate unsecured creditors and the class of the Debtor's affiliates.  *See In re Riviera Drilling & Expl. Co.*, No. BR 10-11902, 2012 WL 6719591, at *8 (Bankr. D. Colo. Dec. 19, 2012) (holding separate classification of insider claims was appropriate), *aff'd*, 502 B.R. 863 (B.A.P. 10th Cir. 2013).  Again, as noted above, Drivetrain itself acknowledges that the Debtor "operated as one facet among others as part of Abengoa's integrated and interrelated bioenergy group."  Drivetrain goes to lengths in its Objection to demonstrate how intertwined the

companies truly were, touching on issues of shared board members, shared services, integrated financial statements and budgets, and employees and supplies. *See* Objection at pp. 22-24. Indeed, this is why Drivetrain's Plan sought to, at least on a conceptual level, "substantively consolidate" the Debtor's estate with its Missouri counterparts.

33.     Also, as noted above, the as-filed Intercompany Claims are wholly devoid of any invoices, supplements, or any supporting documents whatsoever.    This further demonstrates the clear difference between how affiliates conducted business with the Debtor, versus the conduct of ordinary suppliers, service providers and trade creditors.  Intercompany payables were marked in the company's records as vague general ledger or journal entries.  This is not surprising, given the affiliates' unique position and knowledge vis-à-vis the Debtor, and its vastly different expectations with respect to repayment of intercompany payables, compared to non-insider trade creditors who were not afforded the benefit of an insider's view to the Debtor's financial condition and intercompany business operations.  Indeed, based on historical practice, there was no firm expectation between the Debtor and its affiliates, who operated as an integrated bioenergy company with a consolidated cash management system, to repay intercompany claims. ABBK was akin to a "start-up" company, pursuing new technology in partnership with the Department of Energy.  As such, its access to capital via affiliates was a necessity and is not reflective of an arm's length debtor-creditor relationship as with the Debtor's external trade and other creditors.  This highlights the vastly different nature of these claims from the claims of general unsecured creditors.

34.     In support of confirmation of their own plan, the Missouri affiliate debtors' former CFO testified that the Abengoa affiliates routinely "waived the right to receive payment" from one another on intercompany claims "when, for example, a particular entity had insufficient

cash on hand." *See* Decl. of Sandra Porras Serrano filed in the Missouri Cases at Docket No. 1307, ¶ 48. Even if there was an expectation to repay the Intercompany Claims, Drivetrain's own Rule 30(b)(6) designee conceded that such repayment was only expected to occur if the Debtor's Hugoton Plant became operational and began generating cash flows sufficient to repay those amounts, which never occurred. *See* Deposition of Sam Star, Aug. 16, 2017 at 141:20-142:11; 144:15-23; *see also* DTRAIN-0002599 (repeatedly referring to intercompany claims recorded on intercompany accounts as "monopoly money" that would have "[n]o real cash flow implications.") But even if the Intercompany Claims were supported by documentation, separate classification and treatment of those claims is still appropriate because, in practice, the Abengoa companies always regarded intercompany claims as different from "and junior to the unsecured creditors." *See* Deposition of Gerson Santos-Leon, Aug. 11, 2017 at 137:25-140:12.

35. Further, there is no evidence to indicate that the Debtor's separate classification of Intercompany Claims was for the purpose of improperly "gerrymandering" votes on the Plan. The Objection merely states, in conclusory fashion, that the Debtor separately classified Intercompany Claims "in order to treat the Missouri Intercompany Claims dramatically worse than other unsecured creditors." *See* Objection at p.12. This finds no support in Drivetrain's Objection. Curiously, Drivetrain fails to mention that the Debtor's proposed treatment mirrors treatment of intercompany claims in each of the Missouri Plan and Delaware Plan. Rather than nefariously attempting to gerrymander in order to treat affiliates "dramatically worse" than trade creditors, the Debtor here simply provides a treatment in the Plan that reflects the same treatment afforded affiliates in each of their respective confirmed Plans, precisely for the reasons set forth

above.[5]  Drivetrain's purpose is nefarious – attempting a last-minute "cash grab" at the expense of non-affiliates, who, if Drivetrain prevailed, would receive worse and different treatment than the general unsecured creditors of the other Bioenergy affiliate companies.

36.     Furthermore, courts have held that claims of affiliates and insiders are appropriately classified separately, and treated differently, from general unsecured claims when such affiliates have an unfair advantage over other creditors due to the unique knowledge of the debtor's affairs.  *In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990) (holding that separate classification of insider claims was appropriate because "[a]s officers, directors, and employees of the debtor, they were fully aware of the financial condition of the debtor at the time they made their loans, and for several years thereafter … they were in a unique position to influence the ongoing financial and business operations of the debtor[.]"); *see also In re Carelinc Nat. Corp.*, No. 95-16574DAS, 1995 WL 750160, at *1–3 (Bankr. E.D. Pa. Dec. 15, 1995) (recognizing difference in nature of claim if insider had unique knowledge of the debtor's affairs); *In re LeBlanc*, 622 F.2d 872, 879 (5th Cir. 1980) (separate classification of insiders was appropriate under the Bankruptcy Act because "trade creditors advanced goods and services to the debtor in the ordinary course of business, frequently without any knowledge of the debtor's financially perilous condition and without any real opportunity to protect themselves" whereas "the insiders made loans to the debtor when they were in a position to know of the debtor's financial condition and the risks involved with those loans."); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 306 (Bankr. N.D. Tex. 2007) (separate classification of insiders was appropriate where insiders had unique knowledge); *cf. In re Pattni Holdings*, 151 B.R. 628, 631 (Bankr. N.D. Ga. 1992) (separate classification of non-insider franchisor was appropriate because, given its close

---

[5] *See* Deposition of Gerson Santos Leon, Aug. 11, 2017 at 139:9-18; 198:10-20; 277:14-21 (setting forth the business decision of the Debtor that intercompany claims were being treated uniformly in the various Bioenergy debtor cases).

relationship with the debtor, its claim arose from different circumstances than the claims of the general trade creditors).

37.     Indeed, Courts in this district have regularly confirmed plans under which insiders and/or affiliates are separately classified from general unsecured claimants. *See In re Wittur Inc.*, Case No. 04-B-10334, Docket No. 214 (Bankr. D. Kan. Sept. 22, 2004) (Nugent, J.) (confirming plan of reorganization with separate classification of general unsecured claims from affiliate claims); *In re L&T Machining, Inc.*, Case No. 11-11045-11, Docket Nos. 161, 180, (Bankr. D. Kan. Dec. 28, 2011) (Nugent, J.) (confirming plan of reorganization with separate classification of unsecured claims of insiders from general unsecured claims); *In re P&J Enterprises, Inc.,* Case No. 07-22034-11-RDB, Docket Nos. 88, 102 (Bankr. D. Kan. Aug. 12, 2008) (Berger, J.) (same); *In re Barrett Sutherland Acquisition, LLC*, Case No. 06-21882-rdb, Docket No. 50 (Bankr. D. Kan. June 26, 2007) (Berger, J.) (same).

38.     Here, it is appropriate to classify the Intercompany Claims in a separate class. As demonstrated above, the nature of the Intercompany Claims and the holders of such claims stand in a vastly different, and unfairly advantageous, position to that of the Debtor's trade creditors. Affiliates of the Debtor clearly had unique knowledge of the Debtor's financial condition when they provided services and extended credit to the Debtor, knowledge that was simply not available to general trade creditors. The Debtor and its Missouri affiliates shared numerous officers, directors and employees, as well as cash management related functions, and therefore the affiliates had knowledge of the Debtor's financial and operational conditions that was superior to that of unaffiliated trade creditors.

39.     The Missouri affiliates continued to extend credit to the Debtor or advance funds to the Debtor (being down-streamed through various Missouri affiliates from other foreign

affiliates) while fully aware of the Debtor's precarious financial condition. Again, other trade creditors of the Debtor did not have access to this level of information of the Debtor and thus were not positioned to make the same voluntary credit decision that the affiliates made. Not only did the Missouri debtors have special knowledge of the Debtor, they were in the unique position of influencing the ongoing financial and business operations of the Debtor given a shared board and management. *In re 11,111, Inc.*, 117 B.R. at 478 (holding that unique position of insiders to influence ongoing financial and business operations of the debtor justified separate classification).

40. In light of the above, the Debtor submits that the standard under section 1122(a) of the Bankruptcy Code has been met, because the Plan does not reflect the grouping of dissimilar claims at all, let alone for inappropriate purposes, nor does it impermissibly separately classify General Unsecured Claims from Intercompany Claims. As such, the Court should overrule the Objection and approve the classification scheme as set forth in the Plan as consistent with section 1122(a) of the Bankruptcy Code.

**ii.      The Plan Complies with Section 1123(a) of the Bankruptcy Code.**

41. Section 1123(a) of the Bankruptcy Code sets forth several requirements with which every chapter 11 plan must comply. The Plan fully complies with each enumerated requirement.

a.      Section 1123(a)(1):   Designation of Classes of Claims and Equity Interests.

42. Section 1123(a)(1) provides that a plan must designate, subject to section 1122 of the Bankruptcy Code, classes of claims and equity interests. As discussed above, the Plan designates four different Classes of Claims and Equity Interests, consistent with the dictates of

section 1122.  *See* Plan, Article III.  Accordingly, the Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

   b. <u>Section 1123(a)(2):  Classes That Are Not Impaired by the Plan</u>.

  43. Section 1123(a)(2) of the Bankruptcy Code requires that a plan specify which classes of claims or interests are unimpaired by the plan.  As set forth in Article III of the Plan, Secured Claims in Class 1 (the "<u>Unimpaired Class</u>") are Unimpaired under the Plan.  *See* Plan, Article III.  Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

   c. <u>Section 1123(a)(3):  Treatment of Classes that Are Impaired by the Plan</u>.

  44. Section 1123(a)(3) of the Bankruptcy Code requires that a plan specify how it will treat impaired classes of claims or interests.  Article III of the Plan designates Claims or Equity Interests in Class 2 (General Unsecured Claims), Class 3 (Intercompany Claims), and Class 4 (Equity Interests) (collectively, the "<u>Impaired Classes</u>") as Impaired within the meaning of section 1124 of the Bankruptcy Code and clearly specifies the treatment of the Claims and Equity Interests in those Classes.  *See* Plan, Article III.  Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

   d. <u>Section 1123(a)(4):  Equal Treatment Within Each Class</u>.

  45. Section 1123(a)(4) requires that a plan provide from the assets and rights of the estate the same treatment for each claim or interest within a particular class unless any claim or interest holder agrees to receive less favorable treatment than other class members.  Pursuant to the Plan, the treatment of each Claim against or Equity Interest in the Debtor in each respective Class is the same as the treatment of every other Claim or Equity Interest in such Class (without regard to rights any Holders of Claims may hold against third parties), unless the holder of a particular Claim or Equity Interest has agreed to a less favorable treatment for such Claim or

Equity Interest. *See* Plan, Article III. Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

       e.      <u>Section 1123(a)(5): Adequate Means for Implementation</u>.

46.    Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means for the plan's implementation." 11 U.S.C. § 1123(a)(5). Article IV of the Plan generally sets forth the means for implementation of the Plan which, among other things, include: (i) establishment of the Liquidating Trust, (ii) appointment of a Liquidating Trustee, (iii) transfer of the Liquidating Trust Assets to the Liquidating Trust, (iv) dissolution of the Debtor and (v) cancellation of existing securities and agreements. *See* Plan, Article IV. Accordingly, the Plan, together with the documents and agreements contemplated therein, sets forth the means for the Plan's implementation as required by section 1123(a)(5) of the Bankruptcy Code.

       f.      <u>Section 1123(a)(6): Prohibitions on the Issuance of Non-Voting Securities</u>.

47.    The existing Equity Interests in the Debtor are to be cancelled, and no new Equity Interests are to be issued under the Plan. Therefore, the Plan satisfies the requirements set forth in section 1123(a)(6) of the Bankruptcy Code.

       g.      <u>Section 1123(a)(7): Provisions Regarding Directors and Officers</u>.

48.    Section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7). Article IV.B of the Plan regarding the appointment of the Liquidating Trustee is consistent with the interests of creditors and Equity Interest holders and with public policy, because the selection

shall be undertaken by the Creditors' Committee, in consultation with the Debtor, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

### iii.   **The Plan Complies with Section 1123(b) of the Bankruptcy Code.**

49.   Section 1123(b) of the Bankruptcy Code sets forth various permissive provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) provides that a plan may (a) impair or leave unimpaired any class of claims or interests, (b) provide for the assumption or rejection of executory contracts and unexpired leases, (c) provide for the settlement or retention of claims of the debtor, and (d) include any other appropriate provision not inconsistent with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1123(b)(1)-(3), (6).

50.   Consistent with section 1123(b) of the Bankruptcy Code, Article III of the Plan (i) impairs certain Claims and Equity Interests (*i.e.*, Claims and Equity Interests in the Impaired Classes), (ii) Article III of the Plan leaves unimpaired other Claims and Equity Interests, (iii) Article IX.D of the Plan provides for the preservation of certain Causes of Action, and (iv) Article VII.A of the Plan governs the assumption and rejection of executory contracts and unexpired leases.

51.   Also consistent with section 1123(b), the Plan includes (a) the release by the Debtor and its estate of certain parties in interest, (b) the release by holders of Claims entitled to vote on the Plan of certain non-Debtor third parties, (iii) an exculpation provision, and (iv) an injunction provision prohibiting parties from, among other things, pursuing Claims or Equity Interests otherwise released under the Plan.  These provisions are proper because, among other things, they are the product of good faith and arm's length negotiations with the Creditors' Committee and in exchange for the good, valuable and reasonably equivalent consideration provided by the Released Parties.

52. <u>Debtor Releases</u>. Article IX.B.1 of the Plan provides that, as of the Effective Date, the Debtor, its Representatives and the estate will release claims and causes of action against certain parties in interest in the chapter 11 case. Pursuant to such provision, other than with respect to claims, causes of action, or liabilities arising out of or relating to any act or omission that constitutes actual fraud, willful misconduct, gross negligence, or a criminal act, the Debtor Releasing Parties are releasing the Released Parties, which include the following: (a) the Debtor, (b) the Debtor's current and former directors and officers, (c) the Debtor's Professionals, (d) the Debtor's Affiliates (including holders of the Intercompany Claims), (e) the Creditors' Committee, (f) each of the Creditors' Committee's members (solely in their capacity as members), (g) the Creditors' Committee's Professionals, and (h) with respect to each of the Released Parties, their respective Representatives. These releases are critical to the successful implementation and confirmation of the Plan, are integral to ensuring an orderly liquidation, and should be approved.

53. Courts in this circuit have held that a plan may provide for the release by a debtor of non-debtor third parties after considering certain factors, including whether the releases are an integral part of the plan, whether they are the expression of the debtor's valid business judgment, and whether they are in the best interest of the estate(s). *See, e.g., In re Midway Gold US, Inc., et al.*, Case No. 15-16835-MER, 2017 Bankr. LEXIS 3439 (Bankr. D. Colo. Oct. 6, 2017).

54. Here, the proposed releases granted by the Debtor in favor of the Released Parties are fair, reasonable, and in the best interests of the Debtor and the estate and are appropriate under the circumstances of this case. They are the result of arm's length negotiations with parties in interest, including the Creditors' Committee, and are an integral part of the Plan. Importantly, they have also not been objected to by any party in interest, and would only serve to

benefit the sole party objecting to the Plan generally (but which does not object to the releases), if granted.

55.     Accordingly, the Debtor believes that, under the specific facts and equities of this chapter 11 case, the Debtor's release of the Released Parties constitutes a valid exercise of the Debtor's business judgment and should be approved.

56.     The Holder Release.   In addition to the releases granted by the Debtor, Article IX.B.2 of the Plan provides for the release of the Released Parties by certain third parties of Causes of Action and any other debts, obligations, rights, suits, judgments, damages, actions, remedies and liabilities whatsoever, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor (as set forth more fully in Article IX.B of the Plan, the "Holder Release").   The Holder Release applies only to those persons who are entitled to vote on the Plan and do not mark their Ballots as opting out of the Holder Release under the Plan. *See* Plan, Article IX.B.2.

57.     The Holder Release was conspicuously included in the Plan, Disclosure Statement, and applicable Ballot, and holders of Claims in the sole voting class were given the opportunity to opt out of the Holder Release.   The Holder Release is not binding on any party that has opted out of the Holder Release.   Accordingly, the Holder Release is consensual, is an integral part of the Plan, and is appropriate under applicable law.   *See, e.g., In re U.S. Fidelis, Inc.*, 481 B.R. 503, 516 (Bankr. E.D. Mo. 2012).   Therefore, the Holder Release should be approved.

58.     Exculpation.   Article IX.C of the Plan provides for an exculpation limiting the liability of the Released Parties for acts or omissions in connection with, related to, or arising out

of this chapter 11 case, the negotiation, solicitation, or pursuit of confirmation of the Plan, and the consummation or administration of the Plan. The exculpation provision does not relieve any party of liability for gross negligence or willful misconduct.

59.     Courts have approved exculpation provisions when parties are exculpated for acts or omissions in connection with, or related to, "the pursuit of confirmation of the Plan, the consummation of the Plan or the Administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence . . . ." *In re PWS Holding Co.*, 228 F.3d 224, 245–46 (3d Cir. 2000) (approving an exculpation clause releasing a creditors' committee and its professionals from third party claims); *see In re Midway Gold US, Inc.*, 2017 Bankr. LEXIS 3439, at *72-73 (Bankr. D. Colo. Oct. 6, 2017) (following *PWS Holding Co.* and adopting its reasoning regarding exculpation provision in chapter 11 plan); *see also In re W.R. Grace & Co.*, 446 B.R. 96, 132–33 (Bankr. D. Del. 2011) (approving an exculpation clause exculpating non-debtor parties who were party to a settlement agreement). Here, no parties have objected to the exculpation provisions or brought forth any evidence suggesting the exculpation provisions are not justified.

60.     The Debtor submits that exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability. *See In re Drexel Burnham Lambert Group*, *Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition"). Without protection from liability, key constituents would have been unwilling to cooperate in connection with the negotiation, formulation, and

distribution of the Plan. Thus, the exculpation provision set forth in Article IX.C of the Plan is appropriate and consistent with applicable law.

61. <u>Injunctions</u>. The injunction provision set forth in Article IX.E of the Plan implements the Plan's release and exculpation provisions with respect to certain parties, including the Debtor. Further, the injunction provision is a key component of the Plan. Thus, to the extent the Court finds that the exculpation and release provisions are appropriate; the Debtor respectfully submits that the injunction provision is also appropriate. *See* 11 U.S.C. § 105(a) (authorizing the Court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code); *In re U.S. Fidelis, Inc.*, 481 B.R. at 525-526 (approving release, exculpation and injunction provisions because they were "an integral part of the Plan and as fair, equitable, reasonable and in the best interest of the Debtor, the Estate, and the holders of Claims"); *In re Premier Int'l Holdings Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *9 (Bankr. D. Del. Apr. 29, 2010) (approving injunctions along with release provisions).

62. <u>9019 Settlement</u>. Article IX.A of the Plan provides that "[t]he entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable, and in the best interests of the Debtor, the Estate and holders of Claims and Equity Interests." Section 1123(b)(3)(A) specifically provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."

63. When evaluating plan settlements under section 1123(b) of the Bankruptcy Code, courts consider the standards used to evaluate settlements under Bankruptcy Rule 9019. S*ee In*

*re Midway Gold*, 2017 Bankr. LEXIS 3439 at *61 (noting that "debtors are authorized under § 1123(b)(3)(A) to settle or release their claims in a Chapter 11 plan"); *In re Coram Healthcare Corp.,* 315 B.R. 321, 334 (Bankr. D. Del. 2004). Courts apply a four-factor balancing test for considering motions to approve settlements under Bankruptcy Rule 9019, weighing the following in order to determine whether the proposed settlement is fair and equitable, and in the best interests of the estate: (a) the probable success in litigation on the merits; (b) any potential difficulty in collection; (c) the complexity and expense of the litigation; and (d) the interests of creditors in deference to their reasonable views. *In re Kaiser Steel Corp.*, 105 B.R. 971, 976-77 (D. Colo. 1989); *see Ebel v. King (In re Ebel)*, 175 Fed. Appx. 230, 231 (10th Cir. 2006) (unreported) (affirming bankruptcy court's approval of settlement under Bankruptcy Rule 9019(a) based on the *Kaiser Steel* factors).

64.    The Debtor believes that the Plan is a valid compromise of Claims and Equity Interests, because pursuing an alternative to the Plan via additional litigation may not be successful and is unlikely to provide additional recoveries to creditors. Further, the costs involved would likely outweigh any potential benefit from pursuing such litigation. Finally, the Plan represents the best recovery to general unsecured creditors of the Debtor under the circumstances. Thus, the Plan represents a valid compromise.

65.    The Plan sets forth that it would represent a compromise and settlement in Article IX.A, upon the entry of the Confirmation Order, and that the Confirmation Order would represent a finding that the various compromises and settlements were fair, equitable, reasonable, and in the best interests of the Debtor, the estate and holders of Claims and Equity Interests. The voting Impaired Class overwhelmingly voted to accept this treatment and no party in interest has objected to the proposed compromises and settlements.

### iv.     **The Plan Complies with Section 1123(d) of the Bankruptcy Code.**

66.     Section 1123(d) of the Bankruptcy Code provides that, "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d). As required by section 365(b)(1) of the Bankruptcy Code, any monetary amounts by which any executory contract or unexpired lease that may be assumed under the Plan is in default shall be satisfied by payment of the required cure amount, if any. Accordingly, the Plan complies with section 1123(d) of the Bankruptcy Code.

### B.     **Section 1129(a)(2).**

67.     Section 1129(a)(2) of the Bankruptcy Code requires that the *proponent* of a plan comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). The principal purpose of this section is to ensure that a plan proponent has complied with the requirements of section 1125 in the solicitation of acceptances of the plan. *In re Resorts Int'l Inc.*, 145 B.R. 412, 468–69 (Bankr. D.N.J. 1990); *see also In re Valley View Shopping Ctr., L.P.,* 260 B.R. 10, 26 (Bankr. D. Kan. 2001) (holding that the debtor complied with the solicitation procedures of § 1125, and therefore the plan complied with § 1129(a)(2)); 2H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368.

68.     Here, the Debtor, as plan proponent, has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and other applicable law in obtaining approval of the Disclosure Statement before soliciting any votes on the Plan, and in transmitting the Plan, the Disclosure Statement, the Ballots, and related documents and notices and in soliciting and tabulating the votes on the Plan. Accordingly, the Debtor has fully complied with all the provisions of the Bankruptcy Code, including, in particular, the provisions

of section 1125 of the Bankruptcy Code, and has satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

## C. Section 1129(a)(3).

69.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."  The Tenth Circuit has stated that "the test of good faith is met if there is a reasonable likelihood that the plan will achieve its intended results which are consistent with the purposes of the Bankruptcy Code, that is, is the plan feasible, practical, and would it enable the company to continue its business and pay its debts in accordance with the plan provisions."  *In re Paige*, 685 F.3d at 1178; *Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.)*, 779 F.2d 1456, 1459 (10th Cir. 1985). The good faith analysis under section 1129(a)(c) of the Bankruptcy Code is also informed by the "totality of the circumstances."  *In re Rocky Mountain Land Co. LLC,* Case No. 12-21643 HRT, 2014 WL 1338292 at *9 (Bankr. D. Colo. April 3, 2014).  The totality of the circumstances includes: "(1) whether a plan comports with the provisions and purpose of the Code and the chapter under which it is proposed, (2) whether a plan is feasible, (3) whether a plan is proposed with honesty and sincerity, and (4) whether a plan's terms or the process used to seek its confirmation was fundamentally fair."  *Riviera Drilling,* 2012 WL 6719591 at *5 (citing *In re Global Water Tech., Inc.,* 311 B.R. 896, 903 (Bankr.D.Colo.2004)).

70.     The Plan is the product of arm's length negotiations among the Debtor, the Creditors' Committee, and other constituents.  The Plan is proposed to ensure the orderly and efficient liquidation and prompt distribution of the Debtor's remaining cash, *i.e.* net proceeds of the sale of the Debtor's assets.  The Plan, furthermore, allows holders of Allowed Claims to realize the highest possible recovery under the circumstances.  As such, the Plan was proposed

with the legitimate and honest purpose of maximizing the value of the Debtor's assets and maximizing distributions to creditors within the bounds of this Court's jurisdiction.

71.     Additionally, the Plan has been proposed in compliance with all applicable laws, rules, and regulations.  The Plan has been conceived and proposed with the honest intention to "achieve . . . results which are consistent with the purposes of the Bankruptcy Code," which is the measure of "good faith" under section 1129(a)(3) in the Tenth Circuit.  *In re Pikes Peak Water Co.*, 779 F.2d at 1459 (internal quotation marks, citation omitted); *see also In re Paige*, 685 F.3d at 1179 ("We reaffirm today that the test of good faith under § 1129(a)(3) focuses on whether a plan is likely to achieve its goals and whether those goals are consistent with the Code's purposes.").  Accordingly, the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

**D.     <u>Section 1129(a)(4).</u>**

72.     Section 1129(a)(4) of the Bankruptcy Code requires that any payments by a debtor "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case," either be approved by the Court as reasonable or subject to approval of the Court as reasonable.  11 U.S.C. § 1129(a)(4).  Any payments made or promised by the Debtor, or a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the Plan and incident to the chapter 11 case, have been approved by, or are subject to approval of, the Court as reasonable.

73.     Specifically, Articles II.A-C of the Plan set forth the procedures for Court approval of Administrative Claims and any compensation and reimbursement Claims through the Effective Date.  The procedure for the Court's review and ultimate determination of the fees, costs, and expenses to be paid by the Debtor satisfies the requirements of section 1129(a)(4) of

the Bankruptcy Code. *See In re Valley View Shopping Ctr., L.P.*, 260 B.R. at 22-23 (Bankr. D. Kan. 2001) (holding section 1129(a)(4) was satisfied by requirement of court approval of debtor's professionals' fees).

**E.**     **Section 1129(a)(5).**

74.     Section 1129(a)(5) of the Bankruptcy Code requires that a plan proponent disclose "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor . . . or a successor to the debtor under the plan." 11 U.S.C. § 1129(a)(5)(A)(i). Further, section 1129(a)(5) requires that the appointment of such individual be "consistent with the interests of creditors and equity security holders and with public policy . . . ." 11 U.S.C. § 1129(a)(5)(A)(ii).

75.     The Plan complies with section 1129(a)(5) of the Bankruptcy Code because the identity of the Liquidating Trustee, Mark D. Kozel of BDO USA, LLP, is disclosed in the Plan Supplement. The appointment of the Liquidating Trustee is consistent with the interests of holders of Claims against and Equity Interests in the Debtor and with public policy. Accordingly, the Debtor submits that the provisions of the Plan satisfy the requirements of section 1129(a)(5) of the Bankruptcy Code.

**F.**     **Section 1129(a)(6).**

76.     Bankruptcy Code section 1129(a)(6) provides that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." 11 U.S.C. § 1129(a)(6). The Plan does not provide for any rate changes over which a governmental regulatory commission has jurisdiction. The Debtor submits that this provision of the Bankruptcy Code is not applicable to the Plan.

G.    **Section 1129(a)(7).**

77.    The Bankruptcy Code protects creditors and equity holders who are impaired by the Plan and have not voted to accept the Plan through the "best interests" test of section 1129(a)(7).  The "best interests" test requires that holders of impaired claims or interests that do not vote to accept the plan "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."  11 U.S.C. § 1129(a)(7)(A); *In re Valley View Shopping Ctr., L.P.*, 260 B.R at 30.  If the Court finds that each non-consenting member of an impaired class will receive at least as much under the plan as it would receive in a chapter 7 liquidation, the plan satisfies the best interests test.  *See*, *e.g.*, *In re Paige*, 439 B.R. 786, 797-98 (D. Utah 2010).

78.    In considering whether a plan is in the "best interests" of creditors, a court need not consider any alternative to the plan other than the dividend projected in a liquidation of all the debtor's assets under chapter 7 of the Bankruptcy Code.  *In re Experient Corp.*, 535 B.R. 386, 411-12 (Bankr. D. Colo. 2015); *see also In re Larson, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("[t]o measure value, the Court must contrive a hypothetical chapter 7 liquidation conducted on the effective date of the plan.") (citing *In re Sierra-Cal*, 210 B.R. 168, 172 (Bankr. E. D. Cal. 1997)).

79.    The Debtor's liquidation analysis filed along with its Disclosure Statement demonstrates that holders of General Unsecured Claims will receive more under the Plan than they would were the Debtor to be liquidated on the Effective Date under chapter 7 of the Bankruptcy Code, because, among other reasons, conversion to a chapter 7 case and appointment of an outsider to this chapter 11 case would entail substantial expense and delay while the chapter 7 trustee climbs the learning curve, such that the conclusion that chapter 7 will diminish

creditor recoveries is inescapable.  See *In re Fox*, No. 98-20105-11, 2000 Bankr. LEXIS 1713, at *43 (Bankr. D. Kan. Aug. 4, 2000) (accounting for chapter 7 administrative expenses in determining amount available for distribution in hypothetical liquidation scenario).  And with respect to the Intercompany Claims, while the Debtor's liquidation analysis places potential affiliate claims alongside general unsecured creditors for purposes of calculating a "worst case" hypothetical recovery to creditors, the Debtor believes that even in a chapter 7, affiliates' Intercompany Claims would be treated differently from and subordinate to the claims of trade and other non-affiliate creditors.  A chapter 7 trustee could object to the Intercompany Claims, seek their disallowance or subordination, offset such claims, or characterize (or re-characterize) such claims as equity; in any such scenario, Intercompany Claims would receive no distribution. Thus, under the Plan, holders of General Unsecured Claims are better served than they would be in a chapter 7, and holders of Intercompany Claims are no worse off than they otherwise would have been.

80.      In sum, the Debtor submits that, with respect to each Impaired Class of Claims or Equity Interests, each holder of a Claim or Equity Interest in such Impaired Class (a) has accepted the Plan, (b) will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date, or (c) has agreed to receive less favorable treatment.  Therefore, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**H.      Section 1129(a)(8).**

81.      Subject to section 1129(a)(10) and 1129(b), section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept the Plan or not be impaired by the Plan.  As set forth above and in the Voting Certification, of greatest significance is that

holders of Claims in Classes 3 (General Unsecured Claims) overwhelmingly voted to accept the Plan. As such, section 1129(a)(8) is satisfied with respect to that Class. Section 1129(a)(8) is also satisfied with respect to holders of the Unimpaired Class which is deemed to accept the Plan. *See* 11 U.S.C. § 1126(f).

82. Class 3 (Intercompany Claims) and Class 4 (Equity Interests) are deemed to reject the Plan. Nonetheless, as set forth below, the Plan may be confirmed pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

**I.**     **Section 1129(a)(9).**

83. Section 1129(a)(9) of the Bankruptcy Code provides that holders of certain types of priority claims must receive specific treatment dependent upon the circumstances of such claims, unless the holders of such claims have agreed to different treatment. *See* 11 U.S.C. § 1129(a)(9). Except to the extent that the holder of a particular Allowed Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims against the Debtor will be treated in accordance with section 1129(a)(9) of the Bankruptcy Code. *See* Plan, Article II.

84. The Plan also provides that the deadline for submission by Professionals for Court approval of Accrued Professional Compensation shall be sixty (60) days after the Effective Date. All Professionals employed by the Debtor or the Creditors' Committee shall provide to the Debtor an estimate of their Accrued Professional Compensation through the Effective Date (including an estimate for fees and expenses expected to be incurred after the Effective Date to prepare and prosecute allowance of final fee applications) before the Effective Date. Therefore, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

**J.**     **Section 1129(a)(10).**

85.     Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider" if a class of claims is impaired by the plan.  The sole voting Impaired Class (Class 2 – General Unsecured Creditors) has overwhelmingly accepted the Plan, determined without including any acceptances of the Plan by any insider, thereby satisfying the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.**     **Section 1129(a)(11).**

86.     Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that

> confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).  This requirement, commonly known as the "feasibility" standard, usually encompasses two interrelated determinations (where the plan does not contemplate the liquidation of the debtor):  (i) the debtor's ability to consummate the provisions of the plan, and (ii) the debtor's ability to reorganize as a viable entity.  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); *In re Valley View Shopping Ctr., L.P.*, 260 B.R. at 33 ("This does not require that substantial consummation of the plan be guaranteed….") (internal citations omitted);  *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (stating that the definition of feasibility "has been slightly broadened and contemplates whether [a] debtor can realistically carry out its Plan . . . and [b] whether the Plan offers a reasonable prospect of success and is workable").

87.     Since the Plan expressly provides for the liquidation of the Debtor's estate and there are sufficient cash assets available to satisfy all Allowed Administrative Claims, Accrued Professional Compensation Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims consistent with the treatment set forth in the Plan, the Debtor will be able to implement the Plan; accordingly section 1129(a)(11) of the Bankruptcy Code is satisfied.  *See In re Experient Corp.*, 535 B.R. 386, 413 14 (Bankr. D. Colo. 2015) (holding that section 1129(a)(11) was satisfied for liquidating plan based on evidence the plan was likely to be consummated). Thus, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

**L.     Section 1129(a)(12).**

88.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 [of title 28 of the United States Code], as determined by the court at the hearing on confirmation of the plan."  11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.  11 U.S.C. § 507(a)(2).

89.     In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, Article V.N of the Plan provides that statutory fees under 28 U.S.C. § 1930 shall be paid on the Effective Date and thereafter, as such fees may thereafter accrue and be due and payable, by the Liquidating Trustee in accordance with the applicable schedule for payment of such fees.  Thus, the Plan satisfies section 1129(a)(12) of the Bankruptcy Code.

**M.     Sections 1129(a)(13), 1129(a)(14), 1129(a)(15) and 1129(a)(16).**

90.     Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the continuation of all retiree benefits, as defined in, and at the levels established pursuant to, section 1114 of the Bankruptcy Code.  The Debtor has no pension or retiree benefits, thus, section

1129(a)(13) of the Bankruptcy Code does not apply to the Plan. Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations. The Debtor is not subject to any domestic support obligations and, as such, section 1129(a)(14) does not apply. Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code). The Debtor is not an "individual" and, accordingly, section 1129(a)(15) is inapplicable. Section 1129(a)(16) of the Bankruptcy Code applies to transfers of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust. The Debtor was moneyed, business, or commercial corporations and, accordingly, section 1129(a)(16) is inapplicable.

**N.**     **Section 1129(b).**

91.     Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan in circumstances where not all impaired classes of claims and equity interests vote to accept a plan. This mechanism is known colloquially as "cram down" and only applies if all the requirements of section 1129(a) of the Bankruptcy Code have been satisfied except for the voting requirement in subparagraph eight that the Plan be accepted by all impaired classes. As noted already, the sole voting impaired class has overwhelmingly voted to accept the Plan.

92.     With respect to the Classes of Claims and Equity Interests that are deemed to reject the Plan, the Plan complies with section 1129(b)(1) because it "does not discriminate unfairly, and is fair and equitable, with respect to" such Classes.

93.     The Plan "does not discriminate unfairly in that all similar claims are treated the same." *In re Paige*, No. 05-34474, 2007 Bankr. LEXIS 4759, *54 (Bankr. D. Utah Nov. 13, 2007), *aff'd*, 685 F.3d 1160 (10th Cir. 2012). As discussed above, the General Unsecured Claims that will receive a distribution under the Plan are fundamentally dissimilar from the Intercompany Claims that will receive no distribution. It is for this reason that they were

Case 16-10446    Doc# 1123    Filed 10/18/17    Page 42 of 46

classified separately and provided separate treatment that, while in a sense "discriminatory," is not "unfairly" so under the circumstances of this case. *See In re LeBlanc*, 622 F.2d at 879 (noting that "[a] bankruptcy court can permit discrimination when the facts of the case justify it," and holding that the separate classification and treatment of insider claims from trade claims did not constitute unfair discrimination); *In re 11,111, Inc.*, 117 B.R. at 477-78 (noting "section 1129(b)(1) does not prohibit all discrimination, but only that discrimination which is unfair," and holding that the separate classification and treatment of insiders' claims "separately from those of other general unsecured claimants without the same knowledge or influence has a reasonable basis and is not unfairly discriminatory"). This is because the treatment of Intercompany Claims (i) is supported by a reasonable basis (i.e., the superior knowledge and influence of the affiliate claimants versus general trade creditors), (ii) is necessary for consummation of a chapter 11 plan (as evidenced by the lack of creditor support for Drivetrain's chapter 11 plan, which had proposed equal treatment of Intercompany Claims and General Unsecured Claims), and (iii) was proposed in good faith, as part of the original bargain struck between the various Abengoa debtor groups as to the treatment of Intercompany Claims. *See 11,111, Inc.*, 117 B.R. at 477-78 (citing multi-part test applied by a large number of courts in assessing the "fairness" of discrimination in a chapter 11 plan).[6]

94. The Plan is "fair and equitable" within the meaning of section 1129(b)(2)(B) of the Bankruptcy Code in that no holder of any interest junior to the impaired Classes of Claims and Equity Interests will receive or retain any property on account of such junior interest.

---

[6] The test cited in *11,111, Inc.* is also the test espoused by Judge Norton. *See* 6 Norton Bankr. L. & Prac. 3d § 113:3 ("In making a determination whether the discrimination is unfair, courts have applied four factors as follows: (1) whether the discrimination is supported by reasonable basis; (2) whether the debtor can confirm and consummate a plan without discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against.").

95.     Therefore, based on the foregoing reasons, the Debtor submits that the "cram down" requirements are satisfied with respect to the impaired Classes of Claims and Equity Interests, and the Plan can be confirmed notwithstanding their deemed rejection of the Plan.

**O.      Section 1129(c).**

96.     Subject to certain conditions, section 1129(c) of the Bankruptcy Code requires that the Court confirm only one plan.  The Plan is the only plan being confirmed in this chapter 11 case, given that Drivetrain's proposed competing plan did not receive sufficient votes to be confirmed.  Therefore, section 1129(c) is satisfied.

**P.      Section 1129(d).**

97.     The principal purpose of the Plan is not the avoidance of taxes or the application of section 5 of the Securities Act of 1933.  The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**Q.      Section 1129(e).**

98.     This chapter 11 case is not a "small business case" as defined in the Bankruptcy Code and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

[*Remainder of page left intentionally blank.*]

**WHEREFORE**, for the reasons set forth above, the Debtor respectfully requests that the Court (a) confirm the Plan, (b) overrule the Objection, and (c) grant such other relief as this Court deems just and proper.

Dated: October 18, 2017

Respectfully submitted,

s/ *Christine L. Schlomann*
Christine L. Schlomann, KS # 18712
Richard W. Engel, Jr.  MO #34641
Erin M. Edelman, MO #67374
**ARMSTRONG TEASDALE**
2345 Grand Blvd., Suite 1500
Kansas City, Missouri  64108
Telephone: (816) 472-3153
Fax: (816) 221-0786
cschlomann@armstrongteasdale.com
rengel@armstrongteasdale.com
eedelman@armstrongteasdale.com

-and-

David E. Avraham (IL 6308516)
**DLA Piper LLP (US)**
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089
Telephone:  (312) 368-4000
Fax: (312) 251-2892
david.avraham@dlapiper.com

-and-

Vincent P. Slusher (TX 00785480)
**Drinker Biddle & Reath LLP (US)**
1717 Main Street, Suite 5400
Dallas, Texas 75201-7367
Telephone: (469) 357-2500
Facsimile: (469) 327-0860
vince.slusher@dbr.com

*Co-Counsel for the Debtor*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 18th day of October 2017, a true and correct copy of the *Debtor's Memorandum Of Law In (I) Support Of Approval Of Plan Of Liquidation Pursuant To Chapter 11 Of The Bankruptcy Code And (Ii) Response To Objection Of Missouri Liquidating Trustee* was electronically filed with the Court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system, and was forwarded via U.S. Mail, first class, postage prepaid, and properly address to those parties who have requested notice but are not participating in the ECF System, pursuant to instructions appearing on the Electronic Filing Receipt received from the U. S. Bankruptcy Court.

*s/ Christine L. Schlomann*
