SO ORDERED.

SIGNED this 8th day of February, 2018.



_____
Robert E. Nugent
United States Bankruptcy Judge
_____

**DESIGNATED FOR ONLINE PUBLICATION ONLY**

**THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| IN RE: | |
| **ABENGOA BIOENERGY BIOMASS OF KANSAS, LLC.** | **Case No. 16-10446**<br>**Chapter 11** |
| Debtor. | |

## MEMORANDUM OPINION

A chapter 11 plan must meet the requirements of 11 U.S.C. § 1129 to be confirmed. Section 1129(a)(1) and (2) require that the plan and its proponent have complied with Chapter 11 and the rest of the Bankruptcy Code. This requirement implicates the provision in § 1122(a) that claims may only be classified together if they are substantially similar to each other. Claims that are otherwise similar may not be isolated in a different class if the debtor's purpose is to gerrymander the votes for confirmation. Another § 1129(a) requirement is that the creditors receive

1

no less than they would were the estate liquidated in chapter 7—the "best interests of creditors" or "chapter 7" test—found in § 1129(a)(7). Section 1129(a)(8) requires that each class of creditors must either accept the plan or not be impaired by it. If a class either rejects or is impaired by the plan, but the other provisions of § 1129(a) are met, the debtor may cram the plan down over a creditor's objection, but only if it does not unfairly discriminate among the classes and if it is fair and equitable under § 1129(b)(1) and (2).

Debtor ABBK's plan separately classifies the claims of its affiliates, classifying them below non-affiliate general unsecured creditors and denying them payment. The holder of four such claims, the Missouri Liquidating Trustee,[1] contends that the separate classification was done to gerrymander the unsecured creditors' class and is improper. It also objects that its four claims on behalf of related companies that did business with this debtor would be paid pro rata in a chapter 7 case and that they will receive less under the debtor's plan. The Missouri trustee contends that, even if the payments meet the best interest test, because its claims will receive nothing, they are impaired and are deemed to have rejected the plan. Therefore, the debtor must show that the plan does not unfairly discriminate against those claims and is fair and equitable.

---

[1] The Missouri Liquidating Trustee holds the claims of four Missouri debtors, Abengoa Bioenergy Company, LLC (ABC), Abengoa Bioenergy Engineering & Construction, LLC (ABEC), Abengoa Bioenergy Trading US, LLC (ABT), and Abengoa Bioenergy Outsourcing, LLC (ABO), under the terms of those debtors' combined and confirmed plan. Drivetrain, LLC, acts as the Missouri Liquidating Trustee.

2

The debtor incurred the debts owed to the Missouri Debtors either for credit or to enable payments for goods and services to non-affiliates. But, the debtor and the Missouri Debtors shared a board of directors and a management team that included financial, budgeting, and legal functions. Because of that, the Missouri Debtors were much better informed about ABBK's financial condition than third-party creditors would be. The affiliate debtors amongst themselves regarded these claims as different from, and junior to, those of the non-affiliate creditors. The affiliated debtors shared an intention to subordinate or extinguish the intercompany claims. For those reasons, these claims are different from ordinary non-affiliate claims. A chapter 7 trustee would be likely to recognize these debtors' shared understanding and their intention to subordinate or extinguish these debts. Accordingly, the plan meets the best interests of creditors test. Because the Missouri Debtors' are deemed to have rejected the plan, the debtor must cram the plan down under § 1129(b). Given the difference between these claims and the third-party unsecured creditors, and considering their intent that these claims be subordinated, the plan's discrimination against the affiliates' claims is not unfair under § 1129(b)(1). The plan is fair and equitable under § 1129(b)(1) and (b)(2)(B) because it does not violate the absolute priority rule. The Missouri Trustee's objections are therefore overruled and the plan is confirmed.

<u>Findings of Fact</u>

*General Background*

3

ABBK is one of over 700 affiliates and subsidiaries in a global concern, Abengoa, S.A., a Spanish corporation organized in 1941 and located in Seville, Spain ("Abengoa"). In late 2015, Abengoa and several of its Spanish subsidiaries and affiliates filed a proceeding under Article 5bis of the Spanish Insolvency Act. This is a pre-insolvency proceeding to allow companies to negotiate with creditors for restructuring their financial affairs without filing for insolvency; it culminated in a Master Restructuring Agreement ("MRA"). This foreign proceeding was recognized in the United States in a chapter 15 filing in Delaware.[2]

ABBK is part of Abengoa's United States bioenergy group. ABBK is wholly owned by Abengoa Bioenergy Hybrid of Kansas (ABHK), a Kansas limited liability company.[3] ABBK's upstream corporate parent is Abengoa Bioenergy US Holding, LLC (ABUSH).[4] Its sibling affiliates include ABC (Abengoa Bioenergy Company, LLC), ABEC (Abengoa Bioenergy Engineering & Construction, LLC), ABT (Abengoa Bioenergy Trading, LLC), and ABO (Abengoa Bioenergy Outsourcing, LLC), all of whom are part of the bioenergy group and chapter 11 debtors in Missouri (collectively the "Missouri Debtors."). The Missouri cases began as voluntary petitions filed in the Eastern District of Missouri (including ABUSH, ABBK's

---

[2] *In re Abengoa, S.A.*, *et al.,* Case No. 16-10754 (Bankr. D. Del.). Abengoa Bioenergia, S.A. is one of Abengoa's Spanish subsidiaries and its chapter 15 case, No. 16-10763, is being jointly administered with Abengoa, S.A.
[3] ABHK is a chapter 11 debtor in jointly administered Delaware cases, *In re Abeinsa Holding, Inc., et al.,* Case No. 16-10790 (Bankr. D. Del.).
[4] ABUSH is a chapter 11 debtor in jointly administered Missouri cases.

4

upstream parent) in late February, and were jointly administered.[5] When their combined plan was confirmed, these debtors' estates were substantively consolidated. Abeinsa Holding Inc. and other related subsidiaries and affiliates (including ABHK, ABBK's direct corporate parent) filed voluntary chapter 11 cases in the District of Delaware in late March and early April of 2016.[6]

This case began when several mechanic's lien creditors filed an involuntary chapter 7 petition against ABBK on March 23, 2016. ABBK converted the case to chapter 11 and sought a transfer of its venue to the District of Delaware with the other Delaware cases. After the Court denied the transfer motion and the venue order became final, ABBK prepared to sell its principal asset, a 25 million gallon capacity, second-generation cellulosic ethanol and cogeneration plant that it had built at Hugoton, Kansas. ABBK built this plant as a demonstration project to be used by its upstream corporate parents to demonstrate their design-build capabilities and new technology developed in the alternative fuels and power cogeneration fields. The initial construction was funded in part by a $95 million grant and a $45,000,000 loan guaranty by the United States Department of Energy (DOE).

ABBK substantially completed the plant in late 2014, but only after extensive cost overruns. At start up, ABBK experienced operational and equipment problems.

---

[5] *In re Abengoa Bioenergy US Holding, LLC, et al.*, Case No. 16-41161 (Bankr. E.D. Mo.) (hereafter cited as the "Mo. Case, Doc. __").
[6] *In re Abeinsa Holding Inc., et al.,* Case No. 16-10790 (Bankr. D. Del.) (hereafter cited as the "Del. Case, Doc. __").

**5**

The Hugoton plant produced 75,000 gallons of ethanol in 2015, but never approached commercial viability.[7] By 2015 all of the DOE funds had been expended and ABBK was wholly reliant on its affiliates and Abengoa S.A. for funding its operations. Abengoa implemented stringent cash management practices until late 2015 when Abengoa discontinued funding of U.S. entities and itself entered Spanish insolvency proceedings. The Hugoton plant was idled while ABBK and Abengoa contemplated measures to "fix" the operational problems at the facility.

In November of 2016, ABBK sold its Hugoton plant at auction for $48.5 million. In the ensuing months, ABBK settled and paid the mechanic's lien claimants, paid its post-petition lender, Reich Bros. Business Solutions, LLC, and paid administrative expenses to its financial advisor and investment banker Ocean Park Advisors, including a $500,000 transaction fee on the sale.[8] ABBK also resolved a dispute with the DOE[9] concerning the DOE's assertion, based upon a cost-share agreement, that it, not ABBK, owned 27 per cent of the plant's sale proceeds. ABBK agreed to pay the DOE $3.4 million of the proceeds, leaving about $21 million in the pot for certain key employees under a KEIP order[10] and the

---

[7] Prior to the bankruptcy filing, ABBK never generated significant cash flow and the Hugoton plant was never fully operational. It had been expected to generate a cash flow by late 2014. Star Depo. Tr. 128: 2-9; 151:13-15.

[8] *See* Doc. 715, Order approving mechanic's lien claimant settlements of $15,589,678); Doc. 648, Order approving Ocean Park Advisors transaction fee and expenses); Doc. 217, Order approving $3.69 million post-petition financing.

[9] *See* Doc. 1030, Order approving Department of Energy settlement of the $95 million award. ABBK had repaid the $45 million loan guaranty prior to the bankruptcy filing.

[10] Key Employee Incentive Program Order at Doc. 473, entered Oct. 13, 2016.

**6**

unsecured creditors. A condition of the KEIP order was a stipulation among the debtor, the ABBK Unsecured Creditors Committee (the "Kansas Committee"), and the United States Trustee that intercompany claims would be subordinated to the unsecured claims of third parties.

ABBK filed its liquidating plan and disclosure statement on April 14, 2017.[11] The plan provides for the classification of unsecured third party trade creditors in Class 2, paying them *pro rata*, but relegates all unsecured intercompany claims by other Abengoa entities to Class 3 and pays them nothing. Class 4 consists of the equity interests in ABBK, including the DOE's interest under its grant to ABBK, but the equity interests are canceled and will receive no distribution. Classes 2, 3, and 4 are impaired. Class 1 consisting of secured claims is unimpaired. Only Class 2 claims were entitled to vote on ABBK's plan. On May 23, 2017, the four Missouri Debtors, acting through DLA Piper, filed proofs of claim for the claims that underlie these objections to confirmation. Those claims total $69,504,931.[12] After ABBK's Amended Disclosure Statement was approved,[13] the debtor solicited acceptances of its plan in late May, 2017.[14] Balloting of the ABBK plan was completed on July 7, 2017 and the unsecured creditors accepted it by a wide margin.

---

[11] Doc. 811 and 812. *See also* Doc. 863 (Amended Disclosure Statement dated May 21, 2017 mostly expanding upon the Department of Energy's claimed interest in the Hugoton plant and its classification and treatment).

[12] Claim No. 93, ABEC -- $1,883,354; Claim No. 94, ABT -- $10,905,144; Claim No. 95, ABC -- $55,044,643; and Claim No. 96, ABO -- $1,671,790.

[13] Doc. 872.

[14] Doc. 915.

7

The Missouri Debtors and the Missouri Unsecured Creditors Committee ("Missouri Committee") filed their third amended joint plan on February 27, 2017.[15] Under the combined plan in those cases, the Missouri debtors liquidated various assets and the proceeds were vested in a liquidating trust to be administered by Drivetrain, LLC. ABBK did business with the Missouri Debtors as evidenced by the proofs of claim filed against it by ABC, ABEC, ABT, and ABO. ABBK and the Missouri Debtors were managed by the same board of directors and officers, had the same general counsel (Jeffrey Bland) and chief financial officer (Sandra Porras Serrano), and shared back office operations in Chesterfield, Missouri that included accounting, legal, administrative, IT, and other services. The same law firm, DLA Piper, represented this debtor, the Missouri Debtors, and the Delaware Debtors in their respective bankruptcy cases. Armstrong Teasdale is debtor co-counsel in both this case and the Missouri case. Drivetrain's lead counsel Hogan Lovells represented the Official Committee of Unsecured Creditors in both the Missouri and Delaware cases.

The Missouri plan was confirmed on June 8, 2017 and Drivetrain was appointed liquidating trustee of the GUC Liquidating Trust.[16] Drivetrain promptly filed an objection to confirmation of ABBK's plan on July 7,[17] along with a competing plan of liquidation that provided for payment of the four Missouri Debtors' claims on par with trade creditors' claims, but separately classified other

---

[15]  Mo. Case, Doc. 1022 and 1070 (as corrected) filed March 2, 2017.
[16]  Mo. Case, Doc. 1443.
[17]  Doc. 931.

8

intercompany claims of Abengoa entities in a lower class.[18] Drivetrain was permitted to ballot that plan, but the plan received few votes, leaving ABBK's plan as the only one eligible for confirmation.[19] I conducted a confirmation hearing on October 25 and 26, 2017 and, afterward, left the record open for certain deposition designations, and post-trial memoranda of law.

Only one Abengoa employee testified at trial (and by designated deposition testimony). He was Gerson Santos-Leon, the executive vice-president of ABBK and a member of its Board of Directors.[20] Drivetrain called two witnesses: (1) Timothy Daileader, its authorized representative as trustee for the Missouri GUC Liquidating Trust, two Delaware liquidating trusts, and the Delaware litigation trust for certain reorganizing debtors; and (2) Matthew Diaz of FTI Consulting, engaged by Drivetrain as its financial advisor, who analyzed certain intercompany transactions between ABBK and the Missouri Debtors. In addition, the Court received testimony of Sam Star, Drivetrain's Rule 30(b)(6) designee, by deposition designations and the Declaration of Sandra Porras Serrano, the Chief Financial Officer of ABUSH and its bioenergy affiliates, that she submitted in support of the Missouri plan's confirmation.[21]

*How The Intercompany Claims are Different*

---

[18] Doc. 932. On July 19, 2017, Drivetrain filed a disclosure statement and a First Amended Chapter 11 Plan of Liquidation. Doc. 969, 968.

[19] Doc. 1093.

[20] As an "authorized officer," Mr. Santos was empowered to take any action on behalf of ABBK deemed necessary to pursuing and obtaining chapter 11 relief. *See* Doc. 123.

[21] Trial Ex. 10; Mo. Case, Doc.1307.

**9**

The evidence shows that many of the U.S. Abengoa bioenergy affiliates did business with one another. While Drivetrain focused on the Missouri Debtors' claims it holds, ABBK recognized and scheduled other intercompany transactions and claims.[22]  Because it was not intended to be a revenue producer, ABBK relied on financing through ABC which operated as a cash manager for the domestic bioenergy affiliates. That reliance increased when ABBK ran out of DOE funds at the end of 2014.[23] ABC accessed credit and funding mechanisms from Abengoa's "central treasury" in Spain and provided those funds to ABBK (and other affiliates) when funds were available. ABO provided shared services for the bioenergy group (management, legal, administrative, accounting, IT, etc.), including ABBK. ABEC supplied engineering and construction management services. ABT procured and supplied ABBK with biomass for the plant, mostly corn stalks. [24]

---

[22] ABBK listed two intercompany receivables among its assets – ABT and ABNE (Abengoa Bioenergy of Nebraska, LLC). *See* Doc. 120, p. 30. ABBK scheduled the following affiliates and intercompany payables, in addition to the Missouri Debtors, as having unsecured claims:  Abener Teyma Hugoton General Partnership - $31,616,127; Abengoa Bioenergia Nuevas Tecnologias S.A. - $394,285; Abengoa Bioenergia, S.A. - $1,417,134; Abengoa Bioenergy Hybrid of Kansas, LLC (ABHK) -- $268,665; and Abengoa Bioenergy New Technologies, LLC (ABNT) -- $2,866,305. *See* Doc. 120, pp. 35-36, and Simosa IT, S.A. -- $71,078 and Simosa IT US, LLC -- $105,609, s*ee* Doc. 120, p. 57.

[23]  As a start-up, ABBK was not expected to cash flow until the plant construction was completed and became operational in 2015.

[24] The Court observes several claims filed against ABBK for the costs and expenses of disposing of biomass bales and abandoned corn stover when the Hugoton plant stopped production and went into idled maintenance in late 2015. *See* Claim Nos. 89, 90 and 91, the claims of Greg Morris ($1.2 million), Spikes Bros. (nearly $800,000) and Pacific Ag ($758,663), respectively.

Though all four Missouri Debtor claims were filed as "intercompany payables," Drivetrain contends that each claim is based on extensions of credit to ABBK, without which ABBK would have been forced to rely on third-party credit, making these claims the equivalent of non-affiliate claims. Given ABBK's start-up status, unsecured third-party credit was likely unavailable to ABBK. The assets of ABBK could not be encumbered without the DOE's consent. ABBK's affiliates were its only likely sources of working capital or operating credit. Apart from book entries, the ABO, ABEC, and ABT dealings with ABBK are evidenced by a written contract.[25] Santos' undisputed testimony was that the written contracts were only prepared as a formality to satisfy the DOE's requirements to obtain the DOE loan guaranty. In contrast to the ABBK affiliate intercompany extensions of credit, the third-party trade creditors never intended to advance open-ended operating credit to ABBK; those unsecured creditors provided labor, materials, and services to ABBK for the construction and equipping of the Hugoton facility, anticipating prompt payment of their invoices. Nor were those creditors privy to the kind of in-depth insider information and insight that the management, shared by the Missouri Debtors and ABBK, had.

Mr. Santos served as Executive Vice President of the debtor since 2008. He also served in that role for Abengoa Bioenergy New Technology (ABNT), meanwhile serving on the Board of Directors for ABUSH. In his testimony about the treatment

---

[25] Trial Ex. E (ABT), F (ABEC) and G (ABO). *See also* Trial Ex. Y at pp. 12-14, note 12 to the December 31, 2014 audited financial statements of ABBK.

**11**

of the affiliate claims, he noted that ABBK and the other bioenergy affiliates operated in an integrated manner, sharing the same management and services. Their financials were ultimately consolidated as were budgets and cash management functions. He described the flow of funds as follows: ABBK would ask ABO for money for some purpose.[26] If ABO could not source that money domestically, it would request a draw from Central Treasury in Seville, Spain. If that was approved, the funds would disburse to ABC who would then disburse to ABBK. These transfers would be booked as short-term loans. He described the debtor as being "totally one hundred percent dependent on . . . the affiliates and the corporate entity."[27] By 2015, funds were requested for utilities and other essential services required "to keep the lights on."[28] The affiliates' boards met regularly and all were aware of ABBK's condition at that time.[29]

Drivetrain offered the testimony of Matthew Diaz. He is a distressed business specialist from FTI Consulting, Drivetrain's financial adviser, and holds credentials as a CIRA[30] and a certified turnaround manager. He examined ABBK's books and

---

[26] ABO regularly prepared budgets and financial statements for the Abengoa bioenergy group and would have been involved in financial matters between the bioenergy affiliates and Central Treasury. As shared services providers, both ABO and ABC, which provided cash management of the transfers to and from Central Treasury in Spain, would have interacted with Central Treasury. *See* Trial Ex. 10 – Serrano Dec. ¶s 45, 47-48, 50, 52, 62.

[27] Trial Tr., 95:1-3.

[28] *Id.* at 96: 8-24.

[29] The declaration of Ms. Serrano, the Chief Financial Officer of ABUSH and its bioenergy affiliates, including ABBK, corroborates Santos' testimony regarding the integrated nature of the bioenergy affiliates and their shared management of bioenergy operations. *See* Trial Ex. 10.

[30] CIRA is the acronym for Certified Insolvency & Restructuring Advisor.

**12**

records, along with those of the Missouri Debtors and attempted to "build up" the elements of the four claims, viewing the company's relations with the Missouri Debtors as standalone bilateral arrangements rather than in the context of the greater Abengoa enterprise. He viewed the latter as "spaghetti" that would cloud a straightforward analysis of the claims. He admitted that he did not "go back to Spain" to view the flow of money among all of the 700 entities. Instead, Diaz concluded that because these intercompany claims were, in fact, incurred for valid contractual obligations and because ABBK's books and records reflected as much, they should be treated on par with non-affiliate claims. He referred to contracts between ABEC, ABO, ABT, and ABBK for provision of engineering, human resources, and biomass to the debtor. He also relied on internal records to show that ABC tracked fund outlays to ABBK, that it accrued interest on these outlays, and, from time to time, requested their repayment. These outlays were consistently booked as "short term loans." He also noted payments to Abener Teyma[31] from ABC loans to ABBK.[32] He did not consider that the relationships among these affiliates here were complex or unusual and opined that these claims were "good claims" based on what he learned from his analysis of the books and records.

> *--The ABC Claim*[33]

---

[31] Abener Teyma refers to Abener Teyma Hugoton General Partnership.
[32] Trial Tr.at 410:4 - 412:7. The source of ABC loans for at least one such payment, in excess of $28 million, came from central treasury in Spain. *See* Trial Ex. 29. No written contract for intercompany loans from Abengoa central treasury was produced at trial.
[33] Trial Ex. A-1.

13

According to Santos, prepetition ABBK had three components of financing: capital and credit from the larger Abengoa entities, a $98.7 million grant from the Department of Energy (DOE), and a loan guaranty from DOE. He testified that the grant was taken to "buy down" the risk the company was taking by embarking on the experimental cellulosic project. ABC was one of the conduits through which the debtor received funds from the other Abengoa entities. ABC managed the consolidated revenue of the bioenergy companies at the level of ABUSH. Under the cash management measures in force before filing, when ABBK needed cash, it asked ABO who would either fund the request from its own funds or request funds from Central Treasury in Seville to do so. If Central Treasury funded the request, those funds were transmitted from Spain to ABC who transferred them to ABBK. These were recorded as short-term loans that accrued interest on ABC's books. These ABC loans did not begin until 2015. This accords with Sandra Porras Serrano's Declaration where she states generally that the bioenergy debtors group maintained a "confirming bank line" of credit (the PPB system) that was connected to Central Treasury in Spain. PPB banks would pay vendors and bioenergy debtors would repay the banks for whatever was advanced though ABO.[34]

ABC's claim for $55,044,663.41 is the largest intercompany claim. ABC was Abengoa's original domestic bioenergy concern, organized when, according to Santos, Abengoa, S.A. acquired High Plains Corporation's existing ethanol plants in Kansas, Nebraska, and New Mexico in the early 2000's. ABC became the conduit for

---

[34] *See* Trial Ex. 10, ¶s 62-63.

funds from the Central Treasury in Spain and other Abengoa affiliates and, in general, became the cash manager for the domestic bioenergy affiliates. In his deposition testimony, Drivetrain's Sam Star described ABC's essential function "as the bank for the [b]ioenergy companies."[35] ABC did not report any loans payable by ABBK in its 2014 audited financial statement. Significant "lending" only began in 2015 when ABBK had exhausted the DOE funds and grew more reliant on other affiliates and Abengoa, S.A. to fund the completion, start up, and commissioning of the Hugoton plant.[36] Over $28 million of the claim consists of funds acquired by ABBK and paid in July of 2015 to Abener Teyma Hugoton General Partnership, the general contractor on the Hugoton project (and another affiliate Abengoa entity).[37] Like many other advances by ABC to ABBK, this was booked as a "loan." Contained in records summarized by Diaz is a spreadsheet that itemizes advances and repayments for 2015 between ABBK and ABC and includes the accrual of interest on ABBK's obligations to ABC commencing in July of that year.[38] Significantly, there is only one repayment noted in Diaz's summary, a $460,000 payment (without interest) by ABBK to ABC in March of 2015. That payment came one day after the

---

[35] Star Depo. Tr. 47:8-14. Star was Drivetrain's Fed. R. Civ. P. 30(b)(6) designee.
[36] ABC's cash management function and loans to ABBK started in early 2015 and occurred through early 2016. Star Depo. Tr. 151:16-23.
[37] *See* Trial Ex. B, pp. 362-67; Abener Teyma Hugoton General Partnership filed a voluntary chapter 11 petition in Delaware on April 6, 2016, No. 16-10880. ATHGP was jointly administered with the *Abeinsa Holding, Inc.* Delaware case, No. 16-10790. *See* Del. Case, Doc. 67. ATHGP is a reorganizing debtor classified with the EPC (Engineering, Procurement, and Construction) Reorganizing Debtors under the Delaware Plan. Del. Case, Doc. 991-1, Art. I.A., ¶s 54, 56.
[38] *See* Ex. B, pp. 3-5

15

advance.[39] Thereafter, though interest continued to accrue, no further payments were made or, based on the record here, demanded. Likewise, there is no evidence of a written agreement or protocol governing the borrowing and repayments, setting the interest rate, or otherwise defining the companies' credit relationship.

In general, when ABBK needed money, and if Spain concurred with the request, ABC obtained a transfer from Central Treasury, and transferred those funds to one of ABBK's pledged bank accounts at Comerica Bank and Deutsche Bank. Some of the e-mails in evidence suggest that if ABBK requested funds and ABC had money on hand, ABC would transfer that money to ABBK.[40] For example, ABC transferred $1.1 million to ABBK's Deutsche Bank account for "June funding" on June 4, 2015. ABC internally directed that it be processed as a "book transfer," and the transfer was posted on ABBK's books as a June 10, 2015 loan.[41] For another $1.1 million loan to ABBK processed on July 9, 2015, rather than request the funds from "CT" [Central Treasury], ABC used the proceeds of a sugar sales check to fund ABBK.[42] All such transactions were booked as "loans" to ABBK. Although Drivetrain argued that "Central Treasury" referred to ABC, and not Abengoa, S.A., daily cash transactions from ABC's check register, show deposits

---

[39] Trial Ex. B, p. 5.

[40] According to Drivetrain's witness Sam Star, cash generated by the bioenergy entities was "funneled" to ABC and ABC used those funds to pay obligations or expenses of the bioenergy entities. ABBK, however, didn't have cash flow to funnel to ABC. ABC also transferred funds back and forth with Abengoa in Spain. Star Depo. Tr. 48:19 - 49:10; 67:19 - 68:14; 95:23 – 96:3.

[41] Trial Ex. B, pp. 182-86.

[42] *See* Trial Ex. B, pp. 338-44. ABC sometimes sold sugar and other commodities for other affiliates in the Americas. *See* Trial Ex. 22, p. 1617.

from both Abengoa, S.A. described as "Central Treasury Loan," as well as loans from other Abengoa affiliates, were used to make loans to ABBK.[43]

In a March 2017 e-mail, Sandra Porras-Serrano, the Chief Financial Officer of both ABC and ABBK, requested a copy of the "latest version of the waterfall and liquidation analysis" from Angelo Pietrosanti, a member of Alvarez and Marsal, the workout consultant for Abengoa, S.A. Pietrosanti replied that he could match up the intercompany claims "all but the 55m [sic] toward ABC."[44] He stated, "I have no clue in the AP schedule" and suggested that the ABC payable "needed to be reviewed." Joseph Abkemeier responded that the claim was composed of ABC loans from Deutsche Bank and Comerica for ABBK's benefit (nearly $31 million), "paid per bank" (PPB) transactions of nearly $22 million, accrued interest, and other components. PPBs are transactions where ABC has lines of credit for paying affiliates' expenses to which ABBK had access, but which ABC managed.[45]

---

[43] *See e.g.,* Trial Ex. 29, excerpt of ABC check register – daily cash transactions show deposits on 6/25/2015 from ABNE, ABO, and Abengoa, S.A.'s Central Treasury were combined for ABC's intercompany loan to ABBK of $28,712,364. This ABBK loan is shown on ABBK's books at Trial Ex. B, pp. 362-63, with the loan proceeds deposited in ABBK account at Trial Ex. B, pp. 364-66, and instructions to draw this amount from ABBK to pay Abener Teyma Hugoton General Partnership another Abengoa affiliate at Trial Ex. B., p. 367. Nothing in the transactional support records indicates the purpose of the loan or a description of the payment to Abener Teyma. I suspect that domestic Abengoa employees may have referred to both Abengoa and ABC as "central treasury," given their respective banking and cash management roles.
[44] Trial Ex. C.
[45] Star testified that the PPB lines functioned as a credit facility for ABBK. Star Depo. Tr. 145:4-19.

Drivetrain believes that ABC had a written agreement that governed its relations with ABBK as did the other Missouri Debtors. That agreement had not yet been located by the time of trial, but ABBK does not deny the existence of that agreement and the consistent treatment of the loans on ABC's and ABBK's books suggests the existence of some form of agreement or protocol.

*--The ABEC Claim[46]*

Abengoa Bioenergy Engineering & Construction, LLC, provided construction management services to ABBK during the plant's construction at Hugoton. At the petition date, ABBK owed ABEC $1,883,354.84 based upon invoices discussed by Mr. Diaz.[47] According to the debtor's 2014 audited financial statements, these services were tendered under a written agreement.[48] That agreement provided for services to be rendered and billed monthly with set hourly rates to be charged by ABEC depending on the nature of services it rendered. Monthly invoices would be submitted and, according to the agreement, were payable within two days of billing. While the run of invoices referenced in Mr. Diaz's report contain summaries of the amounts billed, there is no hourly charge detail or description of services. Nor does it appear that any demand was ever made for payment though all amounts billed were payable on net two day terms making these invoices long past due by ABBK's petition date in March of 2016.

---

[46] Trial Ex. A-2.
[47] Trial Ex. B, pp. 6-8.
[48] Trial Ex. F, Construction Management Services Agreement dated September 23, 2011.

18

*--The ABT Claim[49]*

Abengoa Bioenergy Trading, LLC contracted with ABBK to provide biomass for consumption and conversion into ethanol at Hugoton.[50] This contract, entered into on September 18, 2013, as an amended and restatement of a prior agreement made in 2011, and, per its terms, was to run until 2030 unless the plant did not commence commercial operations by December 31, 2015, in which case, either party could terminate the agreement.[51] The filing of bankruptcy by either party constituted an event of default and automatically terminated the agreement.[52] ABT's contract provided for it to acquire biomass from Pacific Ag (through Advanced Feed Stock) and sell it to ABBK at cost plus a $1/ton fee. Though Santos testified that the contract was subject to the DOE's approval, the contract itself contains no such term. According to Mr. Santos, ABT was also responsible for marketing ABBK's paltry ethanol production. During 2015, the plant only produced 75,000 gallons of ethanol. ABT traded other products for other Abengoa affiliates, including the sugar for the Brazilian entities. ABT paid Pacific Ag bills for biomass that ABBK would otherwise have had to pay. This was a function of what Santos characterized as ABBK's "100% dependen[cy] on affiliates."[53]

---

[49] Trial Ex. A-4.
[50] Trial Ex. E.
[51] *Id.* at Art. 1, p. 2.
[52] *Id.* at Art. 5, § 5.2, p. 6.
[53] Trial Tr. 95:2.

**19**

After netting payables due ABBK, the debtor owes ABT $10,776,238.19.[54] ABT's filed claim is for $10,905,104.17. Under the agreement, ABBK was to pay ABT's invoices within 15 days of issue or collection could commence. Santos testified that no collection occurred even though the balance stated above had accrued by February of 2016 over the life of the contract. It appears that no payments were made from August of 2014 forward, though Drivetrain showed that ABT invoiced each shipment of biomass in that period, some with the $1/ton fee and some without.[55] ABBK received actual physical goods from ABT, goods that ABT acquired from other sources, goods for which it presumably paid.[56] Mr. Santos conceded that had ABT not paid for the biomass it delivered, its suppliers would have been unsecured creditors of the debtor.

*--The ABO Claim[57]*

Abengoa Bioenergy Outsourcing, LLC. filed a claim in this case for $1,617,790.74 for operation and financial services rendered to ABBK up to the petition date. According to Mr. Santos, ABO provided these services to ABBK and other ABUSH bioenergy affiliates in an "integrated manner" and had the same board of directors, general counsel, and back office operations as the other affiliates. ABO played a variety of roles, including being the middleman on budget and

---

[54] Trial Ex. B, p. 13.
[55] *See* Trial Ex. B, p. 14. *Cf.* Support File, C10-11 to C12-13. Note that sometimes the invoiced amount included the fee in the price of the biomass, *see, e.g.*, C48-49.
[56] *See* Trial Ex. B, p. 14 and referenced support files consisting of ABT invoices and delivery tickets for the biomass supplied to ABBK.
[57] Trial Ex. A-3.

20

financial dealings with Abengoa in Spain; funding requests were commonly run through ABO. As with ABT, Santos said that the DOE loan guaranty was conditioned in part on ABBK having a separate written agreement with ABO.

ABO's service contract with ABBK was executed on September 13, 2013.[58] ABO was to provide ABBK a suite of services that included human resources, office furniture and rent, IT services (contracted with Simosa IT), legal services, insurance, and aviation. If ABO was contracting these services for other affiliate entities, ABBK would be allocated its share of the expenses. The cost of legal services would be shared among all the ABUSH affiliated entities and that each affiliates' attorney would report to the General Counsel and be considered authorized to represent each unit, all acting for each entity with their expenses being allocated among the entities. The agreement would remain in effect until December 31, 2028 or the termination of the DOE loan guaranty agreement. Santos and Diaz both testified that the loan guaranty terminated sometime in 2015.

ABO charged ABBK a fixed annual fee of $535,000, an amount to be adjusted in the second and subsequent years of the term by increasing or decreasing the fee in step with the Consumer Price Index. Expenses allocated to ABBK, along with one-twelfth of its fee would be billed within 15 days of the end of the billed-for month and be payable within 30 days of receipt. No payment would be due if the guaranty agreement was in default. Mr. Daileader noted that ABO continued to provide services to ABBK post-petition, but those expenses appear to have been

---

[58] Ex. G.

paid—in any event, they are not part of the claimed amounts. Mr. Diaz's analysis sets out how the expenses for the pre-petition period were invoiced.[59] ABBK made no payments to ABO during the year preceding the filing.

*Plans' Similar Treatment of Intercompany Claims*

The Missouri Debtors' claims have several things in common. All arose while the Missouri Debtors shared management with ABBK and knew of the status of the Hugoton plan and ABBK's financial condition. Three of the four are grounded on written contracts (with a strong suggestion that ABC's is grounded on one, too). The written contracts were required by the DOE as a condition of its loan guaranty to ABBK, but nothing suggests they were the product of any arm's length bargaining. The liquidation of each claim is based on book entries, e-mail threads, wire transfers, and in some cases, other source documents such as invoices. Many of the transactions are for operating credit or direct payments to vendors. ABC booked credit transactions and funds deposited in ABBK's accounts as loans, akin to operating loans without interest, repayment, and maturity terms. Only the issuing of invoices and direct payments make these claims look similar to ordinary trade creditor claims. But ABBK made no payments on these claims, and, despite scrupulous documentation that included payment provisions, no documented demands for payment or collection efforts were made. And, as Santos testified, none of the affiliates harbored any expectation of payment from this debtor, even when the obligations were incurred.

---

[59] Ex. B, pp. 9-11 and Support files numbered, C2067-68.

The Missouri, Delaware and Kansas debtors' plans and treatments are very similar. By the time ABBK filed its plan on April 14, 2017, the other domestic Abengoa entities had also filed plans. The Delaware Debtors filed their Modified First Amended Plans of Reorganization and Liquidation on December 7, 2016 and it was confirmed on December 15, 2016.[60] The Delaware plan is a liquidating plan as to the bioenergy debtors.[61] The Missouri Debtors filed their Third Amended Plan of Liquidation on February 27, 2017.[62] In all those plans, with few exceptions, the proponents separately classified intercompany claims below unsecured third-party claims and denied those claims payment.

Each of the three plans filed on behalf of the Abengoa bioenergy affiliates contains a plan release. The Delaware plan denies distribution to any intercompany claims except that ABC's claim against ABHK (ABBK's direct parent) is reserved.[63] In the plan release, each debtor releases the "Released Parties," who include the debtors in the Delaware cases, their corporate parent, their representatives, the creditors' committee, and other entities.

The Missouri plan, filed jointly by the Missouri Debtors and the Missouri Committee, subordinates all intercompany claims and denies them distribution, except for distributions to ABBK on account of its claims.[64] The release in these cases is similar to that in the Delaware plan, but excepts from its scope any intercompany

---

[60] Del. Case, Doc. 991, 1033, 1039, 1042.
[61] Del. Case, Doc. 991-1, pp. 31-33.
[62] Mo. Case, Doc. 1022 and 1070 (as corrected).
[63] Del. Case, Doc. 991-1, p. 33.
[64] Mo. Case, Doc. 1070 at Art. III.C.4. and 5., p. 20.

23

claims by Missouri Debtors entitled to payment under the Master Restructuring Agreement.[65]

ABBK's plan subordinates all intercompany claims with no exceptions and its release applies to affiliates, conditioned upon the affiliates' claims being subordinated; if such claims are not subordinated, the affiliates are not released by the Debtor. The ABBK amended disclosure statement reports that the Missouri Committee does not agree to the subordination of the Missouri Debtors' intercompany claims and intends to object to that treatment unless a consensual resolution is reached.[66]

*Separate Classification and Treatment Recognizes Difference of Affiliate Claims*

In his testimony, Mr. Santos said that the complexity of intercompany transfers made it more expeditious to classify them below third-party claims. Cross examination revealed that part of that complexity was the debtor's two-sided relationship with the DOE. The agency provided ABBK with a loan guaranty while it was building the plant and, as part of the building process, the debtor received a $95 million grant as well. Among the guaranty's conditions was a requirement that ABBK's financial relationships with its siblings be recorded as contracts. The grant provided for the Government to receive a proportion of the ownership in the plant and real estate assets, excluding any technology intellectual property. Santos testified that one of the reasons to subordinate all intercompany claims was to

---

[65] *Id.* at Art. IX.B.1, p. 37.
[66] *See* Doc. 863-1, p. 27.

prevent various intercompany disputes whose litigation might turn up facts previously unknown to DOE, particularly in connection with a side agreement between ABBK and ABNT concerning the technology for the plant.

Santos also stated that while it might be possible to analyze each companies' respective obligations to and entitlements from one another, that binary analysis might disregard the larger picture. Given that money and property flowed among both U.S. and Spanish entities with impunity, untangling that web might prove more difficult than its cost would merit. Moreover, by the time the ABBK plan was drafted in April of 2017, the Delaware case was complete and those debtors' claims against ABBK had been released. He stated that, early on, the debtors considered subordinating one another to be the most efficient way to treat the intercompany claims. Those claims were different and deserved to be treated differently from those of third-party creditors who had none of the inside knowledge that the affiliates shared. As for providing for each affiliate to claim against the others, Santos stated that they were "better off not going there."[67]

Santos also said that none of these affiliates ever expected to be paid, particularly after the beginning of 2015 when the Hugoton project became plagued with problems and "everybody" knew it would not be profitable.[68] No prepetition efforts were made by ABT to collect for biomass it delivered; likewise, ABC, ABEC, and ABO took no measures to collect or enforce the debtor's obligations to them. Even

---

[67] Trial Tr. at 133: 3.
[68] *Id.* at 80:4 – 82:15.

25

though the claims may have had contractual foundation, and even though the debtor did not oppose their being allowed, the affiliates knew of ABBK's condition when the debts were incurred, they understood ABBK's dependence upon them, and they understood that ABBK was a demonstration project, not a revenue-producing entity like the other bioenergy affiliates that operated first generation plants. This understanding was facilitated by the board meetings among the shared leadership of the entities at which its condition was regularly discussed. This demonstrates that these managers had access to financial and other information about ABBK that no non-affiliate could hope to attain.

Compare this evidence with Sam Star's deposition testimony. He could not recall why Drivetrain pursued these claims here while not objecting to similar treatment in Delaware.[69] He noted that some of the other intercompany claims subordinated by ABBK had already been released in the Delaware case. As a Rule 30(b)(6) designee, Star was charged with testifying about information known or reasonably available to Drivetrain.[70] In general, his testimony accords with what Santos said about the relations between the debtors, but he could not specify how Drivetrain decided to pursue some claims, but not others.

Timothy Daileader, Drivetrain's principal, testified that the Missouri plan eliminated the intercompany claims because the Missouri Debtors' estates were consolidated. He noted that many like claims in the other cases were negotiated away

---

[69] Star Depo. Tr. at 191:10-16.
[70] Fed. R. Civ. P. 30(b)(6); Fed. R. Bankr. P. 7030.

26

as part of other agreements among the debtors and with the committees. ABBK's claims in Delaware were released by consent. Mr. Daileader placed this case in context with the others and agreed that in all the other matters, extinguishing or denying distributions to the intercompany claimants was heavily negotiated. He agreed that Drivetrain's failed creditors plan provided for treatment of the four Missouri Debtors' claims, but none of the other intercompany claims. He justified that distinction by noting that he had not had an opportunity to investigate the other claims.[71]

Mr. Diaz also testified to the negotiations that went into the intercompany treatments in the other two venues, noting that there were other considerations beyond the debt being "insider" or it "being too hard" to treat them. Some of these releases were for value and were a part of compromising claims under the MRA. Diaz viewed what Santos referred to as "complexity" as being "spaghetti" or "fog" that obscured an accurate examination of these claims as stand-alone transactions.

*Kansas KEIP Order Evidence of Subordination Understanding*

In October of 2016, as the sale process for the Hugoton plant was gearing up, ABBK and the Kansas Committee stipulated to the terms of an order providing for a Key Employee Incentive Program ("KEIP") that would incentivize key employees to remain and facilitate the sale by offering bonuses. These incentive payments would be made after the mechanics' lien claims and the DIP Financing Facility were paid from the proceeds of the sale. As part of this stipulation, all intercompany claims were

---

[71] Trial Tr. at 357:8-25.

to be subordinated to the claims of trade creditors. While the Missouri Debtors were not a party to this stipulation, their plan recognized the Kansas KEIP's priority over the Missouri creditors. That plan provided that any funds recovered from ABBK's estate by the liquidating trustee on account of the Missouri Debtors' claims would be paid only after the KEIP claims are paid.[72] The Missouri Debtors' plan, as corrected, was filed on March 2, 2016, about six weeks before ABBK's plan and, notably, also provides for the subordination of all intercompany claims (except those of ABBK).[73]

*Affiliates Agreed to Subordinate*

Only the ABBK plan release specifically refers to intercompany or affiliate claims, but the similarity of the other plan and release provisions supports the debtor's contention that, *at least among the debtors*, there was an understanding that each other's debts would be released and not paid (except where specified). Mr. Santos testified that the exchange of these releases for the subordination of intercompany claims was "part of the strategy from the beginning … that the [shared bioenergy] management team had from the time that these cases were filed, probably from the beginning of 2016."[74] This consensus, reached among Santos, Serrano, Antonio Salvador Martos (the companies' CEO at that time), Jeffrey Bland (general counsel of the bioenergy group), and possibly Christopher Standlee, was not reduced to writing, but was "reflected in the disclosure statement."[75] This testimony stands

---

[72] Mo. Case, Doc. 1070, p. 32.
[73] *Id.* at p. 19.
[74] Santos Depo. Tr. at 138:10 – 139:18.
[75] Santos Depo. Tr. at 139:19 – 140:12; 144:25 -145:9. *See* Doc. 863-1, p. 27.

uncontroverted. Only when the Missouri Debtors encountered their committees' resistance to the planned subordination did ABBK amend its schedules to question the Missouri Debtors' claims in this case. The other affiliates' claims had been resolved, either in the Spanish case or in Delaware.[76]

The Missouri Debtors' intercompany claims are different from those of non-affiliate Class 2 creditors, and, in any event, the evidence demonstrates the existence of an Abengoa-wide understanding among the affiliates that intercompany claims would be subordinated to trade creditors and would receive no distribution. Each of the three plans reflected that understanding.

The evidence of a subordination agreement is not based solely upon the testimony of debtor's witness. Star acknowledged that, given the experimental nature of the Hugoton project, the intercompany claimants expected repayment of the intercompany obligations only if and when the plant was completed and became operational.[77] That didn't occur. Because ABBK never generated cash flow, there was no expectation of repayment as the Missouri Debtors (and the Delaware debtors) and ABBK approached bankruptcy in 2016. The Missouri Debtors, by virtue of shared management, certainly knew the state of ABBK's affairs in 2015-16 as they continued to fund ABBK. That understanding is circumstantial evidence

---

[76] Santos Depo. Tr. at 287:23 – 288:25.

[77] Star Depo. Tr. at 141:20-142:11, 144:15-23. Drivetrain objects to the question beginning at 141:20 on the grounds that it call for speculation. Star, as the Rule 30(b)(6) designee, may testify to Drivetrain's understanding of the means by which ABBK would repay loans from ABC, and may testify if Drivetrain lacked any information in that regard. The objection is overruled.

that is consistent with the subordinated treatment of affiliates' intercompany claims.

### No Intention to Gerrymander

The sequence of events alone undercuts Drivetrain's assertion that ABBK separately classified the Missouri Debtors' claims to gerrymander an impaired accepting class. ABBK filed its plan several months before the Missouri joint plan was confirmed and certainly before Drivetrain was appointed liquidating trustee. It could not have been ABBK's intention to "gerrymander" votes to avoid paying Drivetrain when it filed the plan because Drivetrain was not yet the liquidating trustee for the Missouri Debtors. ABBK proved that its motivation to separately classify and treat the Missouri Debtors and other affiliate intercompany creditors' claims was sincere, based upon its understanding and agreement that other Abengoa debtors had treated affiliates in a similar manner. Although ABBK amended its schedules in April of 2017 to dispute these four claims, these Missouri Debtors (acting through the same law firm that represented ABBK) filed claims on May 23, 2017 that drew objections from neither ABBK nor its unsecured creditors committee, resulting in the claims being deemed allowed.[78]

The affiliates' motivation for agreeing to subordinate one another's claims is clear. The Missouri Liquidating Trustee's motivation in bucking that subordination is equally clear. As the Missouri confirmation order states, the Eastern District of Missouri bankruptcy court approved a settlement between Cofides who is a secured

---

[78] 11 U.S.C. § 502(a).

creditor of the Missouri debtors (and other debtors, but not ABBK) and an entity owned or controlled by the Kingdom of Spain.[79] The order provides that as part of the Cofides settlement, Drivetrain as trustee will pay it $2.0 million within 30 days of the plan's effective date as an advance against its obligation to use its best efforts to collect the Missouri Debtors' intercompany claims against ABBK in this case.[80] The order, and the conforming amendments to the Missouri Plan, provide that the Missouri Liquidating Trustee will pay Cofides the first $300,000 of the net proceeds of its ABBK recovery from $4 to $5 million; the first $150,000 of an ABBK recovery from $5 to $6 million, and the first $350,000 of an ABBK recovery above $6 million.[81] In addition, the trustee agrees to use its best efforts, to recover these amounts from ABBK, efforts that presumably include the trustee's filing of a failed creditor's plan and its stolid opposition to ABBK's plan.

*Best Interests of Creditors Test Met*

According to the ABBK disclosure statement, Class 2 third party unsecured creditors will receive a pro rata dividend of 95% based on a "pot" of $22.482 million and Class 3 intercompany claimants will receive nothing. The liquidation analysis contained in the disclosure statement represents that all unsecured creditors would receive an 18.7% dividend in a liquidation. This analysis contains references to footnotes that were not included in the approved disclosure statement. But Exhibit X, admitted at trial, contains the notes. Note 7 states "The 'Chapter 7' analysis

---

[79] Mo. Case, Doc. 1443, pp. 26-30, ¶ 20.C.
[80] *Id.* at p. 28, ¶ vi.
[81] *Id.* at ¶¶ vii and viii; p. 35, ¶ J.

includes estimated DoE claim and Intercompany claims[.]" The note further states that the "chapter 11 scenario" only considers third party unsecured claims.[82] Though treated as a "bombshell" at the hearing, Exhibit X states the obvious: incorporating another $70-odd million in claims into class 3 leads to significant dilution of the trade creditors' take. Mr. Daileader noted that if these claims were treated in Class 2 with other unsecured creditors, they would receive about two-thirds of the distribution—more than $12 million that would principally benefit the Missouri Liquidating Trust, Cofides, and Drivetrain by virtue of its accomplishment fee agreement. As the Kansas Committee points out, that benefit comes at the cost of diluting the dividends of the non-affiliate unsecured creditors. If a hypothetical chapter 7 trustee were to challenge the payment of the affiliate claims or to recognize the subordination agreement, the non-affiliate unsecured creditors would receive a dividend that would be not more than what they will receive under this plan.

<u>Analysis and Conclusions of Law</u>

Drivetrain objects to confirmation of ABBK's plan on four separate grounds.[83] It suggests that the plan violates § 1129(a)(1) and (2) which require that both the plan and its proponent comply with the applicable provisions of Title 11. Drivetrain asserts that the plan violates § 1122(a) by separately classifying the affiliates' claims in an effort to improperly gerrymander an accepting vote. Drivetrain notes that each class must either accept the plan or not be impaired and, here, the

---

[82] Trial Ex. X.
[83] Doc. 931.

affiliate claims class is impaired and is deemed to reject, implicating § 1129(a)(8). Drivetrain also protests that the plan does not meet the best interests of creditors test set out in § 1129(a)(7). Finally, it asserts that the plan unfairly discriminates against the intercompany claims and is not fair and equitable under § 1129(b)(1) and (b)(2)(B). Plan proponents bear the burden of proving that the plan meets the confirmation requirements in § 1129(a) and, if necessary, § 1129(b).[84] Because ABBK did not meet the acceptance/unimpaired requirements of § 1129(a)(8), it seeks to cram the plan down by showing that it does not unfairly discriminate and that it is fair and equitable.

      I.     Separate Classification of the Affiliate Intercompany Claims is
              Permissible Under § 1122.

Section 1122(a) requires that claims within a class be substantially similar. It states: "Except as provided in subsection (b) of this section, a plan *may* place a claim or an interest in a particular class *only if* such claim or interest is substantially similar to the other claims or interests of such class."[85] Dissimilar claims may not be classified together. Nothing in the bankruptcy code prohibits the separate classification of like claims into different classes so long as that is not done for the purpose of gerrymandering voting on the plan.[86]

---

[84] *In re Gentry,* 807 F.3d 1222, 1226 (10th Cir. 2015)*; In re Paige,* 685 F.3d 1160, 1177 (10th Cir. 2012); *In re Lotspeich,* 328 B.R. 209, 219-20 (10th Cir. BAP 2005).
[85] 11 U.S.C. § 1122 (Emphasis added.). *See In re Overland Park Merchandise Mart Partnership, L.P.,* 167 B.R. 647, 651 (Bankr. D. Kan. 1994) (interpreting § 1122(a) to allow similar claims to be placed in separate classes).
[86] There is no controlling Tenth Circuit authority on this point, but other courts and jurisdictions have so held. *See In re Autterson,* 547 B.R. 372, 397-98 (Bankr. D. Colo. 2016) (plan proponent offered no evidence to justify separate classification of

ABBK separated non-affiliates' general unsecured claims from those of affiliates, arguing that third-party vendors lacked the unique access and knowledge that the affiliate creditors had by virtue of their shared ownership, management, and objectives. The affiliates also shared an intention that intercompany claims among them would be paid after the third-party vendors if at all, implying if not expressing an agreement or shared intention of subordinating the affiliates' claims. ABBK demonstrated both the uniqueness of the affiliate claims and the subordination understanding among them. Separating those claims from the general unsecured claims of third parties does not of itself violate the requirements of §1122(a).

### No Gerrymander Shown

Nor does Drivetrain's argument that ABBK separately classified the intercompany claims for the purpose of gerrymandering the voting on its plan pass muster. First, as noted above, the intercompany claims were separately classified because they are dissimilar from the third-party trade creditor claims. Second, even if I had concluded that the intercompany claims and third-party claims are substantially similar, there is no evidence that the separate classification was

single unsecured creditor as a Class 6 administrative convenience claim); *In re Hyatt,* 509 B.R. 707, 714-15 (Bankr. D.N.M. 2014) (separate classification of general unsecured claims and a guaranty claim); *In re Coram Healthcare Corp.,* 315 B.R. 321, 348 (Bankr. D. Del. 2004) (Separate classification of unsecured claims is not improper per se; separate classification of unsecured noteholders from trade creditors was reasonable); *In re Stratford Associates Ltd. Partnership,* 145 B.R. 689, 695 (Bankr. D. Kan. 1992) (separating unsecured claims into three separate classes, including one class comprised of a sole creditor, was not for an improper motive such as gerrymandering).

motivated by gerrymandering the plan voting. It could not have been ABBK's intent to gerrymander Drivetrain or its predecessors because, at the time ABBK's plan was drafted and filed in April of 2017,[87] the Missouri Debtors remained debtors in possession, were still managed by the same individuals that managed ABBK, shared the same general counsel, and were represented in court by the same lawyers. Santos testified that when ABBK's plan was filed the shared management team of ABBK and the Missouri Debtors (though not the Missouri Committee) agreed to the proposed classification and treatment of intercompany claims.[88] There was no tactical reason for ABBK to seek to differently treat a "blocking" unsecured claim. The ABBK plan separately classified the intercompany claims, treating them just as the plans in the Missouri and Delaware cases did, honoring the agreement that third party trade creditors and vendors would be paid ahead of intercompany claims. ABBK's separate classification of the intercompany claims not only complies with § 1122(a), but is likely required by it,[89] and was not done to gerrymander the unsecured claims to create an impaired accepting class.

II.   ABBK's Plan Satisfies the Best Interests of Creditors Test, § 1129(a)(7).[90]

---

[87]  Doc. 811.

[88]  Santos Depo. Tr. at 138:10-140:12, 144:24-145:9.

[89] *In re Overland Park Merch. Mart Partnership, L.P,* 167 B.R. 647, 652 (Bankr. D. Kan. 1994) (only substantially similar claims may be placed in the same class; claims that are not substantially similar must be classified separately).

[90] If the plan fails the (a)(7) test, there is no reason to consider any issues under § 1129(b). *See* § 1129(b)(1) ("…if all the applicable requirements of subsection (a) of this section *other than paragraph (8) are met* …, the court shall confirm the plan … if the plan does not discriminate unfairly, and is fair and equitable ….").

35

Section 1129(a)(7)(A)(ii), commonly referred to as the "best interests of creditors" requirement, provides with respect to each non-accepting impaired class of claims that:

> (A)  each holder of a claim  . . . of such class –
>    . . .
>        (ii)      will receive or retain under the plan on account of such claim . . . property of a value, as of the effect date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date;

Drivetrain asserts that the liquidation analysis submitted with the ABBK's disclosure statement, along with the subsequently produced footnotes to the analysis, unequivocally demonstrates that the affiliated intercompany claims would receive substantially more in a chapter 7 liquidation than under ABBK's plan. I disagree. Applying the best interests test requires that "the court must take into consideration the applicable rules of distribution of the estate under Chapter 7."[91] I must also "engage in rational speculation" of what may occur in a chapter 7 liquidation, including whether certain claims may evoke an objection by the chapter 7 trustee).[92] To do that, a court must take into account potential claims against insiders, subordinations, and disallowed claims under § 502(d).[93] Even without considering whether the Delaware, Missouri, and Kansas debtors agreed that intercompany debt would be subordinated, my "rational speculation" must certainly

---

[91] *See* William L. Norton III, 6 NORTON BANKR. LAW AND PRACTICE § 112:14 at 112-47 and n. 5 (3d ed. 2017).
[92] *In re Affiliated Foods, Inc.,* 249 B.R. 770 (Bankr. W.D. Mo. 2000) (hypothetical chapter 7 liquidation is not exact science but entails considerable speculation).
[93] *In re Sierra-Cal,* 210 B.R. 168, 174 (Bankr. E.D. Cal. 1997).

include the likelihood that a chapter 7 trustee would question paying the claims of four affiliated companies who shared information, management, and objectives at par with unaffiliated and less informed third-party creditors.

Having found as a fact that there was a shared intention among ABBK, the Delaware debtors, and the Missouri Debtors to subordinate these claims, I conclude that the Code honors that agreement under § 510(a). As Santos stated, the affiliate intercompany creditors understood when they extended credit or made advances to ABBK that trade creditors would be paid first. Indeed, the evidence suggests that there was no corporate expectation of any payment unless and until the Hugoton plant achieved commercially profitable production. The subordination and release provisions of the respective Delaware, Missouri, and Kansas chapter 11 plans, the Kansas KEIP Order, and the uncontroverted testimony of Mr. Santos convince me that there was a working understanding that these claims would be subordinated by the plans.[94]

As the Committee points out, a contractual subordination need not be in writing, or in any particular form.[95]  Under Kansas law, a subordination agreement

---

[94] When a chapter 11 plan provides for subordination, an adversary proceeding seeking subordination is not required. *See* Fed. R. Bankr. P. 7001(8). *See In re Hyatt,* 509 B.R. 707, 720 (Bankr. D. N.M. 2014) (noting that appropriate mechanism for subordinating claims in chapter 11 case without relying on equitable subordination is separate classification and treatment). *See also* Alan N. Resnick & Henry J. Sommer, Editors-in-chief, 4 COLLIER ON BANKRUPTCY ¶ 510.02[1] at 510-5 (16th. ed.) (describing subordination as a remedy altering the order of payment of valid claims).

[95] *See In re Howland,* 545 B.R. 653, 659-60 (Bankr. D. Or. 2015). *See also,* 11 Part II Anderson on the U.C.C. § 9-339:3 [Rev] (3d ed. 2017) (There are no formal requirements for subordination agreements; they may be oral.)

37

is a contract requiring a "meeting of the minds" on the essential terms.[96] As noted in *In re Howland*, circumstantial evidence may establish an enforceable subordination agreement. In that case, the bankruptcy court cited an informal, oral agreement that repayment of advances to debtor by his father would not be made until debtor's businesses stabilized and other creditors were paid. The father never made demand for payment.[97] Although *Howland* involved related individuals in a chapter 7 case, the same principles apply here. Until Drivetrain was appointed in Missouri, not a single affiliated debtor challenged ABBK's subordinated treatment of their intercompany claims. And not a single member of Abengoa's bioenergy group's shared management refuted Mr. Santos' testimony regarding the agreed upon treatment of intercompany claims.

The debtor's liquidation analysis supports this conclusion. In preparing that analysis, debtors should consider subordination agreements or any other events (such as claims objections) that may occur in a chapter 7 liquidation and how they may affect distributions, just as a chapter 7 trustee would, in determining the hypothetical distribution in a chapter 7 liquidation to the affiliate intercompany claimants.[98] The rules for distributions in a chapter 7 case are expressly subject to

---

[96] *See Monty Titling Trust 1 v. Terra-Bentley II, L.L.C.*, 355 P.3d 721 (Table), 2015 WL 4758537 at *3 (Kan. App. July 2, 2015).

[97] *Howland,* 545 B.R. at 659.

[98] *See* William L. Norton III, 6 Norton Bankr. Law and Practice § 112:14 at 112-47 and n. 5 (3d ed. 2017) (In determining if the hypothetical liquidation standard is met, "the court must take into consideration the applicable rules of distribution of the estate under Chapter 7," including the subordination provisions of §§ 510, 726(a)(3), and 726(a)(4).). *See also In re Hoffinger Indus., Inc.,* 321 B.R. 498 (Bankr. E.D. Ark. 2005) (refusing to defer to debtor's liquidation analysis that didn't

the subordination provisions in § 510.[99] ABBK's plan satisfies the best interests of creditors test.

III.   <u>No Unfair Discrimination, § 1129(b)(1).</u>

The fact that ABBK separately classified the intercompany claims below the general unsecured claims and that the intercompany claims will receive no dividend is discrimination, but does not amount to unfair discrimination that would violate § 1129(b)(1).[100] There is no controlling Tenth Circuit authority on what constitutes unfair discrimination under § 1129(b)(1), but bankruptcy courts in the Tenth Circuit have cited to several commonly accepted tests.[101] In *In re Deming Hospitality, LLC*, the bankruptcy court mentioned the so-called *Aztec* test—

1. Whether the discrimination is supported by a reasonable basis;
2. Whether the debtor can confirm and consummate a plan without the discrimination;
3. Whether the discrimination is proposed in good faith; and

---

consider potential objections to and equitable subordination of a claim against debtor that might occur in chapter 7); *In re Sierra-Cal*, 210 B.R. 168, 174 (Bankr. E.D. Cal. 1997) (the best interests test requires the court to take into account potential claims against insiders, subordinations, and disallowed claims under § 502(d); in a chapter 11 case, the bankruptcy court may "engage in rational speculation" of what may occur in a chapter 7 liquidation, including whether certain claims may evoke an objection by the chapter 7 trustee); *In re Affiliated Foods, Inc.,* 249 B.R. 770 (Bankr. W.D. Mo. 2000) (hypothetical chapter 7 liquidation is not exact science but entails considerable speculation).

[99] *See* § 726(a) ("Except as provided in section 510 of this title, property of the estate shall be distributed . . . .").

[100] *In re Stratford Associates Ltd. Partnership,* 145 B.R. 689, 700 (Bankr. D. Kan. 1992).

[101] *See In re Riviera Drilling & Expl. Co.*, No. BR 10-11902, 2012 WL 6719591, at *7 (Bankr. D. Colo. Dec. 19, 2012), *aff'd,* 502 B.R. 863 (10th Cir. BAP 2013) and *In re Deming Hospitality., LLC*, No. 11-12-13377 TA, 2013 WL 1397458, at*4-*5 (Bankr. D. N.M. Apr. 5, 2013).

**39**

4. The treatment of the classes discriminated against.[102]

It also alluded to the formulation found in *In re Greate Bay Hotel & Casino, Inc.* where the court summarized "the hallmarks of the various tests" as whether there is a reasonable basis for the discrimination and whether the plan can be confirmed without the proposed discrimination.[103]

> Rather than rely on either, the *Deming* court concluded that—
>
> (1) if the disparate treatment is "grossly disproportionate" the plan proponent will have a heavy burden to justify the treatment, and (2) if a plan is feasible and could be confirmed without materially disparate treatment, then the burden on the plan proponent to justify disparate treatment will be particularly heavy. Apart from these rules, the determination whether any discriminatory treatment is "unfair" will be left to the sound discretion of the Court.[104]

Applying *Deming*'s formulation does not require a finding of unfair discrimination here. Neither do the *Aztec* or *Greate Bay* tests. There is nothing inherently unreasonable about treating affiliate claims differently than non-affiliate claims. The evidence suggested that the former would receive less-favorable

---

[102] *Deming Hosp.* at *4 citing *In re Aztec Co.,* 107 B.R. 585,590 (Bankr. M.D. Tenn. 1989). *See also In re 11,111, Inc.,* 117 B.R. 471, 478 (Bankr. D. Minn. 1990) (recognizing the *Aztec* 4-part test of unfair discrimination and concluding that separate classification of insiders claims having knowledge of debtor's financial condition and unique ability to influence debtor's operations was not unfairly discriminatory).

[103] 251 B.R. 213, 228 (Bankr. D.N.J. 2000).

[104] *In re Deming Hosp.,* 2013 WL 1397458 at*6 (Segregation of secured creditor's unsecured deficiency claim apart from other unsecured creditors not enough, standing alone, to warrant disapproval of disclosure statement).

treatment outside bankruptcy than the latter. There is no reason to believe this plan has been proposed in other than good faith.

ABBK had a reasonable basis for treating the intercompany claims differently than the Class 2 claims. ABBK and its affiliates agreed to the less favorable treatment of intercompany claims. This common understanding was evidenced in the Delaware and Missouri bankruptcies of affiliates and insiders, whose plans were confirmed without objection from the subordinated intercompany creditors. ABBK's purpose was to design and construct the Hugoton plant to demonstrate the viability of Abengoa's technology. Everyone, especially the Missouri Debtors, understood it was a demonstration project with little expectation of profit. The evidence also shows that there was no expectation of repayment of intercompany credit until the Hugoton plant achieved commercial production and that the affiliates understood that third party trade creditors would be paid ahead of them. Only when the Missouri Debtors' plan was amended at confirmation to provide Cofides with a potential recovery at the expense of ABBK's third-party creditors did any of this become an issue.

ABBK cannot confirm a plan without discriminating against these affiliate claims. This is shown by the trade creditors soundly rejecting Drivetrain's competing liquidating plan where the Missouri Debtors' intercompany claims were classified with the unsecured trade creditors in Class 2.[105] Only 5 of 38 votes

---

[105] Notably, Drivetrain's plan separately classified all the other affiliate intercompany claims in Class 3, who were deemed to have rejected the plan because

(13.2%) in Class 2 accepted Drivetrain's plan.[106]   ABBK proposed its treatment of affiliate intercompany claims in good faith, because, as Santos stated, intercompany claimants had no real expectation of payment, and because the companies shared an understanding that those claims be subordinated. ABBKs plan is consistent with those expectations and understandings.

ABBK's plan does not unfairly discriminate under any of the tests typically employed by courts in this and other circuits.

## IV.    ABBK's Plan is Fair and Equitable, § 1129(b)(2).

With respect to a class of unsecured claims, a plan is fair and equitable under § 1129(b)(2)(B) if:

(i)     The plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effect date of the plan, equal to the allowed amount of such claim; *or*

(ii)    The holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, . . .[107]

Subpart (ii) codifies the absolute priority rule. The absolute priority rule requires creditors to be paid in full before any lower priority creditor or interest holder receives any property or assets under the plan.[108] A plan that complies with

---

the affiliates were not entitled to receive any distribution under its plan. This is the very treatment that Drivetrain challenges here with respect to ABBK's plan.

[106] *See* § 1126(c) (requiring more than one-half in number of the claims held by creditors in the class to accept the plan in order for a class to have accepted a plan). Doc. 1093, Drivetrain Certificate of Voting.

[107] § 1129(b)(2)(B) (Emphasis added.).

[108] *In re Geneva Steel Co.,* 281 F.3d 1173, 1180 n. 4 (10th Cir. 2002).

the absolute priority rule is fair and equitable.[109]  This is a liquidating plan with four classes. Class 1 consists of unimpaired secured claims. Class 2 is the impaired unsecured claims of trade creditors. Class 3 is the impaired unsecured intercompany claims of ABBK's affiliates. Class 4 consists of impaired equity interest holders who will receive no distribution under the plan. The class of equity interest holders is the only class with a lower priority than the class of unsecured intercompany claims and because the equity interest holders will receive no sale proceeds or distribution under the plan, ABBK's plan satisfies the absolute priority rule and is therefore "fair and equitable."

## V.     All other Applicable Confirmation Requirements are Satisfied

While Drivetrain's objections to confirmation focus on classification issues, the best interests of creditors test, and cram down confirmation requirements, the Court has an independent duty to ensure compliance with all confirmation standards, including those contained in § 1129(a).[110] Having reviewed ABBK's plan, I find that it complies with all of the confirmation requirements of § 1129(a) to the extent they are applicable to ABBK's plan, as addressed in ABBK's  pre-trial brief in support of confirmation which I incorporate as my findings to the extent not separately addressed in this opinion.[111]

---

[109] *In re Paige,* 685 F.3d 1160, 1183 (10th Cir. 2012).
[110] *In re Autterson,* 547 B.R. 372, 390 (Bankr. D. Colo. 2016).
[111] Doc. 1123, pp. 33-42.  I further find that § 1129(a)(6), (13), (14), (15), and (16) are inapplicable to ABBK's plan

43

The Tenth Circuit test of good faith as that term is used in § 1129(a)(3) is "whether a plan is likely to achieve its goals and whether those goals are consistent with the Code's purposes."[112] ABBK's plan seeks to implement the affiliated companies' shared management's shared intentions. Nothing in the record suggests that ABBK "intended to abuse the judicial process and the purposes of the reorganization provisions."[113] ABBK has not engaged in any improper conduct. ABBK's plan is proposed in good faith.[114]

Conclusion

ABBK's plan meets the confirmation requirements of § 1129(a), (b)(1) and (b)(2). Its separate classification of the Missouri Debtors' claims is permissible and its treatment of those claims is neither unfair nor inequitable. Drivetrain's objection to confirmation is overruled and ABBK's plan is CONFIRMED.

The parties are directed to confer and to submit an order confirming Debtor's Plan, consistent with this Opinion, within 7 days of its entry.

# # #

---

[112] *In re Paige,* 685 F.3d 1160, 1179 (reaffirming test of good faith).
[113] *Id.* quoting *In re Pikes Peak Water Co.,* 779 F.2d 1456, 1460 (10th Cir. 1985).
[114] While Drivetrain did not raise the good faith requirement in its objection, Doc. 931, I address it here because in its post-trial brief, Drivetrain asserts the good faith requirement is not met. *See* Doc. 1201.