SO ORDERED.

SIGNED this 13th day of March, 2018.



_____
Robert E. Nugent
United States Bankruptcy Judge

_____

DESIGNATED FOR ONLINE PUBLICATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

IN RE:

**ABENGOA BIOENERGY BIOMASS
OF KANSAS, LLC.**

                    **Debtor.**

Case No. 16-10446
Chapter 11

### Order (1) Granting in Part and Denying in Part Motion for Reconsideration of Drinker Biddle & Reath Employment Order (Doc. 1146); and (2) Denying Motion to Disqualify DLA Piper LLP and Armstrong Teasdale LLP as Debtor's Counsel (Doc. 1146)

On October 16, 2017, just nine days before the confirmation hearing in this case, the trustee of the Missouri Liquidating Trust ("MLT"), Drivetrain, L.L.C. ("Drivetrain") objected to Drinker Biddle Reath's (DBR's) application to be employed as co-counsel for Abengoa Bioenergy Biomass Kansas, LLC (ABBK), the debtor in

1

possession.[1] A former DLA Piper partner, Vincent Slusher, joined DBR in late September of 2017. After I granted DBR's application in an oral ruling on October 18, 2017 (the "Employment Order"),[2] Drivetrain filed this combined Motion for Reconsideration and Motion to Disqualify DLA Piper ("DLA") and Armstrong Teasdale ("AT") as counsel to the debtor in possession (the "Motion") two days before the confirmation hearing.[3] Drivetrain contends that Slusher, DLA, and AT all should be disqualified for having conflicts of interest with the MLT because the MLT is a "former client." Slusher and the two firms formerly represented the Missouri debtors-in-possession whose estates were consolidated and conveyed to the MLT under the terms of their confirmed plan of liquidation.

A motion to "reconsider" filed within 14 days of an order's entry is a motion to alter or amend under Fed. R. Bankr. P. 9023 which makes Fed. R. Civ. P. 59(e) applicable in bankruptcy cases and proceedings. Rule 59(e) motions are only granted to correct manifest errors of law, to present newly discovered evidence, and to address intervening changes in the controlling law. The burden to demonstrate manifest error falls squarely on the party moving for relief. Drivetrain has not demonstrated that the Employment Order was entered in error, nor did it convince the Court that DLA and AT have conflicts of interest that would warrant disqualification. Both the reconsideration and disqualification motions are denied, except to the limited extent

---

[1] Doc. 1113.
[2] Doc. 1131 and Doc. 1155, formal order entered October 24, 2017.
[3] Doc. 1146.

2

the Employment Order suggested the Missouri debtors waived any conflict of interest by Slusher's, DLA's, and AT's joint representation of ABBK and the Missouri debtors.

Factual Background; Procedural Setting; and the Employment Order[4]

The Memorandum Opinion confirming the debtor's chapter 11 plan contains an extensive discussion of the factual background of this debtor. Suffice it to say here that this case began with an involuntary chapter 7 petition being filed against ABBK in March of 2016. After ABBK moved to convert to chapter 11, DLA and its local counsel, AT, were appointed to act as its counsel.[5] Vincent Slusher of DLA acted as lead counsel, appearing here throughout the course of the proceedings. Slusher joined DBR in late September of 2017 and ABBK sought to employ that firm as co-counsel so Slusher could complete the debtor's confirmation hearing on October 25 and 26, 2017.[6]

ABBK is one of several hundred affiliated companies, some of whom were debtors in bankruptcy or insolvency cases in Spain and the Districts of Delaware, Kansas, and Eastern Missouri. Their parent corporation, Abengoa S.A., is a Spanish entity globally active in the energy and construction business. DLA represents Abengoa S.A. and certain foreign affiliates in jointly administered chapter 15 cases in the District of Delaware. DLA also represented numerous Abengoa United States affiliates in chapter 11 cases in Delaware and Missouri, and represents ABBK here.

---

[4] Readers are referred to this Court's Memorandum Opinion regarding confirmation of ABBK's plan, Doc. 1289, for a more extensive recitation of facts.
[5] Doc. 260 and 261.
[6] Doc. 1099.

3

AT was co-counsel for the Abengoa affiliates in the Missouri cases and is co-counsel for the debtor in this case.

ABBK was part of Abengoa's United States "bioenergy" group that includes among others, its upstream parent, Abengoa Bioenergy U.S. Holdings (ABUS), and its corporate siblings Abengoa Bioenergy Corporation (ABC), Abengoa Bioenergy Engineering and Construction (ABEC), Abengoa Bioenergy Trading U.S. (ABT), and Abengoa Bioenergy Outsourcing (ABO) (cumulatively, the "Missouri Debtors"), each of which were organized as limited liability companies and were chapter 11 debtors in the Eastern District of Missouri. Together with ABBK, these debtors' business operations were all based in Chesterfield, Missouri, where they shared offices and management, including a full slate of officers, directors, operating executives, and the same general counsel. While each company maintained a separate corporate existence, and documented its contractual relationships with the others, the same people were involved.

When the Missouri Debtors hired DLA for restructuring advice and to file their bankruptcies, they jointly executed an engagement letter[7] that provided, among other things, that "any and all information that we [DLA Piper] receive from one of you can be shared with the other(s) [companies], and that any and all information that DLA Piper otherwise obtains during the course of representing you with respect to the

_____

[7] Doc. 1174-1, Declaration of R. Craig Martin, Ex. A at pp. 4-15/265, consisting of an executed "Engagement and Conflict Waiver Letter for Legal Services" dated March 24, 2016, a DLA statement regarding billing practices for expenses and costs, and Terms of Service that are a part of the "Engagement Letter."

4

Matter [the restructuring] can be shared with the other(s)."[8] It further provided that, "you must understand and agree that you cannot disclose any information regarding the Matter to DLA Piper on the condition that it will not be disclosed to the other(s)."[9] This engagement letter also included a waiver of any concurrent conflicts and an expression of consent to the firm's representing these affiliated companies.[10] In the event of an intercompany dispute, the company with an adverse interest agreed not to use the firm's representation of the remaining companies as a basis for disqualifying DLA from further action in the Missouri bankruptcies and expressly waived the right to disqualify DLA from continuing to represent the remaining companies.[11]

Paragraph 4 of the Terms of Service further described potential future conflicts of interest by DLA representing other entities adverse to the Missouri Debtors on restructuring or bankruptcy matters other than those for which DLA had been engaged by the Missouri Debtors. These conflicts were termed "Allowed Adverse Representation," and the Missouri Debtors agreed to not assert DLA's representation of them or any of its current or future affiliates as a basis for disqualifying DLA from representing another party in an Allowed Adverse Representation.[12] The

---

[8] *Id.* at p. 7/265.

[9] *Id.*

[10] *Id.* at p. 6/265. This waiver acknowledged a present conflict between ABBK and Abener Teyma Hugoton General Partnership and excluded DLA from representing either of them in any dispute *between them* in connection with the Hugoton Plant. The Missouri debtors further waived any conflicts of interest created by DLA's joint representation of the affiliates in the Missouri chapter 11 cases.

[11] *Id.* at p. 7/265.

[12] *Id.* at p. 13/265.

5

Engagement Letter controlled if there were any inconsistencies between the Terms of Service and the Engagement Letter.[13]

I have not seen the DLA-ABBK engagement letter.[14] I suspect there is one because, when ABBK filed a voluntary case in the District of Delaware in early April of 2016, it and the other Abeinsa and Abengoa debtors applied to retain DLA as debtors' counsel and the application in that case recites that the debtors had entered into an engagement agreement.[15] The letter may well be the same as or similar to the Missouri Debtors' letter, but I cannot speculate about its contents.

AT's engagement as local restructuring counsel in the Missouri cases and for ABBK is memorialized by separate engagement letters dated February 19, 2016 and May 25, 2016 respectively, and are accompanied by AT's Standard Terms of Representation.[16] The Kansas engagement letter expressly provides that any representation of ABBK's unidentified affiliates will be by a separate engagement letter and that representation of ABBK does not give rise to any conflict of interest

---

[13] *Id.* at p. 12, ¶ 1.

[14] An engagement letter was not attached to DLA's employment application in this case. *See* Doc. 143.

[15] *In re Abeinsa Holding Inc., et al.,* Case No. 16-10790-KJC (Bankr. D. Del.), Doc. 138, filed April 28, 2016 and Doc. 138-5, Supporting Declaration of Jeffrey Bland at p. 3, ¶ 5 referencing "the Engagement Letter." *See also,* Doc. 143, p. 3, ¶ 6 and note 1, where ABBK is described as one of the Phase II Delaware Debtors, having filed a chapter 11 case on April 6 or 7, 2016 and Doc. 143-10, Ex. J is the Delaware Order entered May 25, 2016 authorizing DLA's employment by ABBK and the other Delaware Debtors.

[16] Doc. 1174-1, pp. 191-97 -- Exhibit 1 attached to Declaration of Richard W. Engel, Jr. (Missouri engagement letter); Doc. 134, Exhibit 1, pp. 29-35 (Kansas engagement letter).

6

in the event other AT clients are adverse to ABBK's affiliates.[17] Unlike the DLA engagement letter, ABBK did not waive any concurrent or future conflicts of interest that may arise by AT's concurrent representation of the Missouri affiliates. The terms of AT's Missouri engagement by ABUS and related Abengoa Bioenergy affiliates "listed on Attachment A" is substantially the same as the AT-ABBK engagement letter.[18] The referenced attachment of related Abengoa Bioenergy entities appears to be that chart titled "ABUS and Subsidiaries and Select U.S. Affiliates: Officer & Directors," and includes and identifies ABBK.[19]

Jeffrey Bland, the U.S. Abengoa bioenergy companies' General Counsel, executed all of the DLA and AT engagement documents, the applications to employ that DLA and AT filed here and in the Missouri cases, as well as declarations in support of DLA's retention in the Delaware and Kansas cases.[20]

The affiliate Missouri Debtors filed chapter 11 cases in the Eastern District of Missouri. The bankruptcy court approved DLA's and AT's applications as co-counsel for the Missouri Debtors. At around the same time, other bioenergy group companies and Abengoa affiliates filed cases in the District of Delaware.[21] DLA was national lead counsel for these Abengoa entities and represented them in Missouri and

---

[17] Doc. 134, Exhibit 1 at pp. 29-35.
[18] Doc. 1174-1, Exhibit 1 at pp. 191-97.
[19] *Id.* at pp. 198-201.
[20] *See* Doc.143 (DLA's Kansas employment application); Doc. 134 (AT's Kansas employment application); Doc. 1174-1 at pp. 76-85 (DLA's Missouri employment application); Doc. 1174-1 at pp. 177-83 (AT's Missouri employment application).
[21] "Big Abengoa" originally intended that ABBK's case be filed in Delaware, too, but the involuntary petition in this District was filed first. This Court denied ABBK's motion to transfer venue.

7

Delaware. DLA represented the Missouri Debtors throughout the reorganization process until their joint plan of liquidation was confirmed and became effective, when those estates' assets conveyed to the MLT and Drivetrain was appointed liquidating trustee. Drivetrain plays a similar role in the Delaware cases as both a liquidating trustee and litigation trustee (for some of the reorganizing debtors). Hogan Lovells represented the Missouri unsecured creditors committee ("Missouri Committee") and appeared here in that role, prior to its current representation of Drivetrain.[22] It similarly represented the Delaware committees and currently represents Drivetrain in its role as liquidating and litigation trustee in the Delaware cases.

After ABBK sold the Hugoton ethanol facility and settled various claims, it filed a chapter 11 plan of liquidation in this case on April 14, 2017.[23] The plan provides for the payment of administrative and priority claims and a distribution of the remaining proceeds to non-affiliate unsecured creditors. The plan also provides that intercompany claims by affiliates such as the Missouri Debtors would receive nothing and to that end, classified them separately from the unsecured trade creditors. The Court approved the disclosure statement and ABBK solicited ballots on its plan. The Missouri Debtors never objected to their plan treatment by ABBK.

On May 23, 2017, DLA filed proofs of claim in this case on behalf of four Missouri Debtors:  ABEC, ABC, ABO, and ABT.[24] Because there were no objections

---

[22] *See* Docs. 661-664 (motions to admit Hogan Lovells attorneys *pro hac vice* dated January 12, 2017).
[23] Doc. 811.
[24] Claim Nos. 93, 94, 95, and 96.

8

filed to these intercompany claims, they were deemed allowed. After numerous agreed extensions of the time to file intercompany claims in the Missouri case, Gerson Santos-Leon, ABBK's Executive Vice-President, filed a proof of claim in late May of 2017 on behalf of ABBK in the Missouri Debtors' case.[25] On July 11, 2017, Drivetrain objected to ABBK's claims and the Kansas Committee filed a response on September 8, 2017.[26] On September 11, 2017 this Court granted standing to the Kansas Committee to act on behalf of ABBK in the Missouri Case with respect to ABBK's intercompany claims relating to the Missouri Debtors.[27] Neither DLA nor AT are prosecuting or defending the ABBK claims in the Missouri claims litigation matter. The Kansas Committee (represented by Baker Hostetler) has assumed that role, and is engaged in discovery on the intercompany claims litigation.

The Missouri Debtors' plan was confirmed in June of 2017 and became effective on July 7, 2017. Like the ABBK plan, each of these debtors' plans provided for the intercompany claims among these hundreds of companies to be classified separately from the general unsecured creditors' claims and be paid nothing.[28] The debtors believed that unrelated third-party creditors should be paid before these affiliates paid each other and the proliferation of intercompany claims would be difficult to sort out. ABBK's management believed that there was general agreement among the

---

[25] *See In re Abengoa Bioenergy US Holding LLC,* No. 16-41161, Claim No. 273-1 filed May 24, 2017 (Prime Clerk Claim No. 964).
[26] Missouri No. 16-41161, Doc. 1553 and 1560.
[27] Doc. 1047.
[28] In the Missouri case, an exception was made for ABBK's claim. In the Delaware case, distributions to intercompany claims were denied except that ABC's claim against ABHK (ABBK's direct parent) was reserved.

9

various Abengoa bioenergy debtors that all intercompany claims would be subordinated and paid nothing. But after the Missouri plan was confirmed and became effective, Drivetrain objected to ABBK's claims in the Missouri case, ABBK's plan here, and filed its own plan and disclosure statement. Because ABBK's plan had already been balloted, Drivetrain's filing of the second plan caused me to continue the then-scheduled August 8, 2017 confirmation hearing until Drivetrain's disclosure statement could be approved and its plan balloted.

Drivetrain's plan proposed that the intercompany claims of four Missouri Debtors (to which Drivetrain succeeded under the Missouri plans) be paid on par with the unsecured claims of third-party creditors, while the remaining intercompany claims would be paid nothing. Drivetrain contends that its claims are different from the other intercompany book claims because they were for the actual prepetition extension of credit and the sale of goods and services by the Missouri Debtors to ABBK. The third-party creditors rejected the MLT plan, leaving it to prosecute its objection to ABBK's plan's confirmation. Because no one objected to the Missouri Debtors' claims, they were deemed allowed.[29] The dispute at confirmation centered on ABBK's separate classification and subordinate treatment of these claims under the plan, not their amount or allowance. Drivetrain objected that the plan failed to meet the best interests of creditors test in § 1129(a)(7), that it improperly classified the Missouri Debtors' claims under § 1122 and 1123, that it unfairly discriminated

---

[29] *See* 11 U.S.C. § 502(a).

against those claims under § 1129(b)(1) and was not fair and equitable under § 1129(b)(2).

The employment/conflicts surfaced in court when DLA attorney Vincent Slusher moved to DBR and Drivetrain objected to DBR's employment on October 16, 2017.[30] Only then did Drivetrain allege a conflict of interest, just days before the confirmation trial.[31] Up to this point, Slusher had appeared as the lead attorney prosecuting confirmation of ABBK's plan and was heavily involved in the sale process leading up to ABBK's plan. After hearing arguments and reviewing both sides' memoranda, I granted DBR's application as set out in the Employment Order.[32] Drivetrain's current Motion filed October 23, 2017, two days before the confirmation hearing on ABBK's plan, seeks reconsideration of this Order along with a first-time affirmative motion to disqualify DLA and AT from further work in this case.[33]

In the Employment Order, I reached these conclusions. First, the MLT was and is not a former client of DLA, AT, and Slusher. Even if the MLT was somehow a former client because Slusher represented the Missouri debtors, those debtors had already acquiesced in concurrent representation when Jeffrey Bland, general counsel to the Missouri and Kansas Debtors, executed the applications to retain DLA, AT, and Slusher in the Missouri and Kansas cases. While that did not amount to a written

---

[30] Doc. 1113.
[31] ABBK filed a reply, Doc. 1119, and the MLT sought to file a further response without leave of court, or sur-reply, to ABBK's reply, Doc. 1120, that is not permitted under this Court's local rules and which drew a motion to strike from ABBK, Doc. 1121. *See* D. Kan. Rule 7.1(c) and Rule 83.8.2.
[32] Doc. 1155.
[33] Doc. 1146.

11

waiver under Kansas Rules of Professional Conduct 1.2 *per se*, it showed that the respective debtors were informed about, and expected these firms and their lawyers would be representing all of them at the same time. In any event, the MLT's concerns about counsel having had access to their debtors' confidential information could be addressed by invoking the attorney-client privilege, something it clearly retained once the Missouri plans became effective. Finally, because the MLT did not raise the conflict until a few days before trial, its motivations were at least partially tactical. Most courts regard tactical disqualification motions with disdain.

As noted above, when the MLT filed the Motion, it also sought to disqualify DLA and AT completely, filing that document *two* days prior to trial and seeking a hearing on the day of the trial. Rather than use part of a long-standing trial setting in that way, I allowed ABBK time to respond in writing[34] and set the Motion for later hearing. After reviewing both sides' papers, I vacated the hearing setting and took these motions under advisement. The confirmation trial took place on October 25 and 26, followed by post-trial briefing and designations of deposition testimony. I entered my decision confirming ABBK's plan of liquidation on February 8, 2018 and turned my attention to Drivetrain's pending Motion.[35]

Rule 59(e) Standards

---

[34] Doc. 1174.
[35] Doc. 1290. The Memorandum Opinion on confirmation of ABBK's plan is currently on appeal.

12

A motion to reconsider that is filed within fourteen days of the entry of the challenged order is treated as a motion to alter or amend.[36] Courts should grant motions to alter or amend judgments when they have committed manifest legal error, the movant has newly-discovered evidence that was previously unavailable, or an intervening change of controlling law has occurred.[37]  A motion to alter or amend a judgment allows a party to reargue previously articulated positions to correct clear legal error.[38]  But it cannot be used to raise new arguments that could have been made previously.[39]  These motions do not entitle a party to a second chance where the party failed to present its strongest case in the first instance.[40]  Drivetrain contends that it has new evidence that the Court didn't consider in its Employment Order and that it committed clear legal error.

<u>Motions to Disqualify Standards</u>

Drivetrain's affirmative motion to disqualify DLA and AT made concurrently with its motion for reconsideration, is not subject to the Rule 59(e) standards. The

---

[36] *Hayes Family Trust v. State Farm Fire & Casualty Company,* 845 F.3d 997, 1004 (10th Cir. 2017) (No matter how styled, if the motion is timely filed and seeks relief appropriate to Rule 59(e), the motion will be "deemed a Rule 59(e) motion."). In bankruptcy and this District, motions to "reconsider" or alter or amend must be filed within 14 days of the challenged order's entry. *See* Fed. R. Bankr. P. 9023; D. Kan. Rule 7.3(b). While Rule 9023 incorporates Civil Rule 59(e) in bankruptcy proceedings, it does not incorporate its time requirement. *Cf.* Fed. R. Civ. P. 59(e)'s 28 days to file a motion to alter or amend in other civil proceedings.
[37] *Id.,* quoting *Servants of the Paraclete v. Does,* 204 F.3d 1005, 1012 (10th Cir. 2000).
[38] *Hayes Family Trust,* 845 F.3d 997, 1005.
[39] *Sprint Nextel Corp. v. Middle Man, Inc.,* 822 F.3d 524, 536 (10th Cir. 2016).
[40] *In re American Freight System, Inc.*, 168 B.R. 245, 247 (D. Kan. 1994) (citations omitted).

13

disqualification considerations that this Court should assess have been aptly summarized and are consistent with Kansas law.

> Motions to disqualify opposing counsel are viewed with disfavor because they impinge on a party's right to employ the counsel of its choice." *Scantek Med., Inc. v. Sabella,* 693 F.Supp.2d 235, 238 (S.D.N.Y.2008) (internal quotation marks omitted). As a result, "courts must guard against the tactical use of motions to disqualify counsel[.]" *Murray v. Metro. Life Ins. Co.,* 583 F.3d 173, 178 (2d Cir.2009) (internal quotation marks omitted). "[D]isqualification is warranted only if 'an attorney's conduct tends to taint the underlying trial,' " *GSI,* 618 F.3d at 209 (citation omitted), or when the "conflict of interests ... undermines the court's confidence in the vigor of the attorney's representation of his client[.]" *Nyquist,* 590 F.2d at 1246. "Not all violations of the legal code of ethics require dismissal or disqualification of counsel, and ... the relevant inquiry [is] the possibility of prejudice at trial." *United States v. Quest Diagnostics Inc.,* 734 F.3d 154, 166–67 (2d Cir.2013) (internal quotation marks omitted).[41]

<u>No New Evidence Exists</u>

Drivetrain contends that the Court didn't consider or have before it the Missouri Liquidating Trust Agreement when Drivetrain opposed DBR's employment.[42] This Agreement, however, is not newly discovered evidence. It has been available to Drivetrain since no later than June of 2017 when the Missouri plan

---

[41] <u>*Shader v. Brattleboro Sav. & Loan Ass'n*</u>, No. 5:14-CV-00152, 2014 WL 7140612, at *10 (D. Vt. Dec. 12, 2014). *See also* D. Kan. Rule 83.6.1(a) and 83.8.2 (The Kansas Rules of Professional Conduct ("KRPC") as adopted by the Kansas Supreme Court are the applicable standards of professional conduct for federal court proceedings in the District of Kansas, including Title 11 proceedings in bankruptcy court.); *Koch v. Koch Industries,* 798 F. Supp. 1525, 1530 (D. Kan. 1992) (The court generally defers ethics issues to the disciplinary administrator unless the challenged conduct threatens to taint the proceeding); *Barragree v. Tri-County Elec. Co-op, Inc.,* 263 Kan. 446, 458, 950 P.2d 1351 (1997) (Even if the court found an attorney-client relationship, disqualification is not automatic; the court considers the prejudice to the parties, including the extent of actual or potential delay in the proceedings and whether the motion to disqualify has been used as a tactical device.).
[42] Doc. 1146, p. 13, § I.A.

14

was confirmed and the GUC Liquidating Trust was established.[43]  Drivetrain is not entitled to relief from the Employment Order on this basis. That leaves Drivetrain's claim of legal error under the Kansas Rules of Professional Conduct (KRPC) as to Slusher/DBR and its motion to disqualify DLA and AT.[44]

### Neither MLT nor Drivetrain is a Former Client; KRPC 1.9[45]

Conflicts with former clients are addressed in KRPC 1.9. The rule provides that a lawyer shall not represent a client against a former client "in the same or substantially related matter" when the current client's interests are "materially adverse" to the former client's unless the former client gives "informed consent, confirmed in writing."[46] "The rule is designed to serve three purposes: (1) "to prevent even the potential that a former client's confidences and secrets may be used against him;" (2) "maintenance of public confidence in the integrity of the bar;" and (3) "a client has a right to expect the loyalty of his attorney in the matter for which he is retained."[47]

Drivetrain has cited no case that holds a liquidating trustee appointed pursuant to a confirmed chapter 11 plan and who has succeeded to the chapter 11

---

[43] *In re Abengoa Bioenergy US Holding LLC,* No. 16-41161 (Bankr. E.D. Mo.), Doc. 1439 and Doc. 1443, pp. 13, 19-20.

[44] *See* KANSAS COURT RULES AND PROCEDURE, Vol I – State, Kansas Rules of Professional Conduct, KAN. S. CT. RULE 226 (Thomson Reuters 2018).

[45] For purposes of the Court's legal analysis of the disqualification issue, it considers the MLT and its trustee Drivetrain, one and the same.  The Court therefore refers to MLT or Drivetrain interchangeably and collectively.

[46] KRPC 1.9(a).

[47] *Stanziale v. MILK072011, et al. (In re Golden Guernsey Dairy, LLC),* Adv. No. 14-50953 (KG), 2015 WL 3669932 at *4 (Bankr. D. Del. June 12, 2015).

15

estate, transforms the liquidating trustee to a "former client" of the attorneys who represented the former chapter 11 debtor through confirmation of its plan under Rule 1.9. The MLT did not spring into legal existence until the Missouri liquidating plan was confirmed in the summer of 2017, the trust agreement was established, and the liquidating trustee was approved. At that point, Drivetrain became the post-confirmation designated representative of the estate, making it a separate and distinct entity from the Missouri Debtors.[48] The Missouri Debtors ceased to exist. At no time has DLA or AT represented the MLT. The MLT is not a "former client" of Slusher/DBR, DLA, or AT.

The key cases cited by Drivetrain are distinguishable, and in any event, I am not bound to follow them. In *I Successor Corp.,* applying New York disqualification rules, the post-confirmation committee of unsecured creditors of the renamed debtor I Successor Corp. authorized to pursue transfer claims in adversary proceedings on behalf of former debtor Interliant sued debtor's former officers and directors on chapter 5 and breach of fiduciary duty claims.[49] The Committee sought to disqualify the defendants' attorneys for a conflict of interest based upon the law firm's former prepetition representation of the debtor Interliant in what it contended were substantially related matters. The law firm unsuccessfully argued that I Successor was not its former client and would not continue the business of Interliant in the future, negating the continuing duties of loyalty and confidentiality. The bankruptcy

---

[48] *See* 11 U.S.C. § 1123(b)(3)(B).

[49] *Post-Confirmation Committee of Unsecured Creditors of I Successor Corp. v. The Feld Group, Inc., et al. (In re I Successor Corp.),* 321 B.R. 640 (Bankr. S.D.N.Y. 2005).

16

court applied *Commodity Futures Trading Comm'n v. Weintraub,*[50] a chapter 7 case where the United States Supreme Court held that the attorney-client privilege of an insolvent corporation passes to the chapter 7 trustee, and found that the attorney-client privilege of Interliant passed to the post-petition managers. "I Successor shares the attorney-client privilege of its prepetition predecessor, Interliant, and, consequently, is Proskauer's [law firm] former client."[51] Our fact pattern is nothing like *I Successor Corp.,* which doesn't involve intercompany claims between separate chapter 11 debtors jointly represented by the same counsel.

I agree that *Weintraub* stands for the proposition that a chapter 7 trustee has authority to waive a corporate debtor's attorney-client privilege with respect to prebankruptcy communications. The attorney-client privilege survives a corporation's liquidation and a chapter 7 trustee succeeds to the privilege because the trustee functions most like the management of a corporation does outside of bankruptcy. But preserving the privilege for a chapter 7 trustee does not make that trustee the debtor. *Weintraub* did not involve a motion to disqualify counsel for an alleged former client. The issue in that case was who controls and has the power to waive the attorney-client privilege of a corporation in bankruptcy--the corporation's directors or the chapter 7 trustee. Here, the terms of the MLT agreement specified that the attorney-client privilege would pass to the liquidating trustee.

---

[50] 471 U.S. 343 (1985).
[51] 321 B.R. 640, 652.

17

*I Successor Corp.* goes on to discuss an exception "before the substantial relationship test is even implicated."[52] It must be shown that the attorney could have received information that the former client would reasonably expect to be withheld from the present client.[53] "[W]here the attorney's representation was of two, commonly interested clients, one of whom is now complaining" the substantial relationship test is inapposite because one client couldn't reasonably expect confidences imparted during the course of the joint representation to be withheld from the other client.[54] There is no dispute here that before the Missouri Debtors' plan of liquidation was confirmed, DLA and AT jointly represented the Missouri Debtors and ABBK, albeit under separate engagement letters.

It's also important to remember that both antagonists' interests, ABBK's and the Missouri Debtors' creditors, have been separately represented all along. DLA and AT represented the Missouri Debtors before the MLT was created. Hogan Lovells represented the Missouri creditors' committee before the Missouri plans became effective.[55] The Missouri plans were jointly proposed by the Missouri debtors (represented by DLA and AT) and the Missouri committee (represented by Hogan) and provided for the establishment at the effective date of the MLT. The MLT is the successor of the Missouri debtors and operates for the benefit of their creditors. The MLT did not *become* the Missouri debtors. Rather, it succeeded to their assets, rights,

---

[52] 321 B.R. 640, 654, quoting *Allegaert v. Perot,* 565 F.2d 246, 250 (2d Cir. 1977).
[53] *Id.*
[54] 321 B.R. at 654, quoting *Felix v. Balkin,* 49 F. Supp. 2d 260, 268 (S.D.N.Y. 1999).
[55] DLA and Hogan held analogous appointments in the Delaware bioenergy group cases as well.

18

and interests (including their right to invoke the attorney-client privilege formerly held by the debtors). Even had the Court denied Slusher's application and disqualified DLA and AT before trial, the Kansas Committee counsel would (and did) vigorously defend the plan's denial of payment to affiliate unsecured creditors. I did not manifestly err in determining that Slusher's employment would somehow violate Rule 1.9. DLA and AT stand in the same position as Slusher for purposes of Drivetrain's motion to disqualify them from further representation of ABBK.

Bankruptcy cases with multiple debtors abound and bankruptcy courts have experience wrangling with the ethical issues they pose. Collier suggests that "rather than disapproving of multi-debtor representation as a *per se* conflict, courts generally examine the factual circumstances surrounding the representation to determine whether it is appropriate."[56] As the court in the *Adelphia* case held, "the presence of intercompany claims between debtors represented by the same counsel does not automatically warrant the disqualification of that counsel."[57] That court also noted that courts "recogniz[e] the substantial cost of requiring additional trustees or counsel in cases where individual debtors have claims against each other, [and take] a "wait and see," fact-driven, approach, to determine the extent to which such is

---

[56] 3 COLLIER ON BANKRUPTCY ¶ 327.04[5][a] (15th Ed. Rev.).

[57] *In re Adelphia Communications Corp.*, 336 B.R. 610, 672-73 (Bankr. S.D.N.Y. 2006) (contrasting the case as one involving changed circumstances from cases where counsel was conflicted at the outset), *aff'd,* 342 B.R. 122 (S.D.N.Y. 2006). *See also In re International Oil Co.,* 427 F.2d 186, 187 (2d Cir. 1970); *In re Mulberry Phosphates, Inc.,* 142 B.R. 997, 998 (Bankr. M.D. Fla. 1992); *Hassett v. McColley* (*In re O.P.M. Leasing Services),* 16 B.R. 932, 939-40 (Bankr. S.D. N.Y. 1982).

19

necessary."[58] The *Adelphia* case held that if a firm represents multiple debtors and if, at some point, some of those debtors become adverse to one another, the firm will need to withdraw from those disputes.[59] In *Adelphia*, multiple debtors sought to reorganize their media conglomerate business, but when intercreditor disputes triggered conflict among certain debtors, the firm that had represented all of the debtors in their restructuring efforts, voluntarily disqualified itself from either side of those disputes among parties who it had admittedly previously (and, arguably, still) represented.

*Adelphia* states the principles that underpin Rule 1.9 well, even if its facts don't fit our scenario. I found no cases that do, but the Delaware bankruptcy court's approach in *Golden Guernsey* is instructive and somewhat more helpful here.[60] In *Golden Guernsey*, a law firm, Clark Hill, represented a debtor before bankruptcy in a series of transactions with OpenGate which held an interest in the debtor. Clark Hill gave no bankruptcy advice to the debtor and was not involved in the filing. Clark Hill never formerly terminated its dealings with the debtor and went on to represent OpenGate in adversary proceedings filed by Golden Guernsey's chapter 7 trustee. When the trustee challenged Clark Hill's involvement, the bankruptcy court stated that "the underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in

---

[58] *Adelphia,* at 672-73.
[59] *Adelphia,* at 641.
[60] *Stanziale v. MILK072011, LLC, et al. (In re Golden Guernsey Dairy, LLC),* Adv. No. 14-50953 (KG), 2015 WL 3669932 (Bankr. D. Del. June 12, 2015).

20

the matter in question."[61] The Court went on to note that Rule 1.9 matters are substantially related "if they involve the same transaction or legal dispute *or* if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."[62] The *Adelphia* and *Golden Guernsey* courts agree that the principal interest that Rule 1.9 protects is a former client's expectation that its confidences imparted to its counsel will not later be used against it in a subsequent representation.

Applying that core principal to this matter, I remain convinced that, even if the MLT is a former client of DLA and AT (which I doubt), the circumstances in this case did not imperil its prior confidentiality interest or its loyalty expectations. First, no one has challenged the validity of the MLT's inherited claims. Second, DLA's and AT's *actual* former clients, the four Missouri Debtors, no longer exist, having wound up when the trust was formed. Third, the Missouri debtors not only consented to DLA's and AT's multiple representations of them at the time, but they also stipulated in the DLA engagement letter that none of the information they supplied the attorneys would be deemed confidential as against the other companies. Indeed, DLA stated that they would not receive any information if it were imparted on condition of being kept secret from the other Missouri affiliate companies. Finally, neither DLA nor AT are engaged on behalf of ABBK in the claims litigation in the Missouri

---

[61] *Golden Guernsey Dairy*, at *4, quoting Model Rule 1.9, cmt.2.
[62] *Id.,* quoting Model Rule 1.9, cmt. 3.

proceedings; the Kansas Committee is prosecuting the ABBK-Missouri Debtors claims litigation.

When I confirmed ABBK's plan, I found that ABBK and the Missouri Debtors shared the same management and concluded that they, along with other ABBK bioenergy affiliates, operated in an integrated fashion and had a mutual understanding and agreement as they entered insolvency and bankruptcy proceedings that intercompany claims would be treated separately from general unsecured claims and be paid, if at all, after the general unsecured creditors. It is apparent that the bioenergy debtors in Delaware, Missouri, and Kansas imparted that information to their common counsel DLA, and in the case of the Missouri Debtors and ABBK, to AT. ABBK's plan was consistent with that agreement.

Not having been provided ABBK's engagement letter with DLA, I amend my prior finding that ABBK and the Missouri Debtors validly waived any concurrent representation conflict by consent. There is no direct documentary support for that finding, nor was the finding necessary to reaching the conclusions in the Employment Order. That said, the facts that ABBK and the Missouri debtors shared officers and management (including the same general counsel) and that the same general counsel executed both the application to employ DLA here and in Missouri suggests that all of these debtors were aware of and, at least, did not oppose the joint representation. My previous findings in the Employment order are amended to that extent. I conclude that the concurrent representation issue does not bear on whether the MLT is DLA's former client which is the centerpiece of MLT's argument here.

<u>Drivetrain's Motion to Disqualify DLA and AT is Improperly Motivated</u>

Finally, the timing of Drivetrain's formal assertion of these alleged conflicts leads me to conclude that it was tactically motivated. First, the Missouri Committee (represented by Hogan Lovells) was certainly aware of the progress in this case. When the MLT was established and Drivetrain became its trustee on July 7, 2017 it carried Committee counsel along with it. Drivetrain was very active in this case from its "day one," filing a competing creditors plan, objecting to confirmation of ABBK's plan, objecting to ABBK's proofs of claims, and commencing investigation and discovery.[63] MLT knew or should have known from the outset that I would convene a confirmation hearing as soon as practicable. By the time Drivetrain became involved on July 7, the debtor's plan had already been balloted and set for confirmation hearing on August 8, thirty days hence.[64] Though the MLT and Drivetrain raised numerous disclosure, discovery, and other legal issues over the ensuing three and a half months, they never raised these supposed conflicts, at least not in writing, until nine days before trial and did not affirmatively move for disqualification of ABBK's counsel until two days before trial. Their suggestion that the MLT was unaware of the conflict until the debtor joined in the Kansas Committee's objection to Drivetrain's plan in this case is insupportable.[65] On July 7, the MLT knew or should have known, just as the Missouri

---

[63] *See* Doc. 931 (ABBK plan confirmation objection) and Doc. 932 (Drivetrain's chapter 11 plan) both filed on July 7, 2017; Missouri Case, Doc. 1553 (Drivetrain's objection to ABBK claims) filed July 11, 2017.

[64] The initial Order approving ABBK's disclosure statement and setting the plan for confirmation hearing was issued on May 23, 2017. Doc. 872.

[65] That joinder, Doc. 1077, was filed September 28, 2017 and withdrawn on October 16, 2017, Doc. 1115.

23

Committee knew or could have learned last April, how ABBK proposed to treat the intercompany claims. Whether or not the MLT raised this issue "informally" with DLA and AT, it waited until trial was imminent to bring it up in court and move for disqualification. As I stated in the Employment Order, tactical disqualification maneuvers are highly disfavored.[66] I cannot conclude that DLA's and AT's representation of ABBK in this matter tainted the confirmation proceeding or prejudiced the MLT in any fashion.[67] I did not err in finding Drivetrain's objection to the Slusher/DBR employment or this Motion to disqualify DLA and AT to be more tactical than substantive.

Conclusion

All that is left of ABBK's assets is a fund of money to be distributed by ABBK's liquidating trustee under its confirmed plan. Each month that fund shrinks (as, one presumes, does the MLT's fund) because of the continuing administrative burden imposed by mounting professional fees in this case (and in the Eastern District of Missouri, too).[68] Bankruptcy courts have a duty to be conscious of the "melting ice cube" effect in prolonged cases. I was concerned about the potential for damaging delay to ABBK's creditors when I entered the Employment Order on October 18, 2017.

---

[66] *See Chrispens v. Coastal Refining & Marketing, Inc.,* 257 Kan. 745, 772-73, 897 P. 2d 104 (1995) (use of motions to disqualify as harassment or to divest opposing parties of their counsel of choice should be viewed with "extreme caution," but finding no abuse present in bringing the motion to disqualify where motion was filed immediately before any discovery commenced in newly filed case).

[67] As local counsel, AT was present at the confirmation hearing, but conducted no examinations nor made any arguments.

[68] We can only expect that Drivetrain's appeal of the Memorandum Opinion and confirmation order will add to that burden.

24

I concluded that no unmanageable prejudice would accrue to the MLT or Drivetrain by allowing DLA and AT to represent ABBK at confirmation, and that substantial prejudice would accrue to ABBK's creditors if an unwarranted disqualification of counsel caused the October 25 trial to be adjourned again while ABBK sought and educated a new set of lawyers, no doubt at considerable expense. MLT and Drivetrain are not Slusher's, DLA's, or AT's former clients, nor were they prejudiced at trial by the entry of the DBR Employment Order or by permitting DLA and AT to proceed for the debtor. As discussed above, the Employment Order is amended to delete any legal conclusions concerning concurrent representation, but Drivetrain's motion to alter and amend is otherwise denied, as is its motion to disqualify DLA and AT.

### #