**SO ORDERED.**

**SIGNED this 29th day of March, 2018.**



_____
Robert E. Nugent
United States Bankruptcy Judge

_____

**FOR ONLINE PUBLICATION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANASAS**

| | |
|---|---|
| IN RE: | |
| | Case No. 16-10446 |
| **ABENGOA BIOENERGY BIOMASS OF KANSAS, LLC.** | **Chapter 11** |
| Debtor. | |

**ORDER ON MISSOURI LIQUIDATING TRUSTEE'S MOTION FOR STAY
PENDING APPEAL UNDER FED. R. BANKR. P. 8007 (Doc. 1310)**

Writ large, this is a case where a Spanish global conglomerate, Abengoa,

S.A., and its American affiliates, financed in part, by a Spanish government entity,

Cofides, S.A., received a $95 million dollars United States government grant to

Abengoa's subsidiary, Abengoa Bioenergy Biomass Kansas, L.L.C. (ABBK) to

construct an experimental second-generation ethanol plant in Hugoton, Kansas.

Only after the expenditure of nearly $1 billion was the plant completed. It never

1

produced ethanol in commercial quantities. It didn't work. After this case was filed in the spring of 2016, the debtor sold that plant for $48.5 million, settled and paid the mechanics liens of the vendors and contractors who built it, paid the United States about $3.4 million to settle the Government's claims and interests, and prepared to distribute the balance of the pot (roughly $20 million) to administrative claimants and the unsecured creditors who were not among the over 700 Abengoa affiliates. Four of the affiliates were chapter 11 debtors in the Eastern District of Missouri who filed a joint plan that provided, upon confirmation, for Drivetrain L.L.C., as the Missouri Liquidating Trustee, to liquidate their estates. The four companies ("Missouri Debtors") filed claims of $69 million in this case.[1] Now Drivetrain demands their claims be treated on par with this debtor's (ABBK) non-affiliated creditors, in part so that it can satisfy the Missouri Debtors' commitment to pay part of the Hugoton plant's proceeds to their Spanish government lender at the expense of ABBK's non-affiliated claimants. Drivetrain's actions are akin to someone sticking their straw in your drink and seeking a court order to prevent you from making them remove it.

Drivetrain appealed this Court's confirmation of ABBK's plan of liquidation to the District Court. Granting a stay pending appeal would further delay paying administrative and non-affiliated creditors and impede critical environmental

---

[1] Those entities are Abengoa Bioenergy Company, LLC (ABC), Abengoa Bioenergy Outsourcing, LLC (ABO), Abengoa Bioenergy Trading US, LLC (ABT), and Abengoa Bioenergy Engineering & Construction, LLC (ABEC).

cleanup while the cost of this ongoing litigation continues to grow. The stay motion is denied.

Factual Background

ABBK is one of several hundred affiliated companies, some of whom were debtors in bankruptcy or insolvency proceedings in Spain and the Districts of Delaware, Kansas, and Eastern Missouri. Their parent corporation, Abengoa S.A., is a Spanish entity globally active in the energy and construction business. ABBK is one of several members of Abengoa's United States bioenergy group of companies, as are the Missouri Debtors.

This case began when several mechanic's lien creditors filed an involuntary chapter 7 petition against ABBK on March 23, 2016. ABBK converted the case to chapter 11 and sought a transfer of its venue to the District of Delaware with the other Delaware cases. After the Court denied the transfer motion and the venue order became final, ABBK prepared to sell its principal asset, a 25-million-gallon capacity, second-generation cellulosic ethanol and cogeneration plant that it had built at Hugoton, Kansas. ABBK built this plant as a demonstration project to be used by its upstream corporate parents to demonstrate their design-build capabilities and new technology developed in the alternative fuels and power cogeneration fields. The initial construction was funded in part by a $95 million grant and a $45 million loan guaranty by the United States Department of Energy (DOE).

After ABBK sold the Hugoton ethanol facility in December of 2016 for $48.5 million and settled and paid both the mechanics lien claims and the interests of the United States under its grant program, it filed a chapter 11 plan of liquidation in this case on April 14, 2017.[2] The plan provides for the payment of administrative and priority claims and a distribution of the remaining $20 million sale proceeds to non-affiliate unsecured creditors. The plan also provides that intercompany claims by Abengoa affiliates such as the Missouri Debtors would receive nothing and to that end, classified them separately from the unsecured trade creditors. The Court approved the disclosure statement and ABBK solicited ballots on its plan. Neither the Missouri Debtors nor the Missouri Unsecured Creditors Committee (Missouri Committee) objected to this plan treatment by ABBK.[3]

The Missouri Debtors and the Missouri Committee filed their third amended joint plan in the Eastern District of Missouri on February 27, 2017.[4] Under the combined plan in those cases, the Missouri debtors liquidated various assets and the proceeds were vested in a liquidating trust to be administered by Drivetrain. ABBK received extensions of credit and other shared services from the Missouri Debtors as evidenced by the proofs of claim filed against it by ABC, ABEC, ABT, and ABO.[5] ABBK and the Missouri Debtors were centrally managed by the same board of directors and officers, had the same general counsel (Jeffrey Bland) and

---

[2] Doc. 811.

[3] Drivetrain's current counsel Hogan Lovells represented the Missouri Committee up to the confirmation of the Missouri Debtors' plan and the creation of the Missouri Liquidating Trust.

[4] Mo. Case, Doc. 1022 and 1070 (as corrected) filed March 2, 2017.

[5] Those filed claims exceed $69 million.

4

chief financial officer (Sandra Porras Serrano), and shared back office operations in Chesterfield, Missouri that included accounting, legal, administrative, IT, financing, cash, personnel, and other services.[6]

The Missouri plan was confirmed on June 8, 2017 and Drivetrain was appointed liquidating trustee of the Missouri Liquidating Trust.[7] Drivetrain promptly filed an objection to confirmation of ABBK's plan on July 7 (the last day for doing so),[8] along with a competing plan of liquidation that provided for payment of the four Missouri Debtors' claims on par with ABBK's trade creditors' claims, but separately classified other intercompany claims of Abengoa entities in a lower class.[9] Drivetrain was permitted to ballot that plan, but the plan received few votes, leaving ABBK's plan as the only one eligible for confirmation.[10]

On October 25 and 26, 2017, I conducted a trial on confirmation of ABBK's plan of liquidation. As set out in my February 8, 2018 Opinion, I confirmed the debtor's plan and directed the parties to submit a confirmation order within seven days.[11] When the parties could not agree on the Confirmation Order, ABBK's counsel submitted it under local rule.[12] Meanwhile, Drivetrain appealed my decision to the U.S. District Court for this District and filed this stay motion.[13] I settled the

---

[6] *See* Trial Ex. 10, ¶ 44

[7] Mo. Case, Doc. 1443.

[8] Doc. 931.

[9] Doc. 932. On July 19, 2017, Drivetrain filed a disclosure statement and a First Amended Chapter 11 Plan of Liquidation. Doc. 969, 968.

[10] Doc. 1093.

[11] *See* Doc. 1289 – Memorandum Opinion entered February 8, 2018 (hereafter "Opinion").

[12] D. Kan. L.B.R. 9074.1.

[13] Doc. 1310. Fed. R. Bankr. P. 8007(a)(1) requires a stay pending appeal motion to be first filed in the bankruptcy court.

5

Confirmation Order at a hearing on March 26, 2018, overruling Drivetrain's objections, and directed its entry, rendering my Opinion confirming ABBK's plan final.[14] I also heard oral argument on Drivetrain's motion to stay the effect of the final Confirmation Order pending its appeal under Fed. R. Bankr. P. 8007 on March 26 and am now prepared to rule on that motion.[15]

Stay Pending Appeal Criteria

In deciding Drivetrain's motion for stay pending appeal, this Court weighs the four factors that courts consider in granting a preliminary injunction: (1) whether Drivetrain will likely succeed on the merits of its appeal of the confirmation order; (2) whether Drivetrain will likely be irreparably harmed if the stay is denied; (3) whether the other parties and creditors will be harmed if the stay is granted; and (4) the effect of a stay upon the public interest.[16] A stay pending appeal "is not a matter of right, even if irreparable injury might otherwise result" to the appellant; it is an exercise of judicial discretion dependent on the circumstances of the case.[17] While the first two factors are the most important, Drivetrain must satisfy them *all*.[18]

---

[14] Doc. 1394, Confirmation Order.

[15] I incorporate into this ruling my findings of fact and conclusions of law as set forth in the Opinion, but supply the foregoing summary to provide context to this Order.

[16] *See In re Sunflower Racing, Inc.,* 221 B.R. 940, 942 (D. Kan. 1998); *In re Lang,* 414 F.3d 1191, 1201 (10th Cir. 2005); *Homans v. City of Albuquerque,* 264 F. 3d 1240, 1243 (10th Cir. 2001). *See also Nken v. Holder,* 556 U.S. 418, 426 (2009) (applying traditional stay factors to an alien's stay of a removal order).

[17] *Nken, supra* at 433-34, quoting *Virginian R. Co. v. United States,* 272 U.S. 658, 672 (1926). *See also In re Lang,* 414 F.3d 1191, 1201.

[18] *Nken, supra* at 434-35; *In re Frantz,* 534 B.R. 378, 385 (Bankr. D. Idaho 2015) (failure to establish even one factor "dooms the motion.")

6

Some Tenth Circuit case law suggests that the likelihood of success factor is "somewhat relaxed" if the other harm factors tip decidedly in movant's favor, requiring only a showing of serious, substantial, difficult, and doubtful questions going to the merits.[19] The Tenth Circuit's decision in *Diné Citizens Against Ruining Our Environment v. Jewell* repudiates this "relaxed" or modified standard in this Circuit.[20] In that case, the Court of Appeals concluded that the modified test was inconsistent with *Winter v. Natural Resources Defense Council,*[21] where the Supreme Court rejected the Ninth Circuit's more lenient "possibility" of irreparable harm (rather than "likely") factor because the plaintiffs had demonstrated a strong likelihood of prevailing on the merits, noting that a more lenient standard for relief was inconsistent with the extraordinary remedy of injunctive relief that requires a clear showing for relief.[22] The Court of Appeals went on to acknowledge that the *Winter* case involved application of a more lenient standard for a different factor than the Tenth Circuit's modified test, but that it was a distinction without a difference.

> Although the Ninth Circuit standard overruled in *Winter* dealt with a different prong of the preliminary injunction test than the prong at issue in this case, *Winter's* rationale seems to apply with equal force here. . . . Under *Winter's* rationale, any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible. We accordingly hold that the district court did not abuse its discretion . . .

---

[19] *See F.T.C. v. Mainstream Marketing Services, Inc.,* 345 F.3d 850, 852-53 (10th Cir. 2003); *Prairie Bank of Potawatomi Indians v. Pierce,* 253 F.3d 1234, 1246-47 (10th Cir. 2001). This Court has previously cited this "relaxed" standard. *See In re Holman, No.* 11-13418, 2017 WL 3025929 at *2 (Bankr. D. Kan. July 14, 2017).

[20] 839 F. 3d 1276 (10th Cir. 2016).

[21] 555 U.S. 7 (2008)

[22] *Diné Citizens,* 839 F.3d at 1282. *See Winter,* 555 U.S. 7, 22.

7

applying . . . the requirement that the plaintiff mush show he is likely to succeed on the merits.[23]

Although *Diné Citizens* and *Winter* involved applications for preliminary injunctions, given the similarity of the factors to the stay pending appeal test, and the fact that a stay pending appeal, like injunctive relief, is an extraordinary remedy, I conclude that the modified test or relaxed success on the merits factor is not applicable in determining whether a stay pending appeal should be granted.[24]

I.    Likelihood of Success on the Merits

Under the Bankruptcy Code, a plan shall be confirmed if all the confirmation requirements are met.[25] Drivetrain challenges only some of those confirmation requirements. It is not likely that Drivetrain will succeed on the merits of its appeal. In my order, I found that ABBK's plan met the liquidation test of § 1129(a)(7), that ABBK did not separately classify intercompany claims with the intention of gerrymandering an impaired accepting class, that the plan could honor the subordination agreement among the many Abengoa debtors to treat intercompany claims as it did, and that such treatment was not unfair discrimination that would bar confirmation under § 1129(b)(1). To succeed on appeal, Drivetrain would not only need to show that I committed clear error in my extensive findings of fact, findings that are amply supported by uncontroverted live

---

[23] 839 F. 3d at 1282.

[24] Bankruptcy courts in other jurisdictions have adhered to the *Winter* standard in determining motions for stay pending appeal. *See In re Forest Grove, LLC,* 448 B.R. 729 (Bankr. D. S.C. 2011); *In re Garcia,* 436 B.R. 825 (Bankr. W.D. Va. 2010); *In re Schweiger,* 578 B.R. 734 (Bankr. D. Md. 2017).

[25] 11 U.S.C. § 1129(a) and (b)(1) (confirmation requirements for cramdown of debtor's chapter 11 plan).

evidence and sworn deposition testimony, but also that I erred as a matter of law in applying the liquidation test as I did, in enforcing the parties' subordination agreement, and in finding that there was no unfair discrimination.[26] And, it would need to demonstrate that I abused my discretion in refusing to admit certain hearsay evidence of off-record statements made by Ms. Serrano, the Chief Financial Officer of both ABBK and the Missouri Debtors.[27] Having heard the evidence, those are all tall orders because the appellate court won't retry the facts, weigh testimony, appraise credibility, draw inferences from established facts, or resolve conflicts in the evidence.[28]

The Opinion's fact findings have ample record support, both in the uncontroverted live testimony of Mr. Santos, ABBK's Executive Vice-President, and in the deposition testimony of several witnesses. I found their testimony to be more credible and persuasive on critical issues than that of Drivetrain's witnesses, a conclusion to which an appellate court should ordinarily defer. To reverse, the appellate court would need to find my legal conclusions concerning gerrymandering, plan subordination, and separate classification/unfair discrimination wanting

---

[26] Legal conclusions are reviewed *de novo*. Factual findings are reviewed under a clearly erroneous standard. A finding of fact is clearly erroneous if it has no factual support in the record or if, after reviewing all of the evidence, the district court is left with the definite and firm conviction that a mistake has been made. Otherwise, the bankruptcy court's findings of fact are given deference. *In re Sunflower Racing, Inc.,* 226 B.R. 673, 683 (D. Kan. 1998); *Paul v. Iglehart (In re Paul),* 534 F.3d 1303, 1310 (10th Cir. 2008).

[27] Evidentiary rulings are reviewed for an abuse of discretion and will be reversed only if excluded evidence results in "manifest injustice" to Drivetrain. *In re Sharp,* 361 B.R. 559, 565 (10th Cir. BAP 2007). And it is not for the appellate court to decide which witnesses are more credible. *Id.*

[28] *Holdeman v. Devine,* 572 F.3d 1190, 1192 (10th Cir. 2009).

9

notwithstanding their being firmly based on statute, case law, and treatise authority. Even a cursory review of the record undercuts Drivetrain's complaint that it has somehow been denied due process.

### —*Liquidation Test*

Section 1129(a)(7) requires the plan proponent to show that a creditor that has not accepted the plan would receive no less under it than if the estate's assets were liquidated in a chapter 7 case.[29] Drivetrain makes two principal arguments, first that the debtor's disclosure statement contains a "judicial admission" that Drivetrain would receive 18.7 cents on the dollar in a straight liquidation while receiving nothing under the plan and, second, that I should not have engaged in "rational speculation" concerning whether certain claims would be challenged, subordinated, or otherwise disallowed, in applying the test.

Concerning the first point, testimony clarified that the 18.7% reference refers to a scenario where all of the unsecured claims (including all of the intercompany claims, not just Drivetrain's) would be paid *pari passu* with the claims of unrelated creditors. By noting in the disclosure statement how much better the third-party creditors would fare under the plan than they would in liquidation, the debtor did not "judicially admit" that any of the intercompany affiliated creditors *should* be paid *pari passu*. Second, concerning the need for the bankruptcy court to consider whether insider's and affiliates' claims would be subordinated in a chapter 7,

---

[29] Factual determinations under the best interests of creditors test are reviewed for clear error; whether § 1129(a)(7) was properly applied is an issue of law reviewed *de novo. See In re Keenan,* 431 B.R. 308 (Table), 2009 WL 1743999, at *2 (10th Cir. BAP 2009).

10

bankruptcy courts have long engaged in "rational speculation" about what might transpire in a hypothetical chapter 7 case and that rational examination, which merely recognizes what chapter 7 trustees are charged to do,[30] is entirely consistent with applying the best interests test and is amply supported by the law. No competent chapter 7 trustee would fail to question the notion that over $69 million dollars in claims by affiliates commonly owned with the debtor, and managed by the same people, should be paid on par with ordinary creditors.

The Opinion noted that debtors should consider subordination agreements or any other events (such as claims objections) that may occur in a chapter 7 liquidation and how they may affect distributions, just as a chapter 7 trustee would, in determining the hypothetical distribution in a chapter 7 liquidation to the affiliate intercompany claimants.[31] The rules for distributions in a chapter 7 case are expressly subject to the subordination provisions in § 510.[32] The appellate court

---

[30] See 11 U.S.C. § 704(a)(5) (trustee's duty to examine and object to any claims that are "improper" where a purpose would be served).

[31] *See* Opinion, p. 38-39. *See also* William L. Norton III, 6 NORTON BANKR. LAW AND PRACTICE § 112:14 at 112-47 and n. 5 (3d ed. 2017) (In determining if the hypothetical liquidation standard is met, "the court must take into consideration the applicable rules of distribution of the estate under Chapter 7," including the subordination provisions of §§ 510, 726(a)(3), and 726(a)(4).). *See also In re Hoffinger Indus., Inc.,* 321 B.R. 498 (Bankr. E.D. Ark. 2005) (refusing to defer to debtor's liquidation analysis that didn't consider potential objections to and equitable subordination of a claim against debtor that might occur in chapter 7); *In re Sierra-Cal,* 210 B.R. 168, 174 (Bankr. E.D. Cal. 1997) (the best interests test requires the court to take into account potential claims against insiders, subordinations, and disallowed claims under § 502(d); in a chapter 11 case, the bankruptcy court may "engage in rational speculation" of what may occur in a chapter 7 liquidation, including whether certain claims may evoke an objection by the chapter 7 trustee); *In re Affiliated Foods, Inc.,* 249 B.R. 770 (Bankr. W.D. Mo. 2000) (hypothetical chapter 7 liquidation is not exact science but entails considerable speculation).

[32] *See* § 726(a) ("Except as provided in section 510 of this title, property of the estate shall be distributed . . . .").

11

is unlikely to reverse the finding that ABBK's plan satisfied the best interests of creditors test.

### — *Procedural Due Process Not Denied*

Drivetrain' due process complaint centers on its misconception that a claim cannot be subordinate in a plan without an adversary proceeding. Fed. R. Bankr. P. 7001 outlines the types of disputes that must be resolved by adversary proceedings. It expressly excepts plan subordination in Rule 7001(8). Section 510(a) applies in each remedial chapter of the Bankruptcy Code and expressly provides that subordination agreements are enforceable within a case to the extent they would be under nonbankruptcy law. Nothing in the plain language of the statute suggests that such an "agreement" as I found the jointly owned and managed debtors in these cases to have reached be struck pre-petition. Bankruptcy is largely a consensus-driven process. It is commonplace for parties in chapter 11 cases to negotiate before and after filing concerning the anticipated treatment of their claims.

More broadly, Drivetrain cannot claim it didn't have notice of what was at stake or that it was deprived of the opportunity to appear and be heard concerning the debtor's plan.[33] When Drivetrain became the liquidation trustee in the Missouri cases in July, 2017, it immediately swung into action here, not only objecting to confirmation of the debtor's plan, but filing one of its own. That plan provided for

---

[33]*In re Barton Industries, Inc.,* 104 F.3d 1241, 1245 (10th Cir. 1997) (due process requirements apply to bankruptcy proceedings; creditor's claim is not subject to confirmed plan if creditor did not receive notice that specified the treatment of its claim and afforded it an opportunity to object).

the payment of Drivetrain's claims on par with other unsecured creditors, while omitting payment to any other intercompany claims. Paying the Drivetrain claims would substantially dilute the payments to ordinary creditors so it is not surprising that they soundly rejected Drivetrain's plan. Drivetrain's actions caused me to cancel a previously set August confirmation hearing and delay trial by several months to allow for discovery and pretrial preparation. Preceding the trial was an actively managed pretrial process that included frequent status hearings dealing with discovery and other pretrial issues. It should be lost on no one that Drivetrain was also the liquidating trustee in the Delaware case, represented by the same counsel (which also represented the creditors' committees in both Missouri and Delaware, prior to confirmation of those plans) and brought considerable Abengoa experience to the table when it entered this case. Indeed, its counsel appeared in the ABBK case before and during the plan process, even before the Missouri plans became effective. At the two-day trial (interrupted only by a 45-minute courthouse fire drill), witnesses for both sides testified, deposition and documentary evidence was admitted, and extensive argument was received. All the parties briefed the issues before and after trial. If that is not "procedural due process," what is?

### —*Subordination*

The factual findings supporting the conclusion that these debtors corporately agreed that their claims would be paid after those of unaffiliated third parties, if at all, will be reviewed for clear error. If they are supported by the evidence, which I heard and reviewed, they are entitled to deference. To find "clear error," the

Case 16-10446   Doc# 1396   Filed 03/29/18   Page 13 of 26

reviewing court must conclude that they are "without factual support in the record" or be "left with the definite and firm conviction that a mistake has been made."[34] Reviewing courts give due regard for the trial court's having observed and heard the witnesses and assessed their credibility. Drivetrain is unlikely to succeed on the merits on these points.

### — *Separate Classification and Gerrymandering*

My findings and conclusions concerning ABBK's separate classification of Drivetrain's affiliate claims were two-fold: (1) the affiliate intercompany claims are dissimilar from non-affiliate general unsecured claims and § 1122(a) only permits substantially similar claims to be classified together; and (2) even if the affiliate claims were substantially similar, separate classification of similar claims is permitted so long as it is not for an alleged improper purpose (gerrymandering).[35] While there is no specific Tenth Circuit authority on the standard of review for classification of claims, any findings made in reaching the conclusion that the affiliate claims are dissimilar would be reviewed for clear error and my application

---

[34] *Conoco, Inc. v. Styler (In re Peterson Distributing, Inc.),* 82 F.3d 956, 959 (10th Cir. 1990), citing *Anderson v. City of Bessemer City,* 470 U.S. 564, 573 (1985).

[35] The permitted separate classification of similar claims, provided the classification is not for the purpose of gerrymandering the vote on the plan to obtain at least one impaired, accepting class under § 1129(a)(10), is sometimes referred to as the "one clear rule." *See Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (Matter of Greystone III Joint Venture),* 995 F. 2d 1274, 1279 (5th Cir. 1991); *In re Deming Hospitality,* 2013 WL 1397458 at *2 (Bankr. D. N.M. Apr. 5, 2013) (Describing the one clear rule as the "main judicial gloss on § 1122(a)"). With one impaired, accepting class, the plan proponent may cram down the plan over the objection of a non-accepting creditor and confirm the plan under § 1129(b)(1). The Tenth Circuit has not addressed the "one clear rule," but bankruptcy courts in this Circuit have applied it. *See In re Autterson,* 547 B.R. 372, 397-98 (Bankr. D. Colo. 2016); *In re Hyatt,* 509 B.R. 707, 714-15 (Bankr. D.N.M. 2014); *In re Deming Hospitality,* 2013 WL 1397458 at *3; *In re Stratford Associates Ltd. Partnership,* 145 B.R. 689, 695 (Bankr. D. Kan. 1992).

of § 1122(a) would be reviewed *de novo*. Similarly, any fact findings made in concluding that the debtor did not separately classify the affiliate claims with intent to gerrymander an impaired, accepting class would also be tested for clear error while my application of the legal standards would be reviewed *de novo*.[36]

The record supports my factual conclusion that ABBK did not gerrymander classes to "isolate" and disenfranchise the Drivetrain claims. The chronological sequence outlined in my Opinion as well as the testimonial evidence show that. The plan was drafted and filed months before Drivetrain became the liquidating trustee in Missouri. The disclosure statement was approved and the debtor's plan balloted before the Missouri plans' effective date. The testimony suggested that when this plan was drafted, management of the Kansas and Missouri debtors were "on the same page" about this mode of treatment.[37] Section § 1122(a) prohibits placing dissimilar claims in the same class. There is no dispute that substantially similar claims may be classified together, but no corollary that similar claims *must be* classed together. The time sequence here makes it highly unlikely that ABBK's plan was intended to target Drivetrain's claims to gain a voting advantage. Rather, ABBK's plan subordinated all the other intercompany claims to those of the third-party creditors. It is unlikely that a reviewing court will find that I erred in that finding.

---

[36] *See In re Paige*, 685 F.3d 1160, 1178 (10th Cir. 2012) (summarizing standards of review for confirmation of plan).
[37] *See* Opinion, pp. 34-35.

15

Section 1122(a) states: "Except as provided in subsection (b) of this section, a plan *may* place a claim or an interest in a particular class *only if* such claim or interest is substantially similar to the other claims or interests of such class."[38] Nothing in the bankruptcy code prohibits the separate classification of like claims into different classes so long as that is not done for the purpose of gerrymandering voting on the plan. Here, ABBK separated non-affiliates' general unsecured claims from those of affiliates, arguing that third-party vendors lacked the unique access and knowledge that the affiliate creditors had by virtue of their shared ownership, management, objectives and integrated operations. The affiliates also shared an intention that intercompany claims among them would be paid after the third-party vendors if at all, implying if not expressing an agreement or shared intention of subordinating the affiliates' claims. That intention is understandable given the context of this case; the Hugoton plant was a demonstration project and never cash flowed. ABBK demonstrated both the uniqueness of the affiliate claims and the subordination understanding among them. Separating those claims from the general unsecured claims of non-affiliated unsecured creditors does not of itself violate the requirements of § 1122(a).

## --*Evidentiary Ruling Correct*

Drivetrain argues that I abused my discretion in not allowing Mr. Daileader to testify about the comments of Sandra Porras Serrano made during an off-record

---

[38] 11 U.S.C. § 1122 (Emphasis added.). *See In re Overland Park Merchandise Mart Partnership, L.P.,* 167 B.R. 647, 651 (Bankr. D. Kan. 1994) (interpreting § 1122(a) to allow similar claims to be placed in separate classes).

16

interview in Spain attended by them, an Abengoa inside "counsel" identified only as Anna Hamm, who appeared with Ms. Serrano, and Mr. Dunn, one of Drivetrain's lawyers. I disallowed the testimony as hearsay under Fed. R. Evid. 801(c) and 802. At the time of the conversation, Ms. Serrano was the debtor's chief financial officer and had held the same position with the Missouri Debtors. Drivetrain claimed that she was speaking for ABBK and, as such, her statements constituted party admissions, not hearsay, under Rule 801(d)(2). Because Ms. Serrano was the CFO of both the debtor and the Missouri Debtors, I could not determine whether her statement regarding the nature of the Drivetrain claims was made in her capacity as CFO for the debtor (in which case it might be a party admission) or as the Missouri Debtors' CFO (making it hearsay).

The murky circumstances surrounding this interview and the fact that it took place without the knowledge or presence of ABBK's bankruptcy counsel before trial added to my discomfort with admitting the testimony.[39]  At the oral argument on March 26, Drivetrain's counsel reported that the conversation occurred in Spain in the fall of 2017, at a time when the confirmation issues between ABBK and Drivetrain were joined. Drivetrain also conceded at oral argument that Ms. Serrano's "counsel," worked for Abengoa, S.A., not ABBK. At trial, I concluded that Daileader's testimony about what Ms. Serrano said was hearsay and ultimately declined Drivetrain's request to proffer the testimony.[40]

---

[39] This could easily have been avoided had Drivetrain *deposed* Ms. Serrano and given ABBK counsel notice so they could attend and cross-examine.
[40] *See* Trial Tr., pp. 303-318.

When it filed this motion, Drivetrain attached Mr. Dunn's supporting declaration containing his rendition of Ms. Serrano's excluded purported testimony. The Committee moved to strike.[41] Drivetrain countered that its inclusion in the Dunn declaration was to provide a record for its appeal of what its proffer would have been had it been permitted to make one at trial.[42]

Nothing I heard at trial or on March 26 persuaded me that Ms. Serrano's statements were made in her capacity solely as ABBK's CFO. And, even if I should have admitted the statement, what Ms. Serrano allegedly said doesn't disprove the absence of a working subordination understanding or that the companies did not agree to treat intercompany claims as this plan provides. I would have weighed her statement against the unimpeached live and deposition testimony of Mr. Santos, as well as the various Abengoa plans filed in the Kansas, Missouri, and Delaware bankruptcies, all of which separately classified and treated most of the Abengoa bioenergy group affiliate claims from the non-affiliated unsecured creditors. I did not abuse my discretion in making this evidentiary ruling.[43]

### --*No Unfair Discrimination*

My conclusion that the separate classification and treatment of the intercompany claims as a group did not constitute unfair discrimination under § 1129(b)(1) is subject to mixed standards of review, factual findings for clear error

---

[41] Doc. 1311, ¶ 8; Doc. 1335.
[42] Doc. 1375.
[43] I grant the Committee's motion to strike ¶ 8 of the Dunn Declaration.

18

and legal conclusions de novo.[44] Based on an extensive review of the record before me, I concluded that the Missouri, Kansas, and Delaware debtors had effectively agreed to treat intercompany claims in a manner similar to ABBK's plan. Given that the Bioenergy Group's management consisted of the same individuals who ran the Missouri and Kansas companies, the existence of that working understanding was easy to prove. Drivetrain's response is to argue that its claims are "good claims," which I take to mean "legally valid," a point that no one disputes. As a matter of bankruptcy law, they are deemed allowed.[45] That they are "good," however, doesn't insulate them from being treated in a different manner than non-affiliates' claims.

During general plan drafting discussions, Abengoa senior management decided that third-party trade vendors would be paid before insider or affiliate claims—not a surprising decision. The contents of the respective plans recognized the complexity of attempting to resolve intercompany claims among 700 or more debtors. So did Mr. Santos's testimony. No credible testimony contradicted that. Drivetrain's claims expert testified that his after-the-fact analysis was based on eliminating what he called "spaghetti," the numerous inter-debtor relationships among the hundreds of entities in this international conglomerate. But the presence

---

[44] There is no clear Tenth Circuit authority on the appropriate standard of review for determining whether a plan unfairly discriminates. *See In re Paige,* 685 F.3d 1160, 1179 (10th Cir. 2012) (when the bankruptcy court's factual findings are premised on improper legal standards or on proper legal standards that are improperly applied, *de novo* review is applied; reviewing *de novo* the bankruptcy court's definition of "fair and equitable"); *Citibank N.A. v. Baer,* 651 F.2d 1341, 1346 (10th Cir. 1980) (Generally whether plan is fair and equitable is subject to a clearly erroneous standard of review.).

[45] See 11 U.S.C. § 502(a).

of these complex interlocking relationships did matter. Management managed this complexity by simply agreeing that these debtors wouldn't pay each other until the trades had been paid in full. While there is no controlling Tenth Circuit authority on unfair discrimination under § 1129(b)(1), courts in our Circuit have applied a variety of tests referred to in other Circuits.[46] The Opinion discussed and applied each test and concluded that these facts met each of them.[47] Drivetrain's likelihood of success on this point, driven as it is by factual determinations, and application of the tests to those facts, is low.

## II.   No Irreparable Harm to Drivetrain

The second factor considered when determining whether to grant a stay pending appeal is whether the appellant will be irreparably harmed by its denial. Drivetrain essentially argues that refusing to stay this decision will result in consummation of the plan, creation of the liquidating trust, and distribution to claimants that would be impossible to unwind should Drivetrain prevail on appeal. While it is true that consummation of the plan may potentially render the appeal moot, the hazard of mootness, in and of itself, is not sufficient to show irreparable harm.[48] What Drivetrain implicitly argues here is the economic loss it will incur if

---

[46] *See In re Autterson,* 547 B.R. 372, 398 (Bankr. D. Colo. 1995) (considered a four factor test to determine whether plan unfairly discriminates).

[47] Opinion, pp. 39-42.

[48] *See In re Sunflower Racing, Inc.,* 225 B.R. 225, 228 (D. Kan. 1998) (potential mootness of an appeal is a factor but not dispositive, by itself, of determining irreparable harm); *In re Scrub Island Development Group Ltd.,* 523 B.R. 862, 878 (Bankr. M.D. Fla. 2015); *In re Red Mountain Mach. Co.,* 451 B.R. 897, 908-09 (Bankr. D. Ariz. 2011); *In re Irwin,* 338 B.R. 839, 853 (E.D. Cal. 2006); *In re Fullmer,* 323 B.R. 287, 304 (Bankr. D. Nev. 2005); *In re Convenience USA, Inc.,* 290 B.R. 558, 563 (Bankr. M.D.N.C. 2003); *In re Shenandoah Realty Partners LP,* 248 B.R. 505, 510 (W.D. Va. 2000); *In re 203 North LaSalle St. Partnership,* 190

20

its appeal is not stayed and ABBK's plan is substantially consummated, resulting in nonpayment of Drivetrain's claims under the plan. But the Tenth Circuit has repeatedly held that a harm compensable by money is not "irreparable harm."[49] After all, this case is all about money – who gets how much.

And as the debtor points out, if Drivetrain is successful on its appeal, it will not automatically obtain a distribution on par with the Class 2 unsecured creditors. Instead, the case would be remanded and ABBK would have to go back to the drawing board and propose an alternative chapter 11 plan that could be confirmed, or convert the case to chapter 7 for liquidation by the chapter 7 trustee.  Even then, Drivetrain is not assured of being treated *pari passu* with the non-affiliate general unsecured creditors; the chapter 7 trustee could pursue any number of theories, including subordination, which might prevent Drivetrain and the other affiliate claimants from receiving a distribution. In short, Drivetrain might "win the battle, but lose the war."

Finally, even if Drivetrain has sufficiently demonstrated irreparable harm absent a stay, this is only one of four factors that has been shown. Drivetrain has

---

B.R. 595, 597 (N.D. Ill. 1995); *In re Moreau,* 135 B.R. 209, 215 (N.D.N.Y. 1992); *In re Dakota Rail, Inc.,* 111 B.R. 818, 821 (Bankr. D. Minn. 1990); *In re Public Serv. Co. of New Hampshire,* 116 B.R. 347, 349-50 (Bankr. D. N.H. 1990). *See also Search Market Direct, Inc. v. Jubber (In re Paige),* 584 F.3d 1327 (10th Cir. 2009) (determining that creditor's appeal of bankruptcy court order rejecting its plan and confirming another creditor's competing plan was neither constitutionally moot nor equitably moot; bankruptcy court and district court denied appellant's motions for stay pending appeal but district court erred in dismissing appeal on the basis that the confirmed plan had been substantially consummated and appeal was moot).

[49] *See First Western Capital Mgmt. Co. v. Malamed,* 874 F.3d 1136, 1143-44 (10th Cir. 2017); *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256, 1266 (10th Cir. 2004).

21

the burden to show that *all* factors are in its favor – something that it clearly has not shown here.[50]

### III.   Much Harm to Others if the Stay is Granted

If there is peril to Drivetrain, it is monetary damage at best that can be remedied. By contrast, the non-affiliate creditors who are largely vendors or workers will be forced to wait for years while this appeal unfolds, watching the pot shrink. ABBK will be prevented from implementing its plan and establishing the liquidating trust under the plan. Significant delay in the distribution to creditors under a plan constitutes substantial harm to other parties.[51] They will receive no interest or other compensation for their dividends being delayed. Most of these entities and individuals last provided services to ABBK in late 2015 and early 2016. Some ABBK employee claimholders worked for ABBK during the bankruptcy and may be owed administrative wages. These unfortunates should not be required to finance Drivetrain's continuing quest to divert this estate's assets to pay claims asserted in the Missouri case by a Spanish government financier. Moreover, as discussed in Part IV, there are serious unaddressed environmental concerns that cannot be addressed until claims are paid. The third-party creditors in this case

---

[50] *Nken v. Holder,* 556 U.S. at 433-34 (a stay pending appeal is not a matter of right, even if irreparable injury might result); *In re Frantz,* 534 B.R. 378, 385 (Bankr. D. Idaho 2015) (failure to establish even one factor "dooms the motion."); *In re Efron,* 535 B.R. 516, 518 (Bankr. D. P.R. 2014) (court acts within its discretion to deny a stay pending appeal if the movant fails to satisfy any one of the four requirements).

[51] *See In re F.G. Metals, Inc.,* 390 B.R. 467, 478 (Bankr. M.D. Fla. 2008); *In re Sunflower Racing, Inc.,* 225 B.R. 225, 228 (Bankr. D. Kan. 1998).

should not lose the use of their money for two or three more years, interest free. This factor weighs heavily against Drivetrain and the granting of a stay.

IV.    Public Interest Not Served by Stay

The principles that underpin Fed. R. Civ. P. 1 apply in bankruptcy cases. The just, speedy, and efficient resolution of commercial disputes is the primary goal of bankruptcy courts as it should be of all participants in the bankruptcy process.[52] Promptly resolving bankruptcy cases recognizes that, in most of them, the distributable assets are limited and, as in this case, are usually shrinking as administrative expenses, including attorneys' fees, mount. Indeed, Drivetrain is financing its efforts in this case with property of the Missouri estates at the expense of those creditors (one of which is ABBK), while both the debtor's and the creditor's committee's attorney's fees deplete ABBK's estate. Like the bank creditor in *In re Scrub Island Development Group Limited,* Drivetrain "has tried everything it could to keep the Debtor[ ] from reorganizing," including nonproportional discovery, delaying the confirmation hearing by proposing a competing plan that stood little chance of acceptance (including the same plan treatment of other affiliate intercompany claims as ABBK proposed), and ill-timed motions to disqualify debtor's counsel.[53] It has the right to appeal this Court's confirmation Opinion, but

---

[52] It is well recognized that prompt administration of a bankruptcy estate is a "chief purpose of the bankruptcy laws." *Katchen v. Landy,* 382 U.S. 323, 328 (1966).
[53] 523 B.R. 862, 879 (Bankr. M.D. Fla. 2015).

23

it doesn't "have the right to use a stay pending appeal to accomplish what it could not during the confirmation process."[54]

Bankruptcy should be expeditious because money has time value. The American people's confidence in the bankruptcy system's unique ability to "marshal assets and pay claims" promptly is undermined when cases are unduly prolonged by appeals and stays that result in added expense and delay.[55] No public interest will be served by delaying distribution to the individual and entity third party creditors of ABBK (and of the Missouri debtors as well) while this appeal pends.

This case also involves a real health, environmental, and safety risk to the citizens of Stevens County where the plant is located. During this case, ABBK abandoned 60,000 tons of wheat- and corn-stalk biomass that is baled on open ground. ABBK faced "substantial expenditures" to remove, market, sell or dispose of the bales.[56] ABBK leased land in 2012 for that purpose. Two of those landowners, Spikes Bros. and Greg Morris, objected to the abandonment because the Kansas Department of Health and Environment ("KDHE") had previously determined the bales were a solid waste nuisance that posed an immediate risk to public health. KDHE found the bales were a fire hazard and a habitat for snakes or disease-causing rodents and directed the landowners to take remedial action over the next

---

[54] *Id.* (recognizing the public's interest in allowing a chapter 11 debtor an opportunity to implement its confirmed plan).

[55] As succinctly stated in *In re Frantz,* 534 B.R. 378, 390 (Bankr. D. Idaho 2015): "Assets should be promptly gathered and administered and creditors paid."

[56] Doc. 703. ABBK's motion represented that approximately 60,000 tons of biomass bales were spread over four locations in Stevens County.

24

12 months.[57] Spikes, Morris, and Pacific Ag settled their objections to ABBK's abandonment motion in exchange for the landowners being allowed general unsecured claims of between $758,000 and $1.2 million for the cost of removal and cleanup caused by the abandoned biomass bales on their properties.[58]

On March 26, Stevens County Counselor and Moscow City Attorney Paul Kitzke addressed the Court concerning these problems. H was accompanied by Chairman Joe Thompson of the Stevens County Commission. Mr. Kitzke described the situation in Moscow and Stevens County as "ground zero" and noted that Abengoa bale fires have been a problem since the 2012 fires. The Governor has declared Stevens County a drought disaster area because Stevens County has not had any rainfall since October 2017. Moscow is a city of 350 people that has a volunteer fire department with a mere $600,000 budget—so far in 2018, according to Kitzke, they have spent half of it fighting bale fires. In 2012, they spent $150,000. At that time, neighboring county fire crews assisted and Moscow had to be evacuated. Kitzke pointed out that there are thousands of bales, stacked 21 feet high, located one-half mile from the city. If this case is stayed, the owners of the land where the bales are will continue to take the heat from KDHE and the abandoned bales continue to pose a serious risk in the community. Thus, the public interest in this case cuts sharply against Drivetrain's proposed stay, particularly as another "fire season" in southwestern Kansas begins.

---

[57] Doc. 736 and 737. Another lessor Pacific Ag responded to the motion to abandon and estimated disposal costs of $758,633 for nearly 17,000 tons. Doc. 738.
[58] Doc. 827.

<u>Conclusion</u>

Because Drivetrain failed to meet its burden on each of the four stay factors to show that a stay pending appeal is warranted, its Motion for Stay Pending Appeal is DENIED.

### #