**SO ORDERED.**

**SIGNED this 10th day of April, 2018.**



_____
Robert E. Nugent
United States Bankruptcy Judge
_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: <br><br> **ABENGOA BIOENERGY BIOMASS OF KANSAS, LLC.** <br><br> **Debtor.** | Case No. 16-10446 <br> Chapter 11 |

## COMBINED ORDER APPROVING COMPROMISES (Doc. 1281 and 1282)

      Bankruptcy favors compromise. Fed. R. Bankr. P. 9019 lays out a process for exposing a trustee's or debtor's proposed compromise to the scrutiny of the court after giving the creditors fair notice and an opportunity to heard. A compromise may be approved if it is "fair and equitable and supported by an adequate factual foundation."[1] Courts do not substitute their judgment for the trustee's (or in a

---

[1] *In re Rake*, 363 B.R. 146, 152 (Bankr. D. Idaho 2007).

1

chapter 11 case, the debtor's), nor do they exhaustively analyze the merits of every claim, whether by "mini-trial" or a full-blown evidentiary hearing. That would defeat the purpose of compromise. Instead, we "canvass the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness' " by considering the probability of success in the litigation, its complexity and attendant expense and delay, whether a judgment could be enforced, and the proper deference to the paramount interest and views of the creditors.[2] After the March 26, 2018 non-evidentiary hearing on these motions and after carefully reviewing the pleadings and the employees' proofs of claim, no further evidentiary hearing on the merits is necessary to my consideration of the merits of these compromises.[3]

Drivetrain's objections to these compromises have two flaws. First, it lacks a pecuniary interest in the outcome of the motion because it is "out of the money" under ABBK's confirmed plan. Denied a distribution under ABBK's confirmed chapter 11 plan of liquidation and lacking a beneficial interest in the ABBK Liquidating Trust, Drivetrain has no pecuniary interest and lacks standing to object. Second, even if Drivetrain has standing, the proposed compromises are reasonable and supported by the facts and law. The compromised claims involve unpaid accrued retention bonus compensation payable under employment agreements between the debtor and two key employees. Each employee claimed not

---

[2] 10 COLLIER ON BANKRUPTCY, ¶ 9019.02 (Richard Levin & Henry J. Sommer eds., 16th ed.). *See also In re Kopexa Realty Ventures, Inc.*, 213 B.R. 1020 (10th Cir. BAP 1997).
[3] Doc. 1281 and Doc. 1282. I disregard the Declarations of Gerson Santos-Leon, docs. 1324 and 1325.

only unpaid retention bonuses for the periods they were employed, but also for their accelerated salaries for periods remaining after ABBK breached their 2016 employment agreement and they were let go. ABBK and the Unsecured Creditors Committee ("Committee") negotiated a settlement of each employee's claim of roughly 50 cents on the dollar. The debtor and the Committee agreed that the employees should receive the retention bonuses they earned, but that their salaries for 2017-2018 should be capped as 11 U.S.C. § 502(b)(7) provides. They also agreed that both employees should receive priority wage treatment for their claims up to the statutory maximum in 11 U.S.C. § 507(a)(4), exchanging that for eliminating the employees' possible administrative claim and priority for their post-petition compensation.[4]

The proposed agreements reduce cumulative claims of about $575,000 to half that amount. These agreements are well within a reasonable range of what the employees might recover during further claims litigation. While the claims are not complex, the possibility of disputes over the interpretation of the employment contracts and application of the laws that govern them will entail further legal expense to the estate and delay to these creditors. There is sufficient money in the estate to pay the claims as allowed under the compromise or if they were allowed as filed. The settlements are strongly recommended by the Committee which is the

---

[4] *See* 11 U.S.C. § 503(b)(1)(A)(i) and § 507(a)(2) (second priority for administrative expenses allowed under § 503(b) -- second only to domestic support obligations).

official representative of the unsecured creditors as a body, to whose views the court should ordinarily defer. These compromises are reasonable and should be approved.

Background

Drivetrain is the liquidating trustee under confirmed chapter 11 plans involving affiliate debtors of ABBK in the Eastern District of Missouri. Certain of those affiliate debtors filed intercompany claims of $69 million in this case and Drivetrain has succeed to those claims. ABBK separately classified all intercompany claims in Class 3 of its plan of liquidation and provided for "no Distribution" to be made to Class 3 creditors.[5] ABBK classified unaffiliated, third party unsecured claims in Class 2; those claims will be paid pro rata from the cash that remains from the sale of ABBK's ethanol plan in Hugoton, Kansas. ABBK's plan was confirmed on March 29, 2018.[6]

Drivetrain has objected to several claims in this case, intending to create standing for itself by creating a surplus of funds in the "pot," by reducing the amount necessary to pay Class 2 claims in full. This effort assumes that if a surplus remains after those distributions, the remainder would flow to the next lower class of creditors, Class 3. The Plan and Liquidating Trust Agreement suggest otherwise. The Plan provides that Distributions will be made to the holders of Allowed General Unsecured Claims that do not hold Intercompany Claims. "General Unsecured Claims" are defined as—

---

[5] Doc. 811.
[6] Doc. 1394. Drivetrain has appealed.

4

> Claims against the Debtor that are not Administrative Claims, Accrued Professional Compensation Claims, Secured Claims, Priority Tax Claims, Other Priority Claims, or Equity Interests.[7]

Intercompany Claims are defined as "Claims relating to an intercompany transfer of value to the Debtor by an Affiliate of the Debtor."[8] Holders of Intercompany Claims "will receive no Distribution" under the Plan.[9] Drivetrain's claims are Intercompany Claims. The Plan further provides that only "holders of General Unsecured Claims against the Debtor *entitled to Distributions* shall be the beneficiaries of the Liquidating Trust."[10] In other words, only Class 2 creditors are beneficiaries of the Liquidating Trust.

The Liquidating Trust Agreement ("Trust") provides that it is created "for the benefit of the Beneficiaries (to the extent of their respective legal entitlements)," "Beneficiaries" being defined as "beneficial interests in the Liquidating Trust of holders of Allowed General Unsecured Claims *entitled to Distributions* as described in the Plan."[11] Article VIII, ¶ 8.1 permits payments to a Beneficiary that "shall be made only in accordance with the Plan, the Plan Confirmation Order, and this Liquidating Trust Agreement…."[12] Because none of the Class 3 intercompany claimants is "entitled to a Distribution" under the plan, they cannot be "Beneficiaries" under the Trust. Paragraph 8.6 instructs the Trustee to treat

---

[7] Doc. 811, p. 9, Art. I.A., ¶ 37.
[8] *Id.*, ¶ 39.
[9] *Id.*, p. 15, Art. III.B.3(b) and (c).
[10] *Id.,* p. 17, Art. IV.C. (emphasis added).
[11] Doc. 1108-1, p. 2 (emphasis added) and p. 3, Art. I, ¶ 1.2.
[12] *Id.,* p. 14.

5

unclaimed Distributions as unclaimed property subject to § 347.[13] While the Plan provides for the contribution of undistributed *de minimis* dividends to charity if the cost of calculating the final distribution is excessive in relation to the benefits of the claim holders, there is no express provision that provides for a "waterfall" of surplus funds, if any, from Class 2 to Class 3 or below.[14] Like the Plan, nothing in the Trust provides for Distribution of any surplus (highly unlikely) to the Class 3 intercompany creditors; indeed neither document even mentions the word "surplus."

Turning to the merits of these compromises, the claimants were employed by the debtor Abengoa Bioenergy Biomass Kansas, LLC when this bankruptcy case commenced on March 23, 2016.[15] Brett Inkelaar and Martin Westerhuis worked for Abengoa during the bankruptcy until December 16, 2016, the day the § 363 sale of the Hugoton plant closed and they were terminated. Westerhuis was the Logistics Manager and Inkelaar was the QSE Manager.[16] According to their 3-year employment agreements entered into January 1, 2013, Westerhuis made $68,000 a year in base salary while Inkelaar made $91,805 a year in base salary through the period ending December 31, 2015.[17] Each man's pay increased slightly when they entered into the next contracts on January 1, 2016 to cover the 3-year period

---

[13] *Id.,* p. 15. *Accord* Doc. 811 (Plan), p. 24, Art. V.F.
[14] Doc. 811, p. 26, Art. V.M.
[15] *See* Memorandum Opinion on confirmation, doc. 1289, for an exhaustive factual recitation.
[16] *See* Claim 84-1, p. 4 (Westerhuis had been employed by Abengoa full-time since March 2011). and Claim 85-1, p. 4 (Inkelaar had been employed by Abengoa full-time since July 2007).
[17] *See* Claim 41-1, pp. 4-14 (Westerhuis) and Claim 34-1, pp. 4-14 (Inkelaar).

6

through 2018.[18] Other than the differences in salary, the agreements have nearly identical terms and can be discussed together. For ease of reference and discussion, the Court will refer to the 2016 contract.[19]

Section 4(b)(ii) of the employment agreement provides for a "Special Retention Bonus" ("SRB") that accrues over the three year term of the contract. If the employee performs satisfactorily (satisfying 100% of an annual "Work Plan") and remains employed through the Payment Date (a defined term), the employee would receive a bonus of 100% of his base salary that accrued 50% in year 1 and 25% in each of years 2 and 3.[20] The bonus is payable on the "Payment Date," defined as:

> the earlier of (x) the last business day of May 2019 or (y) the date on which the annual bonus (if any) is paid; <u>provided</u>, that if the 2018 financials of the Employer are not yet completed by such date, then the Payment Date shall be extended accordingly.[21]

But, if the employee becomes disabled or dies, is terminated for cause, or holds over working under an expired agreement, the employee is entitled to be paid "any accrued but unpaid compensation owing Employee pursuant to Section 4, above."[22] Not surprisingly, there is no clause in the agreement that details how (or if) the

---

[18] See Claim 84-1, pp. 6-16 (Westerhuis' base salary increased to $68,924) and Claim 86-1, pp. 5-15 (Inkelaar's base salary increased to $93,053).
[19] *See* Claim 86-1, pp. 5-15.
[20] The rate and amount of accrual of the SRB varied if the employee's performance of the annual work plan was less than 100% satisfactory.
[21] *See* Claim 86-1, p. 7, ¶ 4(b)(ii). The "Payment Date" in the 2013 employment contracts was similarly defined except the dates differed: "last business day of May **2016,**" and if the "**2015** audited financials" are not completed by the Payment Date.
[22] *Id.,* p. 9, ¶ 5.

7

employee is paid if the employee is terminated "[d]ue to bankruptcy and an asset sale."[23]

Westerhuis filed a series of claims requesting his SRBs for the years 2013 through 2016 as well as his base salary for 2017 and 2018, the remaining years on the 2016 contract.[24] His claims total $248,704, of which $75,737 was asserted as a priority claim. Inkelaar filed his own series of similar claims for the same periods that total $326,228.36, of which $38,550 was asserted as a priority wage claim.[25] According to the debtor's motions for compromise, while the chapter 11 plan of liquidation was being developed in the winter or spring of 2017, the debtor and the Unsecured Creditors Committee negotiated with Westerhuis and Inkelaar to reduce their claims, presumably in lieu of the claims objection process, in an effort to reduce the estate's exposure, expedite the employees being paid, and assuring their claims were only allowed to the extent consistent with the Bankruptcy Code. As is detailed in the Committee's Omnibus Response to Drivetrain's objection, the debtor and Committee agreed to allow these claims to the extent of paying the 2013-2016 SRB's, while limiting their recovery for work they didn't and won't do in 2017 and 2018 by agreeing to an allowance of their pro-rated base salary from the date of their terminations to one year from the anniversary of the commencement of the case as § 502(b)(7)(A) provides.[26] Westerhuis' claim was reduced to $121,723 and

---

[23] Claim 86-1, p. 4; Claim 84-1, p. 4.
[24] Claim Nos. 41, 42, 43, 77, 78, and 84.
[25] Claim Nos. 34, 35, 36, 85, and 86.
[26] Doc. 1322, pp. 2-3; § 502(b)(7).

8

Inkelaar's claim was reduced to $164,335 as a result of the settlements. The compromises further limit the treatment of each employee's aggregate claim as priority wages to $12,475 under § 507(a)(4).[27] Drivetrain contends that these settlements are too rich because the employees Payment Dates have not occurred, because these employees weren't terminated for cause or while serving in a holdover status after an agreement expired, and because they have not "proved" that they fulfilled the employment contracts' annual work plans.

Analysis

Drivetrain lacks standing to object to the proposed compromises because it has no pecuniary interest in the dispute. As discussed in the background section, neither Drivetrain nor the Class 3 intercompany claimants are Beneficiaries of the Trust and will receive "no Distribution." Even if enough Class 2 claims were eliminated by disallowance to result in a surplus, the Plan does not expressly provide for any surplus to be paid to Class 3 creditors. In *In re Southern Medical Arts Companies, Inc.*, the Tenth Circuit Bankruptcy Appellate Panel determined that a party with no distribution rights lacked standing to object to a compromise.[28] Likewise, in *In re Xpedior, Inc.*, a bankruptcy court held that a liquidating trustee only has authority to pay surplus funds that is conferred by the trust. In the absence of such a provision in the plan or liquidating trust, that court applied the

---

[27] The amount of the priority claim under § 507(a)(4) was capped at $12,475 for cases commenced between April 1, 2013 and April 1, 2016. *See* 11 U.S.C. § 104(a)
[28] 343 B.R. 258, 262-63 (10th Cir. BAP 2006) (Where creditor's claims against debtor had been disallowed by the bankruptcy court, it lacked a distribution right that deprived it of standing to object to a compromise.).

9

doctrine of cy pres as a "flexible tool" to fashion an equitable and legal disposition of those funds.[29] A surplus is unlikely in this case. But even if there were a surplus, Drivetrain would have no right to it under the Plan or the Trust. Thus, Drivetrain is "out of the money," lacks a pecuniary interest in the outcome of the motions, and lacks standing to object to these compromises.[30]

Courts examine the motives of any party asserting standing because "allowing numerous parties to interject themselves into the case on every issue . . . [thwarts] the goal of a speedy and efficient reorganization."[31] Drivetrain's admitted effort to build its own standing by objecting to claims to create a surplus and "volunteering" to prosecute the claims objections "at its own expense"—which is to say at the expense of the estates for which it is trustee in the Eastern District of Missouri cases—leaves me with the impression that Drivetrain seeks the continued

---

[29] 354 B.R. 210, 239 (Bankr. N.D. Ill. 2006) (liquidating trustee had no authority to distribute unexpected surplus after all administrative claims and allowed claims were paid in full).

[30] *See Nintendo Co., Ltd. v. Patten (In re Alpex Computer Corp.),* 71 F.3d 353,356 (10th Cir. 1995) (party-in-interest includes persons whose pecuniary interests are directly affected by the bankruptcy proceeding); *In re Kaiser Steel Corp.,* 998 F.2d 783, 788 (10th Cir. 1993) (purchasers of chapter 11 debtor's property lacked standing to object to settlement; they "needed to show some interest in the amount that the settlement would enhance the bankruptcy estate.") *In re C.P. Hall Co.*, 2013 WL 140048, *3 (N.D. Ill. Jan. 10, 2013), aff'd, 750 F.3d 659 (7th Cir. 2014) (party in interest does not have standing to object to a settlement proposed under Rule 9019 unless the objector has a "pecuniary interest" that is directly affected by the outcome of the motion); *In re Runnels Broadcasting Sys.*, LLC, 2009 WL 4611447, at *3 (Bankr. D.N.M. Dec. 1, 2009) (explaining that under "pecuniary interest test for standing," the debtor lacks standing to challenge a chapter 7 trustee's final report unless there is a surplus in the estate; where no possible outcome that creditor's chapter 11 administrative expense claim could be paid from chapter 7 estate creditor lacked standing to object).

[31] *In re E.S. Bankest, L.C.*, 321 B.R. 590, 595 (Bankr. S.D. Fla. 2005), quoting *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 850 (Bankr. S.D.N.Y. 1989).

10

obfuscation and delay of the consummation of ABBK's confirmed plan and to control this case as though it were one with the Missouri cases.[32]

Even if Drivetrain had standing in this matter, it has failed to properly frame the dispute concerning the approval of these employee compensation compromises under Rule 9019. In considering these compromises, the court must canvass the facts and law to determine if the debtor and the Committee have used good judgment in determining that these factional payments are the most economical way to resolve the potential dispute and whether the settlements are within reasonable bounds. In this Circuit, as in most, bankruptcy judges look at settlements by "canvass[ing] the issues and see[ing] whether the settlement 'falls below the lowest point in the range of reasonableness.'"[33] Neither a full evidentiary hearing nor a mini-trial need be held.[34] Rule 9019(a) governs the process. The compromise must be "'fair and equitable' and supported by an adequate factual foundation."[35]

As the Bankruptcy Appellate Panel in this Circuit has stated, four factors should be considered, including the probability of success in the litigation, the difficulty in enforcing any judgment, the complexity of the litigation and attendant

---

[32] The Court is mindful that Drivetrain previously sought to effect a substantive consolidation of this case with the Missouri cases through its proposed plan.
[33] 10 COLLIER ON BANKRUPTCY, ¶ 9019.02 [citations omitted]. *See Liberty Bank, F.S.B. v. D.J. Christie, Inc.,* No. 16-3230, 681 Fed. Appx. 664, 668 (10th Cir. Mar. 7, 2017); *In re Tribune Co.,* 464 B.R. 126, 158 (Bankr. D. Del. 2011).
[34] *Liberty Bank, F.S.B.,* 681 Fed. Appx. 664, 667-68.
[35] *Reiss v. Hagmann,* 881 F.2d 890, 892 (10th Cir. 1989) (citations omitted); *In re Rake,* 363 B.R. 146, 152 (Bankr. D. Idaho 2007).

expense and delay, and the paramount interest of the creditors with proper deference to their views.[36] In determining whether the proposed compromise meets these standards, courts should not substitute their judgment for that of the trustee and need not engage in exhaustively analyzing the merits of each claim in a way that would defeat the purpose of the settlement.[37] Though Drivetrain would have the court conduct a robust hearing at which Inkelaar, Westerhuis, and, presumably, their superiors would testify to determine the degree of their job performance and their entitlement to the SRBs, that level of inquiry is wasteful, unnecessary, and would defeat the purpose of the compromise process.[38] All the court must assess here is whether these settlements fall within the "range of reasonableness."

The Committee has attempted to settle potential objections to the employees' claims. Inkelaar's and Westerhuis's claims would likely be allowed to some degree, indicating that they would be successful on the merits. Under Rule 3001(f), their claims have the presumption of validity.[39] No one questions whether they worked for the company through December 16, 2016 or whether the employment agreements attached to their claims are genuine. The amounts of their claims are presumed valid, but limited by the operation of the Bankruptcy Code. Moreover, while there are no clauses in the employment agreements covering the eventuality that the business would close, it is more likely than not that Inkelaar and

---

[36] *In re Kopexa Realty Ventures, Inc.*, 213 B.R. 1020, 1022 (10th Cir. BAP 1997).
[37] *In re Rake,* 363 B.R. 146, 152. [citations omitted].
[38] Drivetrain has already hinted at the need for discovery of the employees' work plans.
[39] Fed. R. Bankr. P. 3001(f).

12

Westerhuis would receive their accrued, unpaid SRBs for the years 2013-2016 based upon the contracts' terms.

All the agreements contain an identical termination clause, ¶ 5. That clause provides that if an employee is employed after the agreement's term has ended, they may stay on, subject to terminating their employment on 30 days' notice. When they leave, they are entitled to receive any pay that has accrued and is unpaid.[40] The right to be paid accrued SRBs and salary at termination is not linked in any fashion to the "Payment Date."[41] This applies whether they are terminated for cause, for disability, or for some other reason.[42] The employees were not terminated for "cause," a defined term in the agreement that embraces various forms of misconduct.[43] Rather, they were terminated because ABBK sold the plant in December of 2016. It is unlikely that a court would read these contracts to mean that an employee terminated for cause (a felony conviction, for instance) would be paid his accrued SRB, but one who lost his job because the employer filed bankruptcy and sold the plant would not. Westerhuis and Inkelaar would not be

---

[40] *See* ¶ 5(c) of Employment Agreement, Claim 86-1. The obligation to pay accrued compensation includes not only the SRBs, but also any accrued, unpaid bonuses and base salary.

[41] An employee's right to be paid accrued compensation when terminated is consistent with the Kansas Wage Payment Act. That statutory law provides that an employer "shall pay" a discharged employee's earned wages not later than the next regular payday. *See* KAN. STAT. ANN. § 44-315(a) (2000).

[42] *Id.* at ¶s 5(a) and 5(b).

[43] Neither employee was terminated for cause. Given that both were offered participation in ABBK's Key Employee Incentive Program (2 of 3 Hugoton employees so offered), and were deemed "critical" to the sale process and maximizing the value of the estate, *see* Doc. 358, I can assume they were desirable and able workers.

13

completely denied their SRBs. Both employees have compelling arguments for being paid the SRBs accrued through the plant's closing.

Even though a court might conclude that the Payment Dates have not yet occurred, it would also conclude that, because ABBK is in liquidation, those dates—tied to the completion of the preceding year's financial statements—will never occur. Nonetheless, a court might find that Westerhuis and Inkelaar should be paid quantum meruit. Kansas law recognizes an action based upon the equitable doctrine of quantum meruit or unjust enrichment, the elements of which in this setting are: services provided to ABBK by the employees, ABBK's knowledge of the employees' services, and ABBK's acceptance or retention of the services under such circumstances as to make it inequitable for ABBK to retain the benefit without payment of their value.[44] All of these elements would appear to be satisfied here (including the reasonable value of the services provided by the employees) as evidenced by the employment contracts themselves.

Another possible negative outcome for the estate would be the likelihood that Westerhuis and Inkelaar are not only entitled to the allowance of their SRBs for 2013 through the petition date as unsecured claims, but also as an administrative

---

[44] *See Haz-Mat Response, Inc. v. Certified waste Services Ltd.,* 259 Kan. 166, 177-78, 910 P.2d 839 (1996) (prerequisite to liability is the acceptance by the owner [ABBK] of benefits rendered under such circumstances as reasonably notify the owner [ABBK] that the one performing such services expected to be compensated therefor); *Consolver v. Hotze,* 306 Kan. 561, 571, 395 P.3d 405 (2017) (quantum meruit generally represents the reasonable value of the services performed); *Brakensiek v. Shaffer,* 203 Kan. 817, 457 P.2d 511 (1969). The "validity, performance, and enforcement" of the employment agreements are governed by Kansas law. *See* ¶ 7(b) of Employment Agreement, Claim 86-1.

14

allowance for the ratable portion of the bonuses (and salary) attributable to their service in the post-petition period from March 23, 2016 until December 16, 2016. One might even argue that the entire bonus entitlement would bear that priority. Section 503(b)(1) wages are payable in full as § 507(a)(2) priority claims *before* any funds flow to the unsecured creditors. That would mean paying Messrs. Westerhuis and Inkelaar the 100-cent dividend they have bargained away in these settlements.

Whatever the outcome, lawyers, principals, and witnesses from Chicago, New York, Cleveland, Dallas, and elsewhere, accompanied by "local" counsel from St. Louis, would be required to travel to Wichita, Kansas to square off against two workers from Hugoton who are probably not even represented. That's not cheap.

The settlements assure the estate and its beneficiaries that Inkelaar and Westerhuis will have an unsecured claim for exactly what they would have received under the agreements at termination outside of bankruptcy and their accelerated salaries from December 16, 2016 until December 31, 2018, capped as provided by § 502(b)(7)(A). That reduces these claims by half their face amounts--roughly 50 cents on the dollar. The compromises are within the range of reasonableness, are fair and equitable, and should therefore be approved.

While the potential claims objection hearings are not particularly complex, conducting them would require the presence of some member of ABBK's management and the employees, not to mention the parties' respective counsel. As to enforceability of a judgment, if the employee claims were allowed as filed, they would be payable mostly as unsecured claims from the existing "pot" of money –

15

funds that are now held by the Trust and subject to distribution by the Liquidating Trustee in accord with the terms of the confirmed Plan. That would dilute payments to other Class 2 unsecured creditors.

As to deference to the creditors, both the debtor and the Committee were involved in settling these claims. The Committee is the official representative of all the unsecured creditors and its views should carry considerable weight in determining whether to approve a compromise. The Committee has endorsed these compromises.

Having considered the four *Kopexa* factors, and having independently appraised the range of outcomes that might occur in litigating these claims, I find that even if Drivetrain had standing to oppose them, its objections should be and are overruled. The compromises are fair and equitable and are approved.

###